# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MAURENE COMEY,

    *Plaintiff*,

    v.

UNITED STATES DEPARTMENT OF JUSTICE;
EXECUTIVE OFFICE OF THE PRESIDENT; FRANCEY
HAKES, in her official capacity as the Director of the
Executive Office for United States Attorneys; PAMELA J.
BONDI, in her official capacity as Attorney General of the
United States Department of Justice; EXECUTIVE
OFFICE FOR UNITED STATES ATTORNEYS; OFFICE
OF PERSONNEL MANAGEMENT; and UNITED
STATES OF AMERICA,

    *Defendants*.

Civil Action No.
1:25-cv-07625 (JMF)

Hon. Jesse
M. Furman

## BRIEF OF *AMICI CURIAE* JUSTICE CONNECTION AND MICHAEL FEINBERG IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ............................................................................1

SUMMARY OF ARGUMENT.............................................................................1

ARGUMENT ......................................................................................................2

    I.      Congress Enacted the CSRA and Created the MSPB in Furtherance of Its 150-Year Commitment to the Nonpartisanship Principle............................................................2

    II.     Congress Did Not Intend a Politically Beholden MSPB to Hear Political Discrimination Claims ..............................................................................5

        (a) The MSPB is No Longer Operating Independently.................................................6

        (b) Prior "channeling" determinations of the Supreme Court do not control here in light of factual developments at the MSPB ...........................................................8

    III.    This Court Should Retain Jurisdiction to Address Immediate, Irreparable Harms Not Only to Plaintiff Comey, but Also to Other Civil Servants and their Associates...........9

        (a) The Exceptional Facts of this Case Fall Outside the Type of Claims That Must Be Channeled .......................................................................................11

        (b) Exceptional Circumstances Warrant a Relaxed Application of Thunder Basin, Similar to how Courts Proceed in Analogous Jurisdictional Contexts .................15

            (i)      In First Amendment Litigation, Courts Ease Ordinary Limits on who Can Challenge Laws because of the Overriding Public Interest against Chilling Protected Speech ...................................................................17

            (ii)     Exceptions to the "Final Judgment" Rule in the Supreme Court also Evince Special Solicitude for First Amendment Harms ...........................19

            (iii)    Exceptions to Younger Abstention Show Courts' Willingness to Override Concerns of Comity to Vindicate Federal Rights in Exceptional Circumstances ...................................................................21

    CONCLUSION...........................................................................................23

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Pages**

*Adler v. Board of Education of City of New York*, 342 U.S. 485 (1952).........................................18

*American Federation of Government Employees v. Department of Education*,
    2025 WL 3123707 (D.D.C. Nov. 7, 2025)...............................................................................14

*Axon Enterprise, Inc. v. Federal Trade Commission*, 598 U.S. 175 (2023) .................6, 10, 15, 16

*Branti v. Finkel*, 445 U.S. 507 (1980)..........................................................................................4

*Allen v. Milas*, 896 F.3d 1094 (9th Cir. 2018)...........................................................................22

*City of Houston, Texas v. Hill*, 482 U.S. 451 (1987).................................................................22

*Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975)....................................................19, 20, 22

*Elgin v. Department of Treasury*, 567 U.S. 1 (2012) ...............................................................8, 9

*Elrod v. Burns*, 427 U.S. 347 (1976).........................................................................................20

*Fort Wayne Books v. Indiana*, 489 U.S. 46 (1989) ...................................................................20

*Gibson v. Berryhill*, 411 U.S. 564 (1973) ............................................................................21, 22

*Gooding v. Wilson*, 405 U.S. 518 (1972) ..................................................................................18

*Harris v. Bessent*, 160 F.4th 1235 (D.C. Cir. 2025) ..................................................................7

*Houston v. Moore*, 16 U.S. (3 Wheat.) 433 (1818) ..................................................................19

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000) .........................................................12

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974)................................................20

*Mims v. Arrow Financial Services, LLC*, 565 U.S. 368 (2012) ..................................................16

*Mitchum v. Foster*, 407 U.S. 225 (1972)...................................................................................21

*National Association of Immigrant Judges v. Owen*, 139 F.4th 293 (4th Cir. 2025) .....................8

*National Socialist Party of America v. Village of Skokie*, 432 U.S. 43 (1977) .............................20

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)................................................................18

*Papasan v. Allain*, 478 U.S. 265 (1986).....................................................................................12

*Powers v. Ohio*, 499 U.S. 400 (1991) .......................................................................................17

*Radio Station WOW, Inc. v. Johnson*, 326 U.S. 120 (1945).......................................................19

*Richardson v. New York City Board of Education*, 711 F. App'x 11 (2d Cir. 2017) .....................12

*Sebelius v. Auburn Regional Medical Center*, 568 U.S. 145 (2013)............................................16

*Secretary of State of Maryland v. Joseph H. Munson Company*, 467 U.S. 947 (1984) ................18

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ..........................................................11

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ......................................18

*Thunder Basin Coal Company v. Reich*, 510 U.S. 200 (1994) ........................5, 6, 9, 10

*Trump v. Hawaii*, 585 U.S. 667 (2018) ...............................................................16

*Trump v. Wilcox*, 145 S. Ct. 1415 (2025) ...........................................................7

*United States v. Cleveland Indians Baseball Company*, 532 U.S. 200 (2001) ...............6

*United States v. Fausto*, 484 U.S. 439 (1988) .................................................8, 9

*United States v. Hansen*, 599 U.S. 762 (2023) .............................................17, 18

*United States v. Salerno*, 481 U.S. 739 (1987) ...................................................17

*Virginia v. Hicks*, 539 U.S. 113 (2003) ...........................................................22

*Withrow v. Larkin*, 421 U.S. 35 (1975) .........................................................8, 15

*Younger v. Harris*, 401 U.S. 37 (1971) .............................................................21

## Codes

5 U.S.C. § 1201 ...................................................................................................7

5 U.S.C. § 1202(a) ..............................................................................................7

5 U.S.C. § 1202(d) ..............................................................................................7

5 U.S.C. § 2301(b)(2) ......................................................................................4, 9

5 U.S.C. § 2301(b)(8) ..........................................................................................9

5 U.S.C. § 2301(b)(8)(A) ....................................................................................4

5 U.S.C. § 2302(b)(1)(E) ....................................................................................9

5 U.S.C. § 2302(b)(3) ..........................................................................................9

28 U.S.C. § 1257 ...............................................................................................19

28 U.S.C. § 1331 ...............................................................................................16

90 Fed. Reg. 17182 (Apr. 23, 2025) ................................................................14

## Other Authorities

*A List of the Trump Administration's Attacks on DOJ*, Justice Connection,
    https://perma.cc/3AUA-822S (last visited Jan. 15, 2026) .......................................13

Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747 (1999) ...............................17

Bobby Allyn, *ICEBlock app sues Trump administration for censorship and 'unlawful threats'*, NPR (Dec. 8, 2025) https://perma.cc/5TGD-3BZP ................................................................12

Carrie Johnson, *3 fired DOJ workers add to chorus of layoffs in 'foundering' workforce*, NPR (July 30, 2025) https://perma.cc/V35N-R82S ................................................................12

Civil Service Reform Act, Pub. L. No. 95–454, 92 Stat. 1111 (1978)............................................3

Cynthia Brown & Jack Maskell, *Hatch Act Restrictions on Federal Employees' Political Activities in the Digital Age*, Congressional Research Service (2016)....................................2

Cong. Rec. S. No. 10012 (May 10, 1990)........................................................................................5

David L. Shapiro, *Jurisdiction and Discretion*, 60 N.Y.U. L. Rev. 543 (1985) ...........................19

Executive Order No. 14215 (Feb. 18, 2025)....................................................................................7

Hatch Act, Pub. L. No. 76-252, 53 Stat. 1147 (1939)......................................................................3

*Hatch Act Reform Amendments of 1993: Hearings Before the Senate Committee on Governmental Affairs on S. 185*, 103rd Cong. (1993) .................................................................5

Jack Murphy Live, *J.D. Vance – JML #070* (YouTube, Sep. 17, 2021), https://www.youtube.com/watch?v=PMq1ZEcyztY ............................................................15

Jon D. Michaels, *An Enduring, Evolving Separation of Powers*, 115 Colum. L. Rev. 515 (2015)..........................................................................................................................4

Josh Meyer, *'Everything is on the table' on DOJ purge of Trump Haters, AG Pam Bondi says*, USA Today (Mar. 4, 2025), https://perma.cc/94ZU-6MJ7 ..............................................13

Joseph Blocher, *Amending the Exceptions Clause*, 92 Minn. L. Rev. 971 (2008) ......................17

Katherine Shaw, *Partisanship Creep*, 118 Nw. U. L. Rev. 1563 (2024) .......................................3

Memorandum from the U.S. Office of Personnel Management on Merit Hiring Plan (May 29, 2025), https://perma.cc/G8TT-R8MY.....................................................................................14

Pendleton Act, Pub. L. No. 47–27, 22 Stat. 403 (1883)..................................................................3

Peter Charalambous et al., *Here's a list of the individuals, including Jerome Powell, targeted by the Trump Administration*, ABC News (Jan. 12, 2026), https://perma.cc/3BC6-SU25...........13

Pub. L. No. 95-454, 92 Stat. 1111 (1978) .......................................................................................9

Pub. L. No. 103-94, 107 Stat. 1001 (1993).....................................................................................5

Raquel Coronell Uribe, *Trump says mass government layoffs will be 'Democrat-oriented'*, NBC News (Oct. 10, 2025), https://perma.cc/JHS7-5F8J .............................................................14

Ryan J. Reilly, *White House firing of a career prosecutor pulls Justice Department under ever-closer control*, NBC News (Apr. 1, 2025), https://perma.cc/9NPE-NTT3 .............................13

S. Rep. No. 95-969 (1978) ................................................................................................4, 6, 8

Shannon Bond, Jenna McLaughlin & Stephen Fowler, *Trump administration uses taxpayer dollars to blame Democrats for government shutdown*, NPR (Oct. 1, 2025), https://perma.cc/F5PM-TBBH ..............................................................................................14

T. Elliot Gaiser, *The Merit Systems Protection Board's Authority to Adjudicate Constitutional Questions within an Administrative Proceeding*, 49 O.L.C. __ (Sep. 26, 2025) ......................7

Timothy Noah, *The Who's Who on Kash Patel's Crazy Enemies List*, New Republic (Dec. 3, 2024), https://perma.cc/QW6Q-D7QE ................................................................................12

William Baude et al., Hart and Wechsler's The Federal Courts and the Federal System (8th ed. 2025) ...................................................................................................................................20

Zolan Kanno-Youngs and Luke Broadwater, *Trump Gives Clemency to More than Two Dozen, Including Political Allies*, New York Times (May 30, 2025), https://www.nytimes.com/2025/05/28/us/politics/ trump-pardons-hoover-grimm-chrisley.html..........................................................................13

## INTEREST OF AMICI CURIAE

Justice Connection provides direct support to the Department of Justice's apolitical career workforce. As a network of DOJ alumni, the organization connects current and recent employees with pro bono legal representation, mental health counseling, whistleblower assistance, and media support. It also advocates for the integrity of DOJ's mission-critical work and speaks out in defense of the rule of law. Justice Connection is fiscally sponsored by the Government Accountability Project, a nonpartisan nonprofit organization that promotes government accountability by protecting whistleblowers.

Michael Feinberg is a former Assistant Special Agent in Charge with the Federal Bureau of Investigation (FBI). In June 2025, Mr. Feinberg was informed he would not receive a promotion, and likely be demoted from his position at the Bureau because he maintained a private friendship with a supposed "enemy" of political leadership at the Bureau. This friendship did not affect Mr. Feinberg's work, cause any of his cases to fall short of institutional standards, nor violate any Bureau rules or regulations. Moreover, Mr. Feinberg is a recipient and multiple times nominee of the FBI's highest investigative recognition, the Director's Award for Excellence, as well as numerous other Bureau honors. Nevertheless, Mr. Feinberg was put in a position where his best option was to resign rather than to indulge the unjustified, blatantly partisan retaliation campaign against him. Since leaving the FBI, Mr. Feinberg has been a public voice criticizing abuses of power within the Department of Justice and advocating for the faithful, ethical, and nonpartisan enforcement of federal law.

## SUMMARY OF ARGUMENT

This Court's determination whether to "channel" Maurene Comey's claim to the Merit Systems Protection Board (MSPB) must be grounded in a functional analysis of the Civil Service

Reform Act (CSRA). Defendants' substantive justification for Comey's termination, as well as their arguments in favor of "channeling," run afoul of fundamental premises of the CSRA. Congress has long enshrined a nonpartisanship principle in civil service laws, including the CSRA, that promotes impartial administration of the law, prevents political patronage or coercion, and protects employees' First Amendment rights in the private sphere. Comey's termination abrogates each of these precepts. Meanwhile, Defendants have eroded the adjudicatory independence of the MSPB, which Congress intended to operate outside the President's control. For both reasons, channeling Comey's case does not comport with Congressional intent.

