**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAURENE COMEY,

                             Plaintiff,

        v.

UNITED STATES DEPARTMENT OF JUSTICE;
EXECUTIVE OFFICE OF THE PRESIDENT;
FRANCEY HAKES in her official capacity as the
Director of the Executive Office for United States
Attorneys; PAMELA J. BONDI, in her official
capacity as Attorney General of the United States
Department of Justice; EXECUTIVE OFFICE FOR
UNITED STATES ATTORNEYS; OFFICE OF
PERSONNEL MANAGEMENT; and THE UNITED
STATES OF AMERICA,

                            Defendants.

Civil Action No: 25-cv-07625

Hon. Jesse M. Furman

**BRIEF OF *AMICUS CURIAE* LAWYERS DEFENDING AMERICAN DEMOCRACY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST OF AMICUS CURIAE LAWYERS
DEFENDING AMERICAN DEMOCRACY ........................................................ 1

INTRODUCTION ................................................................................................ 2

ARGUMENT ...................................................................................................... 4

I.    CONGRESS   DID   NOT   INTEND   FOR   A   STRUCTURAL
      CONSTITUTIONAL QUESTION TO BE CHANNELED THROUGH
      THE CSRA'S ADMINISTRATIVE REVIEW SCHEME. ............................ 4

   A.    Legislative History Provides No Support for the Notion that Congress
         Intended a Constitutional Challenge to the CSRA be Channeled
         through the MSPB ................................................................................ 4

      1.    The CSRA statutory scheme is meant to preserve, not abolish, a
            merit-based federal civil service. ................................................ 5

      2.    Congress intended that cases be channeled only to an
            *independent* MSPB. ...................................................................... 7

   B.    The Constitutional Question Here Lies Outside the MSPB's
         Jurisdiction. ........................................................................................ 10

   C.    The Constitutional Question Here Lies Outside the MSPB's
         Expertise. ............................................................................................ 15

II.   REQUIRING  PLAINTIFF  FIRST  TO  SEEK  RELIEF  FROM  A
      MEANINGLESS ADMINISTRATIVE REVIEW PROCESS WOULD
      CAUSE IRREPARABLE INJURY AND WOULD POSE A THREAT
      TO THE PUBLIC INTEREST AND THE FAITHFUL EXECUTION OF
      LAW. .................................................................................................... 19

   CONCLUSION ............................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Gov't Emps v. U.S. Off. of Personnel Mgmt.*,
   799 F. Supp. 3d 967 (N.D. Cal. Sept. 12, 2025) ................................................................ 22

*Am. Fed'n of Gov't Emps. v. Reagan*,
   870 F.2d 723 (D.C. Cir. 1989)........................................................................................ 20

*Am. Fed'n of Gov't Emps. v. Trump*,
   139 F.4th 1020 (9th Cir. 2025)........................................................................................ 18

*Axon Enterprise, Inc. v. Fed. Trade Comm'n*,
   598 U.S. 175 (2023)........................................................................................................ 3

*Bennett v. U.S. Securities and Exchange Commission*,
   844 F.3d 174 (2016)........................................................................................................ 4

*Connick v. Myers*,
   461 U.S. 138 (1983)...................................................................................................... 20

*Davis-Clewis v. Department of Veterans Affairs*,
   2024 M.S.P.B. 5 (Mar. 20, 2024) ............................................................................. 13, 17

*Department of Navy v. Egan*,
   484 U.S. 518 (1988)...................................................................................................... 13

*Douglas v. Veterans Admin.*,
   5 M.S.P.B. 313 (1981).................................................................................................. 16

*Elgin v. Department of Treasury*,
   567 U.S. 1 (2012)........................................................................................... 13, 16, 17, 18

*Free Enterprise Fund v. PCAOB*,
   561 U.S. 477 (2010)........................................................................................................ 4

*Harris v. Bessent*,
   160 F.4th 1235, 1256 (D.C. Cir. 2025), *pet. for rehearing en banc denied*,
   No. 25-5037, Consolidated with 25-5055, (D.C. Cir. 2026)........................................ 9, 14

*Lovshin v. Department of Navy*,
   767 F.2d 826 (Fed. Cir. 1985) (en banc) ...................................................................... 16

*Nat'l Ass'n of Immigration Judges v. Owen*,
    139 F.4th 293 (4th Cir. 2025) ................................................................................ 5, 10

*New York v. Kennedy*,
    155 F.4th 67 (1st Cir. 2025) ................................................................................ 18

*Rutan v. Republican Party of Illinois*,
    497 U.S. 62 (1990) ................................................................................ 20

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ................................................................................ 4, 15

*United Pub. Workers v. Mitchell*,
    330 U.S. 75 (1947) ................................................................................ 25

*United States v. Perkins*,
    116 U.S. 483 (1886) ................................................................................ 11

**Statutes**

37 Stat. § 539 ................................................................................ 1

37 Stat. § 555 ................................................................................ 1

5 U.S.C. § 1201 ................................................................................ 15

5 U.S.C. § 1204(a) ................................................................................ 4

5 U.S.C. § 2301 ................................................................................ 12, 14

5 U.S.C. § 3502 ................................................................................ 3

5 U.S.C. § 4303 ................................................................................ 2, 3

5 U.S.C. § 7511(a) ................................................................................ 6

5 U.S.C. § 7512 ................................................................................ 5, 6

5 U.S.C. § 7513 ................................................................................ passim

5 U.S.C. § 7532(a) ................................................................................ 3

5 U.S.C. § 7701(a) ................................................................................ 4

5 U.S.C. 1201(d) ................................................................................ 15

**Other Authorities**

Agency Motion for Leave to File Additional Pleading at 6, *Jacker v. Department of Justice*, DA-0752-25-0330-I-1 (Sept. 27, 2025) (available at https://perma.cc/7H4W-SPRG).................................................................... 10

Alan Feuer, *Trump's Retribution Campaign Leaves D.C. Prosecutor's Office in Crisis*, N.Y. TIMES (Nov. 2, 2025), https://perma.cc/3RBZ-9VBB................................. 27

Andrew Goudsward, *Two-thirds of the DOJ Unit Defending Trump Policies in Court Have Quit*, REUTERS (July 14, 2025), https://perma.cc/FWZ7-CDMX.................................................................................................................... 28

Drew Friedman, *MSPB faces high workload, low staffing levels,* Fed. News Network (July 4, 2025), https://perma.cc/A9DS-JUN7.................................... 31

Exec. Order 14215 (Feb. 18, 2025)................................................................................ 9

Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 YALE L.J. 1836, 1875-1882 (2015)........................................................................................... 24

Jed Handelsman Shugerman & Gary Lawson, *Presidential Removal as Article I, Not Article II*, SSRN (Nov. 11, 2025) ............................................................... 13

