# EXHIBIT 2

Q5SRCOMc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MAURENE COMEY,

                Plaintiff,

        v.                              25 Civ. 7625 (JMF)

UNITED STATES DEPARTMENT OF
JUSTICE, *et al.*,

                                        Conference

                Defendants.

------------------------------x

                                        New York, N.Y.
                                        May 28, 2026
                                        3:15 p.m.

Before:

                    HON. JESSE M. FURMAN,

                                        District Judge

                        APPEARANCES


CLARICK GUERON REISBAUM
     Attorneys for Plaintiff
BY:  JENNIFER ELLEN BLAIN
     NICOLE L. GUERON
     DEEPA VANAMALI

     -AND-

KOSKOFF, KOSKOFF & BIEDER, P.C.
     Attorneys for Plaintiff
BY:  MARGARET DONOVAN


JOHN A. SARCONE III
     First Assistant U.S. Attorney
     for the Northern District of New York
BY:  KAREN F. LESPERANCE
     Assistant United States Attorney

THE COURT:  You may be seated.

(Case called)

MS. BLAIN:  Good afternoon, your Honor.  Ellen Blain with Clarick Gueron Reisbaum, and with me at counsel table is plaintiff, Maurene Comey and my colleagues down the table, who I am sure will introduce themselves.

MS. GUERON:  Good afternoon, your Honor.  Nicole Gueron, Clarick Gueron Reisbaum,for plaintiff.

MS. VANAMALI:  Good afternoon, your Honor.  Deepa Vanamali, also with Clarick Gueron Reisbaum.

MS. DONOVAN:  Good afternoon, your Honor.  Margaret Donovan, with Koskoff, Koskoff & Bieder, for plaintiff.

THE COURT:  Good afternoon.

MS. LESPERANCE:  Good afternoon, your Honor.  Karen Lesperance from the United States Attorney's Office for the Northern District of New York for the defendants.

THE COURT:  Good afternoon to you as well.

Let me start by apologizing for keeping everybody waiting.  I had another proceeding elsewhere, and it went a little bit longer than I expected.

In any event, we are here for, I guess, the second initial pretrial conference, but this time to talk about discovery and I gather motion for judgment on the pleadings.  I am advised that there's some update since your joint letter; namely that you've resolved the dispute regarding ESI, and we

don't need to discuss that.

Is that correct, Ms. Blain?

MS. BLAIN:  That's right, your Honor.

THE COURT:  Ms. Lesperance?

MS. LESPERANCE:  Yes.  That's correct.

THE COURT:  So why don't we start with the motion for judgment on the pleadings, and I gather you've also agreed on a briefing schedule for that motion, but it might be helpful to me to at least get a preview of what the motion will involve.

Ms. Lesperance, can you tell me what your thinking is on that and what the proposed briefing schedule is?

MS. LESPERANCE:  Absolutely, Judge.

So as we previewed in the joint letter, the government really believes that this is an issue -- that this whole case is an issue of just purely legal questions.  The government acknowledged in its answer the determination was directed by the former Attorney General, and it has since been ratified by the Acting Attorney General.  So this case presents the legal questions whether the President's Article II removal power is delegable to the Attorney General, and if so, if it is broad enough to reach to a line prosecutor.  It's the government's position that when she acts in her role as a prosecutor, she is performing a core executive function, and it does.  Obviously plaintiffs have a different view, but that is a pure legal question as to the breadth and scope of Article II of the

Constitution.

There's a separate legal question, whether the Attorney General's statutory power under 28 U.S.C. Section 542 authorized this termination separate and apart from Article II of the Constitution. And so now that the pleadings have closed, the government intends to present its arguments on those core legal issues to the Court. And it's our position that there are really no factual issues that -- that those legal arguments do not rely on any factual issues that are not contained within the pleadings.

THE COURT: OK. Obviously I will reserve judgment on the legal issues that you've raised until the matter has been fully briefed, but just to explore and understand the contours of it, is it your portion that the other constitutional protections, say the First Amendment or Fifth Amendment, due process, equal protection, that those principles would not limit the President's and cabinet members' authority under Article II?

