**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAURENE COMEY,

                 Plaintiff,

     v.

UNITED STATES DEPARTMENT OF JUSTICE;
EXECUTIVE OFFICE OF THE PRESIDENT;
FRANCEY HAKES, in her official capacity as the
Director of the Executive Office for United States
Attorneys; PAMELA J. BONDI, in her official capacity
as Attorney General of the United States Department of
Justice; EXECUTIVE OFFICE FOR UNITED
STATES ATTORNEYS; OFFICE OF PERSONNEL
MANAGEMENT; and THE UNITED STATES OF
AMERICA,

                 Defendants.

Civil Action No: 25-cv-07625

Hon. Jesse M. Furman

ORAL ARGUMENT REQUESTED

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS, AND IN SUPPORT OF PLAINTIFF'S PARTIAL MOTION FOR JUDGMENT ON THE PLEADINGS AS TO CLAIMS ONE, TWO, THREE, FIVE, AND SIX

CLARICK GUERON REISBAUM LLP
Nicole Gueron
Ellen Blain
Deepa Vanamali
41 Madison Avenue
New York, NY  10010
Tel.: (212) 633-4310
ngueron@cgr-law.com
eblain@cgr-law.com
dvanamali@cgr-law.com

KOSKOFF KOSKOFF & BIEDER, PC
Margaret M. Donovan
350 Fairfield Ave.
Bridgeport, CT 06604
Tel: (203) 336-4421
mdonovan@koskoff.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ...................................................................................................... 4

I.    Congress Enacted the CSRA to Ensure a Meritocratic, Nonpartisan Civil Service ........... 4

II.   Ms. Comey Was Fired for Illegitimate, Politically Motivated Reasons Under Defendants' Novel Theory that Article II Supersedes the CSRA and the Bill of Rights ... 5

III.  Defendants Unsuccessfully Moved to Dismiss Ms. Comey's Case .................................. 7

IV.   Defendants Answered and Moved for Judgment on the Pleadings ................................. 7

DEFENDANTS' MOTION SHOULD BE DENIED.................................................................... 8

APPLICABLE RULE 12(c) STANDARD................................................................................... 8

ARGUMENT ............................................................................................................................ 9

I.    Article II Does Not Permit the President, the Attorney General, or Anyone Else to Fire an AUSA Without Cause ................................................................................................. 9

    A.    Congress Can and Did Restrict the Removal of Inferior Officers and Employees like Ms. Comey, and the Supreme Court Has Approved Those Removal Protections Repeatedly........................................................................................... 9

        1.    Principal Officers Versus Inferior Officers................................................. 10

        2.    Federal Employees...................................................................................... 14

    B.    Article II Removal Power Cannot Be Implicitly Delegated ................................. 15

        1.    Presidential Article II Removal Authority Resides with the President Alone........................................................................................................... 15

        2.    The President Has Notably Disclaimed His Authority Here .................... 17

    C.    Defendant's Novel Argument that AUSAs Are Not Covered by the CSRA Because They Purportedly Exercise the President's "Conclusive and Preclusive" Authority is Misguided ................................................................... 19

II.   Defendants' Statutory Arguments Fail ......................................................................... 22

    A.    The Attorney General Does Not Have the Power to Terminate AUSAs Without Cause Under Section 542............................................................................ 22

        1.    The CSRA Constrains Section 542............................................................ 22

            a.    Congress Enacted the CSRA and Directed the Attorney General to Comply with and Enforce Merit Systems  Principles................... 23

            b.    Congress Provided AUSAs Additional Protections with  the 1990 Due Process Amendments ........................................................... 25

        2.    Defendants' Contrary Arguments Are Unavailing ................................... 28

            a.    The CSRA and Due Process Amendments Evince  Congress' Clear Intent to Temper Removal Authority ............................... 28

b.      Defendants Flip Statutory Construction on Its Head ....................... 29

B.      The CSRA's "Efficiency of Service" Language Is Not a Self-Defeating Loophole that Grants the Attorney General or Anyone Else Carte Blanche to Remove Civil Servants.................................................................................................... 33

C.      Alternatively, Defendants' Motion Should Be Denied Because They Cannot Rely on Sections 542 or 7513 .................................................................................. 34

III.    The Executive Branch Cannot Override Protections in the Bill of Rights ...................... 37

A.      Ms. Comey Plausibly States a First Amendment Claim..................................... 38

1.      The First Amendment Prohibits Retaliation Against Disfavored Viewpoints ............................................................................................... 38

2.      The First Amendment Protects the Right to Associate in Intimate Family Relationships............................................................................................... 39

3.      The Complaint Plausibly Pleads Each Type of First  Amendment Claim 40

4.      Defendants' Remaining Arguments Fail ................................................... 43

B.      Ms. Comey Plausibly States a Fifth Amendment Claim ..................................... 46

1.      Claims Five and Six:  Defendants Violated Ms. Comey's Property Interest in Her Continued Employment as an AUSA .............................. 46

2.      Claims Seven and Eight:  Defendants Violated Ms. Comey's Liberty Interest by Harming Her Reputation and Effectively Barring Her from Federal Service....................................................................................... 48

IV.     Ms. Comey's Declaratory Judgment and Mandamus Claims Can Survive at This Stage 51

PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT SHOULD BE GRANTED ................. 53

APPLICABLE RULE 12(c) LEGAL STANDARDS ................................................................... 53

ARGUMENT................................................................................................................................. 54

A.      Claim One: Separation of Powers......................................................................... 55

B.      Claims Two and Three: the APA........................................................................... 56

C.      Claims Five and Six:  Due Process ....................................................................... 58

CONCLUSION.............................................................................................................................. 59

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Adler v. Pataki*,
    185 F.3d 35 (2d Cir. 1999)................................................................................*passim*

*Anderson v. Bowen*,
    881 F.2d 1 (2d Cir. 1989) ........................................................................................52

*Anemone v. Metro. Transp. Auth.*,
    410 F. Supp. 2d 255 (S.D.N.Y. 2006)....................................................................50

*Arista Records LLC v. Lime Grp. LLC*,
    No. 06-cv-5936, 2011 WL 13257941 (S.D.N.Y. Jan. 7, 2011) ................................8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................8, 42

*Aviel v. Gor*,
    No. 25-51052025, 2025 WL 1600446 (D.C. Cir. June 5, 2025) .............................16

*Benzman v. Whitman*,
    523 F.3d 119 (2d Cir. 2008)....................................................................................52

*Board of Ed. v. U.S. Dept. of Ed.*,
    No. 25-cv-8547, 2026 WL 948205 (S.D.N.Y. Apr. 8, 2026) ..................................56

*Brown v. Dep't of the Navy*,
    229 F.3d 1356 (Fed. Cir. 2000)...............................................................................33

*Buckley v. Valeo*,
    424 U.S. 1 (1976)....................................................................................................10

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*,
    846 F.3d 492 (2d Cir. 2017)....................................................................................33

*Cheney v. United States Dist. Court for D.C.*,
    542 U.S. 367 (2004)................................................................................................32

*Cine SK8, Inc. v. Town of Henrietta*,
    507 F.3d 778 (2d Cir. 2007)....................................................................................51

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985)................................................................................................46

*Comans v. Exec. Off. of the President*,
    No. 25-cv-1237, 2026 WL 1132803 (E.D. Va. Apr. 15, 2026) ...................13, 18, 52

*Contreras v. Comm'r of Social Sec.*,
  No. 13-cv-6474, 2014 WL 5149111 (JMF) (S.D.N.Y. Oct. 14, 2014) ................................... 54

*Convertino v. U.S. Dep't of Just.*,
  393 F. Supp. 2d 42 (D.D.C. 2005) ....................................................................................... 28

*Cook v. Trump*,
  804 F. Supp. 3d 14 (D.D.C. 2025) ....................................................................................... 17

*Dellinger v. Bessent*,
  766 F. Supp. 3d 57 (D.D.C. 2025) ....................................................................................... 18

*DeMarco v. Holy Cross High Sch.*,
  4 F.3d 166 (2d Cir. 1993) ................................................................................................... 42

*Doe v. Dep't of Justice*,
  565 F.3d 1375 (Fed. Cir. 2009) ..................................................................................... 33, 34

*Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*,
  96 F.3d 623 (2d Cir. 1996) ................................................................................................. 48

*Driscoll v. Patel*,
  No. 25-cv-3109 (D.D.C.), ECF No. 20 ............................................................................... 18

*EEOC v. Ethan Allen, Inc.*,
  44 F.3d 116 (2d Cir. 1994) ................................................................................................. 42

*Elrod v. Burns*,
  427 U.S. 347 (1976) ..................................................................................................... 38, 44

*Esparraguera v. Dep't of the Army*,
  101 F. 4th 28 (D.C. Cir. 2024) ........................................................................................... 48

*Ezekwo v. N.Y.C. Health & Hosps. Corp.*,
  940 F.2d 775 (2d Cir. 1991) ............................................................................................... 47

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*,
  954 F.3d 118 (2d Cir. 2020) ............................................................................................... 57

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ........................................................................................................... 55

*Giglio v. United States*,
  405 U.S. 150 (1972) ........................................................................................................... 22

*Goetz v. Windsor Cent. Sch. Dist.*,
  698 F.2d 606 (2d Cir. 1983) ............................................................................................... 46

*Gorman v. Rensselaer Cnty.*,
910 F.3d 40 (2d Cir. 2018)..................................................................................40

*Gosnell v. DOJ*,
69 F.3d 1138 (Fed. Cir. 1995)........................................................................24, 28

*Hamlett v. DOJ*,
No. DA-0752-01-0407-I-1, 2002 WL 220046 (M.S.P.B. Jan. 25, 2002) ...................27, 30, 48

*Harris v. Trump*,
No. 25-cv-412-RC (D.D.C.), ECF No. 2-2 ..................................................................17

*Hartman v. Moore*,
547 U.S. 250 (2006)..........................................................................................38

*Hayden v. Paterson*,
594 F.3d 150 (2d Cir. 2010)..............................................................................8, 53

*Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977)..........................................................................................38

*Heffernan v. City of Paterson*,
578 U.S. 266 (2016)..................................................................................38, 39, 42

*In re Hennen*,
38 U.S. 230 (1839)............................................................................................15

*HLP Props., LLC v. Consol. Edison Co. of N.Y.*,
No. 14-cv-1383, 2015 WL 5092627 (S.D.N.Y. Aug. 28, 2015)................................................54

*Islander E. Pipeline Co. v. Conn. Dep't of Env't Prot.*,
482 F.3d 79 (2d Cir. 2006)..................................................................................35

*Jackler & Jaroch Consolidation v. Dep't of Just.*,
No. CF-0752-26-0069-I-1 (M.S.P.B. Mar. 20, 2026)........................................................52

*Jenkins v. Tyler*,
167 F. Supp. 2d 652 (S.D.N.Y. 2001)........................................................................45

*JPMorgan Chase Bank, N.A. v. Tesla, Inc.*,
No. 21-cv-9441, 2024 WL 4167340 (S.D.N.Y. Sept. 12, 2024) ........................................53, 54

*Kakar v. United States Citizenship & Immigr. Servs.*,
29 F.4th 129 (2d Cir. 2022) ................................................................................56

*Kartseva v. Dep't of State*,
37 F.3d 1524 (D.C. Cir. 1994) ..............................................................................50

*Kennedy v. Braidwood Mgmt.*,
    606 U.S. 748 (2025)..................................................................................... *passim*

*King v. Briggs*,
    83 F.3d 1384 (Fed. Cir. 1996).......................................................................30

*Kipps v. Caillier*,
    205 F.3d 203 (5th Cir. 2000) ........................................................................40

*Koopmann v. DOT*,
    335 F. Supp. 3d 556 (S.D.N.Y. 2018)...........................................................57

*Langeman v. Garland*,
    No. 21-2888, 2022 WL 5240112 (D.D.C. Aug. 23, 2022) .............................48

*Langeman v. Garland*,
    88 F.4th 289 (D.C. Cir. 2023).......................................................................48

*Lindahl v. OPM*,
    470 U.S. 768 (1985).......................................................................................4

*Lively v. WAFRA Inv. Advisory Grp., Inc.*,
    6 F.4th 293 (2d. Cir. 2021) .....................................................................8, 53

*Lucia v. SEC*,
    585 U.S. 237 (2018)......................................................................................10

*Meisels v. Meisels*,
    No. 19-cv-4767, 2021 WL 1924186 (E.D.N.Y. May 13, 2021).....................53

*Mitchell v. MSPB*,
    741 F.3d 81 (Fed. Cir. 2014)........................................................................28

*Morrison v. Olson*,
    487 U.S. 654 (1988)..........................................................................12, 13, 19

*Myers & Myers, Inc. v. U. S. Postal Serv.*,
    527 F.2d 1252 (2d Cir. 1975).......................................................................51

*Myers v. United States*,
    272 U.S. 52 (1926)................................................................................ *passim*

*Narumanchi v. Board of Trs. of Connecticut State Univ.*,
    850 F.2d 70 (2d Cir. 1988)...........................................................................46

*Nat. Res. Def. Council v. EPA*,
    658 F.3d 200 (2d Cir. 2011).........................................................................57

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024)................................................................................38, 43

*Ndoye v. Joyce*,
  No. 26-cv-1219, 2026 WL 765635 (S.D.N.Y. Mar. 17, 2026)...............................................35

*Nieves v. Bartlett*,
  587 U.S. 391 (2019)................................................................................42

*Paca v. City of New Haven*,
  826 F. App'x 46 (2d Cir. 2020) ................................................................................39

*Patel v. Searles*,
  305 F.3d 130 (2d Cir. 2002).................................................................40, 46

*Patterson v. City of Utica*,
  370 F.3d 322 (2d Cir. 2004).................................................................50

*Paul v. Davis*,
  424 U.S. 693 (1976)................................................................................48

*Perry v. Sindermann*,
  408 U.S. 593 (1972)................................................................................38, 47

*Pimentel v. Magin*,
  No. 10-cv-0616, 2013 WL 4080600 (N.D.N.Y. Aug. 13, 2013)................................................9

*Printz v. United States*,
  521 U.S. 898 (1997)................................................................................18

*Radwan v. Manuel*,
  55 F.4th 101 (2d Cir. 2022) ................................................................................58

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984)................................................................................39

*Ryder v. United States*,
  515 U.S. 177 (1995)................................................................................17

*Samuels v. Trump*,
  No. 25-cv-1069 (D.D.C.), ECF No. 1 ................................................................................17, 18

*Schnitt v. Bondi*,
  No. 25-cv-4111 (D.D.C.), ECF No. 1 ................................................................................18

*Segal v. City of New York*,
  459 F.3d 207 (2d Cir. 2006)................................................................................48, 49

*Seila Law, LLC v. CFPB,*
   591 U.S. 197 (2020)............................................................................10, 15, 19

S*kanska USA Bldg. Inc. v. Regeneron Pharms. Inc.,*
   No. 23-cv-8418, 2024 WL 3274731 (S.D.N.Y. July 1, 2024)................................51

*Slaughter v. Trump,*
   No. 25-cv-909 (D.D.C.), ECF No. 1-2...........................................................17

*Sowards v. Loudon Cnty.,*
   203 F.3d 426 (6th Cir. 2000) ....................................................................40

*Sunvestment Energy Grp. NY 64 LLC v. Nat'l Grid USA Servs. Co.,*
   116 F.4th 106 (2d Cir. 2024) ....................................................................51

*Termination of an Assistant United States Attorney on Grounds Related to His
   Acknowledged Homosexuality,*
   7 Op. O.L.C. 46 (1983).......................................................................24, 29

