IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MARY COMANS, *Plaintiff*, v. EXECUTIVE OFFICE OF THE PRESIDENT, DEPARTMENT OF HOMELAND SECURITY, AND UNITED STATES OF AMERICA, *Defendants*. | 1:25-cv-01237-MSN-WEF |

MEMORANDUM OPINION AND ORDER

Plaintiff Mary Comans, a career civil servant and member of the Senior Executive Service serving as Chief Financial Officer of the Federal Emergency Management Agency, was unceremoniously terminated in February 2025. The sole formal basis provided to Plaintiff by the government for her firing was that the President possessed the power to do so under Article II of the Constitution. But simultaneously, government officials publicly accused Plaintiff of "circumventing leadership to unilaterally make egregious payments for luxury NYC hotels for migrants." Plaintiff filed suit in this Court against the Executive Office of the President, Department of Homeland Security, and the United States of America (collective, "Defendants"), claiming that Defendants deprived her of her property interest in her continued federal employment and her reputational liberty interests without any due process. Now before the Court are the parties' cross-motions for summary judgment (ECF 45, 54), in which Defendants have asserted that Plaintiff's termination was correct, that there can be no relief, and that the Civil Service Reform Act of 1978 ("CSRA") is unconstitutional as applied to Plaintiff—for the fundamental reason that absolute Article II power trumps any congressionally-imposed restrictions on her removal.

The Court cannot agree with Defendants. "As far as the Court can tell, when enacting the CSRA, Congress did not consider 'Article II removals' of career civil servants because they were

not a thing." *Comey v. U.S. Dep't of Just.*, No. 25-CV-7625 (JMF), 2026 WL 1142679, at *7 (S.D.N.Y. April 28, 2026). In accordance with this observation, Defendants do not (and cannot) claim that the President may fire every member of the civil service otherwise protected by the CSRA *carte blanche*. Rather, they argue, equally novelly, that Plaintiff is an inferior officer, and the magnitude and scope of her duties requires that she be immediately removable at-will.

But the Supreme Court has recognized for nearly a century and a half, beginning in *United States v. Perkins*, that Article II does not create a plenary power to remove all inferior officers and that Congress may validly regulate the method by which they are removed. It is this unbroken line of binding precedent that compels the conclusion that the Plaintiff's duties are not so central to the functioning of the Executive Branch, nor the CSRA's protections so restrictive as to deprive the Executive of meaningful control over Plaintiff, such that CSRA must be stricken as to Plaintiff. Indeed, in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the Supreme Court dismissed the notion that the CSRA's protections of members of the Senior Executive Service are unconstitutional.

The Court recognizes that recently, with the overruling of *Humphrey's Executor*, the President's Article II power to remove the principal officer leaders of independent agencies has reached a high-water mark. *Trump v. Slaughter*, 609 U.S. __, 2026 WL 1855612 (June 29, 2026). *Slaughter*, however, had nothing to say about inferior officers or the *Perkins* line of cases, and this Court must exercise great caution in translating principles from one context into another without clear direction. Instead, judicial restraint requires this Court to apply the law as it stands. And the law does not permit Defendants to fire Plaintiff, nor to publicly denigrate her in conjunction with that action, without due process. Accordingly, Plaintiff is entitled to summary judgment on Counts I and II and the Court will enter a declaratory judgment and order a name-clearing hearing in this matter.

## I.  FACTS

The following facts are undisputed unless otherwise noted.

