# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

MAURENE COMEY,
                    *Plaintiff,*

        v.

UNITED STATES DEPARTMENT OF JUSTICE;
EXECUTIVE OFFICE OF THE PRESIDENT;
FRANCEY HAKES in her official capacity as the
Director of the Executive Office for United States
Attorneys; PAMELA J. BONDI, in her official
capacity as Attorney General of the United States
Department of Justice; EXECUTIVE OFFICE FOR
UNITED STATES ATTORNEYS; OFFICE OF
PERSONNEL MANAGEMENT; and THE UNITED
STATES OF AMERICA,
                    *Defendants*

Civil Action No: 25-cv-07625

Honorable Jesse M. Furman

**BRIEF OF *AMICUS CURIAE* LAWYERS DEFENDING AMERICAN DEMOCRACY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENTS ON THE PLEADINGS, AND PLAINTIFF'S PARTIAL MOTION FOR JUDGMENT ON THE PLEADINGS**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT OF INTEREST OF AMICUS CURIAE ................................................................ 1

SUMMARY OF ARGUMENT .............................................................................................. 2

ARGUMENT ................................................................................................................... 4

I.      The Tenure and Due Process Protections Afforded to Assistant United States Attorneys Are Well-Settled, and the Supreme Court's Decision in Trump v. United States Does Not Affect Those Protections.................................................................................... 4

II.     The Civil Service Due Process Amendments of 1990 Provide AUSAs with Tenure Protections....................................................................................................... 8

        A. The Due Process Amendments Extended Tenure Protections to AUSAs. .................... 9

        B. The Due Process Amendments modified the application of 28 U.S.C. § 542. ............. 13

III.    The Due Process Amendments' limitation on the removal of Assistant United States Attorneys is constitutional. ................................................................................. 17

IV.     The Protections Afforded to Plaintiff Under the First Amendment Are Not Diminished by any Alleged Constitutional and Statutory Authority in the President.............................. 21

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Adler v. Pataki*,
    185 F.3d 35 (2d Cir. 1999)……………………………………………………… 23

*Andrus v. Glover Constr.* Co.,
    446 U.S. 608 (1980)…………………………………………………….. 13

*Berger v. United States***,**
    295 U.S. 78 (1935)……………………………………………………… 7

*Branti v. Finkel*,
    445 U.S. 516 (1980)……………………………………………………. 23

*Cleveland Bd. Of Educ. v. Loudermill*,
    470 U.S. 532 (1985)……………………………………………………. 10

*Elrod v. Burns*,
    427 U.S. 347 (1976)……………………………………………………. 23

*Ex Parte Hennen*,
    38 U.S. 230 (1839)……………………………………………………… 19

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
    561 U.S. 477 (2010)…………………………………………………….. 20

*Gosnell v. Dep't of Justice,*
    69 F.3d 1138 (Fed. Cir. 1995)………………………………………….. 15

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004)……………………………………………………. 23

*Hamlett v. Dep't of Justice*,
    90 M.S.P.R. 674 (2002)………………………………………………….. 17

ii

**TABLE OF AUTHORITIES – cont'd**

*Kennedy v. Braidwood Mgmt., Inc.*,
    606 U.S. 748 (2025)……………………………………………………… 13

*Morrison v. Olson*,
    487 U.S. 654 (1988)…………………………………………………... 20

*Myers v. United States*,
    272 U.S. 52 (1926)……………………………………………………. 6

*Perry v. Sindermann*,
    408 U.S. 593 (1972)…………………………………………………… 10

*Rutan v. Republican Party*,
    497 U.S. 62 (1990)…………………………………………………….. 23

*Ruth v. Eagle-Picher Co.*,
    225 F.2d 572 (10th Cir. 1955)…………………………………………. 15

*Seila Law LLC v. Consumer Financial Protection Bureau*,
    591 U.S. 197 (2020)…………………………………………………… 20

*Sorenson v. Secretary of the Treasury*,
    475 U.S. 851 (1986)…………………………………………………… 17

*Trump v. Hawaii*,
    585 U.S. 667 (2018)…………………………………………………… 23

*Trump v. Slaughter*,
    No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026)…………………………… 18, 21

*Trump v. United States*,
    603 U.S. 593 (2024)…………………………………………………… 5, 6

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*,
    413 U.S. 548 (1973)…………………………………………………… 21

*United Pub. Workers of Am. v. Mitchell*,
    330 U.S. 75 (1947)…………………………………………………….. 21

## TABLE OF AUTHORITIES – cont'd

*United States v. Armstrong*,
    517 U.S. 456 (1996)………………………………………………………………. 6

*United States v. Fausto*,
    484 U.S. 439 (1988)………………………………………………………………. 11

*United States v. Nixon*,
    418 U.S. 683 (1974)………………………………………………………………. 23

*United States v. Perkins*,
    116 U.S. 483 (1886)………………………………………………………………. 19, 20

*United States* v. *Texas*,
    599 U. S. 670 (2023)……………………………………………………………….. 5

*Webster v. Doe*,
    486 U.S. 592 (1988)………………………………………………………………. 22, 23

*Windsor v. The Tennessean*,
    719 F.2d 155 (6th Cir. 1983)…………………………………………………… 15

## STATUTES

12 U.S.C. § 248…………………………………………………………………….. 14

28 U.S.C. § 542……………………………………………………………………. 9, 14

29 U.S.C. § 783…………………………………………………………………… 14

5 U.S.C.  § 3302…………………………………………………………………… 9

5 U.S.C. § 2302……………………………………………………………………… 16, 17, 24

5 U.S.C. § 3320…………………………………………………………………….. 17

5 U.S.C. § 3322…………………………………………………………………….. 17

5 U.S.C. § 9811…………………………………………………………………….. 17

5 U.S.C. §§ 1302…………………………………………………………………… 17

**TABLE OF AUTHORITIES – cont'd**

5 U.S.C. §§ 2102–2103……………………………………………………………….. 9, 10

5 U.S.C. §§ 7511-7513………………………………………………………………….. 8, 21

*Act to Revise, Codify, and Enact into Law Title 28*, ch. 646,
    Pub. L. No. 80-773, 62 Stat. 869 (1948)………………………………………… 14

Civil Service Due Process Amendments of 1990,
    Pub. L. No. 101-376, 104 Stat. 461 (1990)……………………………………… 11

Civil Service Reform Act of 1978 (CSRA),
    Pub. L. No. 95-454, § 204, 92 Stat. 1111 (1978)………………………………… 3, 10