Additionally, this case should not be channeled to the MSPB because of its extraordinary factual and legal circumstances and the potential for irreparable harm to both Comey and other civil servants who will be chilled in their protected expression. The MSPB possesses no special competence on the structural separation of powers question at the core of Comey's claims. Further, Comey credibly alleges that powerful political actors at the highest levels of government fired her as part of a high-profile campaign of political reprisal. The extraordinary circumstances of Comey's termination justify a careful analysis of whether the MSPB would offer "meaningful review." In doing so, this Court should draw upon analogous contexts where courts have found it necessary to relax application of or identify exceptions to judge-created jurisdictional doctrines in the face of urgent countervailing interests. Applying a similar analysis here, this Court should assume jurisdiction over Comey's case.

## ARGUMENT

I.    **Congress Enacted the CSRA and Created the MSPB in Furtherance of Its 150-Year Commitment to the Nonpartisanship Principle.**

The CSRA and MSPB emerged from a long line of legislation seeking to eradicate political patronage. *See* Cynthia Brown & Jack Maskell, *Hatch Act Restrictions on Federal Employees'*

*Political Activities in the Digital Age*, Cong. Rsch. Ser., at 1 (2016) (discussing civil service laws that protect "federal employees from coercion by higher level, politically appointed supervisors" to require "political activities against their will"). Through expanding statutory and constitutional protections over the last century, federal law has embraced a "nonpartisanship principle" for the civil service, which "has become a fundamental feature of our system—an aspect, and indeed a core component, of the separation of powers and even the rule of law." Katherine Shaw, *Partisanship Creep*, 118 Nw. U. L. Rev. 1563, 1625 (2024).

Congress began developing merit-based civil service laws in 1883 to counter the spoils system that pervaded each early presidential administration. Under the spoils system, "[p]olitical leaders installed cronies—sometimes manifestly unqualified ones—in a range of positions, with the ever-present prospect of turnover undermining expertise, morale, and the quality of government service." *Id.* at 1573 (citing Ari Hoogenboom, *The Pendleton Act and the Civil Service*, 64 Am. Hist. Rev. 301, 301–02 (1959)). In response to the spoils system, Congress passed laws to professionalize the civil service, including the Pendleton Act, the Hatch Act, and the CSRA. The Pendleton Act established that federal workers should be hired based on their merit and qualifications, rather than political affiliation or cronyism. Pendleton Act, Pub. L. No. 47–27, 22 Stat. 403 (1883). The Hatch Act restricted federal employees' political activities to ensure they would remain nonpartisan while executing official duties. Hatch Act, Pub. L. No. 76-252, 53 Stat. 1147 (1939) (codified as amended at 5 U.S.C. §§ 1501–08, 7321–26). And the CSRA embraced prior civil service protections, while expanding procedural protections and review mechanisms. Civil Service Reform Act, Pub. L. No. 95–454, 92 Stat. 1111 (1978). Among other things, the CSRA created an independent MSPB to mitigate the political conflicts of interest that existed under the prior system for adjudicating civil servants' claims. Previously, the Civil Service Commission

served as the primary administrator of all civil service laws, which required it to "simultaneously serve as a management agent for a President elected through a partisan political process as well as the protection of the merit system from partisan abuse." S. Rep. No. 95-969, at 5 (1978) (finding that the Commission struggled with "role conflicts inherent in the responsibilities and authorities assigned" to it). Each of these laws was intended to insulate Executive Branch administration from politics and to allow the government to function in a manner that benefits all Americans, regardless of political affiliation.

These laws advance separation of powers interests by ensuring nonpartisan actors committed to the fair administration and enforcement of the laws can counteract impulses driven by political agendas, rather than faithful execution of the laws passed by Congress. *See* Jon D. Michaels, *An Enduring, Evolving Separation of Powers*, 115 Colum. L. Rev. 515, 546 (2015). Civil service laws also safeguard the First Amendment rights of federal workers to engage in political speech and expression in their private lives without fear of discrimination or reprisal. *See Branti v. Finkel*, 445 U.S. 507, 516 (1980) (establishing that First Amendment protects public employees against being fired solely based on political affiliation, unless an "overriding interest" of "vital importance" to the government is present). The CSRA establishes the "Merit System Principles," which dictate that "[a]ll employees and applicants for employment" in the civil service "should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation," and "[e]mployees should be protected against arbitrary action, personal favoritism, or coercion for partisan political purposes." 5 U.S.C. § 2301(b)(2), (b)(8)(A). And in 1993, although Congress found that the existing civil service laws had "protected the Federal employee, fostered a more effective workforce, and enhanced the confidence of the citizenry in the nonpartisan administration of Government," it identified a need to expand the rights of civil

servants to engage in political speech and expression outside of work. *Hatch Act Reform Amendments of 1993: Hearings Before the S. Comm. on Governmental Affs. on S. 185*, 103rd Cong., at 10 (1993) (statement of Sen. William Roth). So, Congress amended the Hatch Act to do away with the "sledgehammer approach" of banning all partisan politics for civil servants and embraced a "scalpel" approach that allows federal employees to engage in some partisan politics in their private lives while off duty. *Id.* at 80 (statement of Sen. Joe Lieberman); *see also* Pub. L. No. 103-94, 107 Stat. 1001 (1993) (codified at 5 U.S.C. § 7324(a)). In so doing, Congress carefully struck the "balance between guaranteeing the rights of federal employees" to engage in political speech "and protecting the integrity of the civil service" from partisanship. Cong. Rec. S. No. 10012, at 10046 (May 10, 1990).

There is a robust record illustrating Congress's longstanding commitment to two goals in enacting civil service laws: (1) insulating executive branch employees from the harms of partisan pressures and political patronage; (2) protecting the rights of federal workers to engage in activity protected by the First Amendment without fear of discrimination or reprisal at work. Such principles ought to inform this court's jurisdictional analysis when evaluating Congressional intent. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994) (holding whether Congress "intended to preclude initial judicial review is determined from the statute's language, structure, and purpose").