Jodi Freeman & Sharon Jacobs, *Structural Deregulation*, 135 HARV. L. REV. 585, 589-90 (2021)................................................................................................. 25

Justice Department struggles as thousands exit—and few are replaced, Wash. Letter (Am. Bar Ass'n Gov't & Leg. Work, Nov 19 2025), https://perma.cc/PW3P-BALL....................................................................... 3

Memorandum from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, for the Attorneys of the Office (July 16, 2010), https://perma.cc/8TRN-9HE2 ...................................................................... 10

Memorandum of Law in Support of Motion to Dismiss......................................... 12, 15

Nicholas R. Bednar & Todd Phillips, *Commission Quorums*, 78 STAN. L. REV. __ (forthcoming 2026) ....................................................................................1, 11

Nicholas R. Bednar, *Presidential Control and Administrative Capacity*, 77 STAN. L. REV. 823, 918 (2025) ............................................................................ 24, 25

Nick Bednar & Peyton Baker, *A Primer on the Senior Executive Service*, LAWFARE (Sept. 2, 2025), https://perma.cc/S7W4-GLJN................................. 27

Nick Bednar, *Reductions in Force Challenges in the Federal Courts*, LAWFARE (July 17, 2025), https://perma.cc/ZXM6-WYMA ......................................... 26

Nick Bednar, *Trump's Dismantling of the Government Hurts Due Process*, LAWFARE (Mar. 4, 2025), https://perma.cc/43WN-KSN7 ................................................. 2

Off. of Personnel Mgmt., Chapter 31: Separations by Other than Retirement tbl. 31-B, https://perma.cc/BUP2-GZFX ................................................................. 13

Robin Bravender, *Russ Vought Wanted Feds "In Trauma." It's Happening.* E&E NEWS BY POLITICO (Oct. 16, 2025) ................................................................. 26

Russ Vought and Charles Ezell, *Guidance on Agency RIF and Reorganization Plans* (Feb. 26, 2025), https://perma.cc/2SFN-FA9S ....................................... 25

Russell Vought and Scott Kupor, *Guidance on Executive Order 14356* (Nov. 5, 2025), https://perma.cc/3VYE-AM4J ................................................................. 25

Ryan Goodman, et al., *The "Presumption of Regularity" in Trump Administration Litigation*, JUST SECURITY (Sept. 15, 2025), https://perma.cc/H693-4FTT ............... 26, 27

S. Rep. 95-969 (1978) ................................................................................................. 6, 7, 15

Scott MacFarlane, *DOJ Removes Another Prosecutor from Key Office That Indicted James Comey And Letitia James, Source Says*, CBS News (Oct. 14, 2025), https://perma.cc/C2QW-M73E ................................................. 28

Scott Pelley, et al., *Fired Justice Department Lawyer Says He Refused to Lie in the Abrego Garcia Case*, CBS NEWS (Oct. 19, 2025), https://perma.cc/CY73-4DVT ................................................................. 29

Transcript of Preliminary Injunction Hearing, John Does 1-26 v. Musk, No. 25-cv-00462-TDC, at *67-69 (D.M.D. Mar. 4, 2025) ....................................... 30

## Regulations

5 C.F.R. § 351.201(a)(2) ................................................................................................. 7

## Constitutional Provisions

U.S. Const. art. II ................................................................................................. passim

U.S. Const. art. III ................................................................................................. 22

## <u>STATEMENT OF INTEREST OF AMICUS CURIAE</u>
## <u>LAWYERS DEFENDING AMERICAN DEMOCRACY</u>

Lawyers Defending American Democracy (LDAD) is a non-profit, non-partisan organization devoted to encouraging the legal profession to enforce and uphold principles of American democracy and law, consistent with our obligations as lawyers; demanding accountability from lawyers and public officials; and identifying attacks on legal norms and prescribing redress for them.  LDAD's mission is to defend the underlying constitutional values and norms of political behavior on which our democracy depends, including the rule of law, institutional checks and balances, separation of powers, press freedom, and the integrity of our system of justice.  LDAD's Board of Directors includes, among others, a retired state supreme court justice, a former state attorney general, retired partners and managing partners of major law firms, past presidents of two state bar associations, business entrepreneurs, and legal academics.

LDAD files this amicus brief in support of plaintiff because it regards this case as raising fundamental issues regarding the separation of powers between Congress and the executive branch. It calls into question the ability of Congress to establish a nonpartisan and apolitical system of employment for most members of the federal departments and agencies that it creates. The case also raises the issue of whether the executive branch can challenge the constitutionality of that system while simultaneously insisting that plaintiff must first seek relief from a tribunal created by that system. LDAD has conferred on this brief with <u>Professor Nick Bednar</u> of the University of Minnesota Law School, a widely-recognized expert on the federal civil service system and the MSPB.  His most recent law review article examines how the president's removal power prevents adjudicatory agencies, like the MSPB, from providing adequate due process. *See* Nicholas R. Bednar & Todd Phillips*, Commission Quorums*, STAN. L. REV. (forthcoming 2026), https://perma.cc/D6BP-PT2W. His research has appeared in *Stanford*

*Law Review*, *American Political Science Review*, and other top journals. He regularly publishes analysis on civil service law in *Lawfare*, including on the MSPB's ongoing structural and adjudicatory challenges. *See, e.g.*, Nick Bednar, *Trump's Dismantling of the Government Hurts Due Process*, LAWFARE (Mar. 4, 2025), https://perma.cc/43WN-KSN7.  He holds a Ph.D. in Political Science from Vanderbilt University and a J.D. from the University of Minnesota Law School. Its brief supplements plaintiff's brief in particular by providing a more detailed discussion of the legislative history of the CSRA that sheds light on the issues that Congress intended to be subject to MSPB adjudication.

## **INTRODUCTION**

Maurene Comey, an Assistant United States Attorney (AUSA) whose employment with the Department of Justice had been exemplary, was abruptly removed from her position by way of a memorandum, sent by email, which cites as the sole basis for her removal "Article II of the United States Constitution and the Laws the United States." Although Congress has prohibited the removal of federal employees without cause since the Lloyd-LaFollette Act of 1912, §6, Pub. L. 336, 37 Stat. 539, 555, the government takes the extraordinary position that this law, in effect for 113 years and uniformly regarded as serving a crucial public purpose, runs afoul of Article II of the Constitution because it prevents the President and his appointees from firing anyone they want any reason. Relying on this expansive interpretation that eradicates Congress's constitutional authority to regulate government employment, the President fired at least 200 Justice Department attorneys in his first year of office.[1]

The government characterizes Ms. Comey's lawsuit as a routine challenge to the removal of a federal employee and argues that it must therefore be channeled, as Congress intended,

---

[1] *Justice Department struggles as thousands exit—and few are replaced, Wash. Letter* (Am. Bar Ass'n Gov't & Leg. Work, Nov 19 2025), https://perma.cc/PW3P-BALL.

through the Merit Systems Protection Board (MSPB) pursuant to the administrative review scheme of the Civil Service Reform Act (CSRA). That characterization is wrong, and the government's contention that Article II of the Constitution independently authorizes the removal is an unprecedented claim that places this case outside the category of disputes Congress intended the MSPB to adjudicate. This case involves a single, structural constitutional question—raised by the government—and belongs in federal court.