MS. LESPERANCE: So again --

THE COURT: Let me put a finer point on it. As I understand it, part of the claim here is that Ms. Comey is alleging that she was fired in violation of her First Amendment rights. If that is correct as a factual matter, would that not be a limit on the President's authority and the Attorney General's authority under Article II?

MS. LESPERANCE:  Our position is -- and, of course, we reserve the finer points of our position for the government's briefing on this matter, but our position is that even if there were political motivations associated with the termination to exercise Article II removal power, if there was a determination made that it was in the interest of the nation and affected the efficiency of the service, then it was a valid termination. And, yes, that there would be a balancing factor test there with respect to the First Amendment issue, but that the President is allowed to consider political motivations in determining when to make decisions under his Article II executive power.

THE COURT:  Are there any limits to that principle in your view?  That is to say, if the President decided it was in the nation to have an all white executive branch or an all black executive branch, whatever the case may be, could he exercise his authority under Article II and fire everyone who was not of that race?

MS. LESPERANCE:  I'm not authorized to -- I can't answer on behalf of the government that question.  It does seem like there would have to be some --

THE COURT:  You are here representing the government.

MS. LESPERANCE:  I understand that, and the government will fully brief all of these issues in its anticipated motion. Of course, the hypothetical that your Honor just presented

Q5SRCOMc

facially appears to present some constitutional concerns.  So I don't think the government is going to take the position that there are absolutely no limits to the Article II powers, but that here the exercise of the article removal authority in this instance did not violate this particular plaintiff's First Amendment rights.

THE COURT:  OK.  And the briefing schedule that you've agreed upon, can you tell me what that is?

MS. LESPERANCE:  Yes, your Honor.  The government should be prepared to file its brief by next Friday, June 5.  The plaintiff's opposition and potential cross-motion to be filed by July 17.  The government's reply and opposition to a cross-motion, if one is filed, would be August 7, and then the government's reply on August 21 -- I'm sorry -- the plaintiff's reply is on August 21.

THE COURT:  OK.  Let me just press you before I hear from Ms. Blain on this front.  It sounds like there are some factual issues that may be relevant to the determination, if it's a balancing test, for example, whether competing constitutional rights, how to balance them.  Would it not make sense to reserve making these arguments until summary judgment, until there was a record on which to base them?

MS. LESPERANCE:  Well, again, it's the government's position that there really is no factual discovery that's needed to determine the legal issues.  One of the things that I

mentioned to plaintiff's counsel, and this was a brief back-and-forth very shortly before the conference, was that we are planning to file our motion by the end of next week, that plaintiffs could identify if there was some limited scope of discovery that would be necessary to oppose the motion, and that we could then confer and seek the Court's guidance as to whether or not that discovery was warranted or necessary to oppose the motion.

THE COURT:  OK.  Ms. Blain?

MS. BLAIN:  Thank you, your Honor.

What you just heard was a pretty novel and breathtaking theory about the scope of Article II power.  It seems that the government's position is, in fact, that Article II can supersede the First Amendment and maybe even the Fifth Amendment and therefore the Bill of Rights and the rest of the Constitution, including laws passed by Congress under its appointments clause power.  We look forward to briefing this weighty issue, your Honor, but as the Court points out, it calls for fact discovery.  There are indeed factual questions at issue here, and particularly, we need to know who fired Ms. Comey because every person who works in the federal government has different removal powers.

Now, to be clear, we don't believe that anyone has the power to remove a line AUSA because of her last name or frankly for any reason other than for cause.  But if the government is

Q5SRCOMc

arguing that someone can do it, we need to know who that person was.  If it's the President, then perhaps that's Article II power.  But here critically the White House has disclaimed any responsibility for firing Ms. Comey.  The day after she was fired, as I'm sure your Honor remembers and we plead in the complaint, the White House spokesperson said that the White House had nothing to do with her firing.  And in fact in the answer, the government has admitted, or at least averred rather, that the Attorney General is the one who fired her.