*The Test for Determining 'Officer' Status Under the Appointments Clause,*
   2025 WL 293746 (O.L.C. Jan. 16, 2025) .........................................................15

*Todd v. MSPB,*
   55 F.3d 1574 (Fed. Cir. 1995).....................................................................30

*Trump v. Slaughter,*
   No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026)...................................... *passim*

*Trump v. United States,*
   603 U.S. 593 (2024)...........................................................................20, 21

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,*
   413 U.S. 548 (1973)............................................................................4, 31

*United Pub. Workers of Am. (C.I.O.) v. Mitchell,*
   330 U.S. 75 (1947)................................................................................32

*United States v. Adams,*
   777 F. Supp. 3d 185 (S.D.N.Y. 2025)..............................................................21

*United States v. Arthrex, Inc.,*
   594 U.S. 1 (2021).........................................................................10, 12, 13

*United States v. Comey,*
   810 F. Supp. 3d 768 (E.D. Va. 2025) ..........................................................14, 19

*United States v. Fausto,*
   484 U.S. 439 (1988)...............................................................................25

*United States v. Hilario*,
    218 F.3d 19 (1st Cir. 2000)..................................................................................14

*United States v. Magassouba*,
    544 F.3d 387 (2d Cir. 2008)...............................................................................32

*United States v. Perkins*,
    116 U.S. 483 (1886)...................................................................................... *passim*

*United States v. Whittingham*,
    No. 22-1507, 2024 WL 2104674 (2d Cir. May 10, 2024).....................................8, 55

*Velez v. Levy*,
    401 F.3d 75 (2d Cir. 2005).............................................................................49, 50

*Weiss v. United States*,
    510 U.S. 163 (1994)...........................................................................................16

*Wilcox v. Trump*,
    No. 25-cv-334-BAH (D.D.C.), ECF No. 10-4.......................................................17

*Windsor v. The Tennessean*,
    719 F.2d 155 (6th Cir. 1983) .........................................................................29, 47

*Yao v. Almodovar*,
    813 F. Supp. 3d 461 (S.D.N.Y. 2025)...................................................................35

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952).............................................................................14, 19, 20

*Zann Kwan v. Andalex Grp. LLC*,
    737 F.3d 834 (2d Cir. 2013)................................................................................42

*Zynger v. Dep't of Homeland Sec.*,
    615 F. Supp. 2d 50 (E.D.N.Y. 2009) .....................................................................48

**Statutes**

5 U.S.C. § 706(2) ..........................................................................................56, 57

5 U.S.C. § 2012(c) ...............................................................................................25

5 U.S.C. § 2301(b) .............................................................................................5, 23

5 U.S.C. § 2302(a) ...........................................................................................44, 45

5 U.S.C. § 2302(c) ...............................................................................................23

5 U.S.C. § 3502.....................................................................................................5

5 U.S.C. § 4303(a) ...................................................................................................................5

5 U.S.C. § 7511 ............................................................................................................. *passim*

5 U.S.C. § 7512 .................................................................................................................28

5 U.S.C. § 7513 ............................................................................................................. *passim*

5 U.S.C. § 7532(a) ..............................................................................................................5

18 U.S.C. § 2510(9) ..........................................................................................................21

18 U.S.C. § 2518(1) ..........................................................................................................21

18 U.S.C. § 3553(f) ...........................................................................................................21

18 U.S.C. § 3771 ...............................................................................................................21

18 U.S.C. § 6003 ...............................................................................................................21

28 U.S.C. § 503 .................................................................................................................23

28 U.S.C. § 542 ............................................................................................................ *passim*

## Other Authorities

5 C.F.R. § 351.201(a)(2) ....................................................................................................5

91 Fed. Reg. 34,893,
  https://www.govinfo.gov/app/details/FR-2026-06-10/2026-11594 .......................................45

5C Charles A. Wright & Arthur Miller, *Federal Practice and Procedure* § 1370
  (3d ed. 2004 & Supp. 2019)................................................................................................53

Civil Service Reform Act of 1978 ................................................................................ *passim*

Civilian Personnel Law Manual, Fourth Ed. 1996, Title II at 1 ....................................................24

Executive Order 14,410,
  https://www.whitehouse.gov/presidential-actions/2026/06/implementing-schedule-policy-career-in-the-excepted-service/..................................................................................................45

Fed. R. Civ. P. Rule 12(b)....................................................................................................8

Fed. R. Civ. P. Rule 12(c).........................................................................................35, 53, 54

Fed. R. Civ. P. Rule 12(d)...................................................................................................53

Fed. R. Civ. P. Rule 12(f) ...................................................................................................53

Fed. R. Civ. P. Rule 12(h)......................................................................................53

Fed. R. Crim. P. Rule 48(a) ...................................................................................21

Gary Lawson & Jed Handelsman Shugerman, *Presidential Removal as Article I, Not Article II* (2025), https://scholarship.law.bu.edu/faculty_scholarship/4168 ............................................32

H.R. REP. 101-328, *reprinted in* 1990 U.S.C.C.A.N. 695 .................................................26, 27, 47

Hearing on H.R. 917 Before the Subcommittee on Civil Service of the House Committee on Post Office and Civil Service, 99th Cong. 25, 2-57 (1985) ...........................27

Nicholas R. Bednar, *Presidential Control of the Civil Service*, 110 Minn. L. Rev. 2065, 2146 (2026) ........................................................32

Pendleton Act of 1883 ........................................................................................4, 25

S. Rep. 95-969......................................................................................................4

U.S. Const., Amend. I................................................................................ *passim*

U.S. Const., Amend. V ............................................................................... *passim*

U.S. Const., Art.  I ...............................................................................................32

U.S. Const., Art. II ................................................................................... *passim*

Plaintiff Maurene Comey respectfully submits this memorandum of law in opposition to Defendants' Motion for Judgment on the Pleadings ("Mot."), and in support of her Partial Motion for Judgment on the Pleadings as to Claims One, Two, Three, Five, and Six.

## PRELIMINARY STATEMENT

To ensure the integrity and expertise of the federal civil service, Congress enacted the Civil Service Reform Act of 1978 ("CSRA"), which prohibits firing civil servants for political or other illegitimate reasons.  The CSRA mandates that merit principles—not political loyalty—control personnel decisions for the vast majority of the federal workforce, including Assistant United States Attorneys ("AUSAs") like Maurene Comey.  Presidents of both parties honored this rule for decades—until now.  Based on newly-proclaimed executive powers, Defendants seek an extraordinary ruling as a matter of law: that, despite the constitutional protections of the Bill of Rights and the statutory protections of the CSRA, exemplary AUSAs like Ms. Comey are removable without cause, including for "political motivations."  (ECF No. 70-2 at 5:1-12). Defendants' sweeping and novel arguments—that (1) the President, the Attorney General, or any other official can remove AUSAs without cause based on the President's purported (and purportedly delegable) Article II authority; and (2) the Attorney General can remove AUSAs without cause based on 28 U.S.C. § 542 and the CSRA itself—fly in the face of a century of precedent, upend bedrock principles of democracy and the separation of powers, and should be rejected.

Defendants' motion should be denied in its entirety.  Conversely, Ms. Comey's motion for partial judgment on the pleadings should be granted.

*Defendants' Motion*: Construing all facts in Plaintiff's favor, Defendants' motion fails for three reasons.

1

*First*, Defendants' constitutional analysis is incorrect.  Article II does not authorize the President, let alone the Attorney General or DOJ subordinates, to fire AUSAs without cause in contravention of the CSRA.  No court has identified such removal authority, because none exists. Defendants ignore the Constitution, the law, and over a century of Supreme Court precedent that together establish that AUSAs are "employees" or, at most, "inferior officers"—*not* "principal officers"; that Congress may therefore limit their removal; and that Congress did so with the CSRA.  Moreover, even if the President could exercise Article II power to override laws passed by Congress, Defendants cite no authority for the proposition that the President can delegate that authority to the Attorney General or "other officials."

*Second*, Defendants' new statutory arguments—that the Attorney General can fire AUSAs without cause pursuant to 28 U.S.C. § 542 or the CSRA itself—fail on the merits.  The text and legislative history of the CSRA demonstrate that Congress intended to constrain the Attorney General's Section 542 removal power.  With the enactment of the CSRA in 1978, Congress protected AUSAs from prohibited personnel practices—including political retaliation—and directed the Attorney General to comply with and enforce that prohibition.  In 1990, Congress supplemented those protections by giving AUSAs due process and for-cause removal rights.  Section 542 thus identifies *who* can fire an AUSA (the Attorney General), while the later-enacted CSRA prescribes *why* (for cause) and *how* (with advance notice and due process).  These statutes live in harmony and prohibit the Attorney General (or anyone else) from firing AUSAs at whim.

Defendants' second statutory argument, that the Attorney General's dismissal of an AUSA *per se* "promotes the efficiency of the service" under Section 7513 of the CSRA, is a reverse-engineered contortion.  If, as Defendants concede, there was no cause for Ms. Comey's

termination, and no conduct or performance that negatively impacted DOJ's functions, then her termination did not "promote the efficiency of the service."  (Answer ¶¶ 25, 26, 39.) Defendants' theory would eviscerate the CSRA's protections and negate Congressional intent.

Moreover, these statutory arguments—first made mid-litigation, citing authority absent from Ms. Comey's termination papers—fail for the independent reasons that Defendants waived the arguments, they are entitled to little weight, and they require the Court to draw an inference in Defendants' favor.  Ms. Comey does not plead that the Attorney General fired her—indeed, it is (still) not clear who decided to fire her.  Defendants did not contemporaneously identify the Attorney General as the decisionmaker and cited only "Article II" as justification.  Because the Court may not credit a movant's version of events on a Rule 12(c) motion, the Court may not credit Defendants' late-breaking assertion that Attorney General Bondi fired Ms. Comey—an allegation dubious on its face that conveniently bolsters Defendants' new statutory arguments under Section 542(b) and the CSRA.

*Third*, Defendants' motion should be denied because Ms. Comey plausibly pleads First and Fifth Amendment Claims.  Even if the CSRA did not bar the President or Attorney General (or someone else) from terminating Ms. Comey without cause (it does), Ms. Comey nonetheless retains her constitutional rights under the First and Fifth Amendments.  Executive power cannot supersede those rights—preventing government overreach is exactly why the Bill of Rights exists.  Ms. Comey has stated constitutional claims, plausibly alleging that she was fired in retaliation for her perceived political viewpoint and her status as James Comey's daughter, and in violation of her due process rights.

*Ms. Comey's Motion*: Conversely, construing all inferences in *Defendants'* favor, judgment as a matter of law should be granted to Ms. Comey on Claims One, Two, Three, Five

and Six.  Defendants concede that Ms. Comey was not fired for cause and that they did not

follow the procedural requirements of the CSRA.  (Answer ¶¶ 48, 69.)  Because neither Article

II—however purportedly delegated—nor Section 542, nor the CSRA itself allows *anyone* in the

executive branch to override the CSRA's protections and Ms. Comey's attendant due process

rights, Ms. Comey is entitled to judgment on her Separation of Powers, Administrative

Procedure Act, and Fifth Amendment claims.

## FACTUAL BACKGROUND

### I.    Congress Enacted the CSRA to Ensure a Meritocratic, Nonpartisan Civil Service

Congress established a professional civil service with the Pendleton Act of 1883, seeking

to end the "spoils system under which federal employees came and went, depending upon party

service and changing administrations, rather than meritorious performance."  *U.S. Civ. Serv.*

*Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 557-58 (1973).

In 1978, Congress passed the CSRA to "comprehensively overhaul[] the civil service

system."  *Lindahl v. OPM*, 470 U.S. 768, 773 (1985).  While the Pendleton Act's Civil Service

Commission "largely succeeded in safeguarding merit principles," "there ha[d] been frequent

attempts to circumvent them."  S. Rep. 95-969, at 2-3.  After Watergate exposed a system that

failed to "provid[e] assurance against political abuse," *id.*, Congress instituted more explicit

guardrails to prohibit the without cause or political removal of rank-and-file civil servants like

Ms. Comey.  (Compl. ¶¶ 70-74.)

The CSRA *inter alia* codified nine merit systems principles and fourteen prohibited

personnel practices.  It requires that employees like Ms. Comey[1] "receive fair and equitable

treatment in all aspects of personnel management without regard to [their] political affiliation . . .

---

[1] Defendants agree that Ms. Comey was in the "excepted service" and an employee for CSRA
purposes.  (*See* Mot. 15; *see also* ECF No. 55 at  4; ECF No. 32 at 3 n.1; ECF No. 38 at 23.)

4

and with proper regard for their . . . constitutional rights," and "be . . . protected against arbitrary action, personal favoritism, or coercion for partisan political purposes."  5 U.S.C. § 2301(b). (*See* Compl. ¶¶ 71-73.)  It permits termination for four reasons only: (1) "reduction in force," 5 U.S.C. § 3502; 5 C.F.R. § 351.201(a)(2); (2) "national security," 5 U.S.C. § 7532(a); (3) "unacceptable performance," 5 U.S.C. § 4303(a); or (4) for "such cause as will promote the efficiency of the service," 5 U.S.C. § 7513(a).  (*See* Compl. ¶ 72; ECF No. 55 ("Order") at 4.) Federal employees removed on those bases are entitled to 30 days' notice, time to respond, representation by counsel, and a written decision explaining the decision.  5 U.S.C. § 7513(b). (*See* Compl. ¶ 74; Order at 4.)

These procedures guided presidential administrations for fifty years.  Then, in 2025, the executive branch began removing civil servants without cause, asserting "Article II" authority. Ms. Comey was one of them.

**II.     Ms. Comey Was Fired for Illegitimate, Politically Motivated Reasons Under Defendants' Novel Theory that Article II Supersedes the CSRA and the Bill of Rights**

For a decade, Ms. Comey served as an exceptional, dedicated, and highly decorated Assistant United States Attorney for the Southern District of New York ("SDNY").  (Compl. ¶ 1; Order at 1 ("Maurene Comey was, by all accounts, an exemplary Assistant United States Attorney.").)

Defendants concede she was "outstanding" (Answer ¶¶ 25, 26, 39), yet on July 16, 2025, Francey Hakes, Director of the Executive Office for United States Attorneys, sent Ms. Comey an email terminating her employment effective immediately.  (Compl ¶ 47.)  Her SF-50 form, issued by OPM, listed as the sole "legal authority" for removal "Article II Constitution."  (*Id.* ¶ 52, Ex. B.)  Defendants concede they provided no notice and made no claim of termination for cause.  (Answer ¶¶ 47, 48, 52, 55.)  When Ms. Comey asked the basis for her termination, Acting

SDNY United States Jay Clayton responded, in sum and substance: "All I can say is it came from Washington. I can't tell you anything else." (Compl. ¶ 50.) The White House claimed the decision "was made by the Department of Justice." (*Id.* ¶ 51.)

The Complaint alleges Defendants fired Ms. Comey because she is James Comey's daughter, or because of her perceived political viewpoint, or both. (*Id.* ¶¶ 56-69.) President Trump and James Comey have long been political enemies, and President Trump's supporters called for Ms. Comey's firing in May 2025. (*Id.* ¶¶ 56-67). Those supporters included Laura Loomer, a social media influencer with political sway over Trump Administration firings. (*Id.* ¶¶ 63-68.) Ms. Loomer demanded firing "Mr. Comey's 'liberal' daughter," questioning Ms. Comey's "impartiality . . . due to the undeniable bias and influence stemming from James Comey's public criticism of Trump," and took credit for the termination after it happened. (*Id.* ¶¶ 64, 67.) Defendants admit that "President Trump has publicly criticized Mr. Comey" (Answer ¶ 6) and have all but admitted that there were "political motivations" for Ms. Comey's removal (ECF No. 70-2 at 5:1-12 ("[E]ven if there were political motivations associated with the termination[,] it was a valid termination.")).