Plaintiff Mary Comans began her federal employment as a Presidential Management Fellow, first at the Food and Drug Administration in 2004, and later at the Department of Homeland Security ("DHS") in 2005. ECF 46-2 Plaintiff's Statement of Undisputed Material Facts ("PSUMF") ¶ 1. In the years that followed, she rose through the civil service ranks at DHS and, she eventually joined the Senior Executive Service ("SES") in 2016 as the Deputy Chief Financial Officer for the Federal Emergency Management Agency ("FEMA"). *Id.* ¶¶ 1, 2. In March 2017, Plaintiff assumed the position of FEMA Chief Financial Officer ("CFO") in an acting capacity, and in December 2017, she was selected by the FEMA Administrator as FEMA's permanent CFO. *Id.* ¶ 3. Plaintiff served as CFO under three different FEMA Administrators and was subject to the direct formal supervision of the FEMA Deputy Administrator. *Id.*; ECF 58 Plaintiff's Statement of Additional Undisputed Material Facts ("PSAUMF") ¶ 6.

As FEMA CFO, Plaintiff took on a variety of managerial and bureaucratic tasks regarding FEMA's budget and financial operations. ECF 55 Defendants' Statement of Undisputed Material Facts ("DSUMF") ¶¶ 3–10, 13–14, 16–18. She led 450 personnel and administered FEMA's $45 billion budget. *Id.* ¶¶ 14, 17. In that capacity, she served chiefly as an advisor to higher level FEMA and DHS officials and provided technical, legal, and pragmatic information to decisionmakers. ECF 58-1 ¶¶ 1, 5–9, 10, 11, 14, 15. While Plaintiff could make limited "changes to otherwise fixed terms regarding funding for grantees to cover their management costs for a given disaster or emergency response," ECF 55 at 20 (citing 44 C.F.R. §§ 207.5(d)(e), 207.7(e), 207.8(b)(3), 207.9(d)(3)), she did not make grants or determine the criteria for such, and she generally had no authority over how FEMA spent funds or its budget requests. ECF 58-1 ¶¶ 8, 9. Moreover, higher agency officials could reject any of Plaintiff's advice and could revise or reject any decision that

she made. PSAUMF ¶ 5. Additionally, Plaintiff had no power to initiate or conduct any legal proceedings, nor any power to make rules binding on the public or to bind the public or the agency generally, and even if she identified any violation of appropriations law by the agency, the actions she could take were limited to her mandatory reporting obligations. *Id*. ¶ 8; ECF 58-1 ¶¶ 6, 17. Plaintiff also acted as a liaison to staff from FEMA and DHS, the White House, Congress, and other federal, state, and local authorities, DSUMF ¶¶ 11, 18, and engaged with congressional staffers regarding FEMA's budget and resources, *id*. ¶¶ 15, 21; ECF 58-1 ¶ 13. And in one instance, she managed a team that proposed legislation to appropriations staffers to address technical challenges in disbursing disaster funding due to how that funding is "scored" in appropriations law, DSUMF ¶ 19; ECF 55-2 at PageID# 611, though her role did not entail policymaking. ECF 55-1 ¶ 1.

Plaintiff was an outstanding performer and was lauded as an "effective, well-respected leader and trusted advisor to the FEMA Administrator, Deputy Administrator, and [DHS] leaders" whose "success and accomplishments are further enhanced when one overlays the complexity of FEMA's operations environment, the most nuanced and intricate across [DHS]." ECF 55-2 at PageID# 614. The FEMA Deputy Administrator described her as "a dedicated public servant" who "is results oriented and puts the needs of the Agency, the mission[,] and her people first and foremost." *Id*. at 615. He stated that FEMA was "fortunate to have her leadership and to have such a dedicated financial and management professional" and "[m]any of the Agency's [and] the Department's successes . . . are directly attributable to [her] actions." *Id*. Plaintiff received a perfect rating on her final performance review. *Id*. at 598–99. And she had not an inkling that her job was ever in question. ECF 46-2 ¶ 5.

On February 11, 2025, Plaintiff received a notice of removal from her position signed by the Senior Official Performing the Duties of the FEMA Deputy Administrator that stated:

4

This is an official notice that, effective immediately, you are being removed from your position with the Federal Emergency Management Agency and from Federal service. This action is being taken pursuant to Article II of the United States Constitution, at the direction of the President. Article II, § 1 states that the executive Power "shall be vested in a President of the United States of America," and this termination is an exercise of that vested power.