Lloyd-La Follette Act of 1912,
    Pub. L. No. 62-336, § 6, 37 Stat. 539, 555 (1912)……………………………… 2, 9, 10

Tennessee Valley Authority Act of 1933, ch. 32, § 3, 48 Stat. 58, 59………………….. 14

Veterans' Preference Act of 1944,
    Pub. L. No. 78-359, § 14, 58 Stat. 387, 390 (1944)……………………………… 10

OTHER

91 Fed. Reg. 34,893 (June 3, 2026)……………………………………………….. 24

*Administrative Due Process for Certain Federal Employees: Hearing on H.R. 917 Before the
    Subcomm. on Civil Serv. of the H. Comm. on Post Office & Civil Serv.*, 99th Cong. 25
    (1985)……………………………………………………………………. 11, 12

Bruce A. Green & Rebecca Roiphe, *Can the President Control the Department of Justice*, 70
    Ala. L. Rev. 1 (2018)…………………………………………………… 7, 8

Compl., *Comey v. U.S. Dep't of Justice*, No. 1:25-cv-07625 (S.D.N.Y. Sept. 15, 2025).. 16, 22

Defendants' Memorandum of Law in Support of Motion
    for Judgment on the Pleadings………………………………………….. 5, 9, 13, 22

**TABLE OF AUTHORITIES – cont'd**

Eric Tucker & Alanna Durkin Richer, *How the Trump administration erased centuries of Justice Department experience*, Courthouse News Service (Jan. 16, 2026), https://www.courthousenews.com/how-the-trump-administration-erased-centuries-of-justice-department-experience/ ............................................................................................ 3

H.R. Rep. No. 101-328 (1989)…………………………………………………………. 11

Joseph Story, 3 *Commentaries on the Constitution of the United States* § 1537 (1833)… 19

Nicholas R. Bednar, *Presidential Control of the Civil Service*, 110 Minn. L. Rev. 2065, 2146 (2026)……………………………………………………………………………… 18, 24

Robert H. Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3 (1940)….. 6

*Termination of an Assistant United States Attorney on Grounds Related to His Acknowledged Homosexuality*, 7 Op. O.L.C. 46 (1983)……………………………………………… 16

U.S. Civ. Serv. Comm'n, *Twenty-Third Annual Report* (1903)…………………………. 9

CONSTITUTIONAL PROVISIONS

U.S. Const. Amend. I………………………………………………………………………… 22, 23

U.S. Const. art. II, § 2, cl. 2……………………………………………………………….. 18

**STATEMENT OF INTEREST OF AMICUS CURIAE
LAWYERS DEFENDING AMERICAN DEMOCRACY**

Lawyers Defending American Democracy (LDAD) is a non-profit, nonpartisan organization devoted to encouraging the legal profession to enforce and uphold principles of American democracy and law, consistent with our obligations as lawyers; demanding accountability from lawyers and public officials; and identifying attacks on legal norms and prescribing redress for them. LDAD's mission is to defend the underlying constitutional values and norms of political behavior on which our democracy depends, including the rule of law, institutional checks and balances, separation of powers, press freedom, and the integrity of our system of justice.

LDAD files this amicus brief in support of Plaintiff because this case raises fundamental issues regarding the separation of powers between Congress and the executive branch under the Constitution.  The Government's position calls into question the ability of Congress to establish a nonpartisan and apolitical system of employment for most members of the federal departments and agencies that it creates.  To fulfill Congress' intent and authority under Article II of the Constitution, inferior officers and other federal employees, including attorneys, must be afforded tenure protections under the Civil Service Reform Act of 1978 and the Civil Service Due Process Amendments of 1990.  Accepting the Government Defendants' unprecedented position here would allow federal employees to be terminated on a Presidential or executive branch whim.  The Government even appears to contend that the executive may terminate employees without regard to the exercise of those employees' First Amendment rights of speech and association, a result which contravenes the Constitution and well-settled Supreme Court jurisprudence.

1

Because Plaintiff served as an Assistant United States Attorney, this case implicates significant issues of prosecutorial independence at the federal level. Subjecting prosecutors, including AUSAs, to removal for any reason or no reason would threaten their ability to carry out their obligation of ethical and impartial enforcement of United States criminal laws, and would severely undermine the rule of law.

LDAD has conferred on this brief with three legal scholars. Professor Nicholas Bednar teaches at the University of Minnesota Law School. He holds a Ph.D. in Political Science from Vanderbilt University and a J.D. from the University of Minnesota Law School. Bruce A. Green is the Louis Stein Chair at Fordham Law School, where he directs the Louis Stein Center for Law and Ethics. He holds a J.D. from Columbia University School of Law and an A.B. from Princeton University. Rebecca Roiphe is a Trustee Professor of Law at New York Law School, who focuses on the history and ethics of the legal profession. She holds a J.D. from Harvard Law School and a Ph.D. from the University of Chicago.

## SUMMARY OF ARGUMENT

Maurene Comey, an Assistant United States Attorney (AUSA) whose employment with the Department of Justice had been exemplary, was abruptly removed from her position by way of a memorandum, sent by email, which cited as the sole basis for her removal "Article II of the United States Constitution and the Laws of the United States." Although Congress has prohibited the removal of federal employees without cause since the Lloyd-La Follette Act of 1912, Pub. L. No. 62-336, § 6, 37 Stat. 539, 555 (1912), the Government takes the extraordinary position that this law, in effect for 113 years and uniformly regarded as serving crucial public purposes, runs afoul of Article II of the Constitution because it prevents the President and his appointees from firing anyone they want for any reason. Relying on this

2

expansive interpretation that eradicates Congress's constitutional authority to regulate government employment, the President fired at least 200 Justice Department attorneys in his first year of office. Eric Tucker & Alanna Durkin Richer, *How the Trump administration erased centuries of Justice Department experience*, Courthouse News Service (Jan. 16, 2026), https://www.courthousenews.com/how-the-trump-administration-erased-centuries-of-justice-department-experience/.