## II.    Congress Did Not Intend a Politically Beholden MSPB to Hear Political Discrimination Claims.

The central question posed by Defendants' Motion to Dismiss is whether Congress intended to channel cases like Comey's to the MSPB. *See* Mot. to Dismiss, ECF No. 32 at 10; *Thunder Basin*, 510 U.S. at 207. If *Thunder Basin* applies to Comey's "Article II" firing in the first instance, *see generally* Pl. Opp. to Mot. to Dismiss, ECF No. 38 at 19–25, the Supreme Court

instructs courts to apply a two-step framework to determine whether district court jurisdiction is displaced. *See Axon Enterprise, Inc. v. Federal Trade Comm.*, 598 U.S. 175, 188–89 (2023). The first step requires courts to ask whether Congressional intent to strip jurisdiction is "fairly discernible in the statutory scheme," with reference to a statute's "language, structure, [] purpose, [and] its legislative history." *Thunder Basin*, 510 U.S. at 207.[1] Channeling, like any exercise in statutory interpretation, is a "holistic endeavor." *Cf. United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 217 (2001).

Because step one in *Thunder Basin* requires a functional analysis of Congressional intent and purpose, it is important to understand that one of Congress's primary purposes in the CSRA's statutory review scheme was to ensure prompt and impartial adjudication of employee removals before an *independent* MSPB. But the MSPB is no longer operating independently from Presidential control. In determining jurisdiction, then, this Court must consider whether Defendants' proposed path for review comports with the goals of Congress's original design for an apolitical, independent MSPB. It does not.

*(a) The MSPB is No Longer Operating Independently.*

The MSPB was intentionally designed to handle functions that ought to be separate from Presidential control, like adjudicating personnel disputes. *See* S. Rep. No. 95-969, at 5 (1978); *supra* Section I. By contrast, the Office of Personnel Management (OPM) was designed to serve "as the arm of the President in matters of personnel management." *See id.* at 24. The MSPB's structure reflects this goal of establishing independence from Presidential control. The statute requires the MSPB to consist of three members, no more than two of whom may belong to the

---

[1] The second step of the *Thunder Basin* framework asks whether the particular claims at issue are "of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212. This step will be addressed *infra* in Section III.

6

same political party. 5 U.S.C. § 1201. It grants each member a seven-year term, far exceeding the term of the President who appoints them. *See id.* at § 1202(a). Likewise, it dictates that members of the Board "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." *Id.* at § 1202(d).[2] The Senate must advise and consent to any nomination to the Board. *Id.* at § 1201.

The MSPB operated largely as Congress intended for nearly 50 years. No President asserted authority to fire Board members without cause nor purported to control the Board's legal determinations. That changed in 2025. President Trump fired a Democratic member of the MSPB without cause. *See Harris v. Bessent*, 160 F.4th 1235, 1245 (D.C. Cir. 2025). The President also issued an Executive Order claiming authority to provide authoritative interpretations of law for the Executive Branch, which he argues are "controlling on all employees in the conduct of their official duties." *See* Exec. Order No. 14215, § 7 (Feb. 18, 2025).[3]

In effect, Defendants argue that Comey's claims—about political retribution at the direction of the President—must be "channeled" to an MSPB where the President has the authority to both direct the Board's legal interpretations and to fire any member that doesn't follow his directions. Congress did not intend such a farce. Given Congress' explicit interest in avoiding a

---

[2] Disputes concerning removal protections of MSPB members are ongoing. The Supreme Court stayed an injunction reinstating Cathy Harris, the Democratic MSPB member who was fired without cause. *See Trump v. Wilcox*, 145 S. Ct. 1415 (2025) (Mem.). A panel of the D.C. Circuit recently held that for-cause removal restrictions of MSPB members are unconstitutional. *See Harris v. Bessent*, 160 F.4th 1235, 1257 (D.C. Cir. 2025).

[3] In this vein, Department of Justice's Office of Legal Counsel recently issued an opinion directing the MSPB to adjudicate whether statutes are unconstitutional, contravening decades of MSPB practice in which the Board denied its own authority to make constitutional holdings. *See* T. Elliot Gaiser, *The Merit Systems Protection Board's Authority to Adjudicate Constitutional Questions within an Administrative Proceeding*, 49 O.L.C. __ (Sep. 26, 2025).

"spoils system," it is especially unlikely it intended for a system channeling ideological discrimination claims to an MSPB superintended by the President.

 *(b) Prior "channeling" determinations of the Supreme Court do not control here in light of factual developments at the MSPB.*

While the MSPB operated as a functionally independent quasi-judicial body, the Supreme Court twice held that the CSRA evinced a "congressional intent" to displace district court jurisdiction in favor of adjudication by that independent MSPB. *See United States v. Fausto*, 484 U.S. 439, 452 (1988); *Elgin v. Department of Treasury*, 567 U.S. 1, 12 (2012). However, as the Fourth Circuit recently recognized, the lack of independence at the MSPB requires a "reevaluation of Congress's intent under *Thunder Basin*." *See Nat'l Assoc. of Immigr. Judges v. Owen*, 139 F.4th 293, 307 (4th Cir. 2025), *stay denied sub. nom.*, *Margolin v. Nat'l Assoc. of Immigr. Judges*, 2025 WL 3684278 (U.S. Dec. 19, 2025) (Mem.). The Fourth Circuit found that MSPB independence was an animating impetus in enacting the CSRA. *See id.* at 306. An independent MSPB was "hailed as 'the Cornerstone of Civil Service Reform.'" *Id.* (citing S. Rep. No. 95-969, at 24). In fact, the CSRA Senate committee report explicitly posited that "*absent such a mandate for independence for the merit board,* it is unlikely that the Committee would have granted the Office of Personnel Management the power it has." S. Rep. No. 95-969 at 24 (emphasis added).

Congress's delegation to an executive agency (OPM) to manage the civil service depended on the backstop of an independent adjudicator in the MSPB to serve as a "vigorous protector of the merit system." *Id.* at 6. Now, the President seeks total control over the MSPB and its legal interpretations, while still requiring terminated civil servants to proceed before a biased Board that can hold the employee's case indefinitely, effectively foreclosing meaningful review. *Cf. Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (finding a "biased decisionmaker constitutionally

unacceptable" in agency proceedings on due process grounds). But this would allow the Administration to have its cake and eat it too.