Moreover, if this case is channeled to the MSPB and the government succeeds on its structural constitutional theory, the plaintiff will have suffered an irreparable injury by being subjected to an unconstitutional proceeding. *See Axon Enterprise, Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023) (requiring plaintiffs to channel their structural constitutional challenge to administrative adjudicatory authority through that same administrative review process would cause irreparable injury to plaintiffs if they prevail on their claim). The MSPB cannot avoid the constitutional question at the heart of the dispute, and therefore the potentially unconstitutional proceeding, because the government itself raised Article II as the sole reason for removal.

Finally, the President's wholesale removal of career prosecutors like plaintiff is not related to the efficiency of the service, 5 U.S.C. § 7513(a), or unacceptable performance, 5 U.S.C. § 4303, and has been demonstrably vindictive and partisan. Subjecting this historically critical question regarding the President's Article II authority to a lengthy agency review process, in which the agency has no role to play, would pose a serious threat to democracy and the rule of law.

For the above reasons, the government's structural constitutional claim must be heard in the first instance in federal court.

## ARGUMENT

I. **CONGRESS DID NOT INTEND FOR A STRUCTURAL CONSTITUTIONAL QUESTION TO BE CHANNELED THROUGH THE CSRA'S ADMINISTRATIVE REVIEW SCHEME.**

The government's extraordinary claim that the CSRA is unconstitutional does not belong within the CSRA's administrative review scheme. Channeling only applies when "the claims at issue are of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994). The Supreme Court has rejected the view that the mere existence of a statutory review scheme reflects congressional intent to channel *every* plausible related claim into agency adjudication—particularly challenges to the structure or validity of the review scheme itself. *See id.* at 212; *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010); *Axon Enterprise, Inc. v. Federal Trade Commission*, 598 U.S. 175, 188-89 (2023). The basic structure of the CSRA and the jurisdiction it grants to the MSPB, the demonstrated limits of the MSPB's expertise, and the legislative history of both the MSPB and the CSRA—all show that Congress could not have intended the MSPB to decide the constitutionality of the CSRA.

   A. Legislative History Provides No Support for the Notion that Congress Intended a Constitutional Challenge to the CSRA be Channeled through the MSPB.

Channeling is required when "Congress's intent to preclude district court jurisdiction is 'fairly discernible in the statutory scheme.'" *Bennett v. U.S. Securities and Exchange Commission*, 844 F.3d 174, 181 (2016) (quoting *Thunder Basin*, 510 U.S. at 210). As the Fourth Circuit has explained, "[t]o maintain Congress's intent, the MSPB and the Special Counsel must function such that they fulfill their roles prescribed by the CSRA." *Nat'l Ass'n of Immigration Judges v. Owen*, 139 F.4th 293, 305 (4th Cir. 2025). The legislative history of the CSRA shows

that channeling here would be at odds, not aligned, with Congressional intent because it would require the MSPB to dismantle the very merit principles it was designed to protect.

          1.   The CSRA statutory scheme is meant to preserve, not abolish, a merit-based federal civil service.

The modern civil service rests on the assumption that federal employees should be hired, retained, and removed based on their qualifications and performance—not their political loyalty. *See* 5 U.S.C. § 2301(b)(1)-(2), (8) (emphasizing merit in hiring and removal). Civil service reform emerged in reaction to a spoils system in which presidents and members of Congress promised federal employment to political supporters. That system fostered corruption and prevented the federal government from developing the administrative capacity necessary for effective governance. The Pendleton Act of 1883—the first comprehensive effort at civil service reform—sought to curb partisan influence over federal personnel decisions and to reorient the normative foundations of public employment toward merit. Shortly thereafter, Congress reinforced those commitments by enacting the Lloyd-La Follette Act, which protected federal employees from arbitrary removal. Today, the MSPB serves as the institutional safeguard of these principles, promoting merit-based personnel management by protecting the constitutional and statutory rights of federal employees.

The comprehensive legislative reform that culminated in the Civil Service Reform Act of 1978, and with it the creation of the MSPB, was a careful balancing of the legislative goals of providing the public with a competent and merit-based civil service and ensuring that ineffective employees could be removed for poor performance. As stated in the introductory paragraph to the Senate Report introducing the bill: "The Committee believes [the bill] will promote a more

efficient civil service while preserving the merit principle in federal employment." S. Rep. 95-969, at 2 (1978).

These goals were not in tension, and protecting the rights of federal employees played a vital role in enforcing the merit principle, which ultimately was for the benefit of the public. As the summary of the bill explains, there had long been a tension between employee protections in hiring and firing and the need of employers to have flexibility. Recognizing the tension, the legislative committee opted to view civil service reform from neither the employer nor employee point of view, but from "the standpoint of the public":

> The 'rights of employees' to be selected and removed only on the basis of their competence are concomitant with the public's need to have its business conducted competently. Similarly, the need for federal executives to manage their personnel responsibilities effectively can only be justified by the benefit derived by the public from such management flexibility. An employee has no right to be incompetent; a manager has no right to hire political bed fellows.

S. Rep. No. 95-969 at 4. S*ee also*, *Lovshin v. Dep't of the Navy*, 767 F.2d 826, 832 (Fed. Cir. 1985), which relied on this legislative history and the importance of the merit system in deciding a complex procedural issue regarding MSPB review of performance-based adverse actions.

This case takes civil service in the opposite direction Congress intended. The government's reliance on Article II reflects an effort to restore presidential control over hiring and firing for partisan ends, rather than to protect the merit principles that Congress enshrined in statute. The case has nothing to do with employee competence and everything to do with the president's ability to control federal employment for partisan reasons. The executive branch's assumption of an Article II authority to hire and fire employees at will turns the federal civil service into something the 1978 Congress meant to leave behind: the spoils system. Congressional intent on this point is made clear in the very first section of the Senate Report, after the bill summary, which is entitled "Need for Reform":

> The civil service system is the product of an earlier reform, which, in protest against the 19th century spoils system, promised a work force in which employees were selected and advanced on the basis of competence rather than political or personal favoritism. Protection of the merit principle in federal employment has been accomplished through the enactment of numerous laws, rules, and regulations. Although the civil service system has largely succeeded in safeguarding merit principles, there have been frequent attempts to circumvent them, some of which have been successful.