So is it possible that the Attorney General can exercise this Article II power by delegation silently?  Did the Attorney General fire her?  Was she getting orders from the White House or not?  If it's orders from the White House, is that order delegable to her.  If, however, it was in fact just the Attorney General, then that power does not derive from Article II, and now we have a new theory that that power actually derives from Section 542(b).  There are many reasons why that's not true.  It hasn't been true since the due process amendments to the CSRA were passed in 1990.  It hasn't been true in the decades that have followed.  It hasn't been true in any of the government's briefing on this issue since 1990.  It hasn't been true until today.  That is a different issue, and that also cries out for fact discovery.  Did the Attorney General fire her or was that power delegated to her?

And then there's a third new theory.  The third new

theory was that firing Ms. Comey was in order to help the efficiency of the service under the CSRA. And I will note, your Honor, for these final two new theories, Section 542(b) and the CSRA, in footnote 8 of your Honor's order of jurisdiction, the Court noted that it's likely that the government waived any reliance on any authority other than Article II to fire Ms. Comey.

So some of these arguments, by the way, may have likely been waived. They certainly should be seen for what they are, a post hoc rationalization brought up in the middle of litigation to come up with a reason to fire Ms. Comey now that they know that Article II may not be able to save them since the White House backed away from Article II power here.

All of these reasons call for discovery. And one final point on discovery, if I may, your Honor, and that is, of course, it's the default rule in this district that discovery proceed while motions to dismiss are pending. A movant needs to show good cause to pause discovery while motion practice is undergoing, and the test here is, number one, the breadth of discovery sought.

Here, as we can point out and go into detail, we seek very narrow discovery, a handful of custodians. The timeline would be January 20, 2025, until the day after Ms. Comey was fired. That's only a seven-month time frame. The search parameters are unique: Her name, firing, termination, SDNY,

all in combination.  That's not going to bring out many documents, or if it does, that's another problem, but presumably, that's a narrow universe.  And then, three, the prejudice that would result, if any, to either party.  And here Ms. Comey has been fired since July of last year.  This complaint has been pending since September of last year.  It's hard to see what prejudice the government would suffer if discovery were to go forward.

Actually, I misspoke.  There are three factors in this analysis:  One, breadth of discovery; it's narrow.

Two, prejudice to the parties; a lot to her; none to the government.

Three, the strength of the motion, and as is very clear, this argument has never been posed before.  This is a breathtaking, novel, and unique interpretation of how the separation of branches work or work together.

I don't know what the strength of that motion is going to be, but certainly we intend to oppose it vigorously.  And for those reasons, fact discovery should proceed while this motion is pending.

THE COURT:  OK.  Let's take this in steps.  First, just to press you on one argument that you just alluded to, which is that absent the delegation by the President to the Attorney General that it's not an exercise of Article II power. Insofar as Article II vests the executive power in the

President, then the President's cabinet is exercising executive power, why is there necessarily a need for an express delegation?  Isn't the Attorney General exercising the authority vested in the President under Article II?

MS. BLAIN:  Your Honor, no court has evaluated that question yet, and that would be one pending before you.  But here, there was no express delegation.  In fact, there was an express non-delegation, it seems, that the White House did not direct the DOJ to do it.  So can the AG actually exercise that Article II power when the White House has said it didn't do it?  That is a factual question, and it's hard to see how you can move under 12(c) on that basis.

The other kind of question pending out here is the acting Attorney General's brand new ratification, dated the date that the government's answer was filed, Exhibit A to the answer, purports to ratify what they claim the prior Attorney General did in firing Ms. Comey.  If Attorney General Bondi did, in fact, fire Ms. Comey, it's hard to understand why there needs to be a ratification by the current acting Attorney General ratifying something that Pam Bondi, Attorney General Bondi, had the power to do to begin with.  It's another factual question and relevant to who has the power to do what.

THE COURT:  Would you display discovery with respect to whatever led to the ratification because obviously that post dates the day after Ms. Comey was fired?  You said it's a

Q5SRCOMc

seven-month period or six-month period but not if we have to get into ratification and what led to the ratification.