Ms. Comey sued, alleging that her politically motivated termination violates:

(1) The Separation of Powers, because the President's Article II power to remove *principal officers* does not supersede Congress's Article I and Article II power to impose for-cause protections on the removal of *inferior officers and employees* (Compl. ¶¶ 87-90, Claim One);

(2) The Administrative Procedure Act, because Defendants cannot deprive Ms. Comey of the CSRA's due process and other protections (*id.* ¶¶ 91-96, Claims Two and Three);

(3) The First Amendment, because Defendants cannot fire Ms. Comey for her association with her father or her perceived political viewpoint, or in retaliation for her father's protected speech (*id.* ¶¶ 97-100, Claim Four); and

(4) The Fifth Amendment, because Ms. Comey's termination violated her right to procedural due process (*id.* ¶¶ 101-104, Claim Five), her property interest (*id.* ¶¶ 105-108, Claim Six), and her liberty interest (*id.* ¶¶ 109-118, Claims Seven and Eight).

Ms. Comey seeks a declaration that her termination was unlawful (*id.* ¶¶ 119-121, Claim Nine), and relief in the nature of mandamus, to the extent other remedies are unavailable (*id.* ¶¶ 122-124, Claim Ten).

## III.    Defendants Unsuccessfully Moved to Dismiss Ms. Comey's Case

Defendants moved to dismiss for lack of subject matter jurisdiction, arguing that Article II governed her removal—not the CSRA—but that her case nonetheless had to be channeled to MSPB pursuant to the CSRA.  The Court denied the motion because Ms. Comey "was fired pursuant to Article II of the Constitution, not pursuant to the CSRA."  (Order at 2.)

## IV.    Defendants Answered and Moved for Judgment on the Pleadings

Defendants answered the Complaint, admitting that:

(1) Ms. Comey was an "outstanding" AUSA, Answer ¶¶ 3, 25, 26;

(2) AUSAs and Supervisory AUSAs are "subject to approval requirements as set forth in the Justice Manual, relevant delegations of authority, and office policies for the SDNY United States Attorney's Office," *id.* ¶ 44;

(2) Ms. Comey was removed "pursuant to Article II" via a memo from Francey Hakes, *id.* ¶¶ 3, 14, 47;

(4) She was not fired for "cause" or "based on her performance," *id.* ¶ 69;

(5) She was not given notice, a reason, or an opportunity to respond, *id.* ¶ 48; and

(6) President Trump and James Comey have publicly criticized each other, *id.* ¶¶ 6, 59.

Defendants added affirmative, material factual allegations in their Answer that do not appear in the Complaint, including that:

(1) then-Attorney General Bondi "directed" Ms. Comey's removal, *id.* ¶ 12, 15;

(2) Ms. Hakes removed Ms. Comey "at the direction of the Office of the Attorney General," *id.* ¶¶ 14, 16; and

7

(3) On May 26, 2026 (the Answer date), Acting Attorney General Blanche invoked 28 U.S.C. Section 542(b) to "ratify and affirm" Ms. Hakes's "actions removing Maurene Comey," *id.* ¶¶ 14, 15.

Defendants seek judgment on the pleadings under Rule 12(c), arguing that: (1) Article II authorizes the President, the Attorney General, or other officials to remove AUSAs without cause; (2) Section 542(b) and the CSRA permit the Attorney General to remove AUSAs without cause; (3) Ms. Comey fails to state First or Fifth Amendment Claims; and (4) Ms. Comey is not entitled to declaratory judgment or mandamus.

Ms. Comey opposes Defendants' motion in its entirety. She cross-moves for partial judgment on the pleadings as to her Claims One, Two, Three, Five and Six.

## DEFENDANTS' MOTION SHOULD BE DENIED

## APPLICABLE RULE 12(c) STANDARD

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is evaluated under the same standard as a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d. Cir. 2021). The motion fails if the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In resolving the motion, the Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [the non-movant's] favor." *Hayden v. Paterson,* 594 F.3d 150, 160 (2d Cir. 2010). "A Rule 12(c) motion should be granted only if 'the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.'" *United States v. Whittingham*, No. 22-1507, 2024 WL 2104674, at *1 (2d Cir. May 10, 2024) (citation omitted); *Arista Records LLC v. Lime Grp. LLC*, No. 06 Civ. 5936, 2011 WL 13257941 at *2 (S.D.N.Y. Jan. 7, 2011) (motion "has utility when all

8

material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court"); *see Pimentel v. Magin*, No. 10-cv-0616, 2013 WL 4080600, at *9 (N.D.N.Y. Aug. 13, 2013) (denying judgment on the pleadings where the "facts in support of [defendant's] affirmative defense do not appear on the face of the [] complaint").

## ARGUMENT

I.    **Article II Does Not Permit the President, the Attorney General, or Anyone Else to Fire an AUSA Without Cause**

Defendants' Article II theory—asserting sweeping removal power over inferior officers and employees in contravention of congressional intent—should be rejected on its face, regardless of who decided to fire Ms. Comey.[2]

A.    **Congress Can and Did Restrict the Removal of Inferior Officers and Employees like Ms. Comey, and the Supreme Court Has Approved Those Removal Protections Repeatedly**

Congress codified removal protections for inferior officers and employees like Ms. Comey in the CSRA.  Those removal protections are constitutional.  Defendants' novel position that Article II supersedes the CSRA and authorizes removal of inferior officers and employees without cause cannot be squared with the Appointments Clause or the Supreme Court's long-standing and consistent treatment of inferior officers and employees for nearly 150 years—including most recently in *Trump v. Slaughter*, No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026).

---

[2] While Defendants aver that the Attorney General decided to fire Ms. Comey and can do so under purportedly delegable Article II authority (*see* Mot. 7), they also make a more sweeping argument: that the President, "Heads of Departments," and unspecified "other officials" can fire AUSAs without cause under Article II.  (Mot. 1; Third Aff. Defense.)

Defendants ignore the Constitution's critically different treatment of principal officers, inferior officers, and employees.  Article II's Appointments Clause distinguishes between principal officers, who generally must be removable by the President, and inferior officers, whose appointment Congress may vest "in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.   The Supreme Court has repeatedly explained that executive branch personnel are not interchangeable.

### 1.    Principal Officers Versus Inferior Officers

The Supreme Court has not established an "exclusive criterion for distinguishing between principal and inferior officers[.]" *Seila Law, LLC v. CFPB*, 591 U.S. 197, 217 n.3 (2020) (citation omitted).  Instead, it "examine[s] factors such as the nature, scope, and duration of an officer's duties," and whether the officer was "directed and supervised" by a principal officer. *Id*.  "Principal officers in the Executive Branch encompass at least the Heads of Departments, who report directly to the President," whereas "[i]nferior officers are most readily defined by their relationship to principal officers."  *Kennedy v. Braidwood Mgmt.*, 606 U.S. 748, 761 (2025) ("Inferior officers are those 'whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'") (citation omitted).

Employees fall outside of both these categories.  While officers "exercise significant authority pursuant to the laws of the United States," "[a]n employee, by contrast, does not[.]" *Braidwood*, 606 U.S. at 759.  They are "lesser functionaries subordinate to officers of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126, n.162 (1976); *see United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021).  In terms of appointment and removal authorities for employees, "the Appointments Clause cares not a whit[.]" *Lucia v. SEC*, 585 U.S. 237, 245 (2018).

10

Here, the Court need not parse if Ms. Comey is an inferior officer or employee. It is enough that she is indisputably *not a principal officer*, since she answered to at least one principal officer—the Attorney General—in addition to the Deputy Attorney General, the United States Attorney, the Deputy United States Attorney, the Chief of SDNY's Criminal Division, and the Co-Chiefs of SDNY's Public Corruption Unit, and because she was not appointed by the President with the advice and consent of the Senate. (Compl. ¶ 44.)

The relevant question here is whether Congress had the constitutional authority to regulate Ms. Comey's appointment and removal as a *non-principal* officer. The Supreme Court's long-standing answer is yes.

In *United States v. Perkins*, 116 U.S. 483, 485 (1886), the Supreme Court held that "when congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest." It rejected the argument that a statutory "restriction of the power of removal" infringed on "the constitutional prerogative of the executive." *Id*. at 484. The reason is straightforward: a department head "has no constitutional prerogative of appointment to offices independently of the legislation of congress," and therefore "must be governed" by Congress's law "not only in making appointments, but in all that is incident thereto." *Id*.

Forty years later, in *Myers v. United States*, 272 U.S. 52 (1926), the Court confirmed *Perkins*, repeatedly making clear that Congress may restrict the removal of inferior officers. *See* 272 U.S. at 127 (citing *Perkins* and acknowledging Congress's "power to limit and regulate removal" of inferior officers appointed by department head empowered by Congress under Article II); *id*. at 161 (Congress may "restrict[] [department heads] in the exercise of the power of removal"); *id*. at 162 (Congress can remedy "the evil of political executive removals of

11

inferior offices").  The Court condemned the "evil of the spoils system," and again made clear that where inferior officers are appointed by department heads under Article II, "they could be entirely removed from politics."  *Id*. at 173-74.

Sixty years after *Myers* and a century after *Perkins*, in *Morrison v. Olson*, 487 U.S. 654 (1988), all voting Justices confirmed that Congress, acting through its Article II Appointment Clause Authority, may impose for-cause limits on the removal of inferior officers.  The seven-vote majority rejected the premise that Article II "requires that every officer of the United States exercising any part of that power must serve at the pleasure of the President and be removable by him at will."  *Id*. at 690, n.29.  The Court correctly noted that holding otherwise would render the authority "incapable of being altered by law in the slightest degree, and applicable to tens of thousands of holders of offices neither known nor foreseen by the Framers."  *Id*.  Justice Scalia agreed, even in dissent; citing *Perkins* and *Myers*, he explained that the Constitution does *not* require the President to have "plenary power to remove inferior officers."  *Id*. at 724 n.4 (Scalia, J., dissenting).  For inferior officers, "it is enough" that they are "removable *for cause*," because refusal to accept lawful supervision by principal officers (themselves removable by the President) is itself cause for removal.  *Id*. (emphasis in original).  Thus, for-cause protection for inferior officers preserves the President's ability to ensure faithful execution of the laws while preventing the arbitrary or unlawful dismissal of broad swaths of the civil service.

The Supreme Court recently confirmed this reading of Article II in *Arthrex*.  Concluding that administrative patent judges were not entitled to CSRA removal protections because they rendered decisions unreviewable by a principal officer, the Supreme Court fashioned an instructive remedy: it did not invalidate the CSRA, but instead subjected the judges' decisions to review by the relevant principal officer.  594 U.S. at 14-17, 25-27.  That "tailored" remedy

presumed that inferior officers may constitutionally retain for-cause protection so long as a principal officer has "the discretion to review [those inferior officers'] decisions." *Id.* at 27.  In that way, "the President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people." *Id*.

*Perkins*, *Myers*, *Morrison*, and *Arthrex* resolve the issue.  Defendants' attempt to collapse the definitions of principal and inferior officers to vitiate for-cause removal protections for the latter has been rejected repeatedly.  The CSRA's removal protections for AUSAs do not intrude on the executive's Article II authority; rather, they are consistent with Congress's constitutional prerogative to regulate the appointment and removal of inferior officers, balancing Presidential power to remove principal officers with Congress's authority to structure and protect inferior officers who remain accountable to the President via the principal officer(s) to whom they report.[3]

*Trump v. Slaughter* does not alter this doctrine.  In *Slaughter*, the Supreme Court affirmed the President's authority to remove *principal officers* appointed by the President.  *See* No. 25-332, 2026 WL 1855612 at *7 (officers who "derive their offices from [the President's] appointment" "must be removable by the President") (quotation marks omitted).  The substantive issue decided in *Slaughter*—the scope of the President's individual, non-delegated power to remove *principal officers* at quasi-independent executive agencies—is not relevant here.  *See id.* at *19 n.6 ("identify[ing] the very question at issue in this case" as whether Congress can

---

[3] According to news reports, earlier today, the Court in *Comans v. Executive Office of the President, et. al.*, No. 1:25-cv-01237, (E.D.V.A.), granted summary judgment in favor of Plaintiff, concluding her termination was illegal because, *inter alia*, "For the last 140 years, . . . the Supreme Court has affirmed the president does not have plenary power to remove inferior officers," citing *Perkins*.  https://www.politico.com/news/2026/07/17/trump-fema-firing?utm_source=dlvr.it&utm_medium=twitter.  With the Court's permission, Plaintiff will share that decision with the Court as soon as it becomes available to the public.

regulate principal officers) (cleaned up); *id*. at \*22 (Gorsuch, J., concurring) ("the Court holds that the President must have the ability to remove principal officers").  Moreover, the majority in *Slaughter* embraced the ruling in *Myers*, referring to it as a "landmark decision," a "scholarly opinion," and the Court's "best word" on the removal power.  *Id*. at \*11, \*12.  *Myers*, as discussed above, explains that civil service protections are constitutional.  *Slaughter* thus reaffirms *Myers*, preserving removal protections for non-principal officers.  *See id.* at \*11; *see also id.* at \*27 (Gorsuch, J. concurring) (recognizing "the civil service laws" that "afford rank-and-file agency employees" "protection against removal") (citing 5 U.S.C. §§ 7511-7513).

### 2.    Federal Employees

All of the above speaks to Congress's authority to control the removal of *inferior officers*. Aside from their mangling of Justice Jackson's *Youngstown Steel* framework, *see infra* at I.A.3, Defendants offer no support for their entirely novel theory that Congress may not regulate Ms. Comey's removal if she is deemed an *employee*.  Remarkably, the government has conceded— indeed, vociferously argued—that the *United States Attorney*, several levels of hierarchy above a line prosecutor, is an inferior officer, subject to appointment by a department head in accordance with statutory authority.  *United States v. Comey*, 810 F. Supp. 3d 768, 771-72, n.1 (E.D. Va. 2025) ("The parties agree that U.S. Attorneys are inferior officers.") (citing the government's brief); *see also United States v. Hilario*, 218 F.3d 19, 25 (1st Cir. 2000) ("United States Attorneys are inferior officers.").  If so, Ms. Comey is surely an employee.  She served as a non-policymaking, non-adjudicatory, line prosecutor who was outranked by SDNY Section Chiefs and the SDNY Deputy U.S. Attorney before even reaching the SDNY U.S. Attorney—himself an inferior officer according to Defendants—not to mention the Deputy Attorney General, the Attorney General, and a bevy of political appointees up and down DOJ's operational chain of

command.  (Compl. ¶ 44); *see The Test for Determining 'Officer' Status Under the Appointments Clause*, 2025 WL 293746, at *13 (O.L.C. Jan. 16, 2025) ("[F]ederal law enforcement agents and line attorneys who assist superior officials in conducting litigation on behalf of the federal government need not be appointed consistent with the Appointments Clause . . . .  The authority exercised by these individuals is not sufficiently significant for Appointments Clause purposes because of the ways in which their discretion is constrained and because it is the superior officials, not the line employees assisting them, in whom the powers are vested.").