PSUMF ¶ 4. Plaintiff did not previously know that anyone was considering her termination, and she was not given any notice or opportunity to respond to any alleged performance or conduct issues. *Id*. ¶ 5.

On the same day, DHS issued a public press release stating that Plaintiff had been fired "for circumventing leadership to unilaterally make egregious payments for luxury NYC hotels for migrants" and that "[u]nder President Trump and Secretary Noem's leadership, DHS will not sit idly and allow deep state activists to undermine the will and safety of the American people." *Id*. ¶ 6. DHS spokesperson Tricia McLaughlin told *The New York Times* that four FEMA employees, including Plaintiff, had been fired for similar reasons. *Id*. ¶ 7. Another DHS spokesperson also told CNN that the fired employees had "effectively laundered the forbidden funding" and "knowingly hid this information from legal counsel to manipulate the funding process and undermine the Secretary's order." *Id*. ¶ 10. Then-government employee Elon Musk retweeted a photo of Plaintiff along with the statement "FEMA CFO Mary Comans was just fired for funneling $58M to illegal migrant hotels in Manhattan" and he called it a "criminal action." *Id*. ¶ 8. Finally, the President himself posted on Truth Social that "FEMA spent millions of dollars in Democrat areas, disobeying orders …" *Id*. ¶ 9.

Plaintiff was never afforded an opportunity to be heard regarding these statements about her and the circumstances surrounding her termination and she has never been afforded any sort of name-clearing hearing. *Id*. ¶¶ 11, 12.

## II.    LEGAL STANDARD

5

Summary judgment is proper where the moving party has demonstrated that "there is no genuine issue of material fact," and the movant deserves judgement as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, (1986); *Evans v. Tech. Apps. & Servs. Co.*, 80 F. 3d 954, 958–59 (4th Cir. 1996). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F. 3d 179, 183 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248). Where, as here, the Court is faced with cross-motions for summary judgment, the Court must review each motion separately, taking the facts in the light most favorable to the nonmovant. *Rossignol v. Voorhaar*, 316 F. 3d 516, 523 (4th Cir. 2003).

## III.    DISCUSSION[1]

### A. Count I – Procedural Due Process – Property Right

Count I of the Complaint alleges that Defendants deprived Plaintiff of her property interest in continued federal employment without due process. The facts here would ordinarily make this a simple claim for Plaintiff. Indeed, the CSRA vested Plaintiff with a property interest in her continued federal employment and it is undisputed that Plaintiff was fired without any reason and without any process whatsoever. *Lamb v. Holder*, 82 F. Supp. 3d 416, 424 (D.D.C. 2015) ("Federal employees covered by the CSRA have a property interest in their continued employment."); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and a[] [pretermination] opportunity to present his side of the story.").

---

[1]    Apart from the merits, Defendants challenge this Court's prior determination that it possesses jurisdiction over Plaintiff's claims in this case. ECF 55 at 7. The Court finds Defendants' arguments unpersuasive and determines that, as an alternative basis for jurisdiction, Congress did not intend for Plaintiff's claims to be channeled under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), as articulated by Judge Furman in *Comey v. United States Department of Justice*, No. 25-CV-7625 (JMF), 2026 WL 1142679 (S.D.N.Y. April 28, 2026).

It is only because of Defendants' invocation of Article II that there is any need for further discussion. Defendants claim that the CSRA is unconstitutional as applied to Plaintiff because the President's powers under the Vesting ("[t]he executive Power shall be vested in a President") and Take Care (the President shall "take Care that the Laws be faithfully executed") Clauses require that she (apparently an inferior officer) be removable at-will. ECF 55 at 15; U.S. Const. Art. II, § 1, cl. 1; *id.* § 3. This is a stunning proposition, for the constitutionality of the CSRA's SES protections has never been in doubt at any time in the Act's forty-eight year history. And even assuming that Plaintiff is an inferior officer,[2] it is also a proposition that is not supported by the law as it currently exists.