This case raises fundamental issues regarding the separation of powers between Congress and the executive branch, the Constitutional underpinnings of the federal civil service system, and the enforcement of the criminal laws in an impartial and nonpartisan manner, "without fear or favor." *Independence and evidence-based decision-making must drive federal prosecutorial actions*, ABA (Oct. 16, 2025), https://www.americanbar.org/news/abanews/aba-news-archives/2025/10/independence-and-evidence-must-drive-federal-prosecutorial-actions/. The Government's position in this case calls into question the ability of Congress to establish a nonpartisan and apolitical system of employment for most members of the federal departments and agencies that it creates. Accepting the Government Defendants' position would return the federal government to a long-discredited Spoils system of patronage directed by the President and his political allies. Such a system would disregard clear Constitutional, statutory, and Supreme Court authority that firmly rests the power of removal of inferior officers and employees, including Assistant United States Attorneys (AUSAs), not in the President, but in those designated by Congress under standards set forth in the Civil Service Reform Act of 1978 and the Due Process Amendments of 1990.

This case poses a significant threat to the well-established due process rights of federal employees, which have been developed and reaffirmed over decades of legislation, culminating

in the Civil Service Due Process Amendments of 1990.  Congress has confirmed those rights

particularly as respects attorneys, including AUSAs.  Contrary to the Government Defendants'

arguments, the Due Process Amendments' limitation on the removal of AUSAs is consistent

with Article II of the Constitution.  And as the Supreme Court has repeatedly confirmed, the

executive branch must respect the Constitutional rights of federal employees.  By asserting the

power to terminate federal employees in contravention of their rights to freedom of speech and

association under the First Amendment, the Government Defendants' position would jeopardize

individual freedoms that are fundamental to the federal system and the rule of law.

Moreover, and just as importantly, this case implicates the crucial role of prosecutorial

independence in the American judicial system, and the need to protect federal prosecutors,

including AUSAs, from removal without cause.  The amicus brief examines the history and

context of prosecutorial independence in the federal government as an essential element of

impartial, nonpartisan justice, and argues that eliminating civil service protection for AUSAs

would be a radical departure from historical practice and a dangerous precedent with serious

implications for the rule of law.

## ARGUMENT

I.    **The Tenure and Due Process Protections Afforded to Assistant United States Attorneys Are Well-Settled, and the Supreme Court's Decision in Trump v. United States Does Not Affect Those Protections.**

The Constitution, the Civil Service Reform Act, and the Civil Service Due Process

Amendments of 1990 as well as Supreme Court precedent all establish that inferior officers and

other federal employees are protected from arbitrary removal from their positions.  The history

of the CSRA and the Due Process Amendments demonstrates that these protections extend

equally to attorneys, including Assistant United States Attorneys.  See Section II, *infra*, p. 12.

4

As a threshold matter, the Government Defendants' claim that a recent Supreme Court decision implicitly overturned more than a century of Congressional acts and Supreme Court jurisprudence (Defs.' Mem. L. Supp. Mot. J. Pleadings "D. Mem.") at 5-11) should be considered and readily rejected.  Contrary to the Government's position, the Supreme Court's decision in *Trump v. United States*, 603 U.S. 593, 606 (2024), which held that the President is constitutionally immune from prosecution for official acts, does not cast doubt on AUSAs' tenure protection.  The Court noted that the allegations regarding President Trump's meeting with high-level Department of Justice officials indisputably "involve[d] Trump's 'use of official power," *id.* at 620, because "[i]nvestigative and prosecutorial decision making is 'the special province of the Executive Branch' . . . and the Constitution vests the entirety of the executive power in the President."  The Court also found that "Trump's threatened removal of the Acting Attorney General likewise implicates 'conclusive and preclusive' Presidential authority," *id.* at 620-21 (citation omitted), since the President has authority to remove such principal officers.

Relying on these and other phrases drawn from passages in *Trump v. United States*, the Government argues that "[b]ecause AUSAs exercise the President's 'conclusive and preclusive' executive power when they engage in prosecutorial activities, Article II requires that they be removable at-will."  D. Mem., at 10.

Nothing in *Trump v. United States* justifies this leap of logic.  First, in referring to the President's authority regarding investigations and prosecutions, the Court in *Trump v. United States* quoted *United States* v. *Texas*, 599 U. S. 670, 678–679 (2023): "Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law'" (citation omitted), *Trump*, 603 U.S. at 620.  This affirms that the President has the authority to establish criminal enforcement

5

priorities for the Department of Justice, which affects the types of investigations and

prosecutions that the Department brings.  Prosecutors in individual cases then determine where

there is sufficient evidence to bring criminal charges.  This enables the President to pursue his

policy objectives and prosecutors to fulfill their ethical obligation to impartial enforcement of the

criminal laws.  Nothing in *Trump v. United States* suggests that the President should be able to

intrude on line prosecutors' decisions regarding their obligation of impartial enforcement by

being able to remove them for any reason or no reason at all.

Second, in stating that President Trump has authority to fire the Acting Attorney General

without cause, the Court in *Trump* cited *Myers v. United States*, 272 U.S. 52, 126-27

(1926)..  The Court stated, "As we have explained, the President's power to remove 'executive

officers of the United States whom he has appointed' may not be regulated by Congress or

reviewed by the courts." *Trump*, 603 U.S. at 621 (quoting *Myers*, 272 U. S., at 106, 176).  In

other words, the decision affirmed the authority of the President to remove principal officers at

will.  It said nothing whatsoever about removal of inferior officers or employees, much less

AUSAs.

Prosecutors' legal and ethical obligation to pursue impartial justice is the crucial means

of ensuring compliance with basic due process guarantees. Robert H. Jackson, *The Federal

Prosecutor*, 31 J. Crim. L. & Criminology 18, 20 (1940).  Subordinate prosecutors are tasked

with making discretionary decisions in individual cases and are obligated to do so without

considering the individual characteristics of the parties involved. U.S. Dep't of Just., Justice

Manual §§ 9-27.260, 9-27.300. Partisan political considerations are anathema to this task, and if

AUSAs were to fear that their jobs depended on pleasing political officials, this bedrock of the

American justice system would be at risk. *United States v. Armstrong***, 517 U.S. 456, 464 (1996)

(explaining that prosecutors' discretion is constrained and may not be exercised based on an arbitrary classification); Justice Manual § 1-8.100 ("The legal judgments of the Department of Justice must be impartial and insulated from political influence."); Justice Manual § 9-27.260 (barring prosecutors from considering an individual's "political association, activities, or beliefs" in charging decisions).