Further, Defendants' myopic view of the CSRA as merely seeking to eliminate "parallel litigation, inconsistent decision-making, and duplicative judicial review," *see* Mot. to Dismiss at 10–11, ECF No. 32, is misleading. Congress may have *initially* intended political discrimination claims to be handled under the CSRA's (independent and impartial) review procedures, *see Elgin v. Dep't of Treasury*, 567 U.S. at 11 (citing 5 U.S.C. §§ 7701, 7703), with one goal in establishing a statutory review scheme being to avoid the "wide variations in the kinds of decisions . . . issued on the same or similar matters" that existed in the pre-CSRA regime. *See Fausto*, 484 U.S. at 445 (citing S. Rep. No. 95-969, at 63 (1978)). But this was not Congress's sole "purpose." The CSRA was also enacted to ensure "[f]ederal personnel management . . . be implemented consistent with merit system principles and free from prohibited personnel practices." Pub. L. No. 95-454, § 3, 92 Stat. 1111, 1112 (1978). Avoiding political patronage and partisan discrimination is central to both the merit system principles and prohibited personnel practices. *See* 5 U.S.C. §§ 2301(b)(2); 2301(b)(8); 2302(b)(1)(E); 2302(b)(3).

Because the foundational adjudicatory independence of the MSPB has been lost, a fresh look at whether "channeling" furthers the CSRA's purposes is required.

**III.    This Court Should Retain Jurisdiction to Address Immediate, Irreparable Harms Not Only to Plaintiff Comey, but Also to Other Civil Servants and their Associates.**

Even if this Court were to find that the CSRA, without an independent MSPB, evinces a "fairly discernible" preclusive intent, *Thunder Basin*, 510 U.S. at 207–08, the second *Thunder Basin* step weighs in favor of retaining district court jurisdiction. At that step, courts evaluate whether a plaintiff's claims are "of the type Congress intended to be reviewed within this statutory structure." *Id.* at 212. Comey's case is not "of the type" that Congress intended the CSRA to reach,

given both the nature of her claims and the exceptional "here-and-now" injury she alleges. *See Axon Enterprise*, 598 U.S. at 186, 191.

The Supreme Court has made clear that in determining whether a case is "of the type" that should be channeled, courts use guiding considerations of (1) whether the statutory scheme "foreclose[s] all meaningful judicial review," (2) whether the claim is "wholly collateral to [the] statute's review provisions," and (3) whether the claim is "outside the agency's expertise." *See Thunder Basin*, 510 U.S. at 212–13 (internal citations omitted). Courts also consider the "nature of the claims and accompanying harms," as well as the "interaction between the alleged injury and the timing of review." *Axon Enterprise*, 598 U.S. at 191–92.

In this fact- and context-specific inquiry, courts must determine whether the nature of the claim or underlying harm could place the case outside of agency expertise or render (eventual) resolution by the Federal Circuit ineffective. Here, at least two factors do just that: (1) Defendants' citation to unspecified Article II authority to fire Comey;[4] and (2) the significant and irreparable ongoing harm not only to Comey's fundamental rights, but also to those of many other parties not in front of this Court. Amici write here to emphasize the latter: Comey's case is a quintessential example of the Administration's widescale abuse of civil servants' First Amendment rights and the abandonment of the nonpartisanship principle, and to stress that the vindication of Comey's rights (or lack thereof) will affect the civil service generally.

---

[4] The nature of the legal question at issue (whether the CSRA's for-cause removal protections of civil servants are unconstitutional as-applied because of the President's Article II authority) sounds in structural separation of powers doctrine. The Supreme Court has repeatedly held that "[c]laims that tenure protections violate Article II . . . raise standard questions of administrative and constitutional law," and thus are outside agency expertise. *See Axon Enterprise*, 598 U.S. at 194 (citation modified) (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 (2010)).

*(a) The Exceptional Facts of this Case Fall Outside the Type of Claims That Must Be Channeled.*

The extraordinary facts of this case give rise to ongoing irreparable harm that will be exacerbated by delaying federal court review. The Complaint here credibly alleges that powerful political actors at the highest levels of government fired a line civil servant without input from her supervisors or ordinary due process protections as part of a high-profile campaign of political reprisal against her father for his criticism of the current Administration. This case involves significant and irreparable harm not only to Comey's fundamental rights, but also to those of other federal workers, their families, and close associates. Without prompt judicial resolution of such weighty claims, these individuals and the broader public are left to wonder whether their own protected political speech, activities, or even personal associations will serve as the foundation for another "Article II" firing or other egregious abuse of executive authority. *Cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563 (2011) (establishing First Amendment "plaintiffs have a special interest in obtaining a prompt adjudication of their rights").

Given the extraordinary circumstances associated with Comey's case, the high risks of chilling non-party speech must inform this Court's jurisdictional analysis. To be sure, whenever a federal worker brings a meritorious political discrimination case to the MSPB, their similarly situated colleagues could have their speech, conduct, or association chilled while the case is pending (i.e. if they must continue to report to the same manager engaging in discriminatory behavior at issue in the case). But the chilling effects are much more significant here than in an ordinary MSPB matter, as is the attendant irreparable harm. This is no ordinary employment dispute between manager and employee. Comey credibly alleges her firing was orchestrated by officials at the highest levels of government, including the President himself. *See* Compl. ¶¶ 56–69, ECF No. 1.

Ordinary civil servants and their loved ones have good reason to see this case as a bellwether or a worst-case scenario of what very well could happen to them rather than a *sui generis* case of discrimination based on a high-profile personal vendetta. The political leadership atop this Administration has repeatedly shown a willingness to take adverse actions against individuals in the civil service who have engaged in dissent or have just been identified as associates of dissenters. *Amicus* Michael Feinberg, for example, was threatened with demotion from his position as Assistant Special Agent in Charge in the Norfolk Field Office of the FBI merely because he maintained a personal friendship with Peter Strzok, a former FBI official who drew the ire of the President and his allies for work related to the 2016 investigation into Russian interference in the election. *See* Timothy Noah, *The Who's Who on Kash Patel's Crazy Enemies List*, New Republic (Dec. 3, 2024), https://perma.cc/QW6Q-D7QE.[5] In another case, a forensic accountant working for the U.S. Trustee program (a component of the Justice Department) received a notification she, too, was fired under claimed Article II authority seemingly as part of the Administration's pressure campaign against her husband and his application, ICEBlock, which was designed to track the activities of Immigrations and Customs Enforcement. *See* Carrie Johnson, *3 fired DOJ workers add to chorus of layoffs in 'foundering' workforce*, NPR (July 30, 2025) https://perma.cc/V35N-R82S; *see also* Bobby Allyn, *ICEBlock app sues Trump administration for censorship and 'unlawful threats*,*'* NPR (Dec. 8, 2025) https://perma.cc/5TGD-3BZP.

---

[5] "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court [] may refer to evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Moreover, when evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b), a court may take judicial notice of matters of public record outside the parameters of a complaint. *See Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986); *Richardson v. New York City Bd. of Educ.*, 711 F. App'x 11, 13 (2d Cir. 2017).