S. Rep. No. 95-969 at 2-3.

The CSRA thus was meant to safeguard the goal identified in the Senate Report: the principle of "merit in federal employment." *See* 5 U.S.C. § 2301(b). The 1978 Congress that enacted the CSRA could not have contemplated that nearly 50 years later the executive branch would attempt to use its adjudicatory scheme to hijack the entire merit-based system it was designed to protect. Congress established the MSPB as a guardian of that system—not as a vehicle for its dismantling. Accordingly, Congress could not have intended the MSPB to decide whether the system it is trusted to protect is wholly unconstitutional. Congress could have only intended such an issue to be decided by federal court.

2. Congress intended that cases be channeled only to an *independent* MSPB.

Of primary importance to Congress when it created the MSPB was its independence as an adjudicatory authority.

> There is little doubt that a vigorous protector of the merit system is needed. The lack of adequate protection was painfully obvious during the civil service abuses only a few years ago. Establishment of a strong and independent board and special counsel will discourage subversions of merit principles. Dwight Ink, executive director of the president's personnel management study, called the independent and strong merit board 'the cornerstone' of civil service reform.

S. Rep. 95-969 at 7.

The creation of the MSPB as a separate body from the Civil Service Commission and the executive branch was an essential feature of the reform.

> The board should be insulated from the kind of political pressures that have led to
> violations of merit principles in the past. Both the Board and the special counsel will
> exercise statutory responsibilities independent of any Presidential directives. Absent such
> a mandate for independence for the merit board, it is unlikely that the committee would
> have granted the office of personnel management the power it has or the latitude to
> delegate personnel authority to the agencies.

S. Rep. 95-969 at 7. The legislative history demonstrates that Congress would not have trusted

the MSPB with protection of the merit principles but for its independence.

Congressional intent that the MSPB be an independent, bipartisan, nonpolitical agency

was reflected in the laws providing for a bipartisan composition and that members may be

removed only for cause. 5 U.S.C. §§ 1201, 1202(d).

However, while the MSPB was created as independent, today it is anything but. By the

President's own doing, today's MSPB is not independent of the executive branch as intended by

the CSRA for two reasons.

*First*, the President has decreed that all federal employees must follow his interpretation

of the law. *See* Exec. Order 14215 (Feb. 18, 2025) § 7:

> *Rules of Conduct Guiding Federal Employees' Interpretation of the Law*. The President
> and the Attorney General, subject to the President's supervision and control, shall provide
> authoritative interpretations of law for the executive branch. The President and the
> Attorney General's opinions on questions of law are controlling on all employees in the
> conduct of their official duties. No employee of the executive branch acting in their
> official capacity may advance an interpretation of the law as the position of the United
> States that contravenes the President or the Attorney General's opinion on a matter of
> law, including but not limited to the issuance of regulations, guidance, and positions
> advanced in litigation, unless authorized to do so by the President or in writing by the
> Attorney General.

In recent proceedings before the MSPB, the Department of Justice has asserted that

MSPB must follow the opinions of the Office of Legal Counsel. Agency Motion for Leave to

File Additional Pleading at 6, *Jacker v. Department of Justice*, DA-0752-25-0330-I-1 (Sept. 27,

2025) (available at https://perma.cc/7H4W-SPRG). .[2] Historically, however, OLC opinions have not been understood to bind independent agencies. Indeed, OLC has traditionally refused to provide guidance to independent agencies absent a written agreement that the agency "will conform its conduct to [OLC's] conclusion". *See* Memorandum from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, for the Attorneys of the Office at 2-3 (July 16, 2010), https://perma.cc/8TRN-9HE2. Treating OLC's opinions as binding on the MSPB allows the Department of Justice to issue legal opinions that effectively predetermine the outcome of employee appeals. That concern is especially acute here, where the Department of Justice is itself the agency that removed the plaintiff from her position.

*Second*, a recent decision from the D.C. Circuit eviscerates the structural features designed to preserve the MSPB's independence. In *Harris v. Bessent*, the D.C. Circuit ruled that the statutory removal protections for members of the MSPB are unconstitutional. *Harris v. Bessent*, 160 F.4th 1235, 1256 (D.C. Cir. 2025), *pet. for rehearing en banc denied,* No. 25-5037, Consolidated with 25-5055, (D.C. Cir. 2026). The decision not only eviscerates removal protections but effectively nullifies the partisan balancing requirements of the Board by permitting presidents to remove members of the opposing party—precisely what occurred in *Harris v. Bessent*. Worse still, the President's unchecked removal authority enables strategic manipulation of the Board's quorum, allowing the President to incapacitate the MSPB altogether and prevent employees from vindicating their constitutional and statutory rights. *See* Nicholas R. Bednar & Todd Phillips, *Commission Quorums*, 78 STAN. L. REV. __ (forthcoming 2026).

Other courts have acknowledged that the MSPB no longer functions as intended and, therefore, channeling cannot be required. In *National Association of Immigration Judges v.*

---

[2] Available at: https://washingtonlitigationgroup.org/wp-content/uploads/2025/09/Jackler-Motion.pdf.

*Owen*, the Fourth Circuit held that channeling presupposes the existence of a "functioning and independent MSPB and Special Counsel," and that channeling to the administrative process is required only "when the Civil Service Reform Act functions as designed." *See* 139 F.4th 293, 304 (4th Cir. 2025). The court explained that Congress intended to strip district courts of jurisdiction *only because* federal employees would otherwise receive "adequate and independent review" through the MSPB. *Id.* at 299. Where that premise no longer holds—because the MSPB lacks independence, is subject to presidential control, or is incapacitated altogether—channeling would defeat, rather than serve, congressional intent. Accordingly, the Fourth Circuit vacated the district court's dismissal for lack of jurisdiction and remanded for factfinding on whether "the text, structure, and purpose of the Civil Service Reform Act has been so undermined that the jurisdiction-stripping scheme no longer controls," emphasizing that requiring employees to proceed before a compromised or nonfunctioning MSPB would be futile and inconsistent with the statute's design. *Id.* at 299-300. The situation surrounding MSPB's independence has only worsened since the Fourth Circuit's decision.  Channeling this case to the MSPB as currently constituted—partisan and subject to executive decree—would squarely defy the unequivocal intent of Congress.

        B.  <u>The Constitutional Question Here Lies Outside the MSPB's Jurisdiction.</u>

The CSRA grants tenure protections to covered employees like plaintiff. *See* 5 U.S.C. § 7513(a).[3] Under the CSRA, the Department of Justice could remove plaintiff for one of four statutory reasons: (1) a reduction-in-force (5 U.S.C. § 3502; 5 C.F.R. § 351.201(a)(2)); (2)

---

[3]  The government does not dispute that plaintiff is a covered employee under the plain text of the CSRA (*see Memorandum of Law in support of Motion to Dismiss* at 17.) Yet, in contending that the CSRA's tenure protections do not apply to her, the government is essentially arguing that the Constitution prohibits Congress from classifying the plaintiff as a covered employees and providing her with tenure protections. The government should not be permitted to have it both ways, arguing that plaintiff is subject to the CSRA for purposes of channeling but not for tenure protections.

national-security reasons (5 U.S.C. § 7532(a)); (3) unacceptable performance (5 U.S.C. § 4303(a)); or (4) for "such cause as will promote the efficiency of the service" (5 U.S.C. § 7513(a)). The government has not offered any explanation for plaintiff's removal that comports with existing civil service law.