MS. BLAIN:  I think we would have to think about that, your Honor.  It's a fair question obviously.  The most important question is what happened leading up to her termination, and that really should end by July 17, 2025.

THE COURT:  All right.  One minor point, you invoked footnote 8 in my opinion and suggested that I ruled that some of those arguments were forfeited.  To be clear, you left out a couple words which was "for present purposes."  It remains to be seen the scope of what that forfeiture waiver would be, but I just wanted to make that point.

Ms. Lesperance mentioned -- you can sit, Ms. Lesperance.  I'm still on Ms. Blain.  Ms. Lesperance mentioned the possibility of a cross-motion, but you didn't make any reference to that.  Can you tell me what your thinking is on that score?  Is that just hedging your bets in the event that you decide there's a motion to bring?  To the extent that you are saying this is all dependent on facts, how would you be in a position to make a motion?  What are your thoughts there?

MS. BLAIN:  Exactly, your Honor.  We just don't know yet because we don't know exactly the contours of what the motion is going to say.  Today in open court is the first time we've actually heard what the government intends to move on and that they don't think there's any need for factual discovery,

including on the First Amendment claim, which, again, that's hard to see, because not only do we need to know who fired Ms. Comey, but we need to know why.  And the why is critical to the First Amendment retaliation claim.

And the government's answer only raises more questions on that point.  They affirm that they did not fire her for cause.  That's in paragraphs 12, 15, and 16 of the answer. They say that she wasn't fired for cause and that she wasn't fired due to her performance as an AUSA.  They acknowledged that she had received outstandings throughout her tenure in the office.  They acknowledged that she raised or she led rather very high-profile, successful prosecutions in this district.

And so it begs the question:  Well, if she wasn't fired for cause, why was she fired?  The only possible reason is because her dad is James Comey.  That is a First Amendment violation, and to answer that question, we need discovery, which is why we can't actually answer the Court's question about what our cross-motion could look like.  We do believe that there are factual issues at play here, but to the extent that the government can actually articulate something that is a pure legal question, that does not need a factual sort of basis, and we can find a way -- we can move in a similar way, we would like to reserve our opportunity to do that.  But I think it's unlikely, frankly, and we'll just oppose.

THE COURT:  OK.  Let's take this in steps.  I will

adopt the parties' proposed briefing schedule, so the government's motion is due by next Friday, June 5.  Any opposition and any cross-motion would be due by July 17.  Any reply/opposition by August 7, and any reply in support of a cross-motion by August 21.

I will say, Ms. Lesperance, I'm a little skeptical of the breadth of the argument and whether as a matter of law you can deal with it on a 12(c) motion.  But I don't think there's any provision in the rules that allows me to prevent you from filing a motion, so I will certainly reserve judgment, and we'll see.  But if it turns out that discovery is necessary to resolve the issues in this case, then obviously that motion is not going to do it for you.

Did you want to say anything further on that or do you want to talk about discovery?

MS. LESPERANCE:  Understood on that, your Honor, and I will communicate that to the client agency as well.

THE COURT:  OK.  So let's talk about discovery, what discovery would entail, and whether it should proceed while this motion is briefed and under consideration.  Ms. Blain, I'll start with you on that.  You've already spoken a little bit about the scope of discovery, what you'd be looking for, but if you can flush that out a little bit for me.  I would imagine in this case there might be thorny issues of executive privilege, apex issues with respect to depositions.  Do you

anticipate those coming down the pike?

MS. BLAIN:  Yes, we do, your Honor.  I see no way around those issues coming down the pike.  And it's another reason why it's necessary to start discovery now rather than wait for the pendency of the motions to be briefed, filed, cross-motions, decision to be issued.  This case has been pending since September, as I know the Court knows.  And because there is likely to be thorny executive privilege, deliberative process privilege questions with document production, interrogatory responses, and depositions, we should start the clock now, we respectfully submit.