Thus, Article II does not permit the President to remove an AUSA without cause as if she were a principal officer reporting directly to the President

## B.    Article II Removal Power Cannot Be Implicitly Delegated

But even if this Court were to embrace the unprecedented argument that the President has such authority, there is no precedent to establish that such removal power is delegable to the Attorney General or any "other officials."  (Third Aff. Defense.)

The two clauses of Article II on which Defendants rely to justify Ms. Comey's firing— the Take Care and Vesting clauses—refer to the President only.  *See* Mot. 5; U.S. Const., Art. II, §§ 1, 3.  While it is true that the "the Framers expected that the President would rely on subordinate officers for assistance" in carrying out executive duties, *Seila Law*, 591 U.S. at 203-04, no court has suggested—much less held—that removal authority is among those delegable duties.  And even if it was, there is no support whatsoever for the idea that it could be *implicitly* delegable, without written action or communication from the President himself.

### 1.    Presidential Article II Removal Authority Resides with the President Alone

Removal authority flows from appointment authority.  *In re Hennen*, 38 U.S. 230, 259 (1839) (deeming "the power of removal as incident to the power of appointment"); *Myers*, 272

15

U.S. at 119 (observing "as a constitutional principle the power of appointment carried with it the power of removal"); *Perkins*, 116 U.S. at 485. The President's Article II appointment authority has never been understood to reside anywhere except the Presidency. *See* 26 O.L.C. 22 (2002) ("Nor can the President delegate his power to appoint and remove Executive Branch officials."); 5 O.L.C. 91, 94 (listing "[t]he power to remove purely executive presidential appointees" as a "nondelegable function[]" since it is "vested in the President as an incident of his appointment power"). This understanding is consistent with the Supreme Court's treatment of removal authority, which it recognizes is a uniquely powerful tool. *Edmond*, 520 U.S. at 664 ("The power to remove officers, we have recognized, is a powerful tool for control."); *Braidwood*, 606 U.S. at 785 n.6 ("[W]here the Constitution requires that the Secretary personally perform a particular function, like appointing the Task Force members, delegation is not an option[.]").

In *Myers*, the President insisted that his removal authority could not be shared or regulated by others—in that case, Congress. The Court held that "the power of removal must remain where the Constitution places it," whether that be with the President or with courts of law or heads of departments, as vested by Congress. *Myers*, 272 U.S. at 161; U.S. Const. art. II, § 2; *Aviel v. Gor*, No. 25-5105, 2025 WL 1600446, at *1 (D.C. Cir. June 5, 2025) (Katsas, J., concurring, joined by Pillard, J.) (If "Congress vests a department head with the power to appoint and remove an inferior officer"—or an employee—"'the President has certainly no power to remove' the inferior officer [or employee] directly." (quoting *Hennen*, 38 U.S. at 260)).

This principle of singular authority remains true even where a constitutional actor may *want* to diffuse his power. *See Weiss v. United States*, 510 U.S. 163, 188 (1994) (Souter, J., concurring) ("[N]o branch may abdicate its Appointments Clause duties. Congress, for example, may not authorize the appointment of a principal officer without Senate confirmation; nor may

16

the President allow Congress or a lower level Executive Branch official to select a principal officer."). This is because "[t]he [Appointments] Clause is a bulwark against one branch aggrandizing its power at the expense of another branch, but it is also more: it 'preserves another aspect of the Constitution's structural integrity *by preventing the diffusion* of the appointment power.'" *Ryder v. United States*, 515 U.S. 177, 182 (1995) (emphasis added) (cleaned up).

### 2.    The President Has Notably Disclaimed His Authority Here

Here, Defendants cannot plausibly rely on the President's delegated authority to the Attorney General and/or Ms. Hakes, both because (a) they concede that the President disclaimed involvement; and (b) even if the President were involved, he *cannot* as a matter of law delegate to Ms. Hakes or the Attorney General a removal power over inferior officers and employees that he never had. Rather, Congress exercised that power through Section 542 and the CSRA.

The official who transmitted and signed the termination memo is Ms. Hakes, an employee of a subordinate unit within DOJ. (Compl. Exhibit A.) Constitutionally speaking, Ms. Hakes is effectively Ms. Comey's equal in terms of constitutional removal power—that is, she has none. Ms. Hakes's memorandum did not state she was acting "on behalf of" the President or the Attorney General. In fact, the President appears to have been entirely insulated from Ms. Comey's termination, expressly disclaiming any involvement. (Compl. & Answer ¶ 51 (White House press secretary stating this "was a decision made by the Department of Justice").)

This is a remarkable gap in Defendants' Article II theory. To the best of Ms. Comey's knowledge, in nearly all the recent cases involving summary removals of executive branch officials, the contested authority was invoked specifically by or on behalf of the President. *See Cook v. Trump*, 804 F. Supp. 3d 14, 19 (D.D.C. 2025); *Wilcox v. Trump*, 1:25-cv-334-BAH (D.D.C.), ECF No. 10-4; *Harris v. Trump*, 1:25-cv-412-RC (D.D.C.), ECF No. 2-2; *Slaughter v. Trump*, 1:25-cv-909-LLA (D.D.C.), ECF No. 1-2; *Samuels v. Trump*, 1:25-cv-1069-TSC

17

(D.D.C.), ECF No. 1 at ¶ 35; *Brown v. Trump*, 1:25-cv-1764-DLF (D.D.C.), ECF No. 1 at ¶ 29; *Hamilton v. Scavino*, 1:26-cv-290-ACR (D.D.C.), ECF No. 1 at ¶ 21; *Comans v. Exec. Off. of the President*, No. 25-cv-1237, 2026 WL 1132803, at *1 (E.D. Va. Apr. 15, 2026); *Boyle v. Trump*, 8:25-cv-1628-MJM (D. Md.), ECF No. 1 at ¶¶ 21, 22; *Dellinger v. Bessent*, 766 F. Supp. 3d 57, 62 (D.D.C. 2025).

There are currently only a handful of district court challenges to purported Article II terminations that did *not* occur at the direction of the President himself.  And those cases all involve termination documents signed by the Attorney General.  *See Gordon v. EOP*, 1:25-cv-2409-JMC (D.D.C.), ECF No. 1 ¶¶ 25, 35, 40; *Schnitt v. Bondi*, 1:25-cv-4111-CRC (D.D.C.), ECF No. 1 ¶¶ 28-29.  To the best of Ms. Comey's knowledge, there is only one other case—like hers—challenging the use of purported Article II removal authority by a non-department head where the President's involvement has been disclaimed.  *See Driscoll v. Patel*, 1:25-cv-3109-JMC (D.D.C.), ECF No. 20 at 40 (former FBI employees challenging their "Article II" firings by FBI Director).

Defendants' reliance on the President's supposedly delegated authority to the Attorney General and/or Ms. Hakes fails, both because the President was apparently carved out of the process, and because Congress has legislated AUSA appointment and removal.  Put another way, Defendants' theory defeats the very executive unity outlined in *Myers* and *Slaughter*.  *See Slaughter*, 2026 WL 1855612 at * 12 and *16 (calling *Myers* the "best word" on the subject and describing unified accountability as the "very premise of our system of government"); *Printz v. United States*, 521 U.S. 898, 923 (1997) ("[U]nity would be shattered, and the power of the President would be subject to reduction" if a constitutional actor exercising widely-delegated authority could act "as effectively without the President as with him[.]").

18

Finally, that the current Acting Attorney General subsequently "ratif[ied] and affirm[ed]" Ms. Hakes's actions cannot cure the illegality of the firing. "[F]or ratification to be effective, 'the principal must have [had] the authority to authorize the action *both* when the action [was] initially performed by the agent, *and* when the act [was] affirmed (and thereby ratified) by the principal.'" *United States v. Comey*, 810 F. Supp. 3d 768, 785 (E.D. Va. 2025) (quoting *Wille v. Lutnick*, 158 F.4th 539 (4th Cir. 2025) (emphases and alterations in original)). Here, neither Ms. Bondi nor Ms. Hakes ever had constitutional removal authority under Article II to remove a line prosecutor without cause, nor did Acting Attorney General Blanche. Thus, Mr. Blanche's retroactive ratification of Ms. Hakes's action is meaningless.

C.    **Defendant's Novel Argument that AUSAs Are Not Covered by the CSRA Because They Purportedly Exercise the President's "Conclusive and Preclusive" Authority is Misguided**

Defendants' assertion that Ms. Comey wielded the President's "conclusive and preclusive" executive power and thus was an inferior officer who was removable without cause, ignores 150 years of Supreme Court precedent, as explained *supra* Point I.A. *See* Mot. 1, 4-6, 8-14; *cf. Perkins* 116 U.S. at 485; *Myers* 272 U.S. at 161; *Morrison*, 487 U.S. at 689, n.27; *Seila Law*, 591 U.S. at 217-18. While principal officers may wield the President's "conclusive and preclusive" power, hence the President's ability to remove them, inferior officers do not: they answer to principal officers and Congress may restrict their removal.

Defendants' use of the phrase "conclusive and preclusive" fundamentally misapplies the concept. It has never been used to describe the duties of an AUSA or an inferior officer, nor could it. Its first use can be traced back to a single line of Justice Robert Jackson's concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), where he noted the three categories of Presidential power: (1) when an executive action is "pursuant to an express or

19

implied authorization from Congress"; (2) when an action falls into a "zone of twilight" between congressional authorization and independent constitutional powers; and (3) "[w]hen the President takes measures incompatible with the expressed or implied will of Congress."  343 U.S. at 635-38 (Jackson, J., concurring).  With respect to the third category, executive power "is at its lowest ebb, and courts "can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject"—such that a "*Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution*, for what is at stake is the equilibrium established by our constitutional system."  *Id.* at 638 (emphasis added).

Ironically, then, the phrase "conclusive and preclusive" on which Defendants rely originates where Presidential power "must be scrutinized with caution" when it conflicts with statutes.  *Id*.  *Youngstown*'s use of "conclusive and preclusive" thus supports the opposite of what Defendants assert.  Moreover, in this case, someone *besides* the President has purported to take action on his behalf, *without his input*, and against what Congress expressly intended with the CSRA.  Presidential power "at its lowest ebb" most certainly should be "scrutinized with caution" when it is not even wielded by the President in the first place.

The next relevant use of the phrase appeared over 70 years later, in *Trump v. United States*, 603 U.S. 593 (2024).  The Supreme Court ruled that when the President acts within his "conclusive and preclusive" authority he cannot be constrained by Congress or the courts.  *Trump*, 603 U.S. at 607.  As an example of such authority, the Court noted that "Congress lacks authority to control the President's 'unrestricted power of removal' with respect to '*executive officers* of the United States *whom he has appointed*.'"  *Id.* at 608-09 (citing *Myers*, 272 U.S. at 106, 176) (emphases added).  Thus, *Trump* says nothing about removing inferior officers, much less employees—and, indeed, specifies that the President's power to manage DOJ grants him

20

"unrestricted power to remove the most important of his subordinates–such as the Attorney General." *Id.* at 621. This statement treads no new ground; it is consistent with years of precedent affirming removal protections for lesser executive branch officers. *See id.*; *id*. at 651, n.1 (Barrett, J., concurring) ("the supervision and removal of *appointed, high ranking* Justice Department officials falls within the President's core executive power") (emphasis added). At bottom, the Supreme Court's use of "conclusive and preclusive" is meant to evaluate the power of the *President* to take unilateral action without congressional control; no court has suggested that the area of responsibility of inferior officers or employees limits Congress's ability to condition their removal.

Moreover, any contention that the Supreme Court's use of "conclusive and preclusive" in *Trump v. United States* could be read to convert thousands of line prosecutors into political appointees is belied by the multiple congressionally- or court-regulated procedures governing and restricting a criminal prosecutor's authority. For example a prosecutor cannot: investigate a case using a wiretap without the approval of an Article III judge (18 U.S.C. §§ 2510(9), 2518(1)); offer a defendant less than the mandatory minimum punishment for certain offenses in exchange for a plea, except where approved by Congress (18 U.S.C. § 3553(f)); prevent crime victims from being reasonably heard by the Court (18 U.S.C. § 3771); offer a witness immunity without court approval (18 U.S.C. § 6003(a)) and approval by various political appointees (18 U.S.C. § 6003(b)); and—significantly—cannot dismiss a criminal case without leave of Court. Fed. R. Crim. P. 48(a); *United States v. Adams*, 777 F. Supp. 3d 185, 206-07 (S.D.N.Y. 2025) (presumption of good faith prosecution is "not conclusive upon the Court" and Rule 48 allows a court to balance prosecutorial discretion against threat of executive overreach). These external limitations upon prosecutorial discretion writ large do not remotely approach the Department of

21

Justice's vast internal limitations upon the powers of an individual AUSA. *See, e.g.*, Justice Manual, Title 9; *cf. Giglio v. United States*, 405 U.S. 150, 154 (1972) (noting that "procedures and regulations can be established" to mitigate risk of inconsistent promises on immunity).

## II.    Defendants' Statutory Arguments Fail

Defendants' new statutory theories of removal authority—28 U.S.C. § 542(b) and the CSRA itself—are also nonstarters.

### A.    The Attorney General Does Not Have the Power to Terminate AUSAs Without Cause Under Section 542

Perhaps recognizing that their Article II removal defense fails, Defendants manufacture a new authority (absent from Ms. Comey's termination memorandum, her separation papers, and Defendants' motion to dismiss) based on Acting Attorney General Blanche's "ratification" memorandum. Defendants now assert that 28 U.S.C. § 542(b) independently authorizes the Attorney General to remove AUSAs without cause, superseding the CSRA's protections.

This argument fails. As discussed *supra* Point I.A.1, Congress *can* regulate the removal of inferior officers and employees and did so in the CSRA.

#### 1.    The CSRA Constrains Section 542

Section 542(b) provides: "Each assistant United States attorney is subject to removal by the Attorney General." 28 U.S.C. § 542(b). Defendants read this provision in a vacuum to authorize removal without cause, unconstrained by the CSRA. But that reading is foreclosed by the text and legislative history of the CSRA and 1990 Due Process Amendments, and decades of administrative practice and court decisions. As Defendants repeatedly state, the Supreme Court requires Congress to "use 'very clear and explicit language'" when it wishes to "'take away' the power of at-will removal from an appointing officer." *Braidwood*, 606 U.S. at 770-71 (citations omitted). True—and Congress did so here.

22

Specifically, Congress provided *two* protections to Ms. Comey through the CSRA, both of which independently prohibit the Attorney General from removing AUSAs for political reasons. *First*, Section 2302(c)(2) directs the Attorney General to "comply" with the nine merit systems principles and "prevent[] prohibited personnel practices," which prohibits adverse action based on political affiliation, *see* 5 U.S.C. §§ 2301(b)(2) & (b)(8), 2302(b)(3). *Second*, in 1990, Congress enacted Section 7511(a)(1)(C) specifically to provide AUSAs like Ms. Comey with for cause and due process protections that were previously provided only to veterans and those in the competitive service, *see id.* §§ 7511(a)(1)(C), 7513(a)-(e). Defendants ignore these statutory provisions, as well as DOJ's own longstanding interpretation that Section 542 is tempered by the CSRA.

> ### a.    Congress Enacted the CSRA and Directed the Attorney General to Comply with and Enforce Merit Systems Principles

In 1978, Congress passed the CSRA and established merit systems principles and prohibited personnel practices such as "arbitrary action, personal favoritism, or coercion for partisan political purposes." 5 U.S.C. § 2301(b). Critically, the CSRA explicitly provided that the "head of each agency shall be responsible for" "preventing prohibited personnel practices" and "complying with and enforcing applicable civil service laws, rules, and regulations and other aspects of personnel management[.]" 5 U.S.C. § 2302(c)(2). The head of DOJ is the Attorney General. 28 U.S.C. § 503.