One hundred forty years ago, the Supreme Court recognized in *United States v. Perkins* that:

> when congress, by law, vests the appointment of inferior officials in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest. The constitutional authority in congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as congress may enact in relation to the officers so appointed.

116 U.S. 483, 485 (1886). Since that time, the Court has repeatedly reaffirmed the principle that the President does not have plenary power to remove all inferior officers and that Congress may validly regulate the method by which such officers are removed. *See, e.g.*, *Myers v. United*

---

[2]    Principal officers are appointed by the President with the advice and consent of the Senate, while inferior officers may be appointed by the President, the head of an executive department, or a court. *United States v. Arthrex*, 594 U.S. 1, 10 (2021). Generally, inferior officers are those officers whose work is "directed and supervised at some level" by principal officers. *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025). And officers of any sort are those who occupy a continuing position established by law and exercise "significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 585 U.S. 237, 245 (2018). No one suggests Plaintiff is a principal officer. ECF 60 at 9. Plaintiff for her part argues that she is not an inferior officer but a mere "employee." ECF 58 at 14, 15. Defendants contend otherwise but acknowledged at oral argument that they are not suggesting that "employees" may be removed at-will under Article II. *See Lucia*, 585 U.S. at 245 ("non-officer employees" are part of the "broad swath of 'lesser functionaries' in the Government's workforce").

Given the limited scope of her duties and powers, the Court doubts that Plaintiff is an inferior officer rather than an employee. But even assuming that she is an inferior officer, the CSRA is constitutional as applied to her for the reasons discussed below.

*States*, 272 U.S. 52, 127 (1926); *Morrison v. Olson*, 487 U.S. 654, 689 n. 27 (1988) [3] ("this Court has never held that the Constitution prevents Congress from imposing limitations on the President's power to remove *all* executive officials simply because they wield 'executive' power"); *Seila L. LLC v. CFPB*, 591 U.S. 197, 217 (2020) ("We have recognized a second exception for *inferior* officers in . . . *Perkins*"). Rather, the "ultimate question" on the permissibility of an inferior officer's removal restriction is whether the "removal restriction is of such a nature that it impedes the President's ability to perform his constitutional duty." *Id*. at 217 (cleaned up) (citing *Morrison*, 487 U.S. at 691).

The answer to the "ultimate question" here is a clear "no."

Considering first the nature of the removal restriction itself, it is important to understand what the CSRA restricts, and what it does not. Even though there is no per se bar against "good cause" restrictions on removal, *Morrison*, 487 U.S. at 691 ("we cannot say that the imposition of a 'good cause' standard for removal by itself unduly trammels on executive authority"), the CSRA does not actually vest Plaintiff with absolute for-cause protection, but rather something materially short of that. As explained in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, "members of the SES may be reassigned or reviewed by agency heads (and entire agencies may be excluded from that Service by the President)." 561 U.S. 477, 506-07 (2010) (citing 5 U.S.C. §§ 2302(a)(2)(B)(ii), 3132(c), 3395(a), 4312(d), 4314(b)(3), (c)(3)). Of particular note, SES members may be transferred to any other position within the SES without any reason and with minimal notice. 5 U.S.C. § 3395(a). And SES members may be removed to a civil service position outside of the SES "at any time for less than fully successful executive performance"—short of

---

[3]     Even Justice Scalia, dissenting in *Morrison*, would agree. *See* 487 U.S. at 724 n.24 (Scalia, J., dissenting) (the Constitution "does not require that [the President] have plenary power to remove inferior officers. Since [inferior officers] are . . . subordinate to, *i.e.*, subject to the supervision of, principal officers who (being removable at will) have the President's complete confidence, it is enough . . . that they be removable *for cause*, which would include, of course, the failure to accept supervision. Thus, *Perkins* is in no way inconsistent with my views").