Eliminating civil service protections for AUSAs would result in a radical departure from historical practice. It would be contrary to the Anglo-American system of prosecution and dangerous from a policy perspective.  Prosecutors have long been seen as servants of the public with a special obligation to pursue impartial justice.  As the Supreme Court explained, "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States,* 295 U.S. 78, 96 (1935).  Impartiality, in the context of criminal prosecution, means that prosecutors seek to enforce the criminal laws rather than pursuing individuals based on personal characteristics, like party affiliation or political power. As the former Attorney General Robert Jackson explained, the greatest danger is that the prosecutor "will pick people that he thinks he should get, rather than pick cases that need to be prosecuted." Jackson, *The Federal Prosecutor*, *supra*, at 20.  If a subordinate prosecutor could be fired by a president for any reason, this is, of course, the likely result. Presidents, after all, have the obligation to pursue policy objectives and the incentive to serve their own partisan interest. They lack the expertise and may lack the inclination to pursue impartial justice in individual cases.

The even-handed administration of justice has been the goal and practice in federal prosecution since the founding.  Bruce A. Green & Rebecca Roiphe, *Can the President Control the Department of Justice*, 70 Ala. L. Rev. 1, 74 (2018). When Congress created the DOJ in

1870, it sought to professionalize prosecution and create more uniformity. *Id*. at 48. If anything, Congress hoped to remove federal prosecutors from the influence of local politicians, which was viewed as the source of political pressure at the time. *Id*. at 49-55. Especially after abuses involved in the Watergate scandal, Attorneys General have seen it as their job to complement civil service protection by preserving the impartial administration of justice and protecting line prosecutors from political influence. *Id*. at 22, 62-69.

One might assume that courts or grand juries could serve as a check if a political actor were to improperly influence a prosecutor by implicitly or explicitly threatening his job. But a great deal of damage can be done even before a grand jury could return a "no true bill" or a court could dismiss an indictment. Not only could a politician tie up his adversary in an expensive legal battle, but he could also deter dissent and chill political opposition by ordering investigations and prosecutions of political adversaries, a result that is inconsistent with democratic principles.

Accordingly, the Court should reject the Government's invitation to allow it to convert federal line prosecutors and the Department of Justice into a political arm of the government. The Supreme Court's decision in *Trump v. United States* did not countenance such a result.

## II.    The Civil Service Due Process Amendments of 1990 Provide AUSAs with Tenure Protections.

Under the Civil Service Due Process Amendments of 1990, an agency may remove an "employee" in the excepted service "only for such cause as will promote the efficiency of the service." 5 U.S.C. §§ 7511-7513. The Government concedes that Maurene Comey satisfies the definition of "employee." D. Mem. at 15. It also concedes that it did not provide Comey with the requisite statutory protections and procedures required by 5 U.S.C. § 7511. *Id.* at 16.

The Government argues instead that 28 U.S.C. § 542, which provides that "[e]ach assistant United States attorney is subject to removal by the Attorney General," allows the Attorney General to remove an AUSA at will.  This argument disregards the extensive history of Congressional acts governing the employment relationship between the executive branch and attorneys.  When Congress enacted 28 U.S.C. § 542, attorneys did not enjoy tenure protections within the federal government. In passing the Civil Service Due Process Amendments of 1990, Congress expressly intended the tenure protections provided by 5 U.S.C. § 7513 to extend to AUSAs.

### A.  The Due Process Amendments Extended Tenure Protections to AUSAs.

The civil service comprises multiple personnel systems, the largest of which are the competitive service and the excepted service. *See* 5 U.S.C. §§ 2102–2103. Positions in the excepted service are exempt from many of the competitive examination requirements that define the competitive service. *See* 5 U.S.C.  § 3302 (authorizing the President to make "necessary exceptions of positions from the competitive service" as "conditions of good administration warrant"). Attorneys have appeared in the excepted service since shortly after the passage of the Pendleton Act of 1883. *See* U.S. Civ. Serv. Comm'n, *Twenty-Third Annual Report* 79 (1903) (listing "Attorneys, assistant attorneys, and special assistant attorneys" within Schedule A).

In 1912, Congress enacted the Lloyd-La Follette Act, which provided that "no person in the classified civil service of the United States shall be removed therefrom except for such cause as will promote the efficiency of said service." 37 Stat. 555. Today, this limitation on removal appears at 5 U.S.C. § 7513. The removal protections found in the Lloyd-La Follette Act differed from the modern provision in two meaningful respects. First, it applied only to positions within the "classified civil service," which is known today as the "competitive service." *Cf.* 5 U.S.C.

9

2102(c) ("As used in other Acts of Congress, 'classified civil service' or 'classified service' means the 'competitive service.'").  Second, it expressly denied employees the right to an adjudicatory hearing. 37 Stat. 555 ("[N]o examination of witnesses nor any trial or hearing shall be required except in the discretion of the officer making the removal.").

Over the course of a century, Congress expanded the due process rights of federal employees.  The Veterans' Preference Act of 1944 provided veterans serving in the civil service—whether the competitive service or the excepted service—a right to appeal adverse personnel actions, including removals, to the Civil Service Commission., Pub. L. No. 78-359, § 14, 58 Stat. 387, 390 (1944).  The Civil Service Reform Act of 1978 (CSRA) expanded these due process rights to most employees in the competitive service and created the Merit Systems Protection Board to hear disputes arising under the Act. Pub. L. No. 95-454, § 204, 92 Stat. 1111 (1978). Yet the CSRA did not extend appellate rights to employees in the excepted service, such as attorneys.  *Id.* (defining an "employee" for purposes of 5 U.S.C. § 7513 as "an individual in the competitive service" or "a preference eligible" (i.e., a veteran)).

These statutory reforms coincided with the Supreme Court's expansion of due process rights for federal employees. The Supreme Court has concluded that public employees with statutory removal protections, such as those found at 5 U.S.C. § 7511, have a property interest in their positions and, therefore, are entitled to due process prior to removal. *See Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 538-541 (1985); *Perry v. Sindermann*, 408 U.S. 593, 601-602 (1972).  But in *United States v. Fausto*, the Supreme Court concluded that non-preference eligible employees in the excepted service did not enjoy a right to challenge their removals because they were not covered by the CSRA. 484 U.S. 439, 448-449 (1988).

Shortly after the Supreme Court decided *United States v. Fausto*, Congress enacted the Civil Service Due Process Amendments of 1990 "to grant appeal rights to members of the excepted service affected by adverse personnel actions." Pub. L. No. 101-376, 104 Stat. 461 (1990).  The Act accomplished this by expanding the definition of "employee" under 5 U.S.C. § 7511 to include "an individual in the excepted service (other than a preference eligible)" who is not serving a probationary period and who has completed two years of continuous service. *Id.* § 2. The plain text of the Due Process Amendments covers all employees in the excepted service unless explicitly excluded under 5 U.S.C. § 7511(b).