At the Justice Department in particular, political leadership has made clear that loyalty to President Trump and complete support of his political agenda is a requirement of employment, while dissent and political disagreement can lead to reprisal. *See generally*, *A List of the Trump Administration's Attacks on DOJ*, Justice Connection, https://perma.cc/3AUA-822S (last visited Jan. 15, 2026). Attorney General Pam Bondi has stated she will fire employees who "despise Trump." *See* Josh Meyer, *'Everything is on the table' on DOJ purge of Trump Haters, AG Pam Bondi says*, USA Today (Mar. 4, 2025), https://perma.cc/94ZU-6MJ7. White House officials personally fired another line prosecutor, Adam Schleifer, just an hour after presidential ally Laura Loomer called for his termination based on critical comments he made about the President while he was *not* a federal employee. *See* Ryan J. Reilly, *White House firing of a career prosecutor pulls Justice Department under ever-closer control*, NBC News (Apr. 1, 2025), https://perma.cc/9NPE-NTT3. The Justice Department has also prioritized its resources towards prosecuting political opponents, *see* Peter Charalambous et al., *Here's a list of the individuals, including Jerome Powell, targeted by the Trump Administration*, ABC News (Jan. 12, 2026), https://perma.cc/3BC6-SU25, and rewarding partisan allies with pardons and clemency, *see* Zolan Kanno-Youngs and Luke Broadwater, *Trump Gives Clemency to More than Two Dozen, Including Political Allies*, N.Y. Times (May 30, 2025), https://www.nytimes.com/2025/05/28/us/politics/trump-pardons-hoover-grimm-chrisley.html.

More broadly, Comey's termination arises in the context of an Administration that has consistently used and abused its power to undermine the federal government's 150-year commitment to the nonpartisanship principle and engaged in an overt campaign to make political fealty a prerequisite for federal employment. For example, during the recent government shutdown, President Trump floated mass layoffs with explicitly partisan criteria, saying "It will be

Democrat oriented, because we figure, you know, they started this thing, so [the layoffs] should be Democrat-oriented. . . . These are largely people that the Democrats want. Many of them will be fired." Raquel Coronell Uribe, *Trump says mass government layoffs will be 'Democrat-oriented'*, NBC News (Oct. 10, 2025), https://perma.cc/JHS7-5F8J. Similarly, the Administration unlawfully changed the out-of-office messages of career civil servants without their consent to blame the government shutdown on "Democrat Senators." *See Am. Fed'n of Gov't Emps. v. Dep't of Educ.*, 2025 WL 3123707 at *1 (D.D.C. Nov. 7, 2025) (refusing to channel case to the MSPB and finding a First Amendment violation). Likewise, the Administration used main landing pages for government agencies with critical, public-facing missions—including the Department of Justice— to espouse explicitly partisan messages concerning the government shutdown. *See* Shannon Bond, Jenna McLaughlin & Stephen Fowler, *Trump administration uses taxpayer dollars to blame Democrats for government shutdown*, NPR (Oct. 1, 2025), https://perma.cc/F5PM-TBBH.

This Administration's disregard for nonpartisanship in the civil service has not been limited to the shutdown. In May 2025, the Office of Personnel Management issued new government-wide hiring policies requiring each applicant to the civil service to "identify one or two relevant Executive Orders or policy initiatives *that are significant to you*," blatantly eliciting the political views of applicants. *See* Memorandum from the U.S. Off. of Pers. Mgmt. on Merit Hiring Plan (May 29, 2025), https://perma.cc/G8TT-R8MY (implementing Exec. Order No. 14170). Further, to comply with an Executive Order, OPM issued a notice of proposed rulemaking that would reclassify approximately 50,000 career civil servants to at-will status and remove their whistleblower protections, a move the Administration has explicitly stated is intended to "dismantle the deep state." *See* 90 Fed. Reg. 17182, 17187 n.71 (Apr. 23, 2025). And these moves are aligned with a well-established intent from the Administration to remove civil servants based

14

on perceived political loyalties. As early as 2021, future Vice President J.D. Vance advised the president to "fire every single mid-level bureaucrat, every civil servant in the administrative state, replace them with our people." Jack Murphy Live, *J.D. Vance – JML* #070, at 27:17–27:24 (YouTube, Sep. 17, 2021), https://www.youtube.com/watch?v=PMq1ZEcyztY.

Further, the officials who are credibly accused of directing Comey's discriminatory firing have asserted control over key parts of the adjudicatory process—with the Department of Justice asserting the power to change key rules governing the MSPB's adjudications and the President asserting the power to fire adjudicators with whom he disagrees. *Cf. Withrow*, 421 U.S. at 58 (rejecting a theory of *per se* due process harm, but stating that rejection "does not, of course, preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high").

Against this backdrop, delaying federal judicial review does specific and unique harm to impacted nonparties who see that—even in the most urgent and exceptional cases involving profound abuses of executive power and political retaliation—relief (if it is available at all) will only come after long delay, great expense, and a hearing in front of an initial factfinder that is, at a minimum, tainted by the appearance of conflicts of interest. Channeling this claim to the MSPB would send a clear signal to all 2 million civil servants that federal courts are unwilling to act quickly to check even the most egregious abuse of executive power.

*(b) Exceptional Circumstances Warrant a Relaxed Application of* Thunder Basin*, Similar to how Courts Proceed in Analogous Jurisdictional Contexts.*

This Court may also find that exceptional circumstances warrant a more relaxed application of the *Thunder Basin* factors—which are merely "considerations designed to aid" in the Court's analysis—if a strict application would require channeling but enable extreme abuses of state power or significant irreparable harm to fundamental rights. *See Axon Enterprise*, 598 U.S. at 186. Doing

so is especially appropriate considering the nature of this Court's task. The channeling inquiry is an unusual exercise, asking whether Congress has "implicitly" "preclude[d]" federal question jurisdiction, *Axon Enterprise*, 598 U.S. at 185, a prospect that is usually disfavored, *see Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 383 (2012). Comey's complaint plainly raises claims "arising under the Constitution [and] laws . . . of the United States," such that this court "shall have original jurisdiction." 28 U.S.C. § 1331; *see* Compl. at 30–37, ECF No. 1. Meeting the criteria of the federal question statute would ordinarily be sufficient, since "[t]he [§ 1331] statute is as clear as statutes get." *Axon Enterprise*, 598 U.S. at 205 (Gorsuch, J., concurring in judgment).