Instead, the government advances the historically unprecedented claim that Article II of the Constitution independently authorizes the President and his appointees to remove employees otherwise protected from removal by the CSRA, and that the CSRA's removal protections violate Article II. [4] But Article II has never been seen as conferring an unfettered power on the executive branch to remove inferior officers or federal employees. *See United States v. Perkins*, 116 U.S. 483, 485 (1886) ("We have no doubt that when congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest."). [5]

The Office of Personnel Management's (OPM) own guidance underscores the absence of any historical foundation for the government's claim. The OPM manual governing the completion of the official document for personnel actions provides an exhaustive list of legal authorities that agencies may invoke to separate employees. *See* OFF. OF PERSONNEL MGMT., CHAPTER 31: SEPARATIONS BY OTHER THAN RETIREMENT tbl. 31-B, https://perma.cc/BUP2-GZFX. Article II of the Constitution appears nowhere on that list.

The government's decision to rely on Article II, rather than the CSRA, deprives the MSPB of jurisdiction. The CSRA confers limited jurisdiction on the MSPB, and Congress

---

[4] The "Legal Authority" for plaintiff's removal on the Standard Form 50 ("SF-50")—the official document used to record personnel actions—is stated as "ART II CONSTITUTION" and the reason for removal as "ARTICLE II OF THE CONSTITUTION."

[5] Indeed, it is unclear whether Article II is the proper starting point for analyzing the constitutionality of tenure protections for federal employees. *See* Jed Handelsman Shugerman & Gary Lawson, *Presidential Removal as Article I, Not Article II*, SSRN (Nov. 11, 2025).

intended the MSPB to decide only those issues that arise under the CSRA and other civil service laws. Congress established the MSPB to "hear, adjudicate, or provide for the hearing or adjudication, of all matters *within the jurisdiction of the Board under this title*" or other laws and regulations. 5 U.S.C. § 1204(a)(1) (emphasis added). The CSRA permits an employee to "submit an appeal to the [MSPB] from any action *which is appealable to the Board under any law, rule, or regulation*." *See* 5 U.S.C. § 7701(a) (emphasis added). Although plaintiff has the right to appeal her removal to the MSPB, 5 U.S.C. § 7512, the government's sole reliance on the Constitution—rather than the removal provisions in the CSRA—clearly places this case outside the sort of issues that Congress intended the MSPB to adjudicate.

The legislative history supports limiting the MSPB's jurisdiction to cases arising under the CSRA and other civil service laws—not the Constitution. The role of the MSPB was described in the Senate Report introducing the Civil Service Reform Act of 1978:

> The merit systems protection board, along with its special counsel, is made responsible for safeguarding the effective operation of the merit principles in practice. Composed of three members nominated by the president and confirmed by the senate for single nonrenewable terms and removable only for cause, the bi-partisan board will adjudicate cases of alleged violation of the merit system, enforce compliance with its decisions and orders, order stays of personnel actions in cases where it determines that such relief is justified, and conduct studies of the civil service and other merit systems. . .

S. REP. 95-969, at 7.

Obviously, Congress intended for the MSPB to adjudicate disputes arising from the CSRA in order to safeguard the rights of covered employees and the merit system itself. The notion that Congress meant to give the MSPB jurisdiction to invalidate its own existence by declaring the statute that created it unconstitutional is untenable. Such a decision would dismantle the "effective operation of the merit principles" rather than safeguard them.

Supreme Court caselaw on the jurisdiction of the MSPB and other adjudicatory agencies reaffirms why plaintiff's claims must be heard—in the first instance—in federal court. As the Supreme Court has explained, "the CSRA makes MSPB jurisdiction over an appeal dependent only on the nature of the employee *and the employment action at issue*." *Elgin v. Department of Treasury*, 567 U.S. 1, 18 (2012) (emphasis added). Accordingly, MSPB jurisdiction exists only when (1) the MSPB has jurisdiction over the employee *and* (2) the MSPB has jurisdiction over the personnel action taken by the agency.

With respect to the first requirement, plaintiff indisputably has the right to appeal her removal to the MSPB because she is an "employee" as defined by 5 U.S.C. § 7511(a)(1). *See* 5 U.S.C. § 7512(a). With respect to the second requirement, the government argues that the precise reason for plaintiff's removal is irrelevant to the MSPB's jurisdiction. *See Memorandum of Law in Support of Motion to Dismiss* at 16 ("Plaintiff's expectation that the government may argue that those statutory protections are unconstitutional to the extent that they infringe on the Executive's powers under Article II does not render her underlying claim 'collateral' to the purposes of the CSRA's exclusive review framework."). The government ignores, however, that the MSPB's jurisdiction explicitly depends on the precise reason for the employee's removal because the MSPB does not have jurisdiction over all removal actions taken against covered employees. *See* 5 U.S.C. § 7512(A)-(F); *Department of Navy v. Egan*, 484 U.S. 518 (1988).

The MSPB itself has expressly disclaimed authority to adjudicate Article II challenges to the CSRA. In *Davis-Clewis v. Department of Veterans Affairs*, 2024 M.S.P.B. 5 (Mar. 20, 2024), the Board squarely held that it "lacks the authority to adjudicate the constitutionality of statutes" and therefore could not consider an Article II challenge to statutory tenure protections governing its administrative judges. Like plaintiff, the Board's administrative judges enjoy tenure

protections under 5 U.S.C. § 7513. The Board explained that resolving the Article II claim would (as here) require it to invalidate a provision of the CSRA that grants it jurisdiction (i.e., 5 U.S.C. § 7513). The MSPB rightfully acknowledged that inquiry lies beyond the Board's expertise and constitutional role. *Id.* at 5 ("The removal protections afforded to both members of the Board and its administrative judges derive from the Board's organic statute, the Civil Service Reform Act of 1978 . . . Thus, the appellant is asking the Board to invalidate one or more provisions of the statute that created it."). Contrary to the government's claim, the MSPB would be deprived of jurisdiction if the government intends to argue that the CSRA is unconstitutional as applied to plaintiff, because the Constitution itself prevents the MSPB from entertaining such a claim.