The discovery requests would be narrowed to the following:  Date limits, again, election day -- inauguration day, January 20, 2025, through July 16, 2025; and this is subject to change based on the documents that we see and what we get in the initial pass in just that seven-month window --

THE COURT:  I think that's six months, by the way.

MS. BLAIN:  Well, that's why I didn't go to grad school in math.  We are not seeking non-privileged documents, so we hope to avoid any of these privilege problems, but they are likely to arise.  The custodians would be as follows, we propose, the people who we know were involved in the decision, at least on the documents.  That would be Attorney General Bondi, current Acting Attorney General Todd Blanche, and the director of EOUSA, Francey Hakes, who signed the memorandum.

We also know two people who were involved in communicating that decision to Ms. Comey, the current SDNY U.S. Attorney, Jay Clayton, and the Deputy U.S. Attorney for SDNY, Sean Buckley. Given the status of both Bondi -- Attorney General Bondi and Attorney General Blanche, we might also seek discovery from their administrators administrative assistants to the extent they used others to help them with their communications. And then finally, there are three people who are on the email that Ms. Comey received from Francey Hakes communicating her termination, and we don't really know who those people are. We just know they are affiliated with EOUSA. So those would be relevant custodians as well. All together that is eight—I think I got that math right—custodians.

THE COURT: Plus the admins.

MS. BLAIN: Right, plus the admins potentially, and then again, the date range, limited. I will note on the privilege issue, as I know the Court knows, that even executive privilege is not absolute and subject to a weighing test. So that is probably likely to be teed up.

THE COURT: OK. And expert discovery? I'm not sure what it would be here, but you seem to think that it's appropriate.

MS. BLAIN: We have reserved -- we'd like to reserve the time to do that, your Honor, in the event it's necessary to have someone talk about the pension payments and credits that

Q5SRCOMc

she lost.  If she had stayed a few more months, she would have gotten to the ten-year mark, and the ten-year mark changes your pension credits in DOJ dramatically.  And to figure out what that calculation is, what she lost, what she could have had had she stayed in the normal course, it may be fact discovery, but it may be an expert in economics.  But it's not going to be lengthy.  It's not going to be complicated, and we can certainly do that in tandem with fact discovery if necessary.

THE COURT:  OK.  Ms. Lesperance?

MS. LESPERANCE:  Yes, your Honor.  Well, I am hearing about the scope of the discovery that is going to be sought and the names of the individuals for the first time.  I definitely foresee issues with seeking communications from cabinet members and potentially communications between those cabinet members and the President of the United States, issues of, as Ms. Blain said, executive privilege, deliberative process, and potentially presidential communications.

There's also a complicating issue that former Attorney General Bondi is no longer a federal employee.  She was not named in her individual capacity, her official capacity only, so that would be nonparty discovery but certainly pertaining to information that happened in her role as the Attorney General of the United States.

THE COURT:  To be clear, any documents would be in the possession of the government --

Q5SRCOMc

MS. LESPERANCE:  Yes.

THE COURT:  -- so to the extent that it's nonparty discovery, that would only be if a deposition were to occur.

MS. LESPERANCE:  Yes.  My communications with plaintiff's counsel lead me to believe that there's going to be requests for information that may be contained on personal devices as well, and so that's where that might get into asking things of her that would not be within the -- that shouldn't have been -- she shouldn't have been having personal communications -- no one should have been having personal communications on personal devices.

THE COURT:  You mean professional communications on personal devices.

MS. LESPERANCE:  Professional communications on personal devices.  Thank you.  But if there is that request, that would have to then be personally communicated to her as a former employee, and that gets a little complicated and potentially invokes *Tuohy*.

THE COURT:  Is that true even if it's a professional communication?  Because it would be subject to the Presidential Records Act even if it's on a personal device, no?

MS. LESPERANCE:  Yes.  If it was a professional communication, it would be subject to the federal records act. Whether those exist and whether they are currently in the possession of the federal government is something that's not

known yet.