Thus, against the backdrop of Section 542 (enacted in its current form in 1966, Pub. L. No. 89-554, § 4(c), 80 Stat. 378 (Sept. 6, 1966)), Congress specifically directed the Attorney General to comply with the merit systems principles and prevent prohibited personnel practices. *Id.*

23

And DOJ did.  For example, in 1983, the Office of Legal Counsel ("OLC") instructed that the CSRA prohibited the Attorney General from removing an AUSA based on his sexual orientation, regardless of Section 542, because that would constitute a prohibited personnel practice.  *Termination of an Assistant United States Attorney on Grounds Related to His Acknowledged Homosexuality*, 7 Op. O.L.C. 46 (1983).  OLC concluded that while AUSAs are in the "'excepted service'":

> [t]he Attorney General's authority to remove them, *see* 28 U.S.C. § 542(b), is tempered, however, in several ways, two of which are relevant here: statute and OPM regulation.  The statute and regulation that protect AUSAs from prohibited personnel practices are 5 U.S.C. § 2302(b)(10) and OPM/FPM Supp. 731- 1, subchap. 3-2(a)(3)(c).[4]

*Id.* at 47.  Thus, notwithstanding Section 542, an AUSA may not be terminated in violation of a prohibited personnel practice "in the absence of a reasonable showing that [the protected status] has adversely affected his job performance."  7 Op. O.L.C. 46.

The 1988 United States Attorney's Manual likewise provided that AUSAs have removal protections and due process rights, again notwithstanding Section 542.  *See Gosnell v. DOJ*, 69 F.3d 1138, 1140 (Fed. Cir. 1995) ("Before Congress enacted the [1990] Due Process Amendments, the agency instituted removal actions against assistant U.S. attorneys only for good cause and the actions were taken pursuant to agency procedures.") (citing 1988 U.S. Attorneys' Manual 99).

Thus, in 1978, Congress spoke clearly and directed the Attorney General to comply with the civil service laws.

---

[4] The Federal Personnel Manual (FPM) system was abolished in 1993.  *See* Civilian Personnel Law Manual, Fourth Ed. 1996, Title II at 1.

**b.**      **Congress Provided AUSAs Additional Protections with the 1990 Due Process Amendments**

In the 1990 Due Process Amendments, codified at 5 U.S.C. § 7511(a)(1)(C), Congress further expanded the rights of federal employees to provide "excepted" service employees, specifically including AUSAs, with due process rights and for cause removal protections.[5]

Congress acted in the wake of *United States v. Fausto*, 484 U.S. 439 (1988), in which the Supreme Court held that the CSRA excluded employees in the excepted service "from the provisions establishing administrative and judicial review for personnel action[.]" 484 U.S. at 443-45. In response, Congress enacted 5 U.S.C. § 7511(a)(1)(C) to expressly provide appeal rights to excepted employees, including attorneys. To accomplish that, Congress expanded the definition of "employee" for purposes of Chapter 75, subchapter II, which provides "employees" with for-cause protections (§ 7513(a)) and due process rights (§ 7513(b)-(e)).

Section 7511(a)(1)(C) provides that, "[f]or the purpose of this subchapter," "employee" means:

an individual in the excepted service (other than a preference eligible)--

(i) who is not serving a probationary or trial period under an initial appointment pending conversion to the competitive service; or

(ii) who has completed 2 years of current continuous service in the same or similar positions in an Executive agency under other than a temporary appointment limited to 2 years or less[.]

5 U.S.C. § 7511(a)(1)(C).

---

[5] The Pendleton Act of 1883 divided the civil service into categories, including the classified service (later termed "competitive," and which required employment exams) and excepted service (which did not). Shortly thereafter, Congress included attorneys in the excepted service. *See* Civil Service Commission, Twenty-Third Annual Report, at 79 (1906) (listing "Attorneys, assistant attorneys, and special assistant attorneys" within excepted service); *see also* 5 U.S.C. § 2012(c) (defining "classified" service as "competitive" service).

Thus, Congress expanded the definition of "employee" to include:  (i) an individual in the competitive service (§ 7511(a)(1)(A)); (ii) a preference eligible employee who has completed 1 year of service in certain positions (§ 7511(a)(1)(B)); or (iii) an individual in the excepted service who has completed 2 years of service and is not preference eligible or serving a probationary period (§ 7511(a)(1)(C)).  Next, Congress *excluded* 10 categories of government workers from the definition of "employee," such as those appointed with the advice and consent of the Senate; AUSAs were not excluded (§ 7511(b)).

Section 7511(a)(1)(C) sweeps AUSAs into the definition of "employee," granting them the rights that other federal employees had enjoyed since 1978: for cause and due process rights. *See* Chapter 75, subchapter II (an "employee" covered by Section 7511(a) is entitled to the protections provided in Chapter 75, subchapter II: due process rights (§ 7513(d)), and the right to be fired "only for such cause as will promote the efficiency of the service" (§ 7513(a)). Although Congress did not specifically mention the Attorney General in the new section, it did not need to.  Congress had long ago directed the Attorney General to "comply[] with and enforce[e] applicable civil service laws, rules, and regulations."  Section 2302(c)(B).  Congress simply revised the "civil service laws" that it had already directed the Attorney General to follow.

The legislative history confirms that Congress explicitly intended this expanded definition of employee to apply to government attorneys, including AUSAs.  The House Committee surveyed the federal workforce and noted that, of the nearly 1.4 million employees in the excepted service, some "already have appeal rights because they are veterans' preference eligibles," but "the balance" include "attorneys [] to whom this bill applies."  H.R. REP. 101-328, at 3, *reprinted in* 1990 U.S.C.C.A.N. 695, 697.  The Committee singled out DOJ attorneys in

26

particular: "The fact that an employee is not in the competitive service does not mean that the employee can be hired or fired at whim. As an attorney who has tried to get a job at the Department of Justice knows, hiring is extremely competitive." *Id.* House Committee hearings on the proposed legislation included lengthy testimony about how the Amendments would impact DOJ lawyers, including AUSAs. *See* Administrative Due Process for Certain Federal Employees, Hearing on H.R. 917 Before the Subcommittee on Civil Service of the House Committee on Post Office and Civil Service, 99th Cong. 25, 2-57 (1985) (discussing at length that DOJ attorneys would be covered by the Amendments).

The case law confirms Congress's intent. In the seminal case *Hamlett v. DOJ*, No. DA-0752-01-0407-I-1, 2002 WL 220046 (M.S.P.B. Jan. 25, 2002), the MSPB reviewed the text and legislative history of the CSRA and the 1990 Due Process Amendments, and held that AUSAs are covered employees under the CSRA notwithstanding Section 542.[6] The Board first concluded that Congress intended to include AUSAs as employees under Section 7511, providing AUSAs with protections previously guaranteed only to veterans and those in the competitive service. *See id.* at 678. The Board also concluded that the language of Section 7511, coupled with Congress's exclusion of certain employees (but not AUSAs) from the definition of employee in Section 7511, is more specific than the general language in Section 542: Section 542(a) "merely indicat[es] which official may appoint an AUSA," and the CSRA

---

[6] While in this case, Defendants concede that the government did not appeal the *Hamlett* decision (Mot. 18 n.2), they omit that the government there took the opposite position than it takes here: the United States *affirmatively asserted* that Section 542 did not preempt the CSRA. *Hamlett,* 2002 WL 220046 at 675 ("both parties argued that section 542 does not affect the Board's jurisdiction under chapter 75 with respect to adverse action appeals by AUSAs"). To the best of Ms. Comey's knowledge, DOJ has maintained that position until now.

27

identifies how removal may be accomplished. *Id.* at 680. Thus, the Attorney General may hire and fire AUSAs, and he or she must comply with the CSRA when doing so. *See id*.

Federal courts and the executive branch have operated with the understanding that AUSAs are entitled to for cause removal and due process rights as provided by Section 7511(a)(1). *See, e.g.*, *Gosnell*, 69 F.3d at 1140 ("Since the Due Process Amendments became law, assistant U.S. attorneys have had the right to appeal removal actions, as well as other actions listed in 5 U.S.C. § 7512, to the Merit Systems Protection Board."); *Mitchell v. MSPB*, 741 F.3d 81 (Fed. Cir. 2014) (AUSA covered by Section 7511(a) and permitted to appeal to MSPB); *Convertino v. U.S. Dep't of Just.*, 393 F. Supp. 2d 42, 46 (D.D.C. 2005) (AUSA covered by CSRA prohibited personnel practice forbidding "taking, failing to take, or threatening to take or fail to take, a personnel action 'because of' various forms of 'whistleblowing'") (citing 5 U.S.C. § 2302(b)(8)-(b)(9)).

Thus, the 1990 Due Process Amendments provide another, separate, statutory authority evincing Congress's intent to restrain the Attorney General's 542 removal power over AUSAs.

### 2. Defendants' Contrary Arguments Are Unavailing

#### a. The CSRA and Due Process Amendments Evince Congress' Clear Intent to Temper Removal Authority

Contrary to Defendants' assertion (Mot. 16), the Supreme Court's decision in *Kennedy v. Braidwood* supports rather than defeats Ms. Comey's interpretation of the CSRA. In *Braidwood*, the Supreme Court concluded that the head of HHS could remove Task Force members because "no statute restricts [their] removal," and as a result, "there can be no doubt that the Secretary

28

may remove [them] at will." *Braidwood*, 606 U.S. at 764 (citations omitted). Here, by contrast, the CSRA does restrict removal of AUSAs.[7]

Defendants' reliance on *Windsor v. The Tennessean*, 719 F.2d 155, 159 (6th Cir. 1983)—which concluded that an AUSA "possesses no property entitlement because the Attorney General's power to remove [AUSAs] is unconditional" under Section 542—is likewise unavailing, for two reasons. *First*, the matter did not involve allegations—like here—that the AUSA suffered a prohibited personnel practice. *Compare id.* at 158 (Windsor alleging that decisionmaker defamed him), *with* Compl. ¶¶ 70-75 (alleging violation of prohibition against political retaliation). As a result, the court did not evaluate whether the Attorney General could be constrained on that basis. Indeed, as explained above, DOJ answered that very question in the affirmative the same year: "[t]he Attorney General's authority to remove" AUSAs under 542 "is tempered" by the CSRA's prohibited personnel requirements. 7 Op. O.L.C. 46. Defendants thus again ignore that Ms. Comey has rights under the CSRA irrespective of the 1990 Amendments—to not be fired because of political affiliation. *Second*, *Windsor* pre-dates the 1990 Due Process Amendments, in which Congress deliberately provided AUSAs with due process and for cause rights. Whatever force *Windsor* may have had before 1990, it does not survive now.

### b. Defendants Flip Statutory Construction on Its Head

Defendants invoke the specific-governs-general canon of statutory construction to argue that Section 542's "specific" grant of removal power to the Attorney General overrides the CSRA's "general" protections. (Mot. 16.) This is precisely backwards.

---

[7] Defendants' other citation on this point fares no better. (Mot. 16 (citing *Severino v. Biden*, 71 F.4th 1038, 1040 (D.C. Cir. 2023) (addressing the President's—not a head of department's—removal power and concluding no statute expressly constrained President's removal authority).)

29

Section 542 is the *general* provision. It identifies *who* may remove an AUSA—the Attorney General—without specifying the substantive standard or procedural conditions for doing so. It says nothing about whether cause is required, what process must be afforded, or whether any limitations apply.

The CSRA and the 1990 Amendments, by contrast, are the *specific* provisions, enacted after Section 542, and modify the Attorney General's power. They address the precise question of *why* and *how* covered employees are removed—only for cause, only with specified procedural protections, only for reasons that will promote the efficiency of the service, only consistent with merit systems principles, and constrained by 14 prohibited personnel practices. *See* 5 U.S.C. §§ 7511(a)(1)(C) & 7513 (providing for-cause and due process protections to defined "employees"); § 2302 (defining prohibited personnel practices and directing heads of agencies to prevent such practices).

As the MSPB ruled in *Hamlett*, Section 542 is akin to the statute at issue in *King v. Briggs*, 83 F.3d 1384, 1386-88 (Fed. Cir. 1996), which provided that the agency may hire employees "without regard to the provisions to Title 5 governing appointments in the competitive service, or the provisions of chapter 541 and subchapter III of chapter 53 relating to the classification and General Schedule pay rates." Because that statute explicitly excluded the position from *appointing* provisions of Title 5 but did not exclude the position from the *removal* provisions of Sections 7511-7513, the Federal Circuit concluded the employee was entitled to removal protections. *See id.*; *cf. Todd v. MSPB*, 55 F.3d 1574, 1577 (Fed. Cir. 1995) (DoD employee not covered by Section 7511 because the appointing statute explicitly provided that the agency may appoint personnel whose "incidents of the employment relationship may be fixed

30

without regard to the [CSRA] and [5 U.S.C.] sections 7511, 7512, and 7701"; concluding that the appointing statute's language was more "specific" than the "general" provisions of 7511).

Further, contrary to Defendants' inverted assertion, interpreting the CSRA to constrain Section 542 would not render Section 542 "a nullity." (Mot. 17.) Rather, the CSRA acts *in tandem* with Section 542, specifying how the Attorney General can wield her removal power. And it does so in order to protect the century-old goal of ensuring a non-partisan, professional civil service. *See U.S. Civ. Serv. Comm'n*, 413 U.S. at 557-58. Defendants ask this Court to drill a gaping hole in the CSRA: in their reading, the CSRA protects AUSAs, but not if the Attorney General fires an AUSA "without cause." (Mot. 17.) This exception would swallow the rule—the CSRA's protections would vanish as to the AUSAs Congress specifically intended to protect.

Defendants' last argument, that "the constitutional avoidance doctrine should preclude a reading of the CSRA that [] restrict[s]" "Section 542's grant of unqualified removal authority to the Attorney General," is both incoherent and a misapplication of the constitutional avoidance doctrine. (Mot. 18.)

*First*, the Attorney General's Section 542 removal authority self-evidently derives from a statute passed by Congress. The CSRA's restriction on that authority *also* derives from a statute passed by Congress. To the extent there is a conflict between the two statutes—and there is not—it is not a constitutional conflict.

*Second*, although Defendants' argument is muddled, if they are asserting that the Attorney General's Section 542 authority flows from the *President*'s constitutional Article II authority, that notion has no support.

*Third*, Defendants' argument that the CSRA's restriction "on the power of the President and the Attorney General to remove an AUSA without cause" would "render the statute

31

unconstitutional under Article II" (Mot. 18), gets it precisely backwards. Reading Article II to override the CSRA, as Defendants urge, sets up a conflict with Congress's powers under both the Appointments Clause in Article II and the Necessary and Proper Clause in Article I. *See Perkins*, 116 U.S. at 484-85 (Appointments Clause provides that Congress can "vest[] the appointment of inferior officers in the heads of departments," such that Congress can also "limit and restrict the power of removal"); *see also* U.S. CONST. art. I, § 8, cl. 18 ("Congress shall have Power . . . [t]o make all Laws which shall be necessary and proper"); *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 103 (1947) (evaluating Hatch Act and stating Congress has "authority over the discipline and efficiency of the public service"); *see* Gary Lawson & Jed Handelsman Shugerman, *Presidential Removal as Article I, Not Article II* (2025), https://scholarship.law.bu.edu/faculty_scholarship/4168 ("[T]he Government's maximal interpretation of Article II would violate the separation of powers by overreaching into Article I powers and by overstretching the Article III judiciary."); Nicholas R. Bednar, *Presidential Control of the Civil Service*, 110 Minn. L. Rev. 2065, 2146 (2026) ("Congress's authority to design and fund the civil service reflects its constitutional prerogative to enact laws as 'necessary and proper' to ensure the execution of the laws it enacts.")