8

"cause"—with little notice and only a post-removal informal hearing. 5 U.S.C. § 3592(a)(2).[4]

Thus, although it is generally the case that SES members can be removed from the *civil service* altogether only for "misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function" and with full notice, pre-deprivation hearing, and appeal rights, 5 U.S.C. §§ 7542, 7543, the CSRA scheme provides the Executive with ample latitude to manage SES members even in the absence of good cause. These features are not accidental but are rather a reflection of informed choices by Congress to vest the SES with protections commensurate with both the more prominent role that such employes play in the civil service and the President's attendant need for control. *See* 5 U.S.C. § 3132(a)(2); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (explaining that Congress defined CSRA with "painstaking detail").

It is precisely for these features that the Court in *Free Enterprise Fund*, considering the status of the "double" for-cause protected inferior officer members of the Public Company Accounting Oversight Board (appointed by SEC commissioners who could not be removed "except under the *Humphrey's Executor* standard of "inefficiency, neglect of duty, or malfeasance in office," *Free Enter. Fund*, 561 U.S. at 487), rejected "premonitions of doom" for "hundreds, perhaps thousands of high-level Government officials" in independent agencies, including SES members, flowing from its holding that the Board members could not be validly protected. *Id*. at 506; *id*. at 540–42 (Breyer, J., dissenting). That was because SES members did not "enjoy the same significant and unusual protections from Presidential oversight as members of the Board"—who were rather inferior officers not subject to any comparable authority of the President (and

---

[4]     This is by no means an exhaustive description of the CSRA's statutory carve-outs that enable expedient action. For example, there is also a national security exception, 5 U.S.C. §§ 7532, 7542, and notably, a provision that permits "summary" removal or suspension upon "reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment can be imposed." 5 U.S.C. § 7543(b)(1). It is telling that, despite government official Elon Musk declaring Plaintiff to have taken a "criminal action," Defendants have never suggested that the crime exception applies in this case.

accordingly, were deemed necessarily removable at-will). *Id.* at 492, 506–07. Based on all of this, and the fact that the Supreme Court did not "cast doubt on the use of what is colloquially known as the civil service system within independent agencies," *id.* at 507, significant stock must be placed in the limited nature of the CSRA's SES protections.[5] And that is particularly so as they are applied to Plaintiff here, who was positioned in FEMA within the Department of Homeland Security—not an independent agency—and subject to the supervision of principal officers removable at will.[6]

Moreover, despite Defendants' blanket (and repeated) insistence that she was among the "elite of the elite," nothing about the particulars of Plaintiff's position suggests a conclusion other than that the CSRA is valid as applied to her. Plainly, Plaintiff was a manager and an advisor, and a valuable and effective one at that. But she was not a policymaker, rule maker, regulator, investigator, prosecutor, litigator, adjudicator, or anything of the sort. *See Morrison*, 487 U.S. at 691. She could not bind the public or make grants or final decisions. She did not wield any "core executive power." *Seila L.*, 591 U.S. at 219. She was unable to "bring the coercive power of the state to bear on millions of private citizens," let alone a single person. *Id.* The reach of her "jurisdiction" was confined to the budgetary and financial operations of FEMA. Even then, her jurisdiction was by no means exclusive, she had no more administrative authority "outside of [that] necessary to operate her office," and all of her advice and decision making was "trained inward" to the agency and entirely displaceable by freely removable principal officer supervisors. *Id.*; *Morrison*, 487 U.S. at 662, 671–72; *see also Arthrex*, 594 U.S. at 23, 25 (remedying the

---

[5]    Indeed, the only lower court to have considered the Article II permissibility of any SES member's removal restrictions determined, based on the discussion in *Free Enterprise Fund*, that such restrictions "do not appear to be unconstitutional." *Arnesen v. Raimondo*, 2024 WL 377820, at *25 (S.D. Miss. Jan. 31, 2024).