Congress intended the Due Process Amendments to extend to attorneys, including Assistant U.S. Attorneys. The House Report identified attorneys first among the categories of excepted-service employees "to whom this bill applies," listing them ahead of physicians, teachers, chaplains, and scientists. H.R. Rep. No. 101-328, at 3 (1989). It described lawyers as having "the expectation of continuing employment within the Federal Government" and, therefore, a right to due process prior to removal. *Id.* at 4. The Report also explicitly described the "extremely competitive" hiring practices for attorneys within the Department of Justice and the need to extend protections to employees hired through such a competitive process. *See id.* at 3. The House Committee also devoted substantial time in hearings to discussing the "well over 4,000 attorneys" working in government that would be covered by the Act. *Administrative Due Process for Certain Federal Employees: Hearing on H.R. 917 Before the Subcomm. on Civil Serv. of the H. Comm. on Post Office & Civil Serv.*, 99th Cong. 25, 29 (1985).

In nine provisions, Congress included an exhaustive list of employees exempted from the Due Process Amendments. The President has the constitutional authority to remove principal officers from their positions. *See Myers v. United States*, 272 U.S. 52, 126-27 (1926).

11

Nevertheless, Congress felt compelled to exclude employees "whose appointment is made by and with the advice and consent of the Senate" from the Due Process Amendments, covering the principal officers otherwise removable under *Myers*. 5 U.S.C. § 7511(b)(1). Congress excluded specific employees in specific occupations, including technicians in the National Guard and members of the Foreign Service. *Id.* § 7511(b)(6)-(7). It did not list "attorneys" or "Assistant U.S. Attorneys." It also provided blanket exclusions for employees in over ten agencies, including the Central Intelligence Agency, the Postal Service, and the Federal Bureau of Investigation. *Id.* § 7511(b)(7)-(8). It did not list the "Department of Justice." The drafting of the Due Process Amendments reveals that Congress intended to exhaustively account for all plausible positions excluded—even where existing law made such enumeration unnecessary.

During the legislative debates, the Department of Justice specifically objected to extending the Due Process Amendments to its attorneys, and Congress proceeded without accepting that objection. At the 1985 hearing on the bill, the Subcommittee Chairman reported that the Department of Justice had submitted written comments expressing "grave concern about the ramifications of this legislation" and was "particularly concerned about the effect on positions such as assistant U.S. attorneys." *Administrative Due Process for Certain Federal Employees*, *supra* at 29 (statement of Rep. Mervyn M. Dymally). The Department of Justice's objection reveals that it understood the plain text of the Due Process Amendments as extending removal protections and appellate rights to AUSAs. Over the Department of Justice's objections, Congress did not include an exception for the Department of Justice, attorneys, or AUSAs.

Congress "must speak clearly if it wishes to insulate officers from at-will removal." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 772 (2025). Congress has done so here. The mere fact that 5 U.S.C. § 7511 offers a broad definition of "employee" does not make its

12

pronouncement any less clear. Congress deliberately extended 5 U.S.C. § 7513 to all employees in the excepted service and spoke clearly in articulating specific exclusions. "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980).

Although the Government relies on *Kennedy v. Braidwood Mgmt., Inc.*, for the proposition that removal restrictions may not be implied (D. Mem., at 12, 18), *Braidwood* in fact supports Comey's claim that she was protected from removal without cause. In *Braidwood*, the Supreme Court considered whether members of the U.S. Preventive Services Task Force—who the Court determined were inferior officers—enjoyed removal protections. 606 U.S. at 770 . In declining to read at-will removal restrictions into a statute that did not explicitly provide for one, the Court noted that when Congress wants "to furnish for-cause protection, it knows how to do so" and cited as an example 5 U.S.C. § 7513(a)'s prohibition of agency action against government employees except for cause. The Government concedes that Maurene Comey fits the definition of government employee under 5 U.S.C. § 7511 (D. Mem. at 15), and, therefore, Congress has spoken with the requisite clarity to afford her—and other AUSAs—the protection of 5 U.S.C. § 7513(a).

**B.   The Due Process Amendments modified the application of 28 U.S.C. § 542.**

The Government relies on 28 U.S.C. § 542 for the proposition that the Attorney General may remove AUSAs at will. That provision states, "each assistant United States attorney is subject to removal by the Attorney General." 28 U.S.C. § 542. The central question is whether this provision means that the Attorney General may remove an AUSA for *any* reason and without *any* procedure. It does not. The Due Process Amendments supersede 28 U.S.C. § 542.

First, Congress did not use clear language suggesting that Title 5 would not apply to Assistant U.S. Attorneys. Other statutes illustrate that Congress knows how to limit the applicability of Title 5 to federal employees. In passing the Federal Reserve Act in 1913, Congress provided that "[a]ll such attorneys, experts, assistants, clerks, and other employees shall be appointed without regard to" the Pendleton Act. 12 U.S.C. § 248(l). The Tennessee Valley Authority Act specified that the Board of the Tennessee Valley Authority "shall without regard to the provisions of Civil Service laws applicable to officers and employees of the United States, appoint such managers, assistant managers, officers, employees, attorneys, and agents as are necessary." Tennessee Valley Authority Act of 1933, ch. 32, § 3, 48 Stat. 58, 59. More recently, the statute establishing the National Council on Disability, for example, provides that the Chairperson of the Council "may appoint and remove, without regard to the provisions of Title 5 governing appointments, *the provisions of chapter 75 of such title (relating to adverse actions)*, the provisions of chapter 77 of such title (relating to appeals), or the provisions of chapter 51 and subchapter II of chapter 53 of such title (relating to classification and General Schedule pay rates), an Executive Director." 29 U.S.C. § 783(a)(1) (emphasis added). Congress did not include similar language in 28 U.S.C. § 542, but has done so in plenty of other statutes before and after the CSRA's passage.