In analogous contexts, courts relax, or recognize exceptions to, ordinary judge-created jurisdictional limitations in exceptional circumstances to prevent extreme abuses of state power, prevent significant irreparable harm, or safeguard First Amendment rights. This brief adopts the language of "jurisdiction" here because of its common usage throughout these cases and doctrinal contexts. However, neither channeling doctrine, nor the other judge-created doctrines discussed below involve formal jurisdiction stripping. *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) ("To ward off profligate use of the term 'jurisdiction,' we have adopted a 'readily administrable bright line' for determining whether to classify a statutory limitation as jurisdictional. We inquire whether Congress has 'clearly state[d]' that the rule is jurisdictional; absent such a clear statement, we have cautioned, 'courts should treat the restriction as nonjurisdictional in character.'" (internal citation omitted)); *see also Trump v. Hawaii*, 585 U.S. 667, 682–83 (2018).  The CSRA does not include any language expressly imposing a jurisdictional limitation on district courts.[6]

---

[6] Moreover, although this issue has not been tested, it is unclear whether Congress could constitutionally impose a limitation on jurisdiction that functioned to "abridg[e] the freedom of

That said, three particularly instructive doctrinal examples where courts have found it necessary to relax or find exceptions to "jurisdictional limitations" are worth highlighting: overbreadth challenges, exceptions to the final judgment rule of 28 U.S.C. § 1257, and *Younger* abstention. In each instance, courts flexibly interpret jurisdictional rules to promptly vindicate federal rights in exceptional circumstances. This Court should follow this doctrinal model here.

> *(i) In First Amendment Litigation, Courts Ease Ordinary Limits on who Can Challenge Laws because of the Overriding Public Interest against Chilling Protected Speech.*

Across various justiciability doctrines, First Amendment claims are treated with greater leniency aimed at ensuring federal court review. The overbreadth doctrine provides the most obvious example where the nature of First Amendment harm leads courts to treat justiciability doctrines differently. Likewise, greater relaxation of ordinary constraints in third-party standing and pre-enforcement ripeness show that First Amendment claims with significant ramifications for non-parties or the public at-large warrant special protection.

First Amendment overbreadth challenges are "unusual." *United States v. Hansen*, 599 U.S. 762, 769 (2023). Ordinarily, to bring a facial constitutional challenge to a statute, plaintiffs must establish "that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Further, litigants typically lack standing to assert the constitutional rights of third parties, especially when the litigant cannot allege injury-in-fact to themselves. *See Powers v. Ohio*, 499 U.S. 400, 410–11 (1991). Nevertheless, in overbreadth challenges, a speaker to whom a statute can be *lawfully* applied may bring a facial challenge to a statute if it "prohibits a substantial amount of protected speech" relative to the statute's "plainly legitimate sweep." *Hansen*, 599 U.S. at 769–70. While Article III standing remains a basic

---

speech" or association. *See* Joseph Blocher, *Amending the Exceptions Clause*, 92 Minn. L. Rev. 971, 1019 (2008); *see also* Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 761 (1999).

constitutional jurisdictional limitation, the Supreme Court has created a more relaxed standing inquiry in the context of the First Amendment overbreadth claims.

The Supreme Court has articulated a few justifications for this additional "breathing room for free expression." *Id.* at 769. First, there is the risk that overbroad laws will chill others from engaging in protected speech out of fear of sanction. *Id.* at 770. The Court has also recognized the "transcendent value to all society of constitutionally protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521 (1972). In chilling a substantial amount of protected speech (even if not the plaintiff's own expression at issue), society suffers from the loss of "debate on public issues [that] should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Free speech rights uniquely and directly affect non-parties, both in their own ability to speak freely and in their ability to listen to a free exchange of ideas. *See Hansen*, 599 U.S. at 770.

These same concerns animate flexible analyses of other jurisdictional limits when dealing with First Amendment claims. For example, the Supreme Court has approved a "lessening of prudential limitations on [third-party] standing" for First Amendment claims. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). The Court has held that "when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." *Id.* And in the context of ripeness in pre-enforcement challenges, the Court has found "intended future conduct concern[ing] political speech [] is certainly 'affected with a constitutional interest'" and thus, warrants immediate review. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014); *see also Adler v. Bd. of Educ. of City of N.Y.*, 342 U.S. 485 (1952) (finding ripeness to assess New York law that enabled firing teachers who advocated the overthrow of the U.S. Government, despite none of the plaintiffs alleging they intended to engage in the proscribed conduct).

*(ii) Exceptions to the "Final Judgment" Rule in the Supreme Court also Evince Special Solicitude for First Amendment Harms.*

The Supreme Court has also relaxed ordinary jurisdictional constraints for First Amendment claims under the finality doctrine associated with 28 U.S.C. § 1257. Section 1257 provides that the Supreme Court's appellate jurisdiction by certiorari reaches only "[f]inal judgments or decrees rendered by the highest court of a State." *Id.* A literal reading of the final judgment rule would require that the Supreme Court review state court decisions only when there is nothing left for a state court to do but execute its judgment. *See, e.g.*, *Houston v. Moore*, 16 U.S. (3 Wheat.) 433 (1818) (adopting this general approach). However, the Court has embraced a "pragmatic" approach to finality, creating four categories of exceptions to assert jurisdiction despite the need for additional proceedings at the state level. *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 479–483 (1975). Flexible interpretations of the final judgment rule are intended to prevent "the mischief of economic waste and of delayed justice." *See Radio Station WOW, Inc. v. Johnson*, 326 U.S. 120, 124 (1945).

One of these judicially crafted exceptions is established when reversing a state court on a federal issue would end the litigation, and a refusal to immediately review the federal issue may "seriously erode federal policy." *See Cox Broadcasting*, 420 U.S. at 483. The "erod[ing] federal policy" exception from *Cox Broadcasting* requires the Court to flexibly assess its own jurisdiction with sensitivity to the nature and timing of harm if prompt review is not granted. In doing so, the Supreme Court demonstrates that jurisdictional issues often require discretionary judgments where practical assessments are made. *See* David L. Shapiro, *Jurisdiction and Discretion*, 60 N.Y.U. L. Rev. 543, 566 (1985) (arguing "the standard used to determine finality thus asks the Court to evaluate the intensity of a federal interest and allows for a range of permissible choices").

19

More than any other substantive context, the Supreme Court has "been especially willing to relax finality requirements in order to protect speech interests against the erosion that can attend delay." William Baude et al., Hart and Wechsler's The Federal Courts and the Federal System 722 (8th ed. 2025). It is perhaps predictable that the Court has been especially solicitous of First Amendment claims because "[t]he loss of First Amendment Freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).