In this respect, the issues involved in this case are comparable to the ones presented by plaintiffs in *Axon Enterprise, Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023). *Axon* involved administrative enforcement proceedings initiated by the Securities and Exchange Commission and the Federal Trade Commission. Objections to those enforcement proceedings, like a federal employee's challenge to removal under the CSRA, follow a statutorily prescribed path where the claims are heard at the agency level with a final review, if needed, in a federal court of appeals. Rather than submit to the administrative proceedings, Axon Enterprises sought to enjoin the proceedings as unconstitutional on the ground that the administrative law judges' tenure protections violate separation-of-powers principles. The Court held that constitutional challenges to the agency's structure were not of the kind Congress intended to include in a special statutory review scheme, which "does not necessarily extend to every claim concerning agency action." *Axon Enter. v. FTC*, 598 U.S. at 185.

The government's insistence that the MSPB may adjudicate claims challenging the constitutionality of the CSRA is wholly antithetical to the Supreme Court's holding in *Axon*. In order for the government to prevail on the merits here, the MSPB would need to hold that 5 U.S.C. § 7513 violates   as applied to plaintiff and, therefore, the MSPB lacks jurisdiction over any employment disputes brought by plaintiff. Such a conclusion would amount to a decision that the MSPB "is wielding authority unconstitutionally" over the plaintiff and other employees similarly situated to her, the precise type of claim the Supreme Court has found to be "structural." Such a "sweeping constitutional claim" belongs in federal court. *Axon Enter. v. FTC*, 598 U.S. at 189. By relying exclusively on Article II  as the sole reason for plaintiff's removal, the government has created the sort of issue governed by *Axon* rather than *Thunder Basin*.   The government's position presents an inescapable paradox: the MSPB's adjudicatory authority exists solely by virtue of the CSRA's tenure protections, but if the CSRA's tenure protections are invalid, how can the statute simultaneously serve as the source of the Board's jurisdiction over this dispute? Put another way, given that the government has acted wholly outside the CSRA's strictures on removal, why should plaintiff be compelled to submit to the CSRA's requirements for administratively challenging the removal?

C.   The Constitutional Question Here Lies Outside the MSPB's Expertise.

Congress, without doubt, intended employees to exhaust administrative remedies with the MSPB in run-of-the-mill employment disputes. *See Elgin v. Department of Treasury*, 567 U.S. 1, 18 (2012). Yet in invoking Article II  the government has taken this case out of the run-of-the-mill, as well as the MSPB's expertise.

The constitutional challenge the government raises in removing plaintiff is distinct from the issues ordinarily heard by the MSPB, and a paradigmatic example of a claim unsuitable for

channeling because it is wholly collateral to proceedings before the agency. As the Supreme

Court stated in *Axon*,

> The Commission knows a good deal about competition policy, but nothing special about
> the separation of powers. For that reason, we observed two Terms ago, 'agency
> adjudications are generally ill suited to address structural constitutional challenges'—like
> those maintained here.

*Axon*, 598 U.S. at 194-95 ("Claims that tenure protections violate Article II" are "detached from

considerations of agency policy"). Likewise, the MSPB knows a "good deal" about the civil

service law, but its adjudications are ill suited to address the constitutionality of the statute that

created it.

The MSPB's ordinary docket underscores this point. In practice, the Board adjudicates

fact-bound challenges to routine adverse actions—such as removals for misconduct,

unacceptable performance, or violations of workplace rules—where the central questions

concern the sufficiency of the agency's evidence, the reasonableness of the penalty imposed, and

compliance with statutory and regulatory procedures. *See Douglas v. Veterans Admin.*, 5

M.S.P.B. 313, 324, 331-333 (1981); *Lovshin v. Department of Navy,* 767 F.2d 826, 834–35 (Fed.

Cir. 1985) (en banc) (describing in detail MSPB review of performance-based removals).

This ordinary docket consists of precisely the types of determinations for which

channeling promotes uniformity and takes advantage of agency expertise -- Congressional

concerns the government highlights throughout its Memorandum of Law in support of the

Motion to Dismiss. But there is nothing ordinary in the government's assertion of a freestanding

constitutional power to remove a tenured employee untethered from the procedures required by

the CSRA. Requiring the plaintiff to proceed before the MSPB would not promote uniformity,

efficiency, or expertise, because, as the MSPB confirmed in *Davis-Clewis v. Department of*

*Veterans Affairs*, it does not and cannot entertain constitutional challenges to laws.

16

Although *Elgin* held that an employee's constitutional challenge to their removal must be channeled to the MSPB, the constitutional claims involved there—removal for failure to register with the Selective Service was unconstitutional sex discrimination and an unconstitutional bill of attainder—were intertwined with issues that *were* within the MSPB's expertise:

> But petitioners overlook the many threshold questions that may accompany a constitutional claim and to which the MSPB can apply its expertise. Of particular relevance here, preliminary questions unique to the employment context may obviate the need to address the constitutional challenge. For example, petitioner Henry Tucker asserts that his resignation amounted to a constructive discharge. That issue falls squarely within the MSPB's expertise, and its resolution against Tucker would avoid the need to reach his constitutional claims. In addition, the challenged statute may be one that the MSPB regularly construes, and its statutory interpretation could alleviate constitutional concerns. Or, an employee's appeal may involve other statutory or constitutional claims that the MSPB routinely considers, in addition to a constitutional challenge to a federal statute.

> The MSPB's resolution of those claims in the employee's favor might fully dispose of the case. Thus, because the MSPB's expertise can otherwise be 'brought to bear' on employee appeals that challenge the constitutionality of a statute, we see no reason to conclude that Congress intended to exempt such claims from exclusive review before the MSPB and the Federal Circuit….

*Elgin v. Dep't of the Treasury*, 567 U.S. 1, 22-23 (2012). *Elgin* turned on that fact that these ancillary issues—if resolved by the MSPB—could obviate the need for judicial review of the constitutional question.

The Supreme Court decided *Elgin* before it decided *Axon*. In this case, unlike in *Elgin*, the *only* question to decide here is the constitutionality of the CSRA. The MSPB cannot avoid deciding this issue because it is the sole reason for plaintiff's removal. Thus, a pillar of the ruling in *Elgin*—that "preliminary questions unique to the employment context may obviate the need to address the constitutional challenge"—is absent here. *Elgin*, 567 U.S. at 21. Consequently, *Axon* controls rather than *Elgin*.

17

Recent decisions from other courts reaffirm that this case falls outside *Elgin*. In *American Federation of Government Employees v. Trump*, the Ninth Circuit held that a constitutional challenge to widespread reductions-in-force was wholly collateral to the CSRA's statutory scheme and that the MSPB lacked expertise to adjudicate these constitutional issues—even though RIF challenges are ordinary heard by the MSPB. *See* 139 F.4th 1020 (9th Cir. 2025). Distinguishing *Elgin*, the court emphasized "that in nearly every case cited by Defendants [i.e., the government] in which a court channeled a constitutional or statutory claim through the CSRA, the plaintiffs raised at least one claims properly within the unquestioned jurisdiction of the MSPB or FLRA." *Id.* The First Circuit has reached a similar conclusion, observing that no "other Supreme Court interim order or decision accepted the government's CSRA argument" that personnel disputes presenting purely constitutional issues must be challenged through the CSRA's remedial scheme. *New York v. Kennedy*, 155 F.4th 67, 75 (1st Cir. 2025).   Together, these decisions make clear that *Elgin* cannot be stretched to bar district-court review of constitutional challenges that the CSRA neither contemplates nor equips the MSPB to resolve.