So now we're kind of getting into the discovery schedule. I know the plaintiffs have proposed 120 days from the date of this conference, I believe, to complete all discovery. I just don't think that that is realistic given the complicating factors that are necessarily -- that will have to be probably litigated through motion practice. Again, we take the position and respectfully suggest that the Court could reserve decision on this until after the motion is filed and we see the parameters of the arguments, but we suggest that this fact discovery was not going to be necessary to determine the core legal issues.

THE COURT: OK. And expert discovery from your perspective?

MS. LESPERANCE: If the plaintiff were to get some kind of economic expert, we would want to reserve our rights to have one as well. I think that many of those issues can, you know, be handled by government agencies and calculated fairly easily, but we would reserve our rights there to get a rebuttal expert on economic issues.

THE COURT: All right. So let me talk about a few things. First, I'm not going to pause discovery pending the motion. I'll do it slightly differently, which is to say that the default in this district is to proceed with discovery notwithstanding a 12(c) motion, and so I will proceed in

Q5SRCOMc

accordance with that default.  Having said that, if after defendants file their motion, they want to file a letter motion seeking a stay of discovery, I would certainly be open to considering that.  And let me say that that motion can be made, let's say, within a week of the filing of 12(c) motion.

As Ms. Blain mentioned, one of the factors in assessing whether the discovery should be stayed is the strength of the motion.  It's a little hard to do that without seeing the motion.  So bottom line is:  Discovery will proceed unless and until I say otherwise.  Defendants may renew their request to stay discovery by letter motion, not to exceed five pages, within one week of the filing of the 12(c) motion, and I'll give plaintiff one week thereafter to file a response, also by letter, not to exceed five pages.  I will then decide whether a stay is warranted, but unless and until I say a stay is warranted, then discovery will proceed on the schedule that I'm about to set.

Now, on that score, I'm going to set the deadline for both fact and expert discovery.  It doesn't sound to me like there's any reason to stage the two here.  Number one, I'm frankly skeptical that there would be a need for any discovery here.  It does sound like a matter of either law or simple -- not simple but mathematical --

MS. BLAIN:  Not from me.

THE COURT:  -- calculations.  Not for Ms. Blain, but

Q5SRCOMc

be that as it may, probably not for an expert. Regardless, it doesn't sound like there's any need to stage the two and have fact discovery done first. I'll set a single deadline for the completion of both fact and expert discovery, and I will set it for somewhere in between the parties' proposed deadlines, namely, October 15. That does sound to me like there will be some issues for us to resolve, and that is likely to cause some delay, so I think padding the schedule to accommodate that makes some sense.

In any event, I'll take it as it comes. But to the extent there are issues relating to depositions of high-level government officials, I've been to that rodeo before, and the Supreme Court stayed a prior order of mine authorizing the deposition of a cabinet-level official, which is to say I recognize the sensitivity and complicated issues involved there. And it may end up being the case, for example, that certain discrete portions of discovery should be paused until the 12(c) motion is resolved on the theory that could moot those issues. But, again, I think we should take it one step at a time, and take these things as they come.

Again, I'll set a deadline for all discovery of October 15. Let me say a few things about that. I will review the proposed interim discovery deadlines that were set forth in the proposed case management plan, but on first blush, they looked OK to me. I am going to set a deadline for initial

Q5SRCOMc

disclosures of June 14, which is consistent with the case management plan forum.

The interim discovery deadlines are subject to change by written agreement between the parties.  You don't need my permission to change those so long as it doesn't affect the ultimate discovery deadline of October 15 that I just set. That one is fixed and firm unless and until I say otherwise. You should not assume that you can get more time.  Obviously if some of the disputes that we've alluded to necessitate it, then so be it.  But bottom line is, again, don't assume that you'll get more time.

If something unforeseen arises that you think justifies an extension of that deadline, you can make an application to extend it.  Any such application better be in writing, better be filed as a letter motion, better be filed on ECF, and if the government can't get it filed before the deadline, it better make a good case for why additional time is needed and it's not for lack of due diligence on your part.