Thus, it is *Defendants* who create an unnecessary constitutional confrontation. "[O]ccasion[s] for constitutional confrontation between the two branches should be avoided whenever possible." *Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 389-390 (2004) (cleaned up). The "rule of constitutional avoidance" "instructs that 'where an otherwise acceptable construction of a statute would raise serious constitutional problems,' a court should 'construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *United States v. Magassouba*, 544 F.3d 387, 404 (2d Cir. 2008) (citation

32

omitted); *see also Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 492, 519 (2d Cir. 2017) (rejecting reliance on constitutional avoidance doctrine where statutory interpretation does not raise constitutional concerns).

The constitutional avoidance doctrine favors *Plaintiff's* statutory interpretation, which harmonizes the CSRA and Section 542 and avoids constitutional disputes entirely:  in Section 542, Congress set out *who* can hire and fire AUSAs (the Attorney General), and in the CSRA, Congress prescribed *why* and *how* AUSAs can be fired (for cause, with procedural safeguards, and not in violation of prohibited personnel practices).  This interpretation is also consistent with the statutory text and Supreme Court precedent recognizing Congress's authority to regulate the appointment and removal of inferior officers and employees.

> **B.    The CSRA's "Efficiency of Service" Language Is Not a Self-Defeating Loophole that Grants the Attorney General or Anyone Else Carte Blanche to Remove Civil Servants**

Defendants make the baffling assertion that "Plaintiff's removal under Article II and 28 U.S.C. Section 542" *per se* "qualifies as removal for 'efficiency of the service' under the CSRA."  (Mot. 20-21.)  In other words, "efficiency of service" means whatever they want it to. That is not the law.

The CSRA authorizes termination of civil servants for four reasons, including "for such cause as will promote the efficiency of the service."  5 U.S.C. § 7513(a).  This provision refers to misconduct or performance issues with a *nexus* to an agency's ability to carry out its functions, and only after the agency follows the due process outlined in the CSRA.  *See, e.g., Doe v. Dep't of Justice*, 565 F.3d 1375, 1379 (Fed. Cir. 2009) (agency must establish "existence of a nexus between the employee's misconduct and the work of the agency"); *Brown v. Dep't of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000) ("To satisfy [Section 7513(a)'s] requirement, the agency

33

must show by preponderant evidence that there is a nexus between the misconduct and the work of the agency, *i.e.,* that the employee's misconduct is likely to have an adverse impact on the agency's performance of its functions.").

Defendants concede Ms. Comey was not removed for misconduct or performance issues; Ms. Comey was admittedly "outstanding." (Answer ¶¶ 3, 25, 26, 55.) And Defendants concede she was not afforded the due process prescribed under the CSRA to those fired for "cause." (*Id.* ¶¶ 48, 69); *see also* Mot. 17. Defendants' bare assertion that Ms. Comey was fired for "such cause as will promote the efficiency of the service" thus fails as a matter of law—the charge is contradicted by Ms. Comey's allegations *and* Defendants' own factual admissions.

The real theory Defendants are advancing is that "cause" under the CSRA means whatever the Attorney General (or the President or anyone else) wants it to mean, even if the motivations are unconstitutional, untethered to the employee's performance, and violate the CSRA. *See* Transcript at 5:3-7 ("[E]ven if there were political motivations associated with the termination . . . if there was a determination made that it [ ] affected the efficiency of the service, then it was a valid termination.") That is dead wrong. As the Federal Circuit warned when vacating DOJ's dismissal of an employee: DOJ's use of "overly broad standard[s]" could "legitimize removals made for personal or political reasons." *Doe*, 565 F.3d at 1381. Congress wrote a statute to prohibit partisan, non-meritocratic dismissals; it did not include a loophole authorizing partisan, non-meritocratic dismissals. The Court should reject this argument out of hand.

### C. Alternatively, Defendants' Motion Should Be Denied Because They Cannot Rely on Sections 542 or 7513

Defendants did not cite Section 542 when they terminated Ms. Comey, nor at any point earlier in this case. As this Court previously ruled, "Defendants cited one and only one reason

for her removal:  Article II of the Constitution." (Order at 12-13.)  The Court noted that while Defendants also cited the "laws of the United States" in Ms. Comey's termination memo, "Defendants have forfeited any [] argument [relying on the CSRA] for present purposes." (*Id.* at 13 n.8.)  To the extent Defendants now claim the reference to "laws of the United States" encompasses 28 U.S.C. § 542, that argument, too, was forfeited.

Further, "a 'post hoc rationalization' first articulated in litigation . . . carries little weight."  *Yao v. Almodovar*, 813 F. Supp. 3d 461, 467-68 (S.D.N.Y. 2025) (rejecting agency's position first articulated in litigation that contradicted arrest warrant) (citing *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 21 (2020)); *see Ndoye v. Joyce*, No. 26-cv-1219, 2026 WL 765635, at *4 (S.D.N.Y. Mar. 17, 2026) ("after-the-fact attempt to correct an unlawful agency action would likely be ineffective to retroactively cure a decision").  Courts hold government defendants, in particular, to their previously articulated reasons for acting:  "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Islander E. Pipeline Co. v. Conn. Dep't of Env't Prot.*, 482 F.3d 79, 95 (2d Cir. 2006).

Moreover, Defendants' Sections 542 and 7513 removal arguments require the Court to accept the Attorney General fired Ms. Comey and did so under those authorities—factual assumptions in favor of the movant that are not permitted on a Rule 12(c) motion. (Answer ¶¶ 12, 15).  The Complaint pleads that Attorney General Bondi did not sign Ms. Comey's termination memorandum; the memo did not come from the Attorney General's office; and the memo does not even mention the Attorney General, Section 542, or Section 7513. (Compl. ¶ 47.)  Construing all inferences in Ms. Comey's favor, the Court should not credit Defendants' version of events.  It possible that the Attorney General made the decision; it is also

35

possible that the President, or another White House official, or someone else in the administration did so.

Defendants' Answer undercuts their version of events.   Defendants aver inconsistently that either Attorney General Bondi or "the Office of the Attorney General" "directed" Ms. Comey's removal, but they are careful not to aver that the Attorney General *decided* to remove Ms. Comey.  Defendants concede that Ms. Hakes issued the termination memo (Answer ¶ 47), which does not mention Ms. Bondi, Section 542, or Section 7513.  They concede that Ms. Comey's SF-50 cited "Article II" as the sole legal authority and reason for her removal, with no reference to statutory authority or delegation of any statutory authority.  (Answer ¶¶ 52-53.) Defendants' May 26, 2026, memo from Acting Attorney General Blanche raises more questions; it is addressed to the "Director, EOUSA," purportedly "ratifying" and "affirming" "*your* actions removing Maurene Comey."  ECF No. 63-1 (emphasis added).  It makes no mention of Attorney General Bondi.  It also raises the glaring question of why Blanche would have had to "ratify" an action that Bondi purportedly already took.

Defendants' new assertion that they fired Ms. Comey under Section 542 or Section 7513 is absent from the Complaint.  Ms. Comey alleges that she was fired only under "Article II" and in *violation* of the CSRA—without the cause or due process the CSRA provides.  The CSRA's provision authorizing removal of civil servants "for such cause as will promote the efficiency of the service" is the very clause that Ms. Comey alleges Defendants violated—in text and spirit— when they fired her *without* cause and committed a prohibited personnel practice.  (Compl. ¶¶ 4, 9, 55-75.)  If Ms. Comey were fired for "cause" under the CSRA, her SF-50 would have said so, Defendants' jurisdictional briefing would have argued as much, and Defendants would not be asserting defenses that Article II and Section 542 ostensibly *override* the CSRA.

36

On *Defendants'* motion, the Court should not credit their (dubious) factual assertions, especially because they self-evidently operate to Defendants' newly constructed legal arguments. Doing so would require the Court to draw an impermissible inference in Defendants' favor. And, should the Court determine that Defendants' assertion that Attorney General Bondi fired Ms. Comey creates a disputed issue of fact, that is yet another reason to deny Defendants' motion. The fundamental factual question about who decided to fire Ms. Comey precludes judgment in Defendants' favor at this stage, because the actual decisionmaker(s) may not have had authority to fire Ms. Comey under the statutory defenses Defendants now proffer. (*See* Mot. 17 (Defendants admit that "[I]f the Attorney General does not direct the removal of an AUSA [] the CSRA may provide the AUSA a different process and different protections.").)

## III.    The Executive Branch Cannot Override Protections in the Bill of Rights

Defendants concede that, even if they could terminate Ms. Comey without cause, they could do so only for a "constitutionally permissible reason." (Mot. 22.) The Complaint plausibly alleges that they did not. *First*, the Complaint plausibly alleges that Defendants fired Ms. Comey in violation of the First Amendment "because of her association with her father and in retaliation for her father's protected speech, or because of her presumed political affiliation and beliefs, or both." (Compl. ¶ 99.)

*Second*, the Complaint plausibly alleges that Defendants fired Ms. Comey in violation of her property and liberty interests under the Fifth Amendment. Ms. Comey has a property interest in keeping her job both because of the for-cause removal protections afforded to Ms. Comey under the CSRA, and the rules and understandings fostered by DOJ for decades. And Ms. Comey has a liberty interest in clearing her name from Defendants' ratification of defamatory comments and in not being excluded from government employment. She was thus entitled to due process before her termination.

A.      **Ms. Comey Plausibly States a First Amendment Claim**

1.      **The First Amendment Prohibits Retaliation Against Disfavored Viewpoints**

The First Amendment prohibits viewpoint discrimination, and retaliation to effectuate viewpoint discrimination, because it is "uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187-88 (2024) (government officials cannot "use the power of the State to punish or suppress disfavored expression"). "Official reprisal for protected speech offends the Constitution," even if the challenged action would "be unexceptionable if taken on other grounds." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

These rules protect federal government employees. "The Constitution prohibits a government employer from discharging or demoting an employee" for protected conduct, because of "the First Amendment's hostility to government action that 'prescribe[s] what shall be orthodox in politics.'" *Heffernan v. City of Paterson*, 578 U.S. 266, 270 (2016) (citations omitted); *see Elrod v. Burns*, 427 U.S. 347, 356 (1976) (the First Amendment bars political patronage systems that remove government employees for their political beliefs and associations).

First Amendment claims "are not defeated by the fact that [plaintiff] did not have tenure." *Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977) ("Even though he could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him, he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms.") (citations omitted); *see Perry v. Sindermann*, 408 U.S. 593, 596-97 (1972) (untenured public employee can pursue First Amendment case, citing a dozen Supreme Court cases applying First Amendment protections to "denials of public employment").

38

Importantly for this case, retaliation is prohibited whether or not a plaintiff *actually* holds the imputed, disfavored viewpoint, because viewpoint discrimination "caus[es] precisely th[e] same harm" even if the plaintiff does not hold the viewpoint attributed to her (or her father). *Heffernan*, 578 U.S. at 271-74 (government employer violated First Amendment by retaliating against employee based on *mistaken* belief as to employee's politics, because constitutional violation lies in intent to punish disfavored political activity, regardless of whether employee engaged in activity).

### 2. The First Amendment Protects the Right to Associate in Intimate Family Relationships

The First Amendment also protects free association, including the right to intimate family relationships free from state intrusion, because "implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others[.]" *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (citing extensive Supreme Court precedent); *see Adler v. Pataki*, 185 F.3d 35, 45 (2d Cir. 1999) ("retaliatory discharge based solely on litigation instituted by one's spouse is actionable under the First Amendment," including termination due to "simple vindictiveness . . . on account of his wife's lawsuit"). "[B]ecause the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." *Roberts*, 468 U.S. at 618.

The First Amendment forbids firing a governmental employee for a family member's protected speech. "The freedom of association protected by the First Amendment includes both 'choices to enter into and maintain certain intimate human relationships' and the 'right to associate for the purpose of engaging in those activities protected by the First Amendment.'" *Adler*, 185 F.3d. at 42, 45 (citations omitted); *see Paca v. City of New Haven*, 826 F. App'x 46,

39

48 (2d Cir. 2020) (reaffirming that *Adler* held "a spouse's claim that adverse action was taken solely against that spouse in retaliation for conduct of the other spouse should be analyzed as a claimed violation of a First Amendment right of intimate association"); *Gorman v. Rensselaer Cnty.*, 910 F.3d 40, 47 (2d Cir. 2018) ("First Amendment associational rights protect against state intrusion into a family relationship intended to retaliate for a family member's exercise of his or her First Amendment rights[.]"); *cf. Patel v. Searles*, 305 F.3d 130, 136 (2d Cir. 2002) (parent-child relationships "warrant the highest level of constitutional protection"); *Kipps v. Caillier*, 205 F.3d 203, 206 (5th Cir. 2000) (recognizing "clearly established, constitutionally protected right to familial association"); *Sowards v. Loudon Cnty.*, 203 F.3d 426, 433 (6th Cir. 2000) (reversing summary judgment against plaintiff fired for husband's political activity, recognizing "protected conduct of intimate association under the First Amendment").

### 3. The Complaint Plausibly Pleads Each Type of First Amendment Claim

Applying these standards, the Complaint unquestionably states a First Amendment claim based on viewpoint discrimination and/or familial association. Defendants' assertion that Ms. Comey "alleges no facts to support the assertion that her removal was based on her perceived political beliefs" is risible. (Mot. 22.) Ms. Comey plausibly alleges that she was terminated based on her *perceived* political beliefs—imputed to her because of her father's identity and protected political speech criticizing the President—regardless of what her actual beliefs are, and because her father is James Comey.

Specifically, Ms. Comey alleges (and Defendants concede) as follows:

- Ms. Comey was an exemplary employee who was consistently promoted, decorated, and awarded outstanding performance reviews. (Compl. ¶¶ 1-55.)

- Defendants admit the excellence of Ms. Comey's tenure. (Answer ¶¶ 25-26, 37, 55.)

40

- Defendants had no basis to terminate Ms. Comey for cause and did not terminate her for cause.  (Compl. ¶¶ 55, 69.)

- Defendants admit that they did not terminate Ms. Comey for cause and have proffered no reason for her termination.  (Answer ¶¶ 55, 69.)

- Ms. Comey was the only one of at least fourteen AUSAs assigned to the *Epstein*, *Maxwell*, *Hadden*, and *Combs* prosecution teams who was terminated.  (Compl. ¶ 55.)

- Ms. Comey was fired because she is the daughter of James Comey, a political critic of President Trump.  (*Id*. ¶¶ 5, 6, n.1, 56-69.)

- President Trump has publicly attacked Mr. Comey for nearly a decade, including:

  o Disapproving of actions Mr. Comey took as Director of the FBI and terminating him from the position in 2017.  (*Id*. ¶ 59.)

  o Calling Mr. Comey a "liar" and a "dirty cop" and saying that Mr. Comey "should be in jail."  (*Id*. ¶¶ 59, 62.)

  o As of the date the Complaint was filed, posting (or reposting) 259 times about Mr. Comey, calling him, *inter alia*, the "worst" FBI Director in history and reposting claims that he "stood in the way" of investigating then-Democratic presidential candidate Hillary Clinton.  (*Id*. ¶¶ 57-58.)