[6]    The Supreme Court has now overruled *Humphrey's Executor* in *Trump v. Slaughter*, 609 U.S. _, 2026 WL 1855612 (June 29, 2026). Accordingly, the constitutional problem posed by the "double for-cause" protection scheme considered in *Free Enterprise Fund* no longer exists.

constitutional problem posed by unreviewable decision making of for-cause protected inferior officer administrative patent judges by striking down statutory restriction on review by principal officers). Indeed, she could not stop an action, lawful or unlawful, by those superiors, through whom she was accountable to the President. Accordingly, Plaintiff's role does not pose a constitutional question of magnitude anywhere close to even that presented by validly-protected independent counsel in *Morrison*.[7]

For all of these reasons, it cannot be said that the CSRA's SES protections, as applied to Plaintiff, "unduly trammels on executive authority." *Morrison*, 487 U.S. at 691. Defendants, beyond vaguely alluding to the stature of Plaintiff's position, have not identified how this conclusion is incorrect in any concrete way, nor have they explained (nor does the Court understand) "how the President's need to control the exercise of [Plaintiff's] discretion is so central to the functioning of the Executive Branch as to require as a matter of constitutional law that [Plaintiff] be terminable at will by the President." *Id*. at 691–92. And further, the CSRA does not "impermissibly burden[] the President's power to control or supervise [Plaintiff], as an executive official, in the execution of [] her duties" and this is "not a case in which the power to remove an executive official has been completely stripped from the President, thus providing no means for the President to ensure the 'faithful execution' of the laws." *Id*. at 692. To the contrary, the Executive retains appropriate authority to hold Plaintiff to account through the CSRA and her superiors.

---

[7]     Plaintiff's duties simply pale in comparison to those of the independent counsel, who possessed the power, within his jurisdiction, to: "exercise all investigative and prosecutorial functions and powers of" any official or officer of the Department of Justice (including the Attorney General); conduct all aspects of civil and criminal litigation; appoint employees; request and obtain assistance from the Department of Justice, accept referral of matters within his jurisdiction from the Attorney General; operate to the exclusion of efforts by other components of the Department of Justice; and summarily dismiss matters within his jurisdiction. 487 U.S. at 661-62.

11

Accordingly, Plaintiff is entitled to summary judgment on Count I and declaratory judgment thereto.

## B. Count II – Procedural Due Process – Liberty Interest

Count II of the Complaint asserts that Defendants deprived Plaintiff of her liberty interests by making stigmatizing and derogatory public statements in conjunction with her termination accusing her of unilaterally making egregious payments for luxury New York City hotels for migrants. As with Count I, Count II is a straightforward matter for Plaintiff. Plaintiff was terminated, and as articulated above as to Count I, she had a property interest in her continued federal employment.[8] With that termination, Defendants publicized highly-damaging statements that implied serious defects on her part, including that she had refused binding orders, violated the civil and criminal laws, wasted government funds, undermined the "will and safety of the American people" as a "deep state activist," "laundered the forbidden funding," and engaged in a cover-up by "knowingly [hiding] this information from legal counsel to manipulate the funding process." *Elhady v. Kable*, 993 F. 3d 208, 225 (4th Cir. 2021) ("A litigant must show [(1)] a statement 'stigmatizing his good name' and damaging his standing in the community; (2) some type of dissemination or publication of the statement; and (3) some other government action that 'alter[s] or extinguishe[s] one of his legal rights'"); *Robertson v. Rogers*, 679 F. 2d 1090, 1092 (4th Cir. 1982) (qualifying statements include those accusing employee of "serious character defects" such as dishonesty, immorality, criminality, or attacking integrity or honor). Because Plaintiff has never been afforded an opportunity to refute these accusations, such deprivation of liberty amounts