Second, consider the historical context in which Congress enacted 28 U.S.C. § 542. Congress enacted 28 U.S.C. § 542 with its 1947 revisions to Title 28. *Act to Revise, Codify, and Enact into Law Title 28*, ch. 646, Pub. L. No. 80-773, 62 Stat. 869 (1948). Courts have recognized that Congress did not intend to make "any change in existing law" or "substantive change" in revising Title 28. *Ruth v. Eagle-Picher Co.*, 225 F.2d 572, 576-577 (10th Cir. 1955). In 1947, only preference-eligible employees (i.e., veterans) enjoyed a right to appeal their

14

removal to the Civil Service Commission. The case cited by the Government for the proposition that the "Attorney General's power to remove assistant United States attorneys is unconditional" predates the Due Process Amendments. *See Windsor v. The Tennessean*, 719 F.2d 155, 159 (6th Cir. 1983). Both 28 U.S.C. § 542 and the early case law simply reflect the fact that excepted-service attorneys did not enjoy due process.

The Due Process Amendments changed the law governing the tenure of AUSAs. In *Gosnell v. Dep't of Justice*, the U.S. Court of Appeals for the Federal Circuit observed, "determining precisely the rights provided to assistant U.S. attorneys by the Due Process Amendments, however, is problematic because of the language of 28 U.S.C. § 542 which gives the Attorney General broad discretion in appointing and removing assistant U.S. attorneys." 69 F.3d 1138, 1140 (Fed. Cir. 1995). While the court held that the plaintiff could not appeal her reassignment and reduction in pay under the CSRA, because she was not a permanent employee, the court nonetheless recognized, "Since the Due Process Amendments became law, assistant U.S. attorneys have had the right to appeal removal actions, as well as other actions listed in 5 U.S.C. § 7512, to the Merit Systems Protection Board." *Id.*

Third, even before the passage of the Due Process Amendments, the Department of Justice itself recognized that 28 U.S.C. § 542 did not permit the removal of an AUSA for *any* reason. In 1982, the Office of Legal Counsel (OLC) issued an opinion on whether 28 U.S.C. § 542 permitted the Attorney General to remove an AUSA based on their homosexuality. *Termination of an Assistant United States Attorney on Grounds Related to His Acknowledged Homosexuality*, 7 Op. O.L.C. 46 (1983). The CSRA prohibits agencies from "discriminat[ing] . . . against any employee or applicant for employment on the basis of conduct

15

which does not adversely affect the performance of the employee or applicant or performance of others." 5 U.S.C. § 2302(b)(10).

Although OLC acknowledged that 28 U.S.C. § 542(b) permits the Attorney General to remove AUSAs, it concluded that authority is "tempered" by statute, including the provision of the CSRA prohibiting discriminatory employment practices, and Office of Personnel Management Regulations. *Termination of an Assistant United States Attorney on Grounds Related to His Acknowledged Homosexuality*, 7 Op. O.L.C. 46, 47 (1983). OLC concluded that the AUSAs were covered by the CSRA's prohibition on discrimination because that statute specifically covered appointments in the excepted service. *Id.* at 48 n.4. 5 U.S.C. § 2302(a)(2)(B) (defining a "covered position" to include "a position in the excepted service"). OLC ultimately concluded, "The decision not to retain the AUSA may be made for any number of reasons . . . but it may not be made for a reason prohibited by statute or regulation." 7 Op. O.L.C. at 48.

The OLC opinion illustrates that the Department of Justice understands the phrase "excepted service" to encompass AUSAs for purposes of the CSRA. Likewise, it understands that the CSRA constrained the Attorney General's authority under 28 U.S.C. § 542(b). Because the Department of Justice acknowledges that 5 U.S.C. § 2302 covers AUSAs and Maurene Comey alleges violations of 5 U.S.C. § 2302, Compl. ¶¶ 71–73, *Comey v. U.S. Dep't of Justice*, No. 1:25-cv-07625 (S.D.N.Y. Sept. 15, 2025), she alleges a viable claim under the CSRA.

Moreover, 5 U.S.C. § 2302 and 5 U.S.C. § 7511 are both broadly applicable to employees in the "excepted service." "The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Secretary of the Treasury*, 475 U.S. 851, 860 (1986) (quotation omitted). Reading "excepted

16

service" in 5 U.S.C. § 2302 to include AUSAs, but reading the *same phrase* in 5 U.S.C. § 7511 to exclude AUSAs, would violate this rule. It would require the Merit Systems Protection Board, agencies, and the courts to interrogate precisely which positions Congress intended to include in the dozens of instances where it used the phrase "excepted service." *See, e.g.*, 5 U.S.C. §§ 1302(c), 2302(b)(2)(B), 3114(b)(1)(A),3320, 3322, 7511(a)(1)(C), 9811(a)(1)(A).

Finally, the Merit Systems Protection Board itself has come to the only conclusion possible here given the legislative history and rules of statutory interpretation:   AUSAs enjoy removal protections under 5 U.S.C. § 7513 irrespective of the Attorney General's authority under 28 U.S.C. § 542. *See Hamlett v. Dep't of Justice*, 90 M.S.P.R. 674 (2002). The Board began its analysis with the plain text of the CSRA and Due Process Amendments, concluding that none of the exclusions in 5 U.S.C. § 7511 applied to AUSAs. *Id.* at 677-79. It reviewed other appointment and removal authorities outside of Title 5 and concluded that Congress knows how to limit the application of Title 5. *Id.* at 679-680. It concluded "that 28 U.S.C. § 542 does not bring AUSAs outside of the coverage of 5 U.S.C. § 7511(a)(1)(C), and that an AUSA who meets the plain terms of the latter provision has the right to appeal an adverse action covered by 5 U.S.C. § 7512 to the Board." *Id.* at 680.

III. **The Due Process Amendments' limitation on the removal of Assistant United States Attorneys is constitutional.**

The Government argues that the Due Process Amendments are unconstitutional as applied to Assistant U.S. Attorneys, because Article II of the Constitution vests the executive power in the President. However, Article II specifically states that Congress—not the President—has the authority to determine whether the appointment of inferior officers be vested in the President, in the Courts, or in "Heads of Departments." U.S. Const. art. II, § 2, cl. 2. As the Supreme Court has repeatedly held, Congress accordingly has the authority to define and limit

17

the removal power by law, and in the Due Process Amendments, Congress has done so. The Supreme Court's decision in *Trump v. Slaughter*, No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026) does not upset this constitutional settlement.

The Civil Service Reform Act of 1978 is the culmination of a long history of reforms designed to prevent the inefficiency, inequality and abuses inherent in the previous "spoils" system, in which federal employment was based on political loyalty, patronage and service to politicians. Instead, Congress has determined that a robust, apolitical and merit-based federal employee system—with hiring, performance and removal provisions that protect both employee rights and governmental interests—is the best way to structure the federal government. "Congress's authority to design and fund the civil service reflects its constitutional prerogative to enact laws as 'necessary and proper' to ensure the execution of the laws it enacts." Nicholas R. Bednar, *Presidential Control of the Civil Service*, 110 Minn. L. Rev. 2065, 2146 (2026).