In *Cox Broadcasting*, the Supreme Court reversed a state court judgment concerning whether a media entity possessed First Amendment freedom to publish the name of a rape victim obtained from judicial records. *See* 420 U.S. at 491. While the media company also planned to defend itself on state law grounds at trial, the Supreme Court intervened because a trial would "leave the press . . . operating in the shadow of the civil and criminal sanctions," and produce an undesirable chilling effect on the defendant and others. *Id.* at 486. Likewise, in *National Socialist Party v. Skokie*, the Supreme Court reversed a state appellate court's denial of a stay from an injunction barring neo-Nazis from marching in Skokie, Illinois. 432 U.S. 43, 44 (1977) (per curiam). The Court found it intolerable to deny petitioners' rights to free speech "during the period of appellate review which, in the normal course, may take a year or more to complete" and thus assumed jurisdiction over the non-final determination to reverse. *Id.* In these cases and others, the Supreme Court takes a practical approach to jurisdictional questions when irreparable First Amendment harms to a party or chilling effects to non-parties are likely. *See also Fort Wayne Books v. Indiana*, 489 U.S. 46, 56 (1989) (obscenity statute contested as unconstitutionally vague before trial); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 247 n.6 (1974) (settling question on "right to respond" law to assure press freedom prior to an election).

20

*(iii) Exceptions to* Younger *Abstention Show Courts' Willingness to Override Concerns of Comity to Vindicate Federal Rights in Exceptional Circumstances.*

Finally, the *Younger* abstention doctrine and its related exceptions provide another important example illustrating how courts can relax jurisdictional constraints in unusual circumstances—including to provide immediate relief to prevent extreme abuses of state power. *Younger* abstention instructs that federal courts will not utilize their equitable jurisdiction to enjoin pending state criminal proceedings. *See Younger v. Harris*, 401 U.S. 37, 53 (1971). Abstention is ordinarily proper because a criminal defendant plausibly retains an "adequate remedy at law," as they can raise constitutional defenses in the state proceedings. *Id.* at 43. The Supreme Court also justified *Younger* by asserting that "comity" with the states and respect for "Our Federalism" weigh against federal court intervention in state criminal process. *Id.* at 44. *Younger* is a doctrine of equitable restraint designed to coordinate overlapping paths to state and federal court relief. However, abstaining from cases involving pending state prosecutions is *not* an inexorable command under *Younger*. Instead, federal courts apply exceptions to abstention in extraordinary circumstances.

The Supreme Court leaves space for federal courts to exercise jurisdiction to enjoin state criminal proceedings when "irreparable injury is 'both great and immediate,' where the state law is 'flagrantly and patently violative of express constitutional prohibitions,' or where there is a showing of 'bad faith, harassment, or . . . other unusual circumstances that would call for equitable relief.'" *Mitchum v. Foster*, 407 U.S. 225, 230 (1972) (quoting *Younger*, 401 U.S. at 46, 53, 54). For example, an "unusual circumstances" exception to *Younger* was found when the Court refused to abstain in deference to a state agency adjudicatory body that was "incompetent by reason of bias to adjudicate the issues." *See Gibson v. Berryhill*, 411 U.S. 564, 577 (1973). The *Gibson* Court's decision not to abstain was not altered by the availability of judicial review for the

defendant to appeal the administrative decision from the biased agency. *See id*. When grave, imminent harm is likely to result from abstention, the interest in avoiding such harm overcomes the countervailing "comity" interest.

*    *    *    *

While the channeling question at issue here is not directly controlled by the overbreadth, finality, or *Younger* doctrines, this Court must weigh similar considerations. Here, delay in addressing the President's authority to override civil servants' First Amendment freedoms with an underspecified citation to "Article II" is likely to produce harmful chilling effects on protected expression, similar to harm in overbreadth cases. Indeed, chilling effects on non-parties are the very reason the Supreme Court created the overbreadth doctrine. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003). Likewise, the finality doctrine of Section 1257 reckons with chilling harms and shows that jurisdictional rules need not be "administered in such a mechanical fashion" as to ignore extraordinary circumstances warranting the timely vindication of federal rights. *See Cox Broadcasting*, 420 U.S. at 477. And exceptions to *Younger* abstention require courts to weigh the relevant interests of comity and federalism against the potential for irreparable injury or to check extreme abuses of state power resulting in the depravation of a fundamental right, similar to the injuries the Court should weigh here. Importantly, too, these doctrines are not the only ones where courts have recognized it necessary to relax application of or identify exceptions to judge-created jurisdictional doctrines in the face of urgent and weighty countervailing interests. *See, e.g.*, *Allen v. Milas*, 896 F.3d 1094, 1101 (9th Cir. 2018) (discussing exceptions to the doctrine of consular non-reviewability); *City of Houston, Tex. v. Hill*, 482 U.S. 451, 467 (1987) (discussing exceptions to *Pullman* abstention). Here, the Court must make a similar evaluation and find that exceptional circumstances warrant retaining jurisdiction, even if standard application of the *Thunder Basin* factors would suggest channeling is appropriate.

22

## CONCLUSION

*Amici* respectfully request that the Court consider the longstanding nonpartisanship principle, the lack of adjudicatory independence at the MSPB, and the chilling effects on other civil servants in rendering a decision to deny Defendants' Motion to Dismiss.

Dated: January 20, 2026                    Respectfully submitted,

By:    */s/ Alice Huling*
       Alice Huling (N.Y. Bar No. 5144704)
       Brendan Nigro
       Dana Paikowsky
       Danielle Lang
       Robert Brent Ferguson
       Renata O'Donnell
       CAMPAIGN LEGAL CENTER
       1101 14th St. NW, Suite 400
       Washington, DC 20005
       Tel: 202-736-2200
       ahuling@campaignlegalcenter.org

       *Counsel for Amici Justice Connection and Michael Feinberg*

23

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(c) of the Local Rules for the United States District Court for the Southern District of New York, the undersigned counsel for amici hereby certifies that this amicus brief complies with the type volume limitation of Rule 7.1(c). As measured by Microsoft Word, there are approximately 7,134 words in this brief.

By:    */s/ Alice Huling*
Alice Huling
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: 202-736-2200
ahuling@campaignlegalcenter.org

*Counsel for Amici Justice Connection and Michael Feinberg*

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2026, I electronically filed a copy of the foregoing Brief Amici Curiae using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: January 20, 2026

By:    */s/ Alice Huling*
Alice Huling
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: 202-736-2200
ahuling@campaignlegalcenter.org

*Counsel for Amici Justice Connection and Michael Feinberg*

25