The government bears the burden of proving lawful authority for the removal, and its asserted authority in this case turns entirely on a threshold Article II challenge to the CSRA itself. Requiring channeling in these circumstances would not preserve Congress's review scheme; it would compel an employee to submit to an agency proceeding whose jurisdiction and governing statute the government contends are unconstitutional. *Elgin* does not require—and does not support—such a result.

In expressly disclaiming the CSRA as the source of its removal authority, the government has removed this case from the scope of the MSPB's expertise.

## II.   REQUIRING PLAINTIFF FIRST TO SEEK RELIEF FROM A MEANINGLESS ADMINISTRATIVE REVIEW PROCESS WOULD CAUSE IRREPARABLE INJURY AND WOULD POSE A THREAT TO THE PUBLIC INTEREST AND THE FAITHFUL EXECUTION OF LAW.

Subjecting an employee to an agency proceeding that the government contends is without constitutional authority (because the tenure provisions the MSPB exists to enforce are unconstitutional) inflicts precisely the irreparable injury *Axon* forbids—that of being subjected to "unconstitutional agency authority," a "harm that may sound a bit abstract" but is "a here-and-now injury" that "is impossible to remedy once the proceeding is over, which is when appellate review kicks in." *Axon Enterprise, Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 191 (2023).

Permitting the MSPB to decide the constitutionality of the CSRA would subject plaintiff to the same "here-and-now injury" of being subjected to "unconstitutional agency authority." *See* 598 U.S. 175. If the MSPB agrees with the government's argument that 5 U.S.C. § 7513 is unconstitutional as applied to plaintiff, it would lack the constitutional authority to adjudicate any adverse actions taken against plaintiff. Although plaintiff would have a right to appeal the MSPB's decision to the U.S. Court of Appeals for the Federal Circuit, it would be "impossible" to remedy this injury. *See* 598 U.S. 175.

Furthermore, the answer to the question of whether this case should be channeled to administrative adjudication has implications beyond Ms. Comey's individual rights. This is because the President continues to act on the belief that he has the power to fire career prosecutors for any reason, even openly vindictive ones, and install in their place anyone he wants regardless of whether they are qualified for the job—all in violation of the CSRA, the Constitution's separation of powers, and the merit principle reflected in America's early rejection of the spoils system. *See Rutan v. Republican Party of Illinois*, 497 U.S. 62, 72-76 (1990).

19

The public has an interest in the civil service system currently under attack. *See, Connick v. Myers*, 461 U.S. 138, 149 (1983) ("[T]here is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service."). This is being rapidly undermined by actions whose legitimacy is highly questionable, requiring urgent review.

In ordinary circumstances, the President and federal agencies enjoy a presumption that they have engaged in good faith supervision and management of their personnel. *See Am. Fed'n of Gov't Emps. v. Reagan*, 870 F.2d 723, 726 (D.C. Cir. 1989). The duty of meaningful supervision and management stems from the President's constitutional obligation to "take Care that the Laws be faithfully executed." *See* U.S. Const. art. II, §3; Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 YALE L.J. 1836, 1875-1882 (2015). The standard presumption, however, is unwarranted when the President engages in intentional maladministration of the civil service. *See* Nicholas R. Bednar, *Presidential Control and Administrative Capacity*, 77 STAN. L. REV. 823, 918 (2025); Jodi Freeman & Sharon Jacobs, *Structural Deregulation*, 135 HARV. L. REV. 585, 589-90 (2021). Faithful execution of the law necessarily requires faithful management of the civil service because maladministration prevents execution of the laws enacted by Congress. *See* Bednar, *Presidential Control and Administrative Capacity*, *supra*.

The Trump administration no longer enjoys the presumption of regularity with respect to its management of the civil service. There is no question that the Administration has sought to intentionally undermine the execution of law and the merit system through its assault on the civil service. The Office of Management and Budget—which has no jurisdiction over personnel matters—has waged a campaign to substantially reduce the size of the federal workforce and

ensure employees are selected for reasons of loyalty to the President rather than merit. *See* Russ Vought and Charles Ezell, *Guidance on Agency RIF and Reorganization Plans* (Feb. 26, 2025), https://perma.cc/2SFN-FA9S; Russell Vought and Scott Kupor, *Guidance on Executive Order 14356* (Nov. 5, 2025), https://perma.cc/3VYE-AM4J.

Russell Vought, the Director of the Office of Management and Budget, candidly said:

> We want the bureaucrats to be traumatically affected. When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains. We want their funding to be shut down so that the EPA can't do all of the rules against our energy industry because they have no bandwidth financially to do so.

Robin Bravender, *Russ Vought Wanted Feds "In Trauma." It's Happening.* E&E News by Politico (Oct. 16, 2025), https://perma.cc/4EW4-SLFF. The Administration thus has openly conceded that its attacks on the civil service are designed to prevent agencies from executing the law.

District courts have made clear that the Trump administration is no longer entitled to a presumption of regularity, especially in personnel matters. *See* Ryan Goodman, et al., *The "Presumption of Regularity" in Trump Administration Litigation*, Just Security (Sept. 15, 2025), https://perma.cc/H693-4FTT. Courts have repeatedly enjoined the administration's efforts to restructure the civil service, reasoning that dismantling statutory protections for federal employees would undermine Congress's constitutional power to create agencies and ensure that its laws are faithfully executed. *See* Nick Bednar, *Reductions in Force Challenges in the Federal Courts*, Lawfare (July 17, 2025), https://perma.cc/ZXM6-WYMA (analyzing every case to have considered a reduction in force in the federal courts). District courts have repeatedly found that the government has fabricated evidence, refused to comply with court orders, and taken pretextual actions in managing the civil service, *see* Goodman, *supra*, including at least one case

involving a personnel decision made by the Department of Justice. *See Am. Fed'n Of Gov't Emps v. U.S. Off. of Personnel Mgmt.*, 799 F. Supp. 3d 967, 990-993 (N.D. Cal. Sept. 12, 2025).