If there are discovery disputes along the way, you are required under the case management plan and my individual rules to confer with one another in an effort to resolve the issue in good faith.  If that doesn't resolve it, then either side can file a letter motion not to exceed three pages.  The other side has three business days in which to respond, also by letter, not to exceed three pages, and then I will try to resolve it.

Q5SRCOMc

Some of these issues may require additional briefing beyond that, but I'll certainly try to resolve it either by resolving the underlying issue or by convening a conference.

If you think that the issue warrants briefing beyond the three-page letter motion, you should certainly indicate as much in your letter. Some of these issues may well warrant more significant briefing than that, but that is at least the process in the first instance.

What else? The case management plan indicates that you anticipate the need for a protective order. There is certainly standard language for those things that tend to float around, so you should look for something along those lines. Two things to flag. One is I'm the only one in this courtroom that I'm aware of that can authorize that something be filed under seal. So you'll confine yourselves to make an application that something be filed under seal, but I will make that determination and that can only be made on a document-by-document basis.

This case obviously has some public interest/press interest, so I will be attuned to that. There's a right to public access to judicial documents and a test that needs to be applied to it, and I will certainly faithfully apply that test. Bottom line is: You'll confine yourselves to make a request that something be under seal, but only I can authorize it to be under seal. So if there's any provision in the protective

order that would purport to give you the right to something under seal without my permission, I will strike it or modify it as the case may be.

Any questions about any of that, Ms. Blain?

MS. BLAIN:  No, your Honor.  Thank you.

THE COURT:  Ms. Lesperance?

MS. LESPERANCE:  No, your Honor.

THE COURT:  All right.  There seems to be a dispute about privilege logs; that is to say whether it should be document by document versus categorical.  My inclination is that it might be premature to get into the weeds on that, and better to leave it to you to discuss that as things proceed. Frankly, it may be that a hybrid log makes sense but as to certain categories, a categorical log makes sense; as to others, document by document.  You are both nodding as if you agree that leaving that to another day makes sense.  Does that make sense?

MS. BLAIN:  Yes.

THE COURT:  Great.

I'm guessing this case is not amenable to settlement, but I do always ask about settlement at the initial conference.

Ms. Lesperance, am I correct in that assumption?

MS. LESPERANCE:  You are correct, Judge.

THE COURT:  So we'll proceed.  And to the extent you surprise me and there's anything I can do on that front to

facilitate a resolution, don't hesitate to let me know.  I'm certainly happy to make whatever referral would be helpful on that score.  Again, it seems like there's legal issues here that need to be sorted out.

Now, I will flag for you that my normal practice in a non-jury case is not to entertain summary judgment motion practice, and that's for two reasons.  One is bench trial submissions are quite similar to summary judgment submissions because I do direct testimony by affidavit, so in many respects the submissions are similar.  And, number two, to the extent that there are factual issues to be resolved, it is usually much more efficient just to cut to the chase and for me to be able to make whatever factual findings are necessary to resolve a case, rather than pausing to conclude that there are factual disputes, and then having to go through the same motions again.

That may or may not be appropriate here.  There are cases where it's appropriate to entertain summary judgment motions because there is a discrete little issue or because it will narrow the case.  I'm just flagging this so that you can be prepared to address it if or when we get to that point.

I will have you back shortly after the close of discovery.  So at least for now, I'll have you back on October 21 at 4 p.m., and per the case management plan, there's a letter due Thursday before that conference.  And if it were to change, the Thursday before whatever the new date is.  I

think that covers everything that I needed to cover today.

Anything else you think we ought to discuss, Ms. Blain?

MS. BLAIN:  No, I don't think so.  Thank you.

THE COURT:  Ms. Lesperance?

MS. LESPERANCE:  Nothing else from the government. Thank you.

THE COURT:  Again, my apologies for starting late and keeping you waiting.  I will docket the case management plan if not today, given the hour, then certainly tomorrow.  We'll look for your forthcoming motion, and we will go from there.

Thank you very much, and have a good day.  We're adjourned.

(Adjourned)

o0o