- On information and belief, President Trump told his Chief of Staff that he wanted his perceived political enemies to be investigated by the IRS and, thereafter, Mr. Comey was notified that the IRS would audit him.  (*Id*. ¶ 60.)

- Defendants admit that President Trump "has publicly criticized" and "made comments critical of" Mr. Comey.  (Answer ¶¶ 57, 59.)

- Political allies of President Trump, including Laura Loomer with whom Trump has met personally, encouraged terminating Ms. Comey because she is a "Comey", a "Deep State operator", Mr. Comey's "liberal daughter" and "a national security risk via their proximity to [James Comey]"—and took credit for her termination on these grounds.  (Compl. ¶¶ 7, 8, 63-67.)

- President Trump had acknowledged Loomer's influence, stating "If you're Loomered you're in deep trouble. That's the end of your career in a sense."  (*Id*. ¶¶ 7, 63.)

Thus Ms. Comey alleges (and Defendants largely concede) that she was an outstanding

AUSA, that her father and the President have been political enemies for years, that the President

41

posted 259 public criticisms of James Comey as of the date the Complaint was filed, and that Loomer labeled her a "liberal" and "Deep State Operator."  And Defendants concede that they had no cause to fire Ms. Comey.  The Court can also take judicial notice of the remarkable and undeniable fact that, after this Complaint was filed, the President personally directed the Attorney General to indict Ms. Comey's father; and DOJ did indict him—*twice*—including for his speech criticizing the President.

Those allegations sufficiently state a First Amendment viewpoint discrimination and retaliation claim, *see Heffernan*, 578 U.S. at 271-74, and familial association claim, *see Adler*, 185 F.3d. at 42, 45.  Ms. Comey has "establish[ed] a causal connection between the government defendant's retaliatory animus"—the President's clear, years-long political and personal animus towards her father—and her "subsequent injury"—being fired without cause.  *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up).

Indeed, it is far more plausible that Defendants fired Ms. Comey in retaliation for her familial associations and presumed political beliefs than for any other reason—including the implausible idea that Attorney General Bondi (or anyone else) decided *sua sponte* to terminate Ms. Comey for no reason whatsoever.  *See Iqbal*, 556 U.S. at 680 (court can consider "more likely explanations" for defendants' alleged actions when evaluating motion to dismiss). Moreover, the Court can draw an inference of improper motive based on Defendants' ever-shifting justifications (Article II, Section 542, and "efficiency of service").  *See EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (reasonable jury could infer pretext from discrepancies in employer's stated reasons for termination); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (employers' contradictory explanations and proximity in time between firing and alleged discriminatory conduct can be evidence of pretext); *DeMarco v. Holy*

42

*Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993) (genuineness of employer's stated non-discriminatory reasoning can be questioned when implausible or absurd).  Defendants' motion to dismiss the First Amendment claim should be denied.  *See Vullo*, 602 U.S. at 181 (denying motion to dismiss).

### 4.    Defendants' Remaining Arguments Fail

Defendants' remaining arguments in favor of dismissal are meritless and ignore First Amendment precedent.

*First*, Defendants argue that this Court has no power to examine whether they violated the First Amendment because "the Executive is not required to explain the rationale behind its Article II-based decisions, and . . . it would be an extreme intrusion on the separation of powers for courts to interfere in that exercise of executive power by inquiring into those reasons or overriding that determination."  (Mot. 22.)

With this lawless argument, Defendants disavow their own accurate concession (only a paragraph prior) that they can fire Ms. Comey only for "constitutionally permissible reasons"—demonstrating pure disdain for the constitutional limits on their power.  (Mot. 22.)  And Defendants are wrong; their argument inverts our system of checks and balances by shielding the Executive from constitutional scrutiny even as to conduct alleged to violate the Bill of Rights. This is not the law—the First Amendment exists to prohibit executive overreach into speech and association, not to shield it.  First Amendment-based scrutiny of Executive branch terminations is the norm, as the Supreme Court explained in rejecting similar objections fifty years ago:

> Petitioners also object that our review of this case will offend the principle of separation of powers, for the executive's responsibility to insure that the laws be faithfully executed requires the power of appointment or removal at will, unimpaired by any judicial oversight . . . .  [T]he answer to petitioners' objection is that there can be no impairment of executive power, whether on the state or

43

federal level, where actions pursuant to that power are impermissible under the Constitution. Where there is no power, there can be no impairment of power.

*Elrod*, 427 U.S. at 352. So too here.

And, as suggested by the Court's own questions at the pretrial conference, the logical endpoint of Defendants' reckless argument is abhorrent and obviously illegal: if the Bill of Rights cannot constrain Article II removal power, then the President would be free to fire civil servants expressly *because of* their race, religion, sex, or speech. (ECF No. 70-2 at 5-6.) The Court should not endorse such a wrongful, lawless outcome. And even if Defendants could articulate a legitimate "balancing test" between the First Amendment and Article II, the Court was correct in noting that there are necessarily "factual issues that may be relevant to the determination," precluding dismissal.[8] (*Id.* at 6:16-22.)

*Second*, Defendants argue that permitting judicial review of a termination violating the First Amendment would "eviscerate Article II" by requiring a President to retain "even cabinet officials" not to his liking. (Mot. 23.) But that strawman is easily knocked down—First Amendment precedent excepts employees whose roles include political "policy-making decisions." *Adler*, 185 F.3d at 46 ("although public employees are ordinarily protected by the First Amendment from discharge based on their political affiliation, this protection does not apply to employees whose public office legitimately requires policy-making decisions that accord with a particular political viewpoint") (citing *Elrod*, 427 U.S. at 360).

In the CSRA, Congress acknowledged this distinction and exempted from CSRA protection positions that are formally designated as having a "confidential, policy-determining, policy-making, or policy-advocating character." *See* 5 U.S.C. § 2302(a)(2)(B)(i); 5 U.S.C.

---

[8] Ms. Comey requires discovery on her First Amendment claim, because who fired her and why is unknown and dispositive.

44

§ 7511(b)(2).  But Ms. Comey did not hold a policy-making position.  (Compl. ¶ 44.)  AUSAs have never been classified under federal law as occupying such a position, and recent Executive actions confirm this conclusion.  For example, in Executive Order 14,410, issued June 3, 2026, https://www.whitehouse.gov/presidential-actions/2026/06/implementing-schedule-policy-career-in-the-excepted-service/, President Trump reclassified certain federal positions as exempt policy-determining roles, 91 Fed. Reg. 34,893 (June 3, 2026), https://www.govinfo.gov/app/details/FR-2026-06-10/2026-11594, but that list of occupations does not include AUSAs.  And even if Defendants *had* so designated AUSAs like Ms. Comey, that reclassification would not exculpate them because the civil service laws expressly require the classification to be in place "*prior* to the personnel action."  5 U.S.C. § 2302(a)(2)(B).

*Third*, Defendants concede *Adler*'s precedential power and cite only a single case to avoid it—*Jenkins v. Tyler*, 167 F. Supp. 2d 652 (S.D.N.Y. 2001).  But *Jenkins* is easily distinguished.  There, the court recognized the First Amendment right of intimate association protecting family relationships from state interference and retaliation, but upheld firing Jenkins because of an actual conflict of interest created by his mother holding a "position of power" on the board of directors in a "parent organization" to the governmental organization Jenkins ran.  *Jenkins*, 167 F. Supp. 2d at 655.  Here, by contrast, Defendants have identified no nexus between Ms. Comey's familial relationship and her ability to carry out her responsibilities.  *See id.* (discussing *Adler*; that the "lack of any nexus between Adler's wife's actions and Adler's own ability to perform his duties [] justified finding a First Amendment violation").

Here, Defendants admit they had no cause to terminate Ms. Comey.  (Compl. & Answer ¶¶ 55, 69.)  Thus, as pled, the sole plausible basis for Ms. Comey's termination was political

45

animus toward her father and a presumption that Ms. Comey held a disfavored viewpoint—

precisely the unconstitutional retaliation that *Adler* prohibits.

*Fourth*, to the extent Defendants imply that the First Amendment's protection of familial

association does not extend beyond spouses, they are wrong.  *See, e.g.*, *Patel v. Searles*, 305 F.3d

130, 136 (2d Cir. 2002) ("the relationships at issue in this case—those between Patel and his

father, siblings, wife, and children—receive the greatest degree of protection because they are

among the most intimate of relationships").

### B.        Ms. Comey Plausibly States a Fifth Amendment Claim

Defendants' argument that Ms. Comey has not properly pled a Fifth Amendment

property interest claim or alleged sufficient reputational or professional harm to state a liberty

interest (Mot. 26-28) assumes the legitimacy of their removal power theory and is belied by the

allegations in the Complaint.  Cause of Action Five, Six, Seven, and Eight each plausibly state

claims under the Fifth Amendment.

### 1.        Claims Five and Six:  Defendants Violated Ms. Comey's Property Interest in Her Continued Employment as an AUSA

To establish a procedural due process claims, a plaintiff must prove: (1) a property or

liberty interest; and (2) that the government deprived her of that interest without due process.

*Narumanchi v. Board of Trs. of Connecticut State Univ.,* 850 F.2d 70, 72 (2d Cir. 1988)

Defendants' argument that Ms. Comey fails to state a property interest relies nearly

entirely on their assertion that she was an at-will employee lacking a property interest in her job.

But as explained above, Ms. Comey was not an at-will employee.  She had a property interest in

her continued employment based on her rights under the CSRA to serve in her role absent

termination for cause.  5 U.S.C. § 7513(a); s*ee Cleveland Bd. of Educ. v. Loudermill*, 470 U.S.

532, 538-39 (1985) (statutory for-cause removal protections create a property interest); *Goetz v.*

46

*Windsor Cent. Sch. Dist.*, 698 F.2d 606, 608 (2d Cir. 1983) (identifying state law, local ordinances, or implied contracts as sources of property interest).  With the 1990 Due Process Amendments, Congress explicitly acknowledged that AUSAs have expectations of continued employment.  *See* H.R. REP. 101-328, 3 (even though attorneys are not in the competitive service, "getting a job as a Government lawyer . . . can be quite a competitive process," and such "[e]xcepted service employees feel no less secure in their positions than competitive service employees").  Moreover, in addition to statutorily-derived property interests, "the existence of rules and understandings, promulgated and fostered" by an employer can create a mutual expectation of continued employment.  *Perry*, 408 U.S. at 602; *Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 782 (2d Cir. 1991) (referencing *Perry*, parties' "conduct and practice can create" a property interest).

Ms. Comey has properly pled a property interest in her CSRA-protected job and that her summary firing violated that interest.  She alleges that an Article II firing "circumvent[s] legislatively-mandated due process." (Compl. ¶ 103.)  Plus, outside of a statute-based property interest, Ms. Comey alleges that DOJ fostered "rules and understandings" of continued employment, *Perry*, 408 U.S. at 602, and engaged in "conduct and practice," *Ezekwo*, 940 F.2d at 782, that established a property interest.  *See, e.g.*, Compl. ¶¶ 25 (performance reviews), 45 (continued assignments), 70-80 (CSRA and MSPB), and Exhibit B (SF-50 indicating retirement plan).  It is uncontested that Ms. Comey was fired without notice, reason, or opportunity to respond.  (Answer at ¶ 48.)  She has thus sufficiently stated a property interest-based claim under the Fifth Amendment.

The cases cited by Defendants are unavailing.  (Mot. 24-25.)  As explained above, *Windsor* was decided years before the 1990 Amendments, erasing its relevance to a due process

47

analysis.  *See Hamlett*, 90 M.S.P.R at 680 ("[The *Windsor* decision was] issued before the 1990 Civil Service Due Process Amendments were enacted, and consequently, [it] did not consider, nor could [it] have considered, the scope of an AUSA's rights under 5 U.S.C. § 7511(a)(1)(C)."). And *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 629 (2d Cir. 1996), involved the inapposite fact pattern of a state law that "expressly permitted" the termination of a probationary employee "at any time."  In *Zynger v. Dep't of Homeland Sec.*, 615 F. Supp. 2d 50 (E.D.N.Y. 2009), the plaintiff alleged only a substantive due process claim, did not enjoy CSRA rights, and received due process before her termination.  In *Langeman v. Garland*, 88 F.4th 289, 295 (D.C. Cir. 2023), the court's property interest analysis was confined to its interpretation of a decades-old FBI memorandum describing former summary dismissal policy, and the government acknowledged that the plaintiff was not a covered employee under the CSRA.  *See Langeman v. Garland*, No. 21-2888, 2022 WL 5240112, at *2, n.3 (D.D.C. Aug. 23, 2022).  Finally, in *Esparraguera v. Dep't of the Army*, 101 F. 4th 28 (D.C. Cir. 2024), the appellate court determined that the plaintiff had a property interest in her job *specifically because* she had CSRA removal protections.  *Id*. at 33-34.

> **2.** **Claims Seven and Eight:  Defendants Violated Ms. Comey's Liberty Interest by Harming Her Reputation and Effectively Barring Her from Federal Service**

The Due Process Clause also protects a person's liberty interest in their professional reputation when the government makes or ratifies a stigmatizing statement in connection with the deprivation of a tangible interest such as employment; this is known as a "stigma-plus claim."  *Paul v. Davis*, 424 U.S. 693, 701-02 (1976); *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006).

To state a stigma-plus claim, a fired government employee must allege:  (1) that "the government made stigmatizing statements about her—statements that call into question [the] plaintiff's good name, reputation, honor, or integrity"; (2) that "these stigmatizing statements were made public"; and (3) that "the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal[.]"  *Segal*, 459 F.3d at 212 (cleaned up).  As for prong one, a plaintiff need not show that the government itself made such statements; it is enough to show that the government's actions "ratified" stigmatizing statements.  *Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005).  Ms. Comey has plausibly pled each element here, in support of Claims Seven and Eight.

*First*, Ms. Comey alleges the government has "ratif[ied] stigmatizing allegations," by firing her without cause despite her stellar performance, and in the context of a highly public and defamatory campaign led by online personality Laura Loomer.  (Compl. ¶¶ 64-67, 110.)  The President has touted Ms. Loomer's influence on personnel decisions for federal employees.  (*Id*. ¶¶ 7, 63.)  Ms. Loomer accused Ms. Comey of being a national security risk, lacking impartiality, and exhibiting bias.  (*Id.* ¶ 64.)  Less than two months later, Defendants fired Ms. Comey—and offered no explanation.  Ms. Loomer publicly claimed credit for the firing.  (*Id.* ¶ 67.)  Defendants' silence in the face of these public characterizations—combined with carrying out the very termination demanded—constitutes implicit government ratification of the stigmatizing message.

Defendants argue that because Ms. Comey "does not allege that any government actor made any defamatory statements," she has not established the requisite reputation damage for a liberty interest claim.  (Mot. 28.)  But this ignores that an employer may create reputational harm by ratifying the defamatory statements of a *third party*.  "Although inflicted by different actors,

49

the 'stigma' and the 'plus' constitute a liberty interest deprivation because the [defendant's] act of termination implicitly adopted [the speaker's] stigmatizing allegations and would appear, to anyone who had read of the allegations, to be connected to them." *Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 270 (S.D.N.Y. 2006); *see Velez*, 401 F.3d at 89-90 (stigma-plus violation properly plead against employer who fired plaintiff after receiving a letter from third parties accusing plaintiff of practicing "voodoo").