---

[8] The parties dispute whether a property interest in employment is required to make a liberty interest claim here. Plaintiff appears to be correct that Count II does not require an entitlement to employment. *See, e.g., Sciolino v. City of Newport News, Va.*, 480 F. 3d 642, 645 (4th Cir. 2007) (dismissing liberty interest claim for failure to allege adequate dissemination, but only after noting "[a]lthough Sciolino, as a probationary employee, has no protected 'property' interest in his employment with the City, a public employer cannot deprive a probationary employee of his 'freedom to take advantage of other employment opportunities" and conducting full analysis of liberty interest claim); *see also id*. at 646 (stating elements of claim without mentioning property interest). Nevertheless, the dispute is immaterial, because Plaintiff prevails on Count I and has established that she does have a property interest in her continued employment.

to a denial of adequate procedure, and the appropriate remedy is a name-clearing hearing. *Harrell v. City of Gastonia*, 392 F. App'x 197, 203 (4th Cir. 2010).

Defendants do not actually deny that Plaintiff has made the requisite showing on the elements of her liberty interest claim, but only argue that even so, "she is nevertheless entitled to no relief" because none of the statements they made about her "bear on the validity of the exercise of Article II removal authority," rendering a name-clearing hearing a "meaningless exercise." ECF 55 at 23. For this proposition, they principally look to *Connecticut Department of Public Safety v. Doe ("CDPS")*, 538 U.S. 1 (2003).[9] This reliance is unavailing.

In *CDPS*, the Supreme Court considered whether a convicted sex offender could assert a liberty interest claim based on the lack of a pre-deprivation hearing to determine whether he was likely to be "currently dangerous" before his personal information was publicized, by operation of Connecticut statute, in a state sex offender registry. 538 U.S. at 4. Connecticut's statutory registry requirement was based on the fact of previous conviction, not the fact of current dangerousness, and the registry included a notice on its front page stating:

> The registry is based on the legislature's decision to facilitate access to publicly-available information about persons convicted of sexual offenses. [DPS] has not considered or assessed the specific risk of reoffense with regard to any individual prior to his or her inclusion within this registry, and has made no determination that any individual included in the registry is currently dangerous. Individuals included within the registry are included solely by virtue of their conviction record and state law. The main purpose of providing this data on the Internet is to make the information more easily available and accessible, not to warn about any specific individual.

---

[9]    Relatedly, to the extent that Defendants argue that the stigmatizing statements must have been made in or as the official reason for Plaintiff's termination to be actionable, that proposition is unsupported. *See Cox v. N. Va. Trans. Comm'n*, 551 F. 2d 555, 557, 558 (4th Cir 1976) (holding that liberty interest claim was established on the basis of stigmatizing statements made by defendants to the press notwithstanding that plaintiff's formal termination notice provided "no reason" for her discharge, noting that "the absence of formal charges of wrongdoing [did not] lessen the injury to her reputation" and that "[t]he opportunity of a discharged public employee to get a new job may be hampered as badly by official leaks to the press insinuating dishonesty as by a published official reprimand.").

13

*Id*. at 5. Additionally, the website warned that use of the registry's information to 'injure, harass, or commit a criminal act against a person included in the registry or any other person is subject to criminal prosecution." *Id*.

Reversing the lower courts, the Supreme Court held that "even assuming, arguendo, that respondent has been deprived of a liberty interest, due process does not entitle him to a hearing to establish a fact that is not material" under the statutory scheme. *Id*. at 7. The plaintiff's dangerousness was not pertinent to publication under the state law. *Id*. Importantly, the Court emphasized that the public website explained that status was based on conviction alone and that non-dangerousness "simply does not matter." *Id*. Thus, because Plaintiff did not challenge the state statute's substantive constitutionality, a hearing on "current dangerousness" would be a "bootless exercise." *Id*. at 8 ("States are not barred by principles of '*procedural* due process' from drawing such classifications").