Article II of the Constitution provides that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. The vesting of this authority in Congress—rather than the President—distinguishes inferior officers and employees from principal officers. Accordingly, the Constitution enables Congress to impose appointment and removal protections on inferior officers and employees that it cannot impose on principal officers.

The Supreme Court has long recognized Congress's authority to limit the removal of inferior officers and federal employees. In his *Commentaries on the Constitution of the United States*, Justice Story described Congress's power to limit removal of inferior officers: "As far as congress constitutionally possess the power to regulate, and delegate the appointment of 'inferior

18

officers,' so far they may prescribe the term of office, the manner in which, and the persons by whom, *the removal*, as well as the appointment to office, shall be made." Joseph Story, 3 *Commentaries on the Constitution of the United States* § 1537 (1833) (emphasis added). Several years later, in *Ex Parte Hennen*, the Supreme Court agreed with Justice Story's conclusion that the power of removal from office was "an incident to the power of appointment." 38 U.S. 230, 233 (1839). The power of removal belongs to the President "when no other tenure of office is prescribed." *Id.* at 233-34. Consequently, the Court alluded to the fact that Congress could limit the tenure and removal of inferior officers "by law." *See id*. at 259.

The Supreme Court had the opportunity to finally consider removal restrictions for inferior officers in *United States v. Perkins*, 116 U.S. 483 (1886). The Court concluded, "The constitutional authority in congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as congress may enact in relation to the officers so appointed." *Id.* at 485.

The Supreme Court has continually reaffirmed Congress's authority to impose removal restrictions on inferior officers and federal employees. In *Myers v. United States*, the Supreme Court reaffirmed *Perkins* in stating that Congress, "in committing the appointment of such inferior officers to the heads of departments, may prescribe incidental regulations controlling and restricting the latter in the exercise of the power of removal." 272 U.S. 52, 161 (1926). In *Morrison v. Olson*, the Supreme Court held that for-cause limitations on the  removal of inferior officers—specifically, independent investigative counsel appointed pursuant to the Ethics in Government Act—do not meaningfully restrict removal in such a way as to interfere with the President's duty to faithfully execute the law. 487 U.S. 654, 692 (1988).  Justice Scalia's dissent, while disputing the characterization of such independent counsel as inferior officers, assumes

19

and affirms Congress's authority to protect inferior officers. In *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, the Supreme Court reaffirmed these principles. 561 U.S. 477, 492-95 (2010).

Even as the Supreme Court has limited Congress's authority to remove principal officers, it has consistently distinguished and reaffirmed *United States v. Perkins*. *See Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 217 (2020) (affirming that *Perkins* remains good law despite striking down removal protections for a principal officer).

Section 7513 applies only to "employees." *See* 5 U.S.C. § 7511(a). Section 7513 does not apply to principal officers or inferior officers "whose appointment is made by and with the advice and consent of the Senate," 5 U.S.C. § 7511(b)(1) or "whose appointment is made by the President," *id.* § 7511(b)(3). Congress tailored Section 7511's protection to inferior officers appointed by the heads of the department and employees. Consequently, Section 7513 comports with Congress's authority to restrict the removal of inferior officers and employees. *See Perkins*, 116 U.S. at 485.

The Supreme Court's decision in *Trump v. Slaughter* has not altered the status quo. In *Slaughter*, the Court held that Congress may not protect *principal officers* from removal, subject only to narrow exceptions. 2026 WL 1855612, at *11; *id.* at *22 (Gorsuch, J., concurring). By its terms, *Slaughter* does not reach inferior officers. The majority opinion relied heavily on three sources—Justice Story's *Commentaries*, *Myers v. United States*, and Justice Scalia's dissent in *Morrison v. Olson*—all three of which acknowledge the ruling in *Perkins* and Congress's authority to extend removal protections to inferior officers and employees. Given its full-throated embrace of these authorities, the majority surely would have explicitly included inferior officers in the decision had it intended *Slaughter* to sweep so broadly. Moreover, Justice Gorsuch

20

acknowledged that the 5 U.S.C. §§ 7511-7513 "afford rank-and-file agency employees considerable protection against removal," suggesting that the decision leaves the constitutionality of the CSRA untouched. *Id.* at \*27 (Gorsuch, J., concurring). The court cannot read *Slaughter*'s failure to mention inferior officers specifically as a wholesale rejection of principles that have governed since the Founding.

The Supreme Court has repeatedly confirmed Congress's authority to establish a merit-based, apolitical civil service. In enacting the Civil Service Reform Act of 1978—the culmination of a reform effort begun with the Pendleton Act of 1883—Congress sought to overcome the patronage and spoils systems and to regularize the standards and procedures governing federal employment, including removal. The Court has "unhesitatingly" endorsed that project, reaffirming the "judgment of history" that "federal service should depend upon meritorious performance rather than political service." *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 557 (1973); *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 96, 99 (1947) (upholding the Hatch Act as a means "to protect a democratic society against the supposed evil of political partisanship by classified employees of government"). These measures serve the "great end of Government—the impartial execution of the laws," and guard against the danger that an ever-expanding federal workforce could be "employed to build a powerful, invincible, and perhaps corrupt political machine." *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. at 565.

21

**IV.    The Protections Afforded to Plaintiff Under the First Amendment Are Not Diminished by any Alleged Constitutional and Statutory Authority in the President.**

Even if the court concluded that the Due Process Amendments were unconstitutional as-applied to AUSAs, Comey's case survives on First Amendment grounds. In their Memorandum, the Government Defendants argue that "protected First Amendment activity is insufficient to override the Executive's prerogative to remove lower officials." D. Mem. at 22.  The Government argues, "If interpreted otherwise, even cabinet officials of a different party from the President and from a prior presidential administration could stay in office given the First Amendment. That would eviscerate Article II." *Id.* This argument displays a bizarre lack of familiarity with the case law governing the First Amendment in public employment.