The assault on the Department of Justice has been particularly acute. The Trump administration removed the head of the Office of the Pardon Attorney after she refused to reinstate actor Mel Gibson's gun rights. *See* Nick Bednar & Peyton Baker, *A Primer on the Senior Executive Service*, LAWFARE (Sept. 2, 2025), https://perma.cc/S7W4-GLJN. It has fired or disciplined dozens of career prosecutors who have been involved in proceedings regarding President Trump and his allies, including participants in the January 6 Insurrection. Alan Feuer, *Trump's Retribution Campaign Leaves D.C. Prosecutor's Office in Crisis*, N.Y. TIMES (Nov. 2, 2025) https://perma.cc/3RBZ-9VBB.

The administration also has fired career prosecutors for refusing to bring charges against people whom President Trump regards as his enemies, and has appointed a U.S. Attorney for the Eastern District of Virginia, someone who has been a personal lawyer to the President with no prosecutorial experience to bring charges against James Comey and Letitia James after career prosecutors found no basis to do so. Scott MacFarlane, *DOJ Removes Another Prosecutor from Key Office That Indicted James Comey And Letitia James, Source Says,* CBS News (Oct. 14, 2025), https://perma.cc/C2QW-M73E.

Morale at the Department of Justice is at an all-time low. The Federal Programs Branch—the office that represents the Executive Branch in civil litigation and defends many of the laws enacted by Congress—has lost nearly two-thirds of its attorneys. *See* Andrew Goudsward, *Two-thirds of the DOJ Unit Defending Trump Policies in Court Have Quit*, REUTERS (July 14, 2025), https://perma.cc/FWZ7-CDMX. These removals bear no connection to the efficiency of the civil service or the faithful execution of the laws. Rather, they exemplify the President's use of

personnel authority as a weapon to punish attorneys who have pursued his allies for alleged violations of criminal law.

These personnel actions within the Department of Justice also threaten the federal courts' ability to ensure fair and impartial hearings. A whistleblower was removed from his position after refusing to sign a brief containing a false statement. Scott Pelley, et al., *Fired Justice Department Lawyer Says He Refused to Lie in the Abrego Garcia Case*, CBS NEWS (Oct. 19, 2025), https://perma.cc/CY73-4DVT. Further, attorneys in the Department of Justice have cited the hemorrhaging of their offices as a defense for their inability to comply with certain court directives. For example, in *John Does 1-26 v. Musk*, the court inquired as to why the Department of Justice had failed to provide documentation it had promised the court in an earlier status conference:

> **Mr. Gardener [Department of Justice Attorney]:** [S]ince January 20th, we have received, I think, approximately 80 lawsuits. And our staff at the federal programs branch has been cut in half. We have about half the number of staff that we had in the beginning of November. And we are working on very expedited schedules on all of these cases, including yours. . . .
>
> **The Court:** So you're saying the Justice Department isn't taking this case seriously, they are not staffing it sufficiently.
>
> **Mr. Gardner:** Quite the opposite. We—Your Honor, I've not had a day off work since January 20th, and none of my colleagues have either. . . .
>
> **The Court:** [I]f you're saying you don't have enough people, maybe that's part of the problem.

*Transcript of Preliminary Injunction Hearing*, *John Does 1-26 v. Musk*, No. 25-cv-00462-TDC, at *67-69 (D.M.D. Mar. 4, 2025).

Allowing the President to continue to remove attorneys at will without an urgent examination by an Article III court of the Article II  power grab would only further erode the

Department of Justice's duty of candor to the courts and frustrate the ability of the courts to decide cases in accordance with law.

Ultimate review by the Federal Circuit Court of Appeals after a two-part administrative proceeding will be meaningless if, in the interim, the baseless firings and unqualified hirings proceed to transform the Department of Justice from an independent agency with competent and ethical prosecutors into one where the only qualification is that the prosecutor be loyal to the President.

In *Axon* there was a problem "stemming from the interaction between the alleged injury and the timing of review," *Axon Enter. v. FTC*, 598 U.S. at 191 —to wit, as discussed earlier, the "here-and-now injury' of subjecting a party to an illegitimate proceeding in the meantime. But there is an additional problem here stemming from that interaction between injury and time of review, and that is forcing the public through the uncertainty and chaos of a justice system in which the old rules are being demolished on a near daily basis while the matter sits with an already over-burdened agency that is almost certainly not going to decide the constitutional issue anyway. *See* Drew Friedman, *MSPB faces high workload, low staffing levels,* Fed. News Network (July 4, 2025), https://perma.cc/A9DS-JUN7.

Given the speed at which the government is firing federal employees without good cause on a claimed Article II authority, submitting the sole legal question here to a lengthy administrative review before an agency without clear jurisdiction to decide it, and whose decision would not be final, would allow for a profound upheaval in the Department of Justice, with a looming unanswered question that goes to the heart of American democracy—the separation of powers. *See*, *United Pub. Workers v. Mitchell*, 330 U.S. 75, 91 (1947) ("By these

mutual checks and balances by and between the branches of government, democracy undertakes to preserve the liberties of the people from excessive concentrations of authority.").

The delay resulting from an ultimately meaningless administrative review of the President's arrogation of power would harm the public's interest in a merit-based civil service system, the prompt administration of justice, and a stable system of government that operates to prevent the unconstrained exercise of power.

## **CONCLUSION**

The government's effort to subject the plaintiff to a tribunal established under a statute that the government claims is unconstitutional, which the MSPB does not have jurisdiction to evaluate, would be pointless and would cause harm to plaintiff. *Amicus curiae* therefore respectfully supports the plaintiff's opposition to defendant's motion to dismiss.

Dated: January 22, 2026                           Respectfully Submitted,

                                        By:    *H. David Krauss*
                                               H. David Krauss
                                               BANTLE & LEVY LLP
                                               99 Park Avenue, Suite 1510
                                               New York, New York 10016
                                               (212) 228-9666
                                               krauss@civilrightsfirm.com

                                               *Attorneys for Proposed Amicus*
                                               *Curiae Lawyers Defending*
                                               *American Democracy*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(c) of the Local Rules for the United States District Court for the Southern District of New York, the undersigned counsel for proposed *amicus curiae* Lawyers Defending American Democracy hereby certifies that this amicus brief complies with the type volume limitation of Rule 7.1(c). As measured by Microsoft Word, there are approximately 7,639 words in this brief.

By:    *H. David Krauss*

H. David Krauss
BANTLE & LEVY LLP
99 Park Avenue, Suite 1510
New York, New York 10016
(212) 228-9666
krauss@civilrightsfirm.com

*Attorneys for Proposed Amicus
Curiae Lawyers Defending
American Democracy*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2026, I electronically filed a copy of the foregoing *Amicus Curiae* Brief using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: January 22, 2026

By:    *H. David Krauss*

H. David Krauss
BANTLE & LEVY LLP
99 Park Avenue, Suite 1510
New York, New York 10016
(212) 228-9666
krauss@civilrightsfirm.com

*Attorneys for Proposed Amicus Curiae Lawyers Defending American Democracy*