*Second*, Ms. Comey alleges that the stigmatizing allegations ratified by Defendants were made public by a social media influencer with over 1.7 million followers (Compl. ¶¶ 64-67), establishing that the statements were public. *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004).

*Third*, Ms. Comey was fired within two months of Ms. Loomer's public crusade and removed from service "effective immediately"—underscoring Ms. Loomer's stigmatizing insinuations that she posed a threat to government service. (*Id.* ¶¶ 47, 54, 110, 112.) She has alleged a sufficient temporal nexus between the statements and her termination. *See Patterson*, 370 F.3d at 335 (2d Cir. 2004) (requiring only approximate temporal proximity between statements and loss of job).

Separately, Ms. Comey's liberty interest was implicated because Defendants' actions serve as an effective bar from Ms. Comey obtaining employment within the executive branch. Defendants removed her from "the federal service, effectively immediately" without defining what that means. (Compl. ¶¶ 47, 54.) Construing all inferences in Plaintiff's favor, Ms. Comey has plausibly alleged that Defendants have deemed her unsuitable to serve in any capacity. *See, e.g., Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994) (holding that "if [the government's] action formally or automatically excludes [the plaintiff] from work on some

50

category of future [government] contracts or from other government employment opportunities, that action changes [the plaintiff's] formal legal status and thus implicates a liberty interest"); *see Myers & Myers, Inc. v. U. S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975) ("de facto debarment" of a federal contractor amounted to a "federal blacklist" violating due process).

Thus, Ms. Comey has sufficiently pled a stigma-plus, reputation-based harm.[9]

**IV.    Ms. Comey's Declaratory Judgment and Mandamus Claims Can Survive at This Stage**

Defendants' arguments to dismiss Ms. Comey's claims for declaratory judgment and mandamus relief (Mot. 28-30), overlooks that this proceeding is in its preliminary stage.

Ms. Comey pleads a Cause of Action under the Declaratory Judgment Act and also requests a declaratory judgment as a form of relief.  (Compl. ¶¶ 119-121, Prayer for Relief.) While Defendants are correct that the Second Circuit has recognized that the Declaratory Judgment Act "only provides courts with discretion to fashion a remedy, not a cause of action," *Sunvestment Energy Grp. NY 64 LLC v. Nat'l Grid USA Servs. Co.*, 116 F.4th 106, 113-14 (2d Cir. 2024), Defendants exalt form over substance.  "The Court's discretionary decision to award declaratory judgment turns on (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment will finalize the controversy and offer relief from uncertainty."  S*kanska USA Bldg. Inc. v. Regeneron Pharms. Inc.*, 2024 WL 3274731, at *3 (S.D.N.Y. July 1, 2024) (quotation and citation omitted).  Defendants have invented a novel, unconstitutional basis for firing federal employees.  Their deviation from over

---

[9] It is unclear whether Defendants make any argument related to Cause of Action Eight concerning substantive due process.  In any event, Ms. Comey has plausibly alleged this reputational harm based on a substantive due process violation, by her extensive allegations of Defendants' deviation from CSRA processes.  *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 789 (2d Cir. 2007) (procedurally irregular actions were "ultra vires and, as a result, sufficiently arbitrary to amount to a substantive due process violation").

51

a century of precedent has wrought confusion across the federal civil service. *See, e.g.*, *Jackler & Jaroch Consolidation v. Dep't of Just.*, Docket No. CF-0752-26-0069-I-1 (M.S.P.B. Mar. 20, 2026); *Comans*, 2026 WL 1132803.  It is absolutely necessary to clarify this matter—for Defendants and the public—in the form of a declaratory judgment.  Doing so would also alleviate uncertainty for other former federal employees who received Article II termination notices but remain in limbo, without any relief, at MSPB.

Ms. Comey pleads her mandamus claim, Cause of Action Ten, "in the alternative." (Compl. ¶ 123.)  Such a claim may be established where (1) there is a clear right to the relief sought; (2) the Government has a plainly defined duty to perform the act in question; and (3) no other adequate remedy is available.  *See Anderson v. Bowen,* 881 F.2d 1, 5 (2d Cir. 1989). Plaintiff alleges that she has a clear right to for-cause removal protections under the CSRA and that the government has a plain duty to provide her with these protections.  However, because this claim is pled "in the alternative," should the Court find any other basis for relief in the balance of the causes of action, Plaintiff agrees that such a finding might constitute an adequate remedy.  *See Benzman v. Whitman*, 523 F.3d 119, 132–33 (2d Cir. 2008).

\* \* \*

## **PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT SHOULD BE GRANTED**

## **APPLICABLE RULE 12(c) LEGAL STANDARDS**

Ms. Comey moves for partial judgment on the pleadings pursuant to Rule 12(c) as to her Claims One, Two, Three, Five, and Six.[10]

When both parties move for judgment under Rule 12(c), the district court must "treat each motion as if the other had not been made and by this process determine whether any material issues of fact are presented by the pleadings." 5C Charles A. Wright & Arthur Miller, *Federal Practice and Procedure* § 1370 (3d ed. 2004 & Supp. 2019).

As above, where *defendants* move for judgment on the pleadings, the Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [plaintiff's] favor," and judgment is appropriate only if no material issue of fact remains to be resolved. *Hayden*, 594 F.3d at 150.

Conversely, where a *plaintiff* moves for judgment on the pleadings, "the court is to accept the defendant's denials and [the] allegations of the answer which are well pleaded, as well as the undenied facts alleged in the complaint." *JPMorgan Chase Bank, N.A. v. Tesla, Inc.*, No. 21 CIV. 9441, 2024 WL 4167340, at *6 (S.D.N.Y. Sept. 12, 2024) (cleaned up). "The court must

---

[10] In the alternative, and for the same reasons, Plaintiff moves as to Affirmative Defenses Two, Three, and Four: (a) to strike under Rule 12(f), *see Meisels v. Meisels*, No. 19-CV- 4767, 2021 WL 1924186, at *8 (E.D.N.Y. May 13, 2021) ("To strike a defense under Rule 12(f) for legal insufficiency, (1) there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense.") (citation omitted); (b) to dismiss under Rule 12(h)(2)(B) for "failure []to state a legal defense to a claim" (providing that a party may raise such an argument in Rule 12(c) motion); and/or (c) for summary judgment under Rule 12(d), *see, e.g.*, *Lively*, 6 F.4th at 304-05 (if the court, in deciding a Rule12(c) motion, considers "documents attached to Defendants' answer" that are "neither incorporated by reference in nor integral to the complaint," Rule 12(d) requires the court to convert the motion to one for summary judgment).

'draw all reasonable inferences in favor of the defendant, who is the non-movant,'" such that "if 'a defendant's answer admits, alleges, or fails to deny facts which, taken as true, would entitle a plaintiff to relief on one or more claims supported by the complaint, then the plaintiff's Rule 12(c) motion should be granted.'" *Id.* (quoting *Lively*, 6 F.4th at 305, and *Allstate Ins. Comp. v. Vitality Phys. Group*, 537 F. Supp. 3d 533,545 (S.D.N.Y. 2021) (where "a plaintiff moves for judgment on the pleadings, the question for determination is whether on the undenied facts alleged in the complaint and assuming as true all the material allegations of fact in the answer, the plaintiff is entitled to judgment as a matter of law")).

Partial judgment on the pleadings is appropriate where, as here, it "resolves at least an entire cause of action or Affirmative Defense." *JPMorgan Chase*, 2024 WL 4167340, at *14 (citations and quotations omitted); *see also HLP Props., LLC v. Consol. Edison Co. of N.Y.*, No. 14-cv-1383, 2015 WL 5092627, at *8 (S.D.N.Y. Aug. 28, 2015) (granting in part plaintiff's motion for partial judgment on the pleadings).

## ARGUMENT

Regardless of who fired her, Ms. Comey has demonstrated as a matter of law that she is entitled to judgment on her Claims One, Two, and Three.  Article II does not authorize the Attorney General—or the President, or anyone else—to fire her without cause.  And, even drawing all inferences in Defendants' favor, thus assuming that the Attorney General fired her and did so under Section 542 or the CSRA, she has demonstrated as a matter of law that those statutory authorities do not authorize firing an AUSA without cause.

Also, again regardless of who fired her, she has demonstrated as a matter of law that she was deprived of her property and procedural due process rights, entitling her to judgment on Claims Five and Six.  *See Contreras v. Comm'r of Social Sec.*, No. 13-cv-6474, 2014 WL

54

5149111, at *7 (JMF) (S.D.N.Y. Oct. 14, 2014) (granting judgment on the pleadings "if, from the pleadings, the moving party is entitled to judgment as a matter of law") (citations omitted); *see also Whittingham*, 2024 WL 2104674, at *1 (judgment on the pleadings appropriate where "no material issue of fact remains to be resolved" and movant "is entitled to judgment as a matter of law").

### A.      Claim One: Separation of Powers

The Court should grant judgment to Ms. Comey on Claim One, asserting violations of Article I and II and the Separation of Powers.  As explained at length above, *see supra* Point I, Article II does not authorize *anyone*—whether the President, the Attorney General, or anyone else—to fire AUSAs without cause or process in contravention of the CSRA, passed by Congress under its own Article I and Article II powers.

The Court can reach this question now, because who fired Ms. Comey is not a material fact for purposes of this separation of powers claim.  Article II does not authorize anyone to override the CSRA; there is no Presidential purported (and purportedly delegable) Article II removal power to terminate an AUSA without cause.  Thus, Ms. Comey prevails no matter *who* exercised that purported authority in violation of the separation of powers.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (granting separation of powers claim, recognizing that government identified "no authority" for treating a "separation-of-powers claim . . . differently than every other constitutional claim")[11] (citing *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 74 (2001) (equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally"); *Bell v. Hood,* 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to

---

[11] *Compare* Compl, ¶¶ 87-90 (Claim One), *with Free Enterprise*, No. 06-cv-217 (D.D.C.), ECF No. 1 (Count One).

issue injunctions to protect rights safeguarded by the Constitution[.]”); *Ex parte Young*, 209 U.S. 123, 149 (1908)).

### B.    Claims Two and Three: the APA

The Court should grant judgment to Ms. Comey on her Claims Two and Three, asserting violations of the APA.

*First*, Defendants concede that they failed to provide Ms. Comey with any process whatsoever.  (Answer ¶ 48.)  That concession alone entitles Ms. Comey to judgment under the APA.  Because the CSRA applies to Ms. Comey and requires that she be provided with process before termination, *see supra* Point II, Defendants acted “without observance of procedure required by law” in violation of the CSRA, 5 U.S.C. § 706(2)(D).  Defendants’ actions were also “contrary to [a] constitutional right” in violation of the Fifth Amendment.  5 U.S.C. § 706(2)(B).  Ms. Comey thus prevails on her APA claim based on Sections 706(2)(D) & (B).  (Compl. ¶ 92); *Board of Ed. v. U.S. Dept. of Ed.*, No. 25-cv-8547, 2026 WL 948205, at *7 (S.D.N.Y. Apr. 8, 2026) (“Since it is undisputed that defendants did not follow Title IX’s procedures, they acted ‘without observance of procedure required by law’” in violation of the APA).  Because the CSRA protects Ms. Comey regardless of who fired her, the Court can reach this issue without regard to that question.

*Second*, Defendants’ attempt to use Article II to override the CSRA, *see supra* Point I, is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,” and/or “in excess of statutory jurisdiction.”  5 U.S.C. § 706(2)(A) & (C).  Ms. Comey thus prevails on her APA claim based on Sections 706(2)(A) and (C).  *See, e.g., Kakar v. United States Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (setting aside agency action as arbitrary and capricious, warranted when “the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, . . . or

[act] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise") (citations omitted); *Nat. Res. Def. Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (courts "'shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citing 5 U.S.C. § 706(2)(A)); *Koopmann v. DOT*, 335 F. Supp. 3d 556, 565 (S.D.N.Y. 2018) ("USDOT's Touhy regulations are invalid to the extent that they extend to former employees" and agency letter relying on regulations "was arbitrary and capricious and in excess of statutory jurisdiction").  Because Article II does not permit *anyone* to run roughshod over the CSRA, the Court can also reach this issue regardless of who fired Ms. Comey.

*Third*, construing all inferences in Defendants' favor and thus assuming that the Attorney General fired Ms. Comey, their faulty claim that Section 542 overrides the CSRA, *see supra* Point II.A, and Defendants' attempt to rely on Section 7513(a) of CSRA to undercut the very premise of the CSRA, *see supra* Point II.B, are likewise "in excess of statutory jurisdiction" and/or "not in accordance with the law," 5 U.S.C. § 706(2)(A) and (C).  Ms. Comey has thus, again, successfully stated an APA claim under Sections 706(2)(A) and (C).  *See Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) ("Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations.").[12]

---

[12] The Court should grant judgment to Ms. Comey on Affirmative Defenses Two, Three, and Four for the same reasons. Specifically, Defense Two ("Attorney General is expressly authorized to remove an Assistant United States Attorney by 28 U.S.C. § 542(b) without cause"), Three (Article II permits the "President, as well as Heads of Departments and other officials employing the President's executive power, to remove [AUSAs] without cause"), and Four (removal pursuant to Article II and Section 542 "'promote[s] the efficiency of the service' as contemplated by [CSRA Section] 7513(a)"), fail under Rules 12(d), (f), and (h)(2)(B), because neither Article II, nor Section 542, nor the CSRA authorize the President, the Attorney General, or anyone else to fire Ms. Comey or any AUSA without cause.

### C.        Claims Five and Six:  Due Process

Finally, the Court should grant judgment to Ms. Comey on Claims Five and Six, asserting property-interest based procedural due process claims under the Fifth Amendment.  Here too, the Court can decide these claims without regard to who fired Ms. Comey.

The analysis is straightforward: "A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Radwan v. Manuel*, 55 F.4th 101, 123 (2d Cir. 2022) (citation omitted).  As discussed above, *see supra* Point III.B, Ms. Comey had a property interest and thus due process rights in connection with her employment.  Defendants concede that she was fired "effective immediately," and deprived of her job without any process whatsoever. (Answer ¶ 3.)  Because Ms. Comey was entitled to statutory for-cause removal protections, or because Defendants fostered a mutual understanding of continued employment, she is entitled to judgment on these claims.  *See supra* Point III.B.

58

## **CONCLUSION**

For the above-stated reasons, this Court should deny the Defendants' motion for judgment on the pleadings in its entirety, and grant Ms. Comey's cross-motion for partial judgment on Claims One, Two, Three, Five, and Six.


Dated:  July 17, 2026
      New York, New York

CLARICK GUERON REISBAUM LLP

By:  */s/ Ellen Blain*_____
Nicole Gueron
Ellen Blain
Deepa Vanamali
41 Madison Avenue
New York, NY  10010
Tel: (212) 633-4310
Fax: (646) 478-9484
ngueron@cgr-law.com
eblain@cgr-law.com
dvanamali@cgr-law.com

KOSKOFF KOSKOFF & BIEDER, PC
Margaret M. Donovan
350 Fairfield Ave.
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com


*Attorneys for Plaintiff Maurene Comey*

59

## CERTIFICATE OF COMPLIANCE

Ellen Blain, pursuant to this Court's Order (ECF 37), undersigned counsel for Plaintiff Maurene Comey, hereby certifies that the number of words within the attached memorandum of law, excluding the caption, table of contents, table of authorities, and signature block, is 17,877 according to the word-processing system used to prepare the aforesaid document.

Dated: July 17, 2026                               */s/ Ellen Blain*_____
      New York, New York              Ellen Blain