*CDPS* is not relevant to this case for several reasons. First, it goes without saying that there could not be a greater difference between the context of *CDPS*, in which the Court prefaced its analysis by recognizing that "[s]ex offenders are a serious threat in this Nation," *id*. at 4, and the case at hand. There simply is no parallel in substance or concern. Indeed, Defendants acknowledged at oral argument that *CDPS* has never been applied to an employment-based liberty interest claim of any sort. This Court is hard-pressed to understand *CDPS* as addressing anything other than specific circumstances that are not present here.

Second, even assuming that *CDPS* would mean that a *valid* Article II termination could somehow preclude a corresponding liberty interest claim, it is difficult to see why a termination that is not permissible on such grounds should foreclose a liberty interest claim. Defendants all but conceded this point at oral argument, stating (in a series of negatives) that they were not arguing that a name-clearing hearing would not be appropriate if Plaintiff prevailed on the Article II issues

14

raised in Count I. Plaintiff has indeed prevailed on those issues. In this regard, Plaintiff is not comparable to the plaintiff in *CDPS* who failed to show that the rule of state law at issue was constitutionally defective as a matter of *substantive* due process. *See* 538 U.S. at 7. Additionally, whereas persons subject to the state law in *CDPS* "already had a procedurally safeguarded opportunity to contest" the criteria for their inclusion on the registry (the fact of their conviction for a sex crime) prior to publication, *id.* at 2, Plaintiff never had an opportunity to challenge the applicability of Article II before she was terminated and stigmatizing statements were made about her.

Finally, and perhaps most crucially, whereas the Court in *CDPS* emphasized that the website operated by the state pursuant to state law provided conspicuous notice that inclusion of a person had nothing to do with their dangerousness or lack thereof, the information was not to be misused on pain of criminal prosecution, and the purpose of the site was for general information accessibility purposes and not to warn about any specific person, the statements of Defendants here stand in stark contrast. Defendants' derogatory statements did not provide that Plaintiff was terminated pursuant to Article II and merely suggest as an aside that Plaintiff had committed misdeeds. Rather, they *expressly* stated that Plaintiff was fired *because* of improprieties—with no mention of Article II—and these statements are precisely the object of Plaintiff's current challenge. Defendants made no disclaimer or warning to the public suggesting that whether Plaintiff had committed wrongs was separate and apart from her termination. And, there is no legal requirement that a purported Article II termination result in the sort of public statements about Plaintiff here, the same way that the state law in *CDPS* mandated publication of certain information. Simply put, the public statements had nothing to do with Defendants' invocation of Article II, and Article II has no bearing on the validity of Plaintiff's liberty interest claim or its remedy.

Accordingly, Plaintiff is entitled to summary judgment on Count II, declaratory judgment thereto, and a name-clearing hearing.

## IV.    CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Plaintiff's Motion for Partial Summary Judgment (ECF 45) is GRANTED as to Counts I and II; and it is further

ORDERED that Defendants' Cross-Motion for Summary Judgment (ECF 54) is GRANTED as to Count VII; and it is further

ORDERED that the parties' Motions (ECF 45, 54) are otherwise DENIED; and it is further

DECLARED that Defendants deprived Plaintiff of her property interest in continued federal employment without due process of law; and it is further

DECLARED that Defendants deprived Plaintiff of her liberty interest in her good name without due process of law; and it is further

ORDERED that a name-clearing hearing will be held in this matter before the Honorable United States Magistrate Judge William E. Fitzpatrick; and it is further

ORDERED that on or before July 31, 2026, the parties will submit a joint proposal outlining the procedure for the name-clearing hearing.

**IT IS SO ORDERED.**

The Clerk of Court is directed to enter judgment in Plaintiff's favor pursuant to Federal Rule of Civil Procedure 58 on Counts I, II, and VI and in Defendants' favor on Counts III, IV, V, and VII, and to forward a copy of this Order to counsel of record.

/s/
_____
Michael S. Nachmanoff
United States District Judge

July 21, 2026
Alexandria, Virginia