Plaintiff Maurene Comey alleges that she was removed based on her perceived affiliation with the Democratic party, her husband's affiliation with the Democratic party, and her association with her father—former FBI Director James Comey—who is a known critic of President Trump. Compl. ¶ 6-9.  For half a century, the Supreme Court has held that a public employee without any statutory or contractual interests in their position may maintain a claim that their removal violated their constitutional rights. *See Webster v. Doe*, 486 U.S. 592, 603-04 (1988).  *Webster* held that a covert CIA employee, allegedly discharged because of his sexual orientation, could pursue constitutional claims challenging his termination even though the National Security Act committed the Director's removal decisions to unreviewable agency discretion, because a statutory construction denying "any judicial forum for a colorable constitutional claim" would raise a "serious constitutional question." *Id.* at 603.

Systems of political patronage wherein employees are removed based on their political beliefs and association violate the First Amendment because they constrain the ability of the employee "to act according to [her] beliefs and to associate with others of [her] political

persuasion." *Elrod v. Burns*, 427 U.S. 347, 356 (1976). The threat to freedom of association is even more pressing in this case, because Plaintiff alleges she was removed for her association with family members: her husband and father. *See Adler v. Pataki*, 185 F.3d 35, 44 (2d Cir. 1999) (holding that a Deputy Counsel for the State of New York could maintain a claim under the First Amendment for retaliation based on the conduct of his spouse).

The President's authority under Article II must respect the constitutional rights of federal employees. Executive power, however broad, "must be considered in light of our historic commitment to the rule of law," *United States v. Nixon*, 418 U.S. 683, 708 (1974 , and no Article of the Constitution confers a "blank check" to disregard individual rights, *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion). Even in domains of maximal executive discretion—national security, foreign affairs, the conduct of covert intelligence—the Supreme Court has insisted that exercises of that discretion remain answerable to constitutional claims. *Webster*, 486 U.S. at 603–04; *Trump v. Hawaii*, 585 U.S. 667, 686–87 (2018) (reviewing the merits of a constitutional challenge to executive action notwithstanding substantial deference). And in the specific context of public employment, the rule is settled: the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech." *Perry*, 408 U.S. at 597. That principle applies with full force to dismissals. *Elrod*, 427 U.S. at 359–60 (plurality opinion). *See also Rutan v. Republican Party*, 497 U.S. 62, 76–78 (1990), which extended *Elrod* and *Branti v. Finkel*, 445 U.S. 516 (1980) to hiring, promotion, and transfer, because "conditioning public employment on the provision of support for the favored political party 'unquestionably inhibits protected belief and association.'" Holding otherwise would turn the Bill of Rights into a nullity that only applies when convenient for the government.

23

Contrary to the Government Defendants' claims, both the Constitution and the civil service laws provide the President with opportunities to appoint (and remove) his preferred advisors. The Supreme Court has recognized that First Amendment protections do not "apply to employees whose public office legitimately requires policy-making decisions that accord with a particular political viewpoint." *Adler*, 185 F.3d at 46 (citing *Elrod* and *Branti*). AUSAs do not fall within this exception.

In drafting the Civil Service Reform Act, Congress created a system that acknowledges this exemption and allows the President to hire and remove employees in policy-determining positions at will. *See* Bednar, *supra*, at 2063-2067 (discussing statutory law governing appointments to temporary political positions). Employees designated by the President as occupying positions of a "confidential, policy-determining, policy-making, or policy-advocating" character are exempt from the statutory protections against political retaliation and the tenure protections afforded by the civil service laws. *See* 5 U.S.C. § 2302(a)(2)(B)(i) ); U.S.C. § 7511(b)(2). The President never classified Maurene Comey—or any other AUSA—as occupying a policy-determining position and, therefore, the exception to the First Amendment recognized by the Supreme Court and the CSRA does not apply.

Recent actions by the President reaffirm this conclusion. In Executive Order 14,410, President Trump established Schedule Policy/Career using his authority under 5 U.S.C. § 3302 and 5 U.S.C. § 7511 to exempt career positions regarded as policy-determining from tenure protections. 91 Fed. Reg. 34,893 (June 3, 2026). Notably, the list of occupations reclassified by President Trump did not include AUSAs, evidencing that the administration does not view these positions as policy-determining positions. *See id.* Even if the Trump administration ultimately concluded that AUSAs qualified as policy-determining positions, 5 U.S.C. § 2302(a)(2)(B)

24

requires the reclassification of the employee "*prior* to the personnel action," which did not occur in this case.

Regardless of whether the Government is correct about the meaning of Article II, 5 U.S.C. § 7511, or 28 U.S.C. § 542—and, to be clear, it is not—Plaintiff Maurene Comey's complaint alleges a sufficient claim of violation of her First Amendment rights.  Under Supreme Court precedent, executive authority must be exercised in a manner that respects the individual constitutional rights of federal employees, including their First Amendment rights of speech and association.

## **CONCLUSION**

For these reasons, the Court should deny the Government Defendants' Motion for Judgment on the Pleadings and grant Plaintiff's Partial Motion for Judgment on the Pleadings.

Dated: July 31, 2026

Respectfully submitted,

By:  /s/ Daniel N. Arshack

Daniel N. Arshack
Managing Partner - Arshack, Hajek & Lehrman
President – Lawyers for the Rule of Law
5 Columbus Circle   Suite 1501
NY, NY 10019
212-582-6500
917-806-0700 mobile (preferred)
Dan@lawAHL.com

*Attorneys for Proposed Amicus Curiae*
*Lawyers Defending American Democracy*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 7.1(c) of the Local Rules for the United States District Court for the Southern District of New York, the undersigned counsel for proposed *amicus curiae* Lawyers Defending American Democracy hereby certifies that this amicus brief complies with the type and volume limitation of Local Rule 7.1(c). As measured by Microsoft Word, there are approximately 7433 words in this brief.

By:  /s/ Daniel N. Arshack
Daniel N. Arshack
Managing Partner - Arshack, Hajek & Lehrman
President – Lawyers for the Rule of Law
5 Columbus Circle   Suite 1501
NY, NY 10019

212-582-6500
917-806-0700 mobile (preferred)
Dan@lawAHL.com


*Attorneys for Proposed Amicus Curiae*
*Lawyers Defending American Democracy*

i

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2026, I electronically filed a copy of the foregoing Amicus Curiae Brief using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:   July 31, 2026

By: /s/Daniel N. Arshack

Daniel N. Arshack
Managing Partner - Arshack, Hajek & Lehrman
President – Lawyers for the Rule of Law
5 Columbus Circle   Suite 1501
NY, NY 10019

212-582-6500
917-806-0700 mobile (preferred)
Dan@lawAHL.com

*Attorneys for Proposed Amicus Curiae*
*Lawyers Defending American Democracy*

ii