UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MAURENE COMEY, Plaintiff, -v- UNITED STATES DEPARTMENT OF JUSTICE et al., Defendants. | : | 25-CV-7625 (JMF) <br> OPINION AND ORDER |

JESSE M. FURMAN, United States District Judge:

Under Article II of the Constitution, "[t]he executive Power" is vested in the President, who must "take Care that the Laws be faithfully executed." U.S. CONST. art. II, §§ 1, 3. The Appointments Clause — which is also part of Article II — provides that he may be assisted in that task by "Officers" of two types: principal officers, who are nominated by the President and confirmed by the Senate, and inferior officers, whose appointment "Congress may by Law vest . . . in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* art. II, § 2, cl. 2. Congress has, by statute, vested the appointment of Assistant United States Attorneys in the Attorney General, the "head" of the Department of Justice ("DOJ"). *See* 28 U.S.C. § 542(a); *id.* § 503. Congress has, by another statute called the Civil Service Reform Act or "CSRA," also limited when and how Assistant United States Attorneys — not to mention millions of other Executive Branch employees — may be removed from office: They may be removed "*only* for such cause as will promote the efficiency of the service," 5 U.S.C. § 7513(a) (emphasis added), and *only* after receiving certain procedural protections, including notice and an opportunity to be heard, *see id.* § 7513(b)(1)-(2).

The question at the heart of this case is whether these limitations on the removal of Assistant United States Attorneys are consistent with Article II and the constitutional separation of powers. The Plaintiff in the case is Maurene Comey, who served for nearly ten years as an Assistant United States Attorney ("AUSA") in the criminal division of the United States Attorney's Office for the Southern District of New York. In that role, she was assigned some of the country's highest profile cases and consistently received the highest accolades from supervisors and peers alike. On July 16, 2025, however, she received an email from DOJ officials in Washington, D.C., summarily terminating her employment "[p]ursuant to Article II of the United States Constitution and the laws of the United States." ECF No. 1-1 ("Termination Memorandum"). Thereafter, she filed this lawsuit — against DOJ and others — challenging her termination as a violation of the constitutional separation of powers, the CSRA, the First Amendment, and the Due Process Clause of the Fifth Amendment. *See* ECF No. 1 ("Compl."). She alleges that she was unlawfully terminated "solely or substantially" because she is the daughter of James B. Comey, the former Director of the Federal Bureau of Investigation ("FBI") and long-time foe of President Donald J. Trump, or because of her perceived political affiliation and beliefs, or both. *Id.* ¶ 5.

The merits of Comey's claims are now squarely before the Court, presented by way of cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Defendants argue that most, if not all, of Comey's claims should be dismissed because her termination — which, they allege, was directed and authorized by then-Attorney General Pamela J. Bondi — was lawful under a statute providing that "[e]ach assistant United States attorney is subject to removal by the Attorney General," 28 U.S.C. § 542(b), or under the CSRA. More consequentially, they argue that, to the extent Comey's termination was *not*

authorized by these statutes, the limitations imposed by Congress are an unconstitutional intrusion on the President's power under Article II of the Constitution. Relying on recent decisions by the Supreme Court that touch on the reach of that power, Defendants contend that Congress may not regulate, let alone limit, the removal of federal prosecutors because federal prosecutors exercise the President's "conclusive and preclusive" powers under Article II.

For the reasons that follow, the Court concludes that Defendants are wrong. First, Comey's removal was not authorized by any statute; to the contrary, it violated the CSRA. Yes, the Attorney General is authorized by law to remove an AUSA. But the Attorney General (and anyone to whom the Attorney General delegates that authority) is also limited by law, namely the CSRA, to do so only in a particular manner and only for certain reasons. And Comey's removal indisputably violated the CSRA. Second, Defendants' argument that Article II bars Congress from regulating the removal of AUSAs flies in the face of nearly two centuries of Supreme Court precedent, rooted in the text of the Appointments Clause, holding that Congress may generally restrict the removal of "inferior officers." Defendants' contention that recent Supreme Court decisions have fatally undermined that precedent is not one that this Court, as a lower court, may accept. It is also without merit. Indeed, to accept Defendants' argument would be to unsettle the very equilibrium established by this Nation's constitutional system.

Accordingly, as discussed below, the Court holds that Comey is entitled to judgment as a matter of law on her central claims that she was terminated in violation of the constitutional separation of powers and federal law. It therefore grants her retroactive reinstatement and backpay effective from the date of her termination through December 20, 2025 (when, the Court infers, she accepted a different job, which she holds now), which will make her whole for the period during which she was unlawfully terminated and ensure that she suffers no adverse

employment consequences for that unlawful termination. Additionally, it grants her request for a declaration that Defendants (1) violated the separation of powers (and, relatedly, that their reliance on Article II as a removal authority was invalid), (2) violated the Administrative Procedure Act ("APA"), and (3) violated her Fifth Amendment due process and statutory rights.

## BACKGROUND

### A. The Statutory Background

From at least the early nineteenth century until shortly after the Civil War, federal employment was a product of the "spoils system," under which "federal employees came and went, depending upon party service and changing administrations, rather than meritorious performance." *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 557 (1973). But "that system did not survive." *Id.* at 558. In 1871, Congress authorized the President to prescribe regulations for a federal civil service, and in 1883 it enacted the Civil Service Act — better known as the Pendleton Act. *Id.* The Pendleton Act declared that "no person in the public service is for that reason under any obligations to contribute to any political fund, or to render any political service" and that "no person in said service has any right to use his official authority or influence to coerce the political action of any person or body." Civil Service Act of 1883, ch. 27, 22 Stat. 403, 404. In the following decades, Congress enacted further protections for civil servants, most prominently the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (1978), and the 1990 Civil Service Due Process Amendments, Pub. L. No. 101-376, 104 Stat. 461 (1990).

The CSRA, which is codified in scattered sections of Title 5 of the U.S. Code, "comprehensively overhauled the civil service system," creating a "new framework for evaluating adverse personnel actions" against federal employees. *Lindahl v. Off. of Pers. Mgmt.*,

470 U.S. 768, 773-74 (1985); *accord Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012). Through the CSRA, Congress sought to "replace the haphazard arrangements for administrative and judicial review of personnel action" and to reform an "outdated patchwork of statutes and rules built up over almost a century." *United States v. Fausto*, 484 U.S. 439, 444 (1988) (quoting S. REP. NO. 95-969, at 3 (1978)); *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 154 (D.C. Cir. 1982) (noting that the CSRA was proposed to strengthen the protection of legitimate employee rights, provide incentives and opportunities for managers to improve the efficiency of the federal government, and reduce the red tape and delay in the present system). The CSRA thus set out "in great detail the protections and remedies applicable to [adverse employment actions], including the availability of administrative and judicial review." *Fausto*, 484 U.S. at 443.

Most relevant here, Subchapter II of Chapter 75 of the CSRA provides protections with respect to, and "governs review of[,] major adverse actions taken against employees 'for such cause as will promote the efficiency of the service.'" *Elgin*, 567 U.S. at 5 (quoting 5 U.S.C. §§ 7503(a), 7513(a)). In 1988, the Supreme Court issued a decision holding that nonpreference eligible employees in the "excepted service" (so-called because they were "excepted" from competitive civil service examinations) were excluded "from the provisions establishing administrative and judicial review for personnel action." *Fausto*, 484 U.S. at 455; *see id.* at 443, 447-49. Two years later, Congress responded with a series of amendments known as the 1990 Due Process Amendments, which expanded the definition of "employee" for purposes of Subchapter II of Chapter 75 to include those in the "excepted service" who meet certain requirements regarding probationary periods and years of service, 5 U.S.C. § 7511(a)(1)(C) — a category that the parties here agree included Comey and other AUSAs, *see* ECF No. 68 ("Gov't Mem."), at 15; ECF No. 77 ("Comey Mem."), at 4 n.1.

Subchapter II of Chapter 75 applies to five "covered" personnel actions, including removals. *See* 5 U.S.C. § 7512.[1] Two provisions of Section 7513 of Subchapter II — titled "Cause and procedure" — are especially relevant here. First, Subsection (a) provides that "an agency may take an action covered by this subchapter," including removal, "against an employee *only* for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a) (emphasis added). Second, Subsection (b) provides that "[a]n employee against whom an action is proposed is entitled to" certain procedural protections, including at least thirty days' advance written notice (subject to certain exceptions not relevant here); "a reasonable time" to respond orally and in writing; representation; and "a written decision and the specific reasons therefor at the earliest practicable date." *Id.* § 7513(b).

Although there is no dispute that Comey and other AUSAs are "employees" within the meaning of Subchapter II of Chapter 75 of the CSRA, it is not the only statute that refers to removal of AUSAs. A statute enacted in 1966 — 28 U.S.C. § 542 — provides both that "[t]he Attorney General may appoint one or more assistant United States attorneys in any district when the public interest so requires," *id.* § 542(a), and that "[e]ach assistant United States attorney is subject to removal by the Attorney General," *id.* § 542(b).

---

[1] By its terms, Subchapter II does *not* apply to national-security removals (which are governed by Subchapter IV); reductions-in-force (which are governed by Chapter 35); certain actions taken against supervisors on probation (which are governed by Chapter 33); performance-based actions (which are governed by Chapter 43); disciplinary actions brought through the Office of Special Counsel (which are governed by Chapter 12); actions involving administrative law judges (which are governed by Subchapter III of Chapter 75); and suitability actions taken by the Office of Personnel Management. *See* 5 U.S.C. § 7512. Nor does it apply to adverse actions taken against members of the "Senior Executive Service" or "SES," defined as employees who "occupy high-level positions in the Executive Branch but are not required to be appointed by the President and confirmed by the Senate." *Elgin*, 567 U.S. at 5 n.1 (citing 5 U.S.C. § 3131(2)). SES employees are covered instead by Subchapter V of Chapter 75.

### B. The Factual Background

The following facts — which are drawn from Comey's Complaint, Defendants' Answer, ECF No. 63 ("Answer"), and the documents attached to them — are, unless otherwise noted, undisputed. The Court assumes familiarity with its earlier Opinion and Order denying Defendants' motion to dismiss for lack of jurisdiction, *see Comey v. U.S. Dep't of Just.*, No. 25-CV-7625 (JMF), 2026 WL 1142679 (S.D.N.Y. Apr. 28, 2026) (ECF No. 55), yet nevertheless recounts the facts relevant to the pending motions.

Comey, the daughter of former FBI Director James B. Comey, served as an AUSA in the United States Attorney's Office for the Southern District of New York from November 16, 2015, until July 16, 2025. Compl. ¶ 11; Answer ¶ 11. According to her Complaint, Comey prosecuted "crime and corruption, without fear or favor," securing hundreds of criminal convictions, including in homicide, racketeering, and public corruption cases. Compl. ¶¶ 1-2, 26-28; *see* Answer ¶¶ 2, 36. An "exemplary, dedicated, and highly decorated public servant," she was, as Defendants concede, assigned to work on any number of high-profile cases, including those involving Jeffrey Epstein, Ghislaine Maxwell, Sean "Diddy" Combs, and Senator Robert Menendez. Compl. ¶¶ 1-2, 26, 40; *see also id.* ¶¶ 28-44; Answer ¶¶ 28, 32-35, 40-41, 43.

Comey's supervisors and peers consistently lauded her work, describing her as a "brilliant lawyer and a gifted supervisor," "the lawyer the office turns to when legal excellence is a must," and "an outstanding AUSA in every respect" with "judgment, work product, and courtroom advocacy [that are] among the finest in the country." Compl. ¶¶ 2, 25; Answer ¶ 25. She and other members of the Maxwell team received the Executive Office for United States Attorneys' ("EOUSA") Director's Award for Superior Performance by a Litigative Team.

Compl. ¶ 38; Answer ¶ 38. And she earned promotions and countless other accolades, including "outstanding" ratings in regular annual reviews. Compl. ¶¶ 2, 3, 25, 55; Answer ¶¶ 25-26, 39.

According to the Complaint, on July 15, 2025, the Co-Chiefs of the Public Corruption Unit asked Comey to join the trial team for another major case, and on July 16, 2025, she agreed to do so. Compl. ¶¶ 45-46; *see* Answer ¶¶ 3, 45-46. At 4:57 p.m. on July 16, 2025, however, Comey received an email from the Director of Human Resources in DOJ's Justice Management Division, which attached a memorandum signed by Francey Hakes, Director of EOUSA. Compl. ¶ 47; *see* Answer ¶ 47. The one-page memorandum stated in full:

> Subject: Notice of Removal from Federal Service
>
> This memorandum provides official notice that you are removed from your position of Assistant United States Attorney, AD-0905-29, Criminal Division, Southern District of New York, Offices of the United States Attorneys, and from the federal service, effective immediately.
>
> Pursuant to Article II of the United States Constitution and the laws of the United States, your employment with the Department of Justice is hereby terminated, and you are removed from federal service effective immediately.
>
> If applicable, you may have a right to file an appeal of this removal with the U.S. Merits Systems Protection Board (MSPB) within 30 days of the effective date of this removal action. For more information on how to file an appeal with the MSPB, please visit www.mspb.gov.

Termination Memorandum. Shortly thereafter, the Office of Personnel Management ("OPM") issued Comey a Standard Form 50, "Notification of Personnel Action," listing as the sole "Legal Authority" for her removal "ART II CONSTITUTION." ECF No. 1-2 ("SF-50"); *see* Compl. ¶¶ 52-53; Answer ¶¶ 52-53. It is undisputed that, before receiving the Termination Memorandum, Comey "received no notice or reason for the termination decision, and she was provided with no opportunity to respond." Compl. ¶ 48; Answer ¶ 48. Defendants further admit that neither the Termination Memorandum nor the SF-50 asserted that Comey's removal was

"for cause," Answer ¶ 55, and that her removal "was not 'for cause' and was not based on her performance," *id.* ¶ 69. Neither the Termination Memorandum nor the SF-50 mentioned the Attorney General, 28 U.S.C. § 542, or Section 7513 of the CSRA.

Who actually made the decision to remove Comey is not clear from the record and is, at least to some extent, disputed. The Complaint does not identify a decisionmaker. It alleges that Hakes signed the Termination Memorandum, Compl. ¶¶ 14, 47, and, "[o]n information and belief," that DOJ, the Executive Office of the President, then-Attorney General Pamela J. Bondi, EOUSA, and OPM each "authorized" Comey's termination, *id.* ¶¶ 12-13, 15-17. The contemporaneous statements described in the pleadings shed little additional light. Shortly after Comey received the Termination Memorandum, she met with Jay Clayton, then serving as Interim U.S. Attorney for the Southern District of New York, and the Deputy U.S. Attorney. *Id.* ¶ 50; Answer ¶ 50. When Comey asked the basis for her termination, Clayton responded, in sum and substance: "All I can say is it came from Washington. I can't tell you anything else." Compl. ¶ 50; *see* Answer ¶ 50 (admitting that Clayton told Comey that her removal "came from Washington," but otherwise disclaiming knowledge). "No other explanation was ever provided to Ms. Comey regarding the reason for her termination." Compl. ¶ 50. On or about July 17, 2025, when asked about Comey's removal, the then-White House Press Secretary stated that the decision was "made by the Department of Justice." Answer ¶ 51; *see* Compl. ¶ 51.

Defendants' Answer — filed on May 26, 2026, more than ten months after Comey's termination and after the Court denied Defendants' motion to dismiss for lack of subject-matter jurisdiction — supplies, for the first time, an account of who made the decision. Defendants admit that DOJ, "through the Attorney General" — at the time, Bondi — "directed" Comey's removal, Answer ¶¶ 12, 15, and that "then-Attorney-General Bondi authorized and directed

Plaintiff's removal," *id.* ¶ 15; *see also id.* at 24 (Second Affirmative Defense) ("Plaintiff was removed . . . at the direction of then-Attorney-General Pamela J. Bondi . . . ."). They further allege that Hakes signed the Termination Memorandum "at the direction of the Office of the Attorney General," *id.* ¶ 14, and that EOUSA, "through Director Hakes, carried out Plaintiff's removal . . . at the direction of the Office of the Attorney General," *id.* ¶ 16. Defendants deny that OPM authorized the removal. *Id.* ¶ 17.

Additionally, Defendants allege that Comey's removal was later "ratified by" Todd Blanche when he was Acting Attorney General. *Id.* ¶¶ 14-16; *see id.* at 24-25 (Second Affirmative Defense). They attach as an exhibit a May 26, 2026 memorandum from Blanche, *see* ECF No. 63-1 ("Ratification Memorandum"), which they describe as ratifying "the former Attorney General's decision to remove Ms. Comey from federal service pursuant to 28 U.S.C. § 542(b) and Article II of the United States Constitution." Gov't Mem. 2-3. Comey, for her part, notes that Blanche's memorandum is addressed to the "Director, EOUSA"; that it purports to "ratify[]" and "affirm[]" "*your* actions removing Maurene Comey," presumably addressing the Director of EOUSA; and that it does not mention Bondi at all. Comey Mem. 36 (emphasis in original) (quoting Ratification Memorandum). In any event, in their memorandum of law, Defendants state without qualification that, "[o]n July 16, 2025, then-Attorney-General Pamela J. Bondi directed that Ms. Comey be removed from her position as an AUSA pursuant to Article II of the United States Constitution and the laws of the United States," and that Hakes "drafted and signed" the Termination Memorandum "[a]t the direction of the Office of the Attorney General." Gov't Mem. 2 (citing Answer ¶¶ 14-15).

Decisionmaker aside, Comey alleges that the real reason she was fired was "because her father is former FBI Director James B. Comey, or because of her perceived political affiliation

and beliefs, or both." Compl. ¶ 5; *accord id.* ¶¶ 56, 69. In support of that allegation, she points to, among other things, what she characterizes as President Trump's well-known and longstanding vendetta against James Comey, whom he fired as FBI Director in 2017. *See id.* ¶¶ 57-62; *see also id.* ¶ 57 (alleging that, as of the filing of the Complaint in this case, President Trump had "posted (or reposted) approximately 259 times about Mr. Comey, including describing him repeatedly as the 'worst' FBI Director in history"); Answer ¶¶ 6, 59, 61 (admitting that President Trump removed James Comey as FBI Director in 2017 and that, "in the years since, Mr. Comey and President Trump have each made public comments critical of one another"). The Complaint alleges that, in May 2025, amidst rising tensions between President Trump and James Comey, supporters of President Trump "called for the termination" of Maurene Comey and her husband, who also worked in DOJ until his resignation on May 9, 2025. Compl. ¶¶ 7, 63-67 & n.40. Most notably, Laura Loomer — a "social media influencer" with over 1.7 million followers on X and "political influence in the Trump Administration, including influence over the termination of federal employees," *id.* ¶¶ 7, 63-64 — pressed repeatedly for "James Comey's liberal daughter and her Democrat husband" to be "FIRED from the DOJ immediately," *id.* ¶ 64; *see also id.* ¶¶ 65-66 (identifying other social media posts in which Loomer called for Comey's firing). The day Comey was fired, Loomer lauded the decision and claimed credit. *Id.* ¶¶ 8, 67.

**C. Procedural History**

Comey filed this action on September 15, 2025, asserting ten claims: violation of the separation of powers (Count One); violation of the APA, 5 U.S.C. § 706(1)-(2) (Count Two); an *ultra vires* claim (Count Three); violation of the First Amendment (Count Four); violation of the Fifth Amendment's Due Process Clause, based on both a property interest in her continued

employment and a liberty interest in her reputation (Counts Five through Eight); and claims for a declaratory judgment and for relief in the nature of mandamus (Counts Nine and Ten). Compl. ¶¶ 87-124; *see* Comey Mem. 6-7. Defendants timely moved to dismiss all claims for lack of subject-matter jurisdiction, arguing that Comey was required to pursue her claims through the CSRA's administrative review scheme. *See Comey*, 2026 WL 1142679, at *1-2, *5. On April 28, 2026, the Court denied that motion, holding that Comey's case "does not fall within the purview of the CSRA's scheme because she was fired pursuant to Article II of the Constitution, not pursuant to the CSRA itself." *Id.* at *1, *5-12.

On May 26, 2026, Defendants filed their Answer, which asserts eight affirmative defenses. Answer 24-26. As relevant here, Defendants allege that Comey was removed at Bondi's direction, that her removal was ratified by then-Acting Attorney General Blanche, and that 28 U.S.C. § 542(b) authorizes the Attorney General to remove an AUSA without cause (Second Affirmative Defense); that Comey's removal was a valid exercise of executive power pursuant to Article II (Third Affirmative Defense); and that her removal "pursuant to Article II . . . and 28 U.S.C. § 542(b) was a removal taken to 'promote the efficiency of the service' as contemplated by 5 U.S.C. § 7513(a)" (Fourth Affirmative Defense). *Id.* at 24-25. On June 5, 2026, Defendants moved, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings as to all of Comey's claims. *See* ECF No. 67; Gov't Mem. 1-2, 21-32. On July 17, 2026, Comey opposed that motion and cross-moved for partial judgment on the pleadings as to Counts One, Two, Three, Five, and Six. *See* ECF No. 76; Comey Mem. 1-4, 53-59. In the alternative, Comey moves to strike or dismiss several of Defendants' affirmative defenses or, to the extent the Court considers documents attached to the Answer that are neither incorporated by reference in nor integral to the Complaint, for conversion of the motions into

motions for summary judgment pursuant to Rule 12(d). *Id.* at 53 n.10, 57 n.12. On September 18, 2026, the Court held oral argument on the parties' cross-motions. *See* ECF No. 90 ("Tr.").

## LEGAL STANDARDS

A Rule 12(c) motion for judgment on the pleadings is subject to the same legal standards as a Rule 12(b)(6) motion to dismiss. *See Patel v. Contemp. Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). Thus, a court must assume the truth of all facts alleged in the nonmovant's pleading and draw all reasonable inferences in the nonmovant's favor. *See Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301-02 (2d Cir. 2021); *accord Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). A claim will survive a Rule 12(c) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

In deciding a motion for judgment on the pleadings, a court can "rely on the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009) (per curiam). "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of

the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). When, as here, both sides move for judgment on the pleadings under Rule 12(c), "[t]he court must treat each motion as if the other had not been made and by this process determine whether any material issue of fact is presented by the pleadings." 5C WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1370 (3d ed. 2004). In that instance, when reviewing the plaintiff's motion for judgment on the pleadings, "the court is to accept the defendant's denials and the allegations of the answer which are well pleaded, as well as the undenied facts alleged in the complaint." *JPMorgan Chase Bank, N.A. v. Tesla, Inc.*, No. 21-CV-9441 (PGG), 2024 WL 4167340, at *6 (S.D.N.Y. Sept. 12, 2024) (cleaned up).

## DISCUSSION

As noted, Comey brings ten claims against Defendants, alleging that her removal violated her constitutional rights and various statutes. Five of those claims — specifically, her separation-of-powers claim (Count One), APA claim (Count Two), *ultra vires* claim (Count Three), procedural due process claim (Count Five), and property-interest due process claim (Count Six) — turn largely on a pure question of law: whether her removal "pursuant to Article II of the United States Constitution and the laws of the United States," Compl. ¶ 47, was lawful. Comey's remaining claims — her First Amendment claim (Count Four), liberty-interest due process claim (Count Seven), substantive-due-process reputational harm claim (Count Eight), declaratory judgment claim (Count Nine), and mandamus claim (Count Ten) — raise separate issues. Accordingly, the Court will address the first set of claims — with respect to which the parties cross-move for judgment on the pleadings — before turning to the other five.

### A. Whether Comey's Removal Was Authorized by Statute or Article II of the Constitution (Counts One, Two, Three, Five, and Six)

Before the Court analyzes the merits of Counts One, Two, Three, Five, and Six, it must address a procedural wrinkle. As noted above, in deciding a motion for judgment on the pleadings, a court must assume the truth of all facts alleged in the nonmovant's pleading and draw all reasonable inferences in the nonmovant's favor. *See Lively*, 6 F.4th at 301-02; *Burch*, 551 F.3d at 124. Moreover, judgment on the pleadings is appropriate only "where material facts are undisputed." *Sellers*, 842 F.2d at 642. As discussed below, however, Defendants' statutory arguments assume the truth of a fact not in Comey's Complaint: that it was the Attorney General who ordered Comey's firing. *Compare* Comey Mem. 3 ("Ms. Comey does not plead that the Attorney General fired her."), *with* Answer ¶ 15 ("[T]hen-Attorney-General Bondi authorized and directed [Comey's] removal from her position as an Assistant United States Attorney."), *and id.* ¶¶ 12, 14, 16. In reviewing *Defendants'* motion for judgment on the pleadings, it would be improper for the Court to assume the truth of that potentially disputed fact.

That said, Comey cross-moves for judgment on the pleadings with respect to Counts One, Two, Three, Five, and Six and, in reviewing *her* motion, the Court is required both "to accept the [*Defendants'*] denials and the allegations of the answer which are well pleaded" and to "draw all reasonable inferences in favor of the [*Defendants*]." *JPMorgan Chase Bank*, 2024 WL 4167340, at *6 (emphases added) (cleaned up). The upshot is that, in resolving the parties' legal disputes, the Court can and will assume the truth of Defendants' assertion that it was the Attorney General who directed Comey's removal. That enables the Court to fully resolve the parties' legal disputes over whether the Attorney General had authority, by virtue of either statute or the Constitution, to remove Comey.

In light of the venerable principle that a court should abstain from deciding a constitutional question if it can resolve a case on other grounds, *see, e.g.*, *Slack v. McDaniel*, 529 U.S. 473, 485 (2000) (citing *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)), the Court begins with Defendants' statutory arguments. Upon concluding that Comey's removal was not authorized by statute, the Court then turns to the question of whether the congressional limits on her removal are unconstitutional.

**1. Comey's Removal Was Not Authorized by Statute**

Defendants advance two statutory arguments for why Comey's removal was lawful. First, they contend that the Attorney General could remove her at will pursuant to Section 542(b), the 1966 statute that provides that "[e]ach assistant United States attorney is subject to removal by the Attorney General." Gov't Mem. 14-18. And second, they assert that even if the CSRA governed her removal, the Attorney General's action constituted an implicit determination that she was removed "for such cause as will promote the efficiency of the service," a basis for removal under the CSRA. 5 U.S.C. § 7513(a); *see* Gov't Mem.19-21. As Comey notes, these arguments smack of "post hoc rationalization," as Defendants conspicuously failed to invoke either Section 542(b) or the CSRA as a basis for her removal until late in this litigation, let alone in her termination papers. *See* Comey Mem. 34-35; *see also Comey*, 2026 WL 1142679, at *6 n.8 (noting that, for purposes of Defendants' motion to dismiss for lack of subject-matter jurisdiction, they had forfeited any argument that Comey was fired pursuant to the CSRA or "for such cause as will promote the efficiency of the service"). But the Termination Memorandum did generically reference "the laws of the United States," *see* Compl. ¶ 47, so Defendants' newfound litigating position is not necessarily a complete about-face. Accordingly, and in view of the importance of the issues at stake, the Court declines Comey's invitation to treat

Defendants' statutory arguments as forfeited or entitled to little weight, *see* Comey Mem. 34-35, and will instead address each argument on its own terms.

**a. Section 542(b)**

Defendants' first statutory argument is based on the proposition — reaffirmed by the Supreme Court last year in *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748 (2025) — that "Congress must use 'very clear and explicit language'" when it wants to "'take away' the power of at-will removal from an appointing officer." *Id.* at 770-71 (quoting *Shurtleff v. United States*, 189 U.S. 311, 315 (1903)); *see* Gov't Mem. 14-15. "Nothing" in the one-sentence-long Section 542(b), Defendants observe, "imposes a 'for cause' requirement — or any other limitation — on the Attorney General's authority to remove an AUSA." Gov't Mem. 14. It follows, they continue, that Section 542(b) "codif[ies] the general rule of at-will removal, at least with respect to the Attorney General's removal authority." *Id.* at 15.

Were Section 542(b) Congress's only word on the subject of AUSA removals, Defendants might have a point. The fatal flaw with their argument, however, is that it ignores the plain language of the CSRA, which was enacted and amended (by the Due Process Amendments) *after* Section 542. After all, the CSRA, by its terms, applies to DOJ and the Attorney General. *See* 5 U.S.C. § 2302(c)(2) (providing that "[t]he head of each agency shall be responsible for," among other things, "preventing prohibited personnel practices" and "complying with and enforcing applicable civil service laws, rules, and regulations and other aspects of personnel management"); *id.* § 2302(a)(2)(C) (defining an "agency" as an "Executive agency"); *see also* 28 U.S.C. §§ 501, 503 (providing that "[t]he Attorney General is the head of the Department of Justice" and that DOJ "is an executive department of the United States"); 5 U.S.C. §§ 101, 105 (defining "Executive agency" to include an "Executive department,"

including DOJ). And as Defendants concede, AUSAs such as Comey fall comfortably within "the definition of 'employee' subject to the CSRA." Gov't Mem. 15 (noting that Comey alleges that she "meets [the] very broad definition" of "employee" in the CSRA, "and Defendants do not disagree"); *see* 5 U.S.C. § 7511(a)(1)(C).[2] Thus, while Section 542(b) grants the Attorney General authority to remove an AUSA, the CSRA limits how and when the Attorney General may do so. Most relevant here, the Attorney General may remove an AUSA in Comey's position only "for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a).

That conclusion is not only consistent with *Braidwood* — the Supreme Court decision upon which Defendants rely, *see* Gov't Mem. 14-15 (quoting 606 U.S. at 770-71) — it is all but compelled by it. The issue in *Braidwood* was whether members of the U.S. Preventive Services

---

[2] Were there any doubt on that score, it would be resolved by the 1990 Due Process Amendments, which, as noted above, broadened the definition of "employee" for purposes of Subchapter II of Chapter 75 of the CSRA. The House Committee Report accompanying the passage of the Due Process Amendments noted that it was meant to remedy the results of *Fausto*, which had held that nonpreference eligible employees in the excepted service — including hundreds of thousands of "attorneys . . . to whom this bill applies" — lacked appeal rights under the CSRA. H.R. REP. NO. 101-328, at 3-4 (1989), *reprinted in* 1990 U.S.C.C.A.N. 695, 697 . And House Committee Hearings on the proposed legislation (which began even before the decision in *Fausto*) included testimony stating explicitly that it would cover DOJ lawyers, including AUSAs. *See Administrative Due Process for Certain Federal Employees, Hearing on H.R. 917 Before the Subcomm. on Civ. Serv. of the H. Comm. on Post Off. and Civ. Serv.*, 99th Cong. 25-26 (1985). DOJ itself conceded as much. It submitted comments to the Subcommittee expressing "grave concern about the ramifications of this legislation" and stating that it was "particularly concerned about the effect on positions such as assistant U.S. attorneys." *Id.* at 26 (statement of Rep. Mervyn M. Dymally); *see also* ECF No. 87 ("Gov't Reply"), at 9 (acknowledging that the 1985 Hearing included "a comment from DOJ expressing concern if the Due Process Amendments were to apply to AUSAs handling 'sensitive cases'"). Congress nevertheless enacted the Due Process Amendments without excepting AUSAs or DOJ attorneys, even as it expressly excepted other categories of employees (including those of the FBI). *See* 5 U.S.C. § 7511(b). It is true, as Defendants assert, that "excerpts from committee hearings are among the least illuminating forms of legislative history." Gov't Reply 9 (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019)). But the legislative history here does confirm what the statutory text makes plain, and Defendants concede, namely that Comey was an "employee" within the meaning of Subchapter II of Chapter 75 of the CSRA.

Task Force, an entity within the Department of Health and Human Services ("HHS"), were principal officers or inferior officers for Article II Appointments Clause purposes. *See* 606 U.S. at 753-54, 761-62. But that constitutional question turned in part on whether the Task Force members were removable at will by the Secretary of HHS. *See id.* at 762-65. The Supreme Court held that they were, "declin[ing]" Braidwood's invitation "to read a for-cause removal restriction into a statute that does not explicitly provide for one." *Id.* at 770. "When Congress wants to depart from the default of at-will removability and instead furnish for-cause protection," the Court reasoned, "it knows how to do so." *Id.* at 771. The Court then pointed to several examples of "clear and explicit language" that Congress had used to do so — including, most notably for present purposes, Section 7513(a) of the CSRA. *See id.* (citing *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021), for the proposition that patent judges may be removed only "'for such cause as will promote the efficiency of the service'" (quoting 5 U.S.C. § 7513(a))). In other words, the Court pointed to the very language that restricts the removal of AUSAs such as Comey as an example of language that Congress can use, and has used, "to 'take away' the power of at-will removal." *Id.*

Defendants do not dispute that the CSRA applies to DOJ and generally covers AUSAs like Comey. Nor do they quarrel with the notion that the Court must, if it can, give effect to both Section 542(b) and the CSRA. *See, e.g.*, *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) (observing that, when "[p]resented with two statutes, [courts] will regard each as effective — unless Congress' intention to repeal is clear and manifest, or the two laws are irreconcilable" (cleaned up)). Instead, Defendants offer an alternative way to harmonize Section 542(b) and the CSRA: The latter, they argue, applies only "[i]f the Attorney General does not direct the removal of an AUSA or the AUSA is provided a reason for their termination." Gov't

Mem. 17. But that alternative does not withstand scrutiny for several reasons. First, *every* AUSA who is removed from office is removed pursuant to the authority granted to the Attorney General by Section 542(b) — which the Attorney General, in turn, can and does delegate to others pursuant to 28 U.S.C. § 510. *See* 28 C.F.R. § 0.15(b)(1)(v); U.S. Dep't of Just., Just. Manual § 3-4.300 (2018) (providing that the Attorney General's "authority to take final action in all matters pertaining to the employment, separation and general administration" of AUSAs "has been delegated to the Deputy Attorney General (*see* 28 C.F.R. § 0.15), with certain authorities redelegated to the Director, EOUSA"); *id.* § 3-4.752 (specifying that removals of AUSAs are proposed by the Director of EOUSA, a designee, the Deputy Directors, or a United States Attorney, and that they are decided by the Director, a designee, or the Deputy Directors). Thus, the category of AUSAs who are removed from service, but not at the direction of the Attorney General, is a null set.

Second, Defendants' proposed reading of the two statutes would render the CSRA "a chameleon" that would treat an AUSA as an "employee" subject to its protections only under certain circumstances. *Clark v. Martinez*, 543 U.S. 371, 382 (2005). The Supreme Court, however, has "forcefully rejected" interpretations of statutes that "giv[e] the same word, *in the same statutory provision*, different meanings *in different factual contexts*" as "interpretive contortion[s]." *United States v. Santos*, 553 U.S. 507, 522 (2008) (emphasis in original). Third, even if Defendants' proposed reading does not make the AUSAs covered by the CSRA a null set, it would render the CSRA's protections virtually useless. If, as Defendants would have it, an AUSA receives the benefits of the CSRA's procedural protections only when he or she is "provided a reason for [his or her] termination," DOJ officials (not to mention officials at many other Executive Branch departments and agencies subject to the CSRA) could immunize their

removal decisions from scrutiny by simply declining to proffer reasons. The Court cannot and will not bless an interpretation of the statutes governing AUSA removals that would lead to such absurdity. *See, e.g.*, *SEC v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011) ("It is, to be sure, well-established that a statute should be interpreted in a way that avoids absurd results." (cleaned up)).

Perhaps recognizing the textual weaknesses in their reading of Section 542(b) and the CSRA, Defendants fall back on the canon of statutory construction "that the specific governs the general." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017) (internal quotation marks omitted); *see* Gov't Mem. 16-17. But that argument fails right out of the gate because the specific-governs-the-general canon applies only "where two statutes conflict," *Am. Land Title Ass'n v. Clarke*, 968 F.2d 150, 157 (2d Cir. 1992), which, as discussed above, is not the case here. In any event, even if there were a conflict, it is the CSRA that would control, as it governs the removal of AUSAs — which is "the matter under consideration," *id.* — with significantly greater specificity than does Section 542(b). The single sentence of Section 542(b) identifies only *who* may remove an AUSA; it says nothing about *when* or *how* — i.e., the substantive standards and procedural protections that apply. By contrast, the CSRA establishes a "comprehensive system for reviewing personnel action taken against federal employees," *Elgin*, 567 U.S. at 5 (internal quotation marks omitted), and "prescribes in great detail the protections and remedies applicable to such action," *Fausto*, 484 U.S. at 443; *see also* 5 U.S.C. §§ 7511(a), 7513.

Finally, in a last-ditch effort to salvage their readings of Section 542(b) and the CSRA, Defendants invoke the canon of constitutional avoidance. *See* Gov't Mem. 18. But that canon also has "no application" where, as here, the statutory language at issue is unambiguous. *United States v. Oakland Cannabis Buyers' Coop.,* 532 U.S. 483, 484 (2001); *accord United States v. Magassouba,* 544 F.3d 387, 404 (2d Cir. 2008) ("Only if we conclude that statutory language is

ambiguous do we resort to canons of construction . . . ." (cleaned up)). And, in any event, for the reasons discussed below, there is no constitutional concern prompted by holding that Congress's grant of authority in one statute — Section 542(b) — is subject to, and limited by, another statute — the CSRA.

In short, the Court holds that Section 542(b) does not override the CSRA's for-cause and due process protections and permit the Attorney General to remove an AUSA such as Comey at will. Notably, in so holding, the Court joins the only other adjudicative body to resolve the relationship between Section 542(b) and the CSRA, as amended.[3] In *Hamlett v. Department of Justice*, 90 M.S.P.R. 674 (2002), the Merit Systems Protection Board ("MSPB") considered the question "of whether an Assistant United States Attorney is precluded, by operation of 28 U.S.C. § 542, from being an 'employee' with Board appeal rights under [the CSRA]." *Id.* at 675. After reviewing the statutes, the MSPB concluded the answer was no, reasoning that the 1990 Due Process Amendments had expanded the scope of AUSAs' rights under 5 U.S.C. § 7511(a)(1)(C) and that Section 542's silence as to the CSRA's appointment and removal procedures meant that it "does not exclude AUSAs from [Chapter 75]" or "any other provision of Title 5." *See id.* at 677-80. Defendants argue that *Hamlett* can be cabined to the question of whether AUSAs have "appeal right[s] to the MSPB" and does not speak to the Attorney General's removal authority. *See* ECF No. 87 ("Gov't Reply"), at 9. But that is incorrect. The MSPB's decision in *Hamlett*

[3] In *Gosnell v. Department of Justice*, 69 F.3d 1138, 1140 (Fed. Cir. 1995) (per curiam), the Federal Circuit observed that "[d]etermining precisely the rights provided to assistant U.S. attorneys by the Due Process Amendments . . . is problematic because of the language of 28 U.S.C. § 542 which gives the Attorney General broad discretion in appointing and removing assistant U.S. attorneys." *Id.* at 1140. But that observation was dictum, as the court was ultimately "not required to decide whether any conflict . . . exist[ed] between 28 U.S.C. § 542" and the CSRA. *Id.* at 1140 n.3.

turned on the fact that, following the 1990 Due Process Amendments, AUSAs are indisputably "employee[s]" within the meaning of 5 U.S.C. § 7511(a)(1). It is that status that gives them both appeal rights, *see id.* § 7513(d), *and* for-cause and due process protections from removal, *see id.* § 7513(a).[4]

Even more notably, Defendants' position in this case flies in the face of over forty years of consistent policy and practice of the Executive Branch. *Cf., e.g.*, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (observing that where "an agency claims to discover in a long-extant statute an unheralded power . . . we typically greet its announcement with a measure of skepticism" (cleaned up)). Indeed, even before the passage of the 1990 Due Process Amendments, DOJ "instituted removal actions against assistant U.S. attorneys only for good cause and . . . pursuant to agency procedures." *Gosnell v. Dep't of Just.*, 69 F.3d 1138, 1140 (Fed. Cir. 1995) (per curiam) (citing U.S. Dep't of Just., United States Attorneys' Manual 99 (1988)); *see* Memorandum Opinion for the Associate Attorney General, *Termination of an Assistant United States Attorney on Grounds Related to His Acknowledged Homosexuality*, 7 Op. O.L.C. 46, 46-49 (1983) (determining that an AUSA's position in the CSRA's "excepted service" prevented his termination based on sexual preference or for conduct that did not adversely affect job performance); *see also id.* at 47 n.3 (citing a 1970 Office of Legal Counsel

---

4 For that reason alone, *Windsor v. The Tennessean*, 719 F.2d 155 (6th Cir. 1983) — the one and only decision construing Section 542(b) upon which Defendants rely, *see* Gov't Mem. 15, 25; Gov't Reply 4, 11 — is inapposite. Yes, the decision declared without qualification that "the Attorney General's power to remove assistant United States attorneys is unconditional." 719 F.2d at 159 (citing 28 U.S.C. § 542(b)). But the decision predated the passage of the 1990 Due Process Amendments, which, as discussed, expanded the CSRA's definition of "employee" to indisputably encompass AUSAs and confer for-cause and due process protections on them. Additionally, the case did not, as this one does, involve an AUSA's allegations of being subjected to a prohibited personnel practice in violation of the CSRA. Nor is there any discussion in the opinion regarding the relationship between Section 542(b) and the CSRA.

("OLC") memorandum, written by then-Assistant Attorney General William H. Rehnquist, for the proposition that "[w]hether the Attorney General's authority in 28 U.S.C. § 542(b) prevails over the veterans' preference statute is a question on which" the OLC had "expressed considerable doubt"). And after the 1990 Due Process Amendments, the Executive Branch conceded in *Hamlett* that Section 542 was subject to, and limited by, the CSRA. *See Hamlett*, 90 M.S.P.R. at 675 (noting that "both parties argued that [S]ection 542 does not affect the Board's jurisdiction under chapter 75 with respect to adverse action appeals filed by AUSAs"). As Defendants acknowledged at oral argument, the Executive Branch consistently maintained that position until this Administration — indeed, perhaps until this case. *See* Tr. 44 ("[U]ntil recently . . . the Department's position was what the *Hamlett*'s position was . . . ."); *id.* (agreeing that DOJ's position dated "back to at least 1983").

In sum, the Court concludes that Section 542(b) does not override the for-cause and due process protections of the CSRA and did not provide a statutory basis for Attorney General Bondi to remove Comey at will. As Defendants conceded at oral argument, it follows that then-Acting Attorney General Blanche's later ratification of Comey's removal pursuant to Section 542(b) had no effect. *See* Tr. 43 (conceding that, if "Former Attorney General Bondi did not have the authority" to remove Comey, then "it wouldn't matter" that Attorney General Blanche ratified the firing). "[F]or ratification to be effective, 'the principal must have [had] the authority to authorize the action *both* when the action [was] initially performed by the agent, *and* when the act [was] affirmed (and thereby ratified) by the principal.'" *United States v. Comey*, 810 F. Supp. 3d 768, 785 (E.D. Va. 2025) (alterations and emphases in original) (quoting *Wille v. Lutnick*, 158 F.4th 539, 553 (4th Cir. 2025)). Section 542(b) did not give Bondi authority to act in the first instance; nor did it give Blanche authority to ratify her act after the fact.

**b. Section 7513(a)**

The Court need not dwell long on Defendants' second statutory argument justifying Comey's removal — that, even if Comey was protected by the CSRA, the Attorney General's decision to remove her constituted an implicit determination that her removal was for "such cause as will promote the efficiency of the service" and, thus, permitted by the statute. *See* Gov't Mem. 19-20 (quoting 5 U.S.C. § 7513(a)). That is because the argument borders on frivolous. First, the argument is at odds with longstanding judicial interpretation of Section 7513(a), which holds that an agency must demonstrate a "nexus between the employee's misconduct and the work of the agency" to satisfy the efficiency-of-the-service standard. *Doe v. Dep't of Just.*, 565 F.3d 1375, 1379 (Fed. Cir. 2009); *accord Brenner v. Dep't of Veterans Affs.*, 990 F.3d 1313, 1316 (Fed. Cir. 2021) (holding that an agency seeking to remove an employee protected by Section 7513(a) must "show by a preponderance of the evidence that the employee's misconduct is likely to have an adverse effect upon the agency's functioning" (internal quotation marks omitted)). Here, Defendants could not meet that standard even if they tried, as it is undisputed that Comey's performance as an AUSA was outstanding. *See, e.g.*, Answer ¶¶ 25-26, 39; *see also* Tr. 60 (Defendants' counsel conceding that Comey "had outstanding service as an AUSA"). Second, and in any event, Defendants' argument ignores the rest of the CSRA, which, among other things, required that Comey be given advance written notice (subject to certain exceptions not relevant here); "a reasonable time" to respond orally and in writing; representation; and "a written decision and the specific reasons therefor at the earliest practicable date." 5 U.S.C. § 7513(b). Defendants concede, as they must, that Comey was not afforded these procedural protections. *See* Gov't Mem. 16 (acknowledging that the CSRA's "procedural mandates

. . . were concededly not followed here"). As they acknowledged at oral argument, *see* Tr. 36, that concession is fatal to their contention that Comey's removal was lawful under the CSRA.

### 2. Comey's Removal Was Not Authorized by Article II of the Constitution

Because Comey's removal was not authorized by any statute — indeed, because it ran afoul of a statute, the CSRA — the Court must confront Defendants' most sweeping claim: that Comey's removal was authorized by the Attorney General's powers under Article II of the Constitution and that the CSRA, to the extent it constrains those powers, is unconstitutional. *See* Gov't Mem. 1-2, 14, 18 (arguing that "[i]nterpreting the CSRA to restrict the power of the President and the Attorney General to remove an AUSA without cause would significantly encroach on the Executive's power and thus render the statute unconstitutional under Article II"). In making that claim, Defendants all but admit they seek to overturn nearly two centuries of Supreme Court precedent, rooted in the text of Article II. *See* Tr. 9-12; Gov't Mem. 11; Gov't Reply 21-23. This Court, however, is bound to follow the Supreme Court's precedents unless and until the Supreme Court itself overturns them. And in any event, Defendants' arguments for their sweeping assertion of executive power fall short on the merits.

#### a. The Supreme Court Has Long Held That Congress May Generally Limit the Removal of Inferior Officers

Under Article II of the Constitution, "[t]he executive Power" is vested in the President, U.S. CONST. art. II, § 1, cl. 1, who has the responsibility to "take Care that the Laws be faithfully executed," *id.* art. II, § 3. But the President is not tasked with executing the laws alone and unaided. The Appointments Clause, *also* part of Article II, provides that the President may be assisted in carrying out his responsibility by "Officers." It provides that the President

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not

> herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

*Id.* art. II, § 2, cl. 2. Thus, the Appointments Clause establishes a class of Executive Branch officials — "Officers" — who are distinct from "mere employees," *i.e.*, "officials with lesser responsibilities who fall outside the Appointments Clause's ambit." *Lucia v. SEC*, 585 U.S. 237, 241, 243 (2018). And it "divides all . . . officers into two classes": "principal officers," who are "selected by the President with the advice and consent of the Senate," and "inferior officers," whom "Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary." *Morrison v. Olson*, 487 U.S. 654, 670 (1988) (internal quotation marks omitted).

The Supreme Court has, on various occasions, been called upon to parse the distinctions among employees, inferior officers, and principal officers. Even so, it has not established an "exclusive criterion for distinguishing between principal and inferior officers." *Seila Law LLC v. CFPB*, 591 U.S. 197, 217 n.3 (2020) (quoting *Edmond v. United States*, 520 U.S. 651, 661 (1997)). Instead, the Court has "examined factors such as the nature, scope, and duration of an officer's duties" and, more recently, whether the officer was "directed and supervised" by a principal officer. *Id.* (quoting *Edmond*, 520 U.S. at 663). "Principal officers in the Executive Branch encompass at least the Heads of Departments, who report directly to the President." *Braidwood*, 606 U.S. at 761. By contrast, "[i]nferior officers are most readily defined by their relationship to principal officers." *Id.* ("Inferior officers are those 'whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" (quoting *Edmond*, 520 U.S. at 663)). Here, the Court need not and does not wade into this jurisprudence. That is because the parties agree that AUSAs like

Comey are either employees or inferior officers — but certainly *not* principal officers. *See* Comey Mem. 11 ("[T]he Court need not parse if Ms. Comey is an inferior officer or employee."); Gov't Reply 14 n.1; *see also, e.g.*, *United States v. Jackson*, 187 F.4th 1198, 1204 (9th Cir. 2026) (holding that U.S. Attorneys — who are above AUSAs in the chain of command — are, themselves, "inferior officers" within the meaning of the Appointments Clause); *United States v. Hilario*, 218 F.3d 19, 25 (1st Cir. 2000) (same). The Court concurs and, thus, proceeds on the assumption that Comey — although concededly an "employee" within the meaning of the CSRA — was an "inferior Officer" within the meaning of Article II.

As noted, the Appointments Clause provides that Congress "may by Law vest the *Appointment*" of inferior Officers "in the President alone" *or* elsewhere, namely "in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2 (emphasis added). For nearly two centuries, the Supreme Court has consistently held that Congress may, by law, *also* regulate or limit the *removal* of inferior officers. The Court first touched on that proposition in *Ex parte Hennen*, 38 U.S. (13 Pet.) 230 (1839). *Hennen* involved the removal of a clerk who had been appointed pursuant to a statute that was silent with respect to how a clerk could be removed. *See id.* at 257-59, 261. The Court declared that, "[i]n the absence of all constitutional provision, *or statutory regulation*," the rule is that "the power of removal [is] incident to the power of appointment." *Id.* at 259 (emphasis added). Notably, as to inferior officers who were appointed, in accordance with law, by a head of department, the Court disavowed any suggestion that the President had the power of removal. *See id.* at 260 ("[T]he President has certainly no power to remove [such officers]."). The removal of inferior officers, the Court explained, "depends upon the authority of law," which demands "an inquiry into the meaning and intention

of the statute" that created the office. *Id.* The Court thus hinted that Congress could, by law, regulate and limit the removal of inferior officers by principal officers.

Approximately fifty years later, in *United States v. Perkins*, 116 U.S. 483 (1886), the Court expressly confirmed that Congress has that authority under the Constitution. In *Perkins*, a naval cadet engineer who had been discharged by the Secretary of the Navy sued, arguing that his discharge had been illegal. *See id.* at 483. The Court noted that Congress had "by express enactment vested the appointment of cadet engineers in the secretary of the navy" and that they were therefore inferior officers within the meaning of the Appointments Clause. *See id.* at 484. But the statute, unlike the statute in *Hennen*, provided certain protections from removal: No "officer in the . . . naval service" could be "dismissed from service except upon and in pursuance of the sentence of a court-martial to that effect" or a finding of misconduct. *Id.* The Court held that the naval cadet was entitled to those protections and categorically rejected the Government's argument that allowing Congress to limit the cadet's removal in these ways "infring[ed] upon the constitutional prerogative of the executive." *Id.* Congress may not have authority to restrict the President's power to remove principal officers, the Court observed. *See id.* But the Court "ha[d] no doubt that when congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest." *Id.* at 485. That is because "[t]he constitutional authority in congress to . . . vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as congress may enact in relation to the officers so appointed." *Id.* A "head of a department," the Court continued, "has no constitutional prerogative of appointment to offices independently of the legislation of congress, and by such legislation he must be governed, not only in making appointments, but in all that is incident thereto." *Id.*

Forty years later, the Supreme Court reaffirmed *Perkins* in *Myers v. United States*, 272 U.S. 52 (1926), a decision the current Court has described as "perhaps [the Court's] best word on the subject" of the removal of Executive Branch officials. *Trump v. Slaughter*, 146 S. Ct. 2283, 2299 (2026). The *Myers* Court held that statutory removal protections for a *principal* officer are unconstitutional because Article II confers on the President "the general administrative control of those executing the laws," 272 U.S. at 164, and he "need[s] in meeting [that] responsibility to have the power to remove those whom [he] appoint[s]," *id.* at 119. That conclusion, the Court explained, flowed from the words of the Appointments Clause, which give Congress (as opposed to the Senate alone) no role in the appointment and removal of principal officers. *See id.* at 127. But those words, the Court observed, *do* grant Congress power with respect to inferior officers: They "give to Congress the power to limit and regulate removal of such inferior officers by heads of departments when it exercises its constitutional power to lodge the power of appointment with them." *Id.* at 127 (citing *Perkins*, 116 U.S. at 485). Put differently: "Congress, in committing the appointment of such inferior officers to the heads of departments, may prescribe incidental regulations controlling and restricting the latter in the exercise of the power of removal." *Id.* at 161.

Another sixty years later, the Court reaffirmed the point yet again in *Morrison v. Olson*, 487 U.S. 654 (1988). As relevant here, the issue in *Morrison* was whether for-cause limitations on the power of the Attorney General to remove an independent counsel appointed pursuant to the independent counsel provisions of the Ethics in Government Act, which have since lapsed, were constitutional. Over a lone dissent by Justice Scalia, the Court held that they were because the independent counsel was an "inferior officer under the Appointments Clause," and the Attorney General's authority to remove her for "good cause" provided the President with

"substantial ability to ensure that the laws are 'faithfully executed' by an independent counsel." *Id.* at 691, 696. Citing *Perkins* and *Myers*, the Court emphasized that it had "never held that the Constitution prevents Congress from imposing limitations on the President's power to remove *all* executive officials simply because they wield 'executive' power." *Id.* at 689 n.27. To the contrary, "*Myers* itself expressly distinguished cases in which Congress had chosen to vest the appointment of 'inferior' executive officials in the head of a department. In such a situation, we saw no specific constitutional impediment to congressionally imposed restrictions on the President's removal powers." *Id.* (citation omitted).

Admittedly, the majority opinion in *Morrison* has borne its fair share of criticism in the decades since the decision, so much so that some have said that, "[i]n anything but the most nominal sense, *Morrison* is probably no longer good law." Adrian Vermeule, Morrison v. Olson *Is Bad Law*, LAWFARE (June 9, 2017), https://www.lawfaremedia.org/article/morrison-v-olson-bad-law [https://perma.cc/P86N-9L5R]. By contrast, Justice Scalia's dissent has been "elevat[ed] . . . to canonical status." *Id.* Thus, it is worth emphasizing that the point of disagreement between Justice Scalia and the majority was *not* over whether Congress may, consistent with Article II of the Constitution, regulate and limit the removal of inferior officers — *all* the Justices who decided *Morrison*, *including Justice Scalia*, agreed that Congress may do so. Instead, the point of disagreement was over whether the independent counsel was properly characterized as an inferior officer. Citing the same cases as the majority (namely, *Perkins* and *Myers*), Justice Scalia acknowledged that the President's "power to remove inferior officers who exercise purely executive powers, and whose appointment Congress had removed from the usual procedure of Presidential appointment with Senate consent, could be restricted, at least where the appointment had been made by an officer of the Executive Branch." *Morrison*, 487 U.S. at 723-

24 (Scalia, J., dissenting). In a footnote, he went even further, explaining that it has "never been the law" that "every officer of the United States exercising any part of the executive power must serve at the pleasure of the President and be removable by him at will," and that he "d[id] not assert otherwise":

> What I *do* assert — and what the Constitution seems plainly to prescribe — is that the President must have control over all exercises of the executive power. That requires that he have plenary power to remove principal officers such as the independent counsel, but it does not require that he have plenary power to remove inferior officers. Since the latter are, as I have described, subordinate to, *i.e.,* subject to the supervision of, principal officers who (being removable at will) have the President's complete confidence, it is enough — at least if they have been appointed by the President or by a principal officer — that they be removable *for cause,* which would include, of course, the failure to accept supervision. Thus, *Perkins* is in no way inconsistent with my views.

*Id.* at 724 n.4 (Scalia, J., dissenting) (emphasis in original) (cleaned up). Even in his "canonical" dissent, that is, Justice Scalia assumed — and reaffirmed — that Congress may, consistent with Article II, regulate and limit the removal of *inferior* officers who were appointed, in accordance with law, by a *principal* officer. So long as the President has plenary power to remove a principal officer (as he indisputably does with respect to the Attorney General), Justice Scalia opined, "it is enough . . . that [inferior officers answering to that principal officer] be removable *for cause*." *Id.* (Scalia, J. dissenting) (emphasis in original).

In more recent years, the Supreme Court has undoubtedly expanded its conception of the "executive power" vested in the President. *See generally* Cass R. Sunstein & Adrian Vermeule, *The Unitary Executive: Past, Present, Future*, 2020 SUP. CT. REV. 83; *see also* Erwin Chemerinsky, *A President Unbound:* Trump v. Slaughter *and the New Unitary Executive*, 17 CAL. L. REV. ONLINE 56, 56-58 (2026). Even so, it has repeatedly reaffirmed the core holding of *Perkins*: Congress may, by law, regulate and limit the removal of inferior officers. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (citing *Perkins* and

*Morrison* for the proposition that Congress may restrict "the power of principal executive officers — themselves responsible to the President — to remove their own inferiors"); *id.* at 493-95 (offering a more detailed discussion of *Perkins* and *Morrison*); *Seila Law,* 591 U.S. at 204 (citing *Perkins* and *Morrison* for the proposition that Congress may "provide tenure protections to certain *inferior* officers with narrowly defined duties"); *Arthrex*, 594 U.S. at 17, 26 (leaving intact the CSRA's restriction on removal of Administrative Patent Judges "for such cause as will promote the efficiency of the service" (quoting 5 U.S.C. § 7513(a))). Of these, *Arthrex* is especially noteworthy. There, the Supreme Court held that the significant "unreviewable executive power" wielded by administrative patent judges was "incompatible with their status as inferior officers." 594 U.S. at 18. Yet, the Court's remedy was not to invalidate the CSRA's restrictions on removal of the administrative patent judges; instead, it was to subject the judges' decisions to review by their superior principal officer. *See id.* at 25-27 (plurality opinion).[5] In other words, the Court accepted that Congress may grant for-cause removal protections to inferior officers so long as a principal officer has "the discretion to review [those inferior officers'] decisions." *Id.* at 27 (plurality opinion).

---

[5] Justice Gorsuch dissented from that portion of Chief Justice Roberts's opinion. *See id.* at 30-33 (Gorsuch, J., concurring in part and dissenting in part). Significantly, however, he did so on the ground that the remedy for the constitutional violation should be left to Congress. *See id.* He did not dispute that the plurality's chosen remedy would be consistent with Article II of the Constitution. *See id.* at 31 (noting that there were multiple "possible way[s] out of the problem," one of which was to "choose as the Court does and make [the administrative patent judges'] decisions subject to review by the Director, who is answerable to the President through a chain of dependence"). Justice Breyer, joined by two Justices, disagreed with the majority's conclusion that there was a constitutional violation but agreed with its "remedial holding." *Id.* at 44 (Breyer, J., concurring in the judgment in part and dissenting in part).

**b. Comey's Removal Falls Comfortably Within the Boundaries of the Supreme Court's Removal Precedents, Which This Court Is Bound to Follow**

In short, for nearly two centuries, the Supreme Court has recognized that Congress may, consistent with Article II of the Constitution, regulate and limit the removal of inferior officers. *See, e.g.*, *Comans v. Exec. Off. of the President*, — F. Supp. 3d —, No. 25-CV-1237 (MSN) (WEF), 2026 WL 2100037, at *4 (E.D. Va. July 21, 2026) ("*Comans II*") (explaining that the Supreme Court "has repeatedly reaffirmed the principle that the President does not have plenary power to remove all inferior officers and that Congress may validly regulate the method by which such officers are removed"). In fact, the Supreme Court has never in its history found unconstitutional a congressionally imposed restriction on the removal of an inferior officer who answers, as AUSAs do, to a principal officer removable by the President at will. *Cf. Free Enter. Fund*, 561 U.S. at 492, 495-96 (holding that "*dual* for-cause limitations on the removal of" inferior officers "contravene the Constitution's separation of powers" (emphasis added)). That is not to say that the Supreme Court's existing removal jurisprudence gives Congress plenary power to limit the removal of inferior officers. The Court has allowed that "removal restrictions" would run afoul of Article II if they were "of such a nature that they impede the President's ability to perform his constitutional duty," *Morrison*, 487 U.S. at 691, and has characterized *Perkins* and *Morrison* as allowing tenure protections only for "inferior officers with limited duties and no policymaking or administrative authority," *Seila Law*, 591 U.S. at 218. Along the same lines, it has described *Morrison* as lying at "the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)).

But if *Morrison* represents the "outermost constitutional limits" of permissible restrictions under the Supreme Court's removal jurisprudence, this case falls comfortably within

those limits. First, the independent counsel in *Morrison* enjoyed far stronger removal protections than did Comey as an AUSA. The former was appointed by an Article III panel of judges and could be removed by the Attorney General only "for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsel's duties." *Morrison*, 487 U.S. at 663 (quoting 28 U.S.C. § 596(a)(1)). The latter, by contrast, was appointed by the Attorney General (a principal officer), *see* 28 U.S.C. § 542(a), and could be removed by the Attorney General "for such cause as will promote the efficiency of the service," 5 U.S.C. § 7513(a).

Second, the powers of the independent counsel far exceeded those of Comey as an AUSA. The independent counsel had "*full* power and *independent* authority to exercise *all* investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General, and any other officer or employee of the Department of Justice." *Morrison*, 487 U.S. at 662 (emphases added) (quoting 28 U.S.C. § 594(a)). And she could "appoint employees"; could "request and obtain assistance from the Department of Justice"; could "handl[e] all aspects of any case, in the name of the United States"; and did not necessarily need to "comply with the written or other established policies of the Department of Justice respecting enforcement of the criminal laws." *Id.* at 662. What is more, her jurisdiction over a matter operated to *divest* the authority of the Attorney General and DOJ. *See id.* at 662-63 (noting that, upon referral of a matter to the independent counsel, the Attorney General and DOJ were "required to suspend all investigations and proceedings regarding the matter"). Comey's powers paled in comparison. She was, like every AUSA, subject to the supervision of the Attorney General, *see* 28 U.S.C. §§ 516, 519, not to mention the Deputy Attorney General, the U.S. Attorney, and a "line of supervisors" within the U.S. Attorney's Office for the Southern District of New York, Compl.

¶ 44; she had no power to appoint anyone; she had no authority to set DOJ policy; and she was "subject to approval requirements as set forth in the Justice Manual, relevant delegations of authority, and office policies for the SDNY United States Attorney's Office," Answer ¶ 44.

By asking the Court to disregard *Morrison*, not to mention *Perkins*, *Myers*, and *Arthrex*, Defendants just about concede as much. Thus, their principal argument is that the holdings of these cases have been abrogated, "if not overruled," by more recent rulings of the Supreme Court — namely, *Trump v. United States*, 603 U.S. 593 (2024), and *Trump v. Slaughter*, 146 S. Ct. 2283 (2026) — at least as applied to "criminal AUSAs who are appearing in court." *See* Tr. 10, 18. On their view, AUSAs who represent the United States in criminal cases in court exercise prosecutorial and investigatory functions that fall squarely within the President's "conclusive and preclusive" powers. *Trump*, 603 U.S. at 607. Accordingly, they argue, the President — and, by extension, the heads of departments appointed by the President — must have the power to remove such AUSAs for any reason or no reason at all pursuant to Article II "to fulfill [the President's] constitutional obligation to take care that the laws be faithfully executed." Gov't Reply 22 (quoting *Slaughter*, 146 S. Ct. at 2291).

Defendants' argument is contrary to an unbroken line of Supreme Court decisions dating back almost two centuries, and the Supreme Court itself has not formally overruled any of those decisions. That is sufficient, in itself, to reject the argument. Time and time again, the Supreme Court has instructed that, when one of its precedents "has direct application in a case" — as *Perkins*, *Myers*, *Morrison*, and *Arthrex* do here — a lower court "should follow the case[s] which directly control[], leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). A lower court is bound by that rule "even if the lower court thinks the precedent is in tension with

some other line of decisions" or that "intervening decisions from [the Supreme] Court ha[ve] implicitly overruled" the precedent. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (internal quotation marks omitted); *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."). Thus, while the Supreme Court may be free to overrule its prior cases holding that Congress can regulate and limit the removal of inferior officers and adopt Defendants' argument, this Court is not.

**c. Neither *Trump v. Slaughter* Nor *Trump v. United States* Supports Defendants' Sweeping Theory of Executive Power**

Even were this Court free to adopt Defendants' argument, it would not, as neither *Trump v. Slaughter* nor *Trump v. United States* — never mind the language of Article II — supports their sweeping and unprecedented theory of executive authority. In *Slaughter*, the Supreme Court overruled *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), which had been understood to hold that Congress could create "expert agencies led by a *group* of principal officers removable by the President only for good cause," *Seila Law*, 591 U.S. at 204 (emphasis in original); *Slaughter*, 146 S. Ct. at 2302 ("If anything more is left of *Humphrey's*, we overrule it."), and held that Congress may not constrain the President's authority to remove any principal officers, *see id.* at 2308 n.6 ("identify[ing] the very question at issue in this case" as whether Congress can regulate the removal of "principal officers" (cleaned up)); *id.* at 2311 (Gorsuch, J., concurring) ("To fulfill his constitutional duty to ensure the laws are faithfully executed, the Court holds, the President must have the ability to remove principal officers who exercise executive power in his name."). The decision, "however, had nothing to say about inferior officers or the *Perkins* line of cases." *Comans II*, 2026 WL 2100037, at *1. To the contrary, the Court explicitly declined to "determine the fate of officials not before [it]." *Slaughter*, 146 S. Ct.

at 2306. And it relied on sources — including Justice Story's *Commentaries*, *Myers*, and Justice Scalia's dissent in *Morrison* — that either acknowledged Congress's authority to limit the removal of inferior officers, explicitly endorsed *Perkins*, or both. *See id.* at 2291, 2298-99, 2306, 2308 n.6.[6] Little wonder, then, that Justice Gorsuch, concurring, observed that Sections 7511 through 7513 of the CSRA "afford rank-and-file agency employees considerable protection against removal," and gave no sign that the Court's decision called that into constitutional doubt. *Slaughter*, 146 S. Ct. at 2317 (Gorsuch, J., concurring).

*Slaughter*, at least, was a case about the President's removal power; *Trump v. United States*, of course, was not. *See* 603 U.S. at 601-02. Instead, it was a case about presidential immunity from criminal prosecution. *See id.* at 602. That said, there is language in *Trump v. United States* that, taken out of context and read broadly (as Defendants do), could call *Perkins* and its progeny into question. Specifically, the Court observed that in certain domains where the President's authority stems from the Constitution itself, his authority is "'conclusive and preclusive.'" 603 U.S. at 607 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring)). In those domains, the President "may act even when the measures he takes are 'incompatible with the expressed or implied will of Congress'" because his "exclusive constitutional authority . . . 'disabl[es] the Congress from acting upon the subject.'" *Id.* (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)). Among those domains, the Court continued, is the "investigation and prosecution of crimes." *Id.* at 620

---

[6] Writing several decades before *Perkins*, Justice Story observed that, "[a]s far as congress constitutionally possess the power to regulate, and delegate the appointment of 'inferior officers,' so far they may prescribe the term of office, the manner in which, and the persons by whom, the removal, as well as the appointment to office, shall be made." 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1531 (1833).

(cleaned up); *see id.* ("Investigative and prosecutorial decisionmaking is the special province of the Executive Branch, and the Constitution vests the entirety of the executive power in the President." (cleaned up)). Seizing on this language, Defendants argue that AUSAs involved in criminal cases "are exercising core executive power under Article II," which means that they must be removable at-will. Gov't Mem. 10. "A different rule," they argue, "would significantly intrude on the President's 'conclusive and preclusive' executive power." *Id.*; *see also* Tr. 19.[7]

Given the broad language in *Trump v. United States*, Defendants' argument is at least colorable. *See, e.g.*, Jack Goldsmith, *The Presidency After* Trump v. United States, 2024 SUP. CT. REV. 1, 22 (observing that *Trump v. United States* "might . . . call into question" *Perkins*, at least to the extent that *Perkins* "allows Congress through removal restrictions to prevent a President from directing the law enforcement actions of all subordinate executive branch officials"). But the Supreme Court itself has underscored that "'[t]he language of an opinion is not always to be parsed as though we were dealing with language of a statute,'" and instead "must be read with a careful eye to context." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373-74 (2023) (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 341 (1979)). And here, there are several good reasons not to read the language as broadly as Defendants do.

First, the principal focus of the opinion's analysis of "conclusive and preclusive" power is on actions of the *President* himself. *See* 603 U.S. at 607-09 (referring to "the President's

---

[7] Defendants' invocation of the "conclusive and preclusive" language in *Trump v. United States* is more than a little ironic, as it is derived from Justice Jackson's famous *Youngstown* concurrence. In Justice Jackson's case, however, he used the phrase to express the need for caution about broad claims of executive power: A "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution," he warned, "for what is at stake is the equilibrium established by our constitutional system." 343 U.S. at 638 (Jackson, J., concurring).

authority," "[the President's] discretion," "[t]he President's power," and "the President's actions"); *see also* Goldsmith, *supra*, at 35 ("The [*Trump v. United States*] Court emphasized that its decision turned on *the unique position of the President* in the constitutional scheme and the need to protect presidential decisionmaking, and its holding . . . concerned *only the President*." (emphases added)). Whether and to what extent the Court's analysis and holding would extend to actions taken by the President's subordinates is a matter of scholarly debate. *See, e.g.*, Trevor W. Morrison, *All the President's Men*, N.Y.U. L. REV. CASE COMMENT 1, 1-10 (2025); Zachary S. Price, *Even if the President Is Immune, His Subordinates Are Not*, YALE J. ON REGUL.: NOTICE & COMMENT (July 11, 2024), https://www.yalejreg.com/nc/even-if-the-president-is-immune-his-subordinates-are-not-by-zachary-s-price/ [https://perma.cc/7UEH-4YKM]. But even those who take the broadest view of the Supreme Court's language on that score read it to apply only "when a subordinate acts *at the President's behest* to effectuate" a conclusive and preclusive power. Trevor W. Morrison, *supra*, at 21 (emphasis added). "If . . . [subordinates] are acting without presidential direction on authority they claim the law has given to them, or if they are illegitimately invoking presidential power, without any delegation or direction from the President . . . then they should not be understood to be exercising the President's powers." *Id.*

Second, nowhere in the *Trump v. United States* opinion did the Supreme Court suggest, let alone hold, that it was overruling two centuries of jurisprudence regarding Congress's authority to restrict the removal of inferior officers. To the contrary, when the Court referred to the President's "unrestricted power of removal" — as it did repeatedly — it made clear that it was referring specifically to the President's power to remove *principal* officers, such as the Attorney General himself. *See id.* at 621 ("[T]he President's management of the Executive

Branch requires him to have unrestricted power to remove the most important of his subordinates — such as the Attorney General — in their most important duties." (internal quotation marks omitted)); *id.* at 608-09 ("Congress lacks authority to control the President's 'unrestricted power of removal' with respect to 'executive officers of the United States whom *he* has appointed.'" (emphasis added) (quoting *Myers*, 272 U.S. at 106, 176)); *id.* at 621 ("[T]he President's power to remove 'executive officers of the United States whom he has appointed' may not be regulated by Congress or reviewed by the courts." (quoting *Myers*, 272 U.S. at 106)); *see also id.* at 651 n.1 (Barrett, J., concurring in part) ("[T]he supervision and removal of appointed, high ranking Justice Department officials falls within the President's core executive power."). What is more, the Court explicitly cited its acknowledgment in *Seila Law* that *Perkins* and *Morrison* constituted an "exception[] to the President's unrestricted removal power" for "certain *inferior* officers with narrowly defined duties." *Seila Law*, 591 U.S. at 204, 215 (emphasis in original); *see Trump*, 603 U.S. at 609.[8] The Supreme Court does not ordinarily "overrule, *sub silentio*, two centuries of jurisprudence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 98 (1998); *accord Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

Third, accepting Defendants' interpretation of the language in *Trump v. United States* would mean that Congress is precluded from "acting upon" DOJ's "investigative and prosecutorial" functions altogether. 603 U.S. at 607, 620-21. That would call into question scores of statutes regulating the conduct of criminal prosecutors. *See, e.g.*, 18 U.S.C. § 242

---

[8] That said, *Seila Law* acknowledged a second exception — for "expert agencies led by a *group* of principal officers removable by the President only for good cause," *Seila Law*, 591 U.S. at 204 (emphasis in original) — that the Supreme Court did explicitly overrule after *Trump v. United States*, in *Slaughter*.

(criminalizing the willful deprivation, "under color of any law," of "rights, privileges, or immunities secured or protected by the Constitution or laws of the United States"); *id.* § 1512(c) (criminalizing corruptly "obstruct[ing], influenc[ing], or imped[ing] any official proceeding, or attempt[ing] to do so"); *id.* §§ 2510-2523 (regulating prosecutors' use of wiretaps); *id.* § 3771 (requiring prosecutors to, among other things, confer with victims and inform them "in a timely manner of any plea bargain or deferred prosecution agreement"); *id.* § 6003 (regulating prosecutors' offers of immunity without court approval); 28 U.S.C. § 530B (subjecting "[a]n attorney for the Government" to the "State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties"); *see also* FED. R. CRIM. P. 48(a) (requiring "leave of court" for dismissal of an indictment). It would also cast doubt on decades of Supreme Court precedent acknowledging that "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Heckler v. Chaney*, 470 U.S. 821, 833 (1985); *see, e.g.*, *The Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457 (1868) ("Public prosecutions, until they come before the court to which they are returnable, are within the exclusive direction of the district attorney, and even after they are entered in court, they are so far under his control that he may enter a *nolle prosequi* at any time before the jury is empanelled for the trial of the case, *except in cases where it is otherwise provided in some act of Congress*." (emphasis added)); *see also, e.g.*, *United States v. Texas*, 599 U.S. 670, 683 (2023) (acknowledging that "an extreme case of non-enforcement" by the Executive Branch "arguably could exceed the bounds of enforcement discretion"); *see id.* at 732 (Alito, J., dissenting) (criticizing the majority for suggesting "that a President can disobey statutory commands unless Congress, by flexing its muscles, forces capitulation. That is not the

Constitution's conception of 'the executive Power.' The Constitution, instead, requires a President to 'take Care that the Laws be *faithfully* executed.'" (citations omitted) (emphasis in original)). It is unlikely the Supreme Court intended to wreak such havoc, let alone that it did so without a word of acknowledgement. *Cf. Atkins v. Crowell*, 945 F.3d 476, 479 (6th Cir. 2019) ("Neither Congress nor the Supreme Court 'hide[s] elephants in mouseholes.'" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001))).

Perhaps recognizing the breathtaking implications of their argument, Defendants try to limit the damage by asserting that the CSRA is unconstitutional only as applied to "criminal AUSAs" such as Comey. Tr. 17-22. But the logic of their argument does not support that limit. The CSRA would almost certainly be unconstitutional as applied to many AUSAs who handle civil cases. *See* 28 U.S.C. § 547(2) (charging United States attorneys to "*prosecute* or defend, for the Government, all civil actions, suits or proceedings in which the United States is concerned" (emphasis added)); *see also, e.g.*, 31 U.S.C. § 3730(a) (authorizing the Attorney General to "bring a civil action" for violations of the False Claims Act); 12 U.S.C. § 1833a(a), (c), (e) (providing that civil penalties for enumerated financial-institution offenses are recoverable in "a civil action" that "shall be commenced by the Attorney General"). It would likely also be unconstitutional as applied to "tens of thousands of holders of offices neither known nor foreseen by the Framers," *Morrison*, 487 U.S. at 690 n.29, who currently enjoy statutory removal protections, including law enforcement officers such as Drug Enforcement Administration agents, Customs and Border Protection officers, Immigration and Customs Enforcement detention-enforcement officers, and Internal Revenue Service agents. *See, e.g.*, *Haebe v. Dep't of Just.*, 288 F.3d 1288, 1291-92 (Fed. Cir. 2002) (DEA Special Agent); *Cheney v. Dep't of Just.*, 479 F.3d 1343, 1348-49 (Fed. Cir. 2007) (DEA Resident Agent in Charge);

*Wrocklage v. Dep't of Homeland Sec.*, 769 F.3d 1363, 1365-66 (Fed. Cir. 2014) (CBP Officer); *Alexander v. OPM*, 21 F. App'x 919, 921 (Fed. Cir. 2001) (INS Detention Enforcement Officer); *Karamanos v. Egger*, 882 F.2d 447, 452 (9th Cir. 1989) (IRS Agent).

At most, therefore, the language in *Trump v. United States* upon which Defendants rely should be read to mean that Congress may not regulate the removal of an Executive Branch official at the behest of the President himself and may not interfere directly with investigative and prosecutorial decisionmaking. So understood, the case has no relevance to the propriety of Comey's removal in this case. For one, Defendants make no claim that Attorney General Bondi (or any other official) acted at the behest of the President when removing Comey. To the contrary, they assert that it was the then-Attorney General who "authorized and directed" Comey's removal. Answer ¶ 15; *see id.* ¶¶ 12, 14, 16. And they acknowledge that, when asked about Comey's removal on the day after it occurred, the then-White House Press Secretary stated that the decision had been "made by the Department of Justice." *Id.* ¶ 51; *see* Compl. ¶ 51.[9] To the extent that the Attorney General had authority to act, therefore, it stemmed from "an act of Congress," not "from the Constitution itself," and thus could constitutionally be limited by an act of Congress too. *Trump*, 603 U.S. at 607 (internal quotation marks omitted).

[9] In light of the fact that Defendants make no claim that the Attorney General acted at the President's behest, the Court need not and does not resolve the parties' arguments with respect to whether or when the President can delegate his Article II authority to remove Executive Branch officials to others, such as the Attorney General. *Compare* Comey Mem. 15-17 (quoting *Aviel v. Gor*, No. 25-5105, 2025 WL 1600446, at *1 (D.C. Cir. June 5, 2025) (Katsas, J., concurring, joined by Pillard, J.), for the proposition "that if Congress vests a department head with the power to appoint and remove an inferior officer, 'the President has certainly no power to remove' the inferior officer directly" (quoting *Hennen*, 38 U.S. at 260)), *with* Gov't Reply 24-25 (arguing that, when then-Attorney General Bondi removed Comey and then-Acting Attorney General Blanche ratified the removal, they "acted pursuant to the executive authority they derive from the President" and questioning the "correctness" of Judge Katsas's opinion in *Aviel*).

Further, the CSRA does not speak directly to prosecutors' investigative and prosecutorial decisionmaking. That is, it does not purport to regulate Executive Branch decisions about whom or what to investigate and prosecute. Yes, it limits the removal of inferior officers (or employees) who make those decisions. But those officers (or employees) are, in turn, "subject to the supervision" of a principal officer, the Attorney General, who is "removable at will." *Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting); *see* 28 U.S.C. § 516 ("Except as otherwise authorized by law, the conduct of litigation in which the United States . . . is a party . . . is reserved to officers of the Department of Justice, under the direction of the Attorney General."); *id.* § 519 ("[T]he Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party, and shall direct all United States attorneys, assistant United States attorneys, . . . in the discharge of their respective duties."). Thus, "it is enough" for purposes of Article II "that they be removable for cause, which would include, of course, the failure to accept supervision." *Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting); *see also* Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 ALA. L. REV. 1205, 1244-45 (2014) (explaining that "[r]emoval at will . . . need not apply to inferior officers" because "[i]f inferior officers lack authority to make autonomous policy decisions (through review or revision by a superior), then the President can make sure inferior officers faithfully exercise their authority through principal officers who report to the President").

Defendants insist that, "[i]f [criminal] AUSAs were not removable at-will, they could bind the President and the entire Executive Branch to positions that the President disagrees with" through in-court statements or filings. Gov't Mem. 10-11; *see* Tr. 5, 18. Whether a line AUSA can bind the "entire Executive Branch" to any position is a debatable proposition. But even assuming the truth of the premise, it does not follow that criminal AUSAs must be removable at

will given that they answer to the Attorney General. To take a position contrary to the President's, a criminal AUSA would need to disregard the instructions and supervision of her superiors and could be removed on that basis alone. *See, e.g.*, *Cobert v. Miller*, 800 F.3d 1340, 1351 (Fed. Cir. 2015) (sustaining the removal of an employee who refused a directed reassignment, on the theory that "failure to follow instructions or abide by requirements affects the agency's ability to carry out its mission" (cleaned up)). Additionally, even taking Defendants' hypothetical on its own terms, it is not clear how abolishing an AUSA's removal protections would prevent the outcomes they fear. Any removal, whether for cause or at will, would presumably happen *after* an offending statement was made, leaving the Executive Branch bound (or not) to the rogue position regardless of the basis for the removal. At oral argument, Defendants asserted that at-will removal was a necessary prophylactic measure because it would deter potentially rogue AUSAs from taking unfavorable positions. *See* Tr. 19-21. But because AUSAs are removable for insubordination, that is a remedy in search of a problem.

### 3. Comey Is Entitled to Judgment on Counts One, Two, Five, and Six

For the reasons set forth above, the Court concludes that Comey's removal "pursuant to Article II of the United States Constitution and the laws of the United States," Compl. ¶ 47, was unlawful. In light of that conclusion, Comey is plainly entitled to judgment on the pleadings with respect to Count One, which claims that her removal violated the separation of powers by encroaching on Congress's authority, under Articles I and II, to place limitations on the removal of inferior officers, which it exercised by enacting the CSRA. She is also entitled to judgment on the pleadings with respect to Count Two, which claims that her removal violated the APA because it was "not in accordance with law" and occurred "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Finally, she is entitled to judgment on the

pleadings with respect to her due process claims in Counts Five and Six. Indeed, Defendants concede that if Comey is entitled to the protections of the CSRA — as she is — then she is entitled to judgment on those claims because she had a property interest in her position and she was not granted the process to which she was due under the statute. *See* Gov't Reply 33; Tr. 55 (Court: "[I]f I agree with plaintiff that she's entitled to the protections of the CSRA, then I take it . . . you would concede that she has a property interest in her job and that she would be entitled to relief on her due process claims also; is that correct?" Defendants: "That's correct, your Honor."); *see also Esparraguera v. Dep't of the Army*, 101 F.4th 28, 34 (D.C. Cir. 2024) ("[B]oth [the D.C. Circuit] and the Federal Circuit have held that 5 U.S.C. § 7513, a CSRA provision that allows agencies to remove certain employees 'only for such cause as will promote the efficiency of the service,' creates a property interest."). Accordingly, Defendants' motion for judgment on the pleadings with respect to Counts One, Two, Five, and Six must be and is DENIED, while Comey's cross-motion for judgment on the pleadings on these counts is GRANTED.

Count Three, however, is a different matter. It alleges that "Defendants had no lawful authority to terminate Plaintiff from federal service without adhering to the statutory protections afforded to her," making her termination "*ultra vires*." Compl. ¶¶ 94-95. Its header labels it both a claim for "Violation of the Administrative Procedure Act" and an "*Ultra Vires*" claim in "Violation of Statutory Authority." Compl. 32. If it is the former, however, it fails because it would be duplicative of the claim Comey advances in Count Two. And if it is the latter, it would fail because an *ultra vires* claim is "unavailable if . . . a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (internal quotation marks omitted). Here, for

the reasons just discussed (and in the Court's ruling denying Defendants' motion to dismiss for lack of subject-matter jurisdiction), the APA provides Comey not only with a meaningful opportunity for judicial review, but also with the very relief she seeks in Count Three.

At oral argument, Comey maintained that she could nonetheless maintain an *ultra vires* claim based on *American Federation of Government Employees, AFL-CIO v. U.S. Office of Personnel Management*, 777 F. Supp. 3d 253 (S.D.N.Y. 2025). *See* Tr. 53. There, Judge Cote dismissed the plaintiffs' Privacy Act claims for want of an available remedy — "except insofar as they [we]re a predicate to the complaint's other claims" — but she denied the motion to dismiss their APA claims and their *ultra vires* claim. *See* 777 F. Supp. 3d at 272, 278, 280-83. But in that case, the APA claims were brought against OPM and its Acting Director, while the *ultra vires* claim was brought solely against a different set of defendants (from the Department of Government Efficiency, also known as "DOGE"). *See id.* at 263-65, 282-83. Here, by contrast, all of Comey's claims are brought against the same Defendants, each of whom is indisputably covered by the APA, so she can secure the relief she seeks through alternate, statutory means. Her cross-motion for judgment on the pleadings on Count Three is therefore DENIED, and Defendants' motion for judgment on the pleadings as to that count is GRANTED.

**4. Comey Is Entitled to Reinstatement, Backpay, and a Declaratory Judgment**

That raises the question of relief for Counts One, Two, Five, and Six. Comey seeks two principal forms of relief. First, she seeks retroactive reinstatement and backpay effective from the date of her termination through December 20, 2025 (when, the Court infers, she accepted a different job, which she holds now). *See* ECF No. 49, at 1-2; *see also* Compl. Prayer for Relief. As she explains, that, in turn, "would provide, *inter alia*, the following relief":

> (a) restoration and supplementation of Ms. Comey's pension rights, credits, and benefits, including by requiring the government to make its required employer

> contributions into her pension plan, the Thrift Savings Plan, through December 20, 2025, along with interest and earnings to make her whole for the loss of investment during that four-month period; (b) restoration of employee contributions into the Thrift Savings Plan from awarded backpay through December 20, 2025, along with interest and earnings to make her whole for the loss of investment during that four-month period; (c) amendment of her service tenure to reflect more than ten years of service (from November 15, 2015, through December 20, 2025, rather than through only July 16, 2025); (d) a revision of her personnel files, including her SF-50, to reflect that she resigned as of December 20, 2025, rather than was terminated on July 16, 2025; and (e) back pay through December 20, 2025.

ECF No. 49, at 2 (footnote omitted). The Court grants Comey that relief, which will make her whole for the period during which she was unlawfully terminated and ensure that she suffers no adverse employment consequences for her unlawful termination.

Second, Comey seeks a declaration that Defendants (1) violated the separation of powers (and, relatedly, that their reliance on Article II as a removal authority was invalid), (2) violated the APA, and (3) violated her Fifth Amendment due process and statutory rights. *See* Compl. Prayer for Relief. In deciding whether to issue a declaratory judgment, courts consider:

> (1) whether the [declaratory] judgment [sought] will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether [such] a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to *res judicata*; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; and (6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction.

*Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99-100 (2d Cir. 2023) (cleaned up). Considering those factors, and exercising its "broad discretion," *id.*, the Court grants Comey the declaration she seeks. As discussed, in purporting to fire Comey pursuant to Article II and the laws of the United States, Defendants invented a new and expansive theory of executive power. And they have also utilized that theory to remove other Executive Branch employees who have

long held protections from removal. *See, e.g.*, *Comans v. Exec. Off. of the President*, No. 25-CV-1237 (MSN) (WEF), 2026 WL 1132803, at *1 (E.D. Va. Apr. 15, 2026) ("*Comans I*"). Accordingly, issuing a declaration that Defendants' removal of Comey was unlawful for the reasons discussed above will "serve a useful purpose in clarifying or settling the legal issues involved." *Admiral Ins. Co.*, 57 F.4th at 99. It may also, for the reasons discussed below, "finalize the controversy" with respect to Comey. *Id.* at 100. In contrast, there is nothing to suggest that Comey's request for a declaratory judgment is motivated by improper purposes or that granting her request would impose friction on any other legal system. Accordingly, and because there is likely no better or more effective remedy than a declaration in these circumstances, the Court will issue a declaration to the effect requested by Comey.

**B. Comey's Other Claims (Counts Four, Seven, Eight, Nine, and Ten)**

That leaves Comey's five other claims, with respect to which Defendants move for judgment on the pleadings but Comey does not: her First Amendment claim (Count Four), liberty-interest due process claim (Count Seven), substantive-due-process reputational harm claim (Count Eight), declaratory judgment claim (Count Nine), and mandamus claim (Count Ten). Taking them in reverse order, Count Ten — the mandamus claim — is pleaded only "[i]n the alternative," Compl. ¶ 123, and, at oral argument, Comey acknowledged that, should she prevail on her other claims, that claim would no longer survive. *See* Tr. 75-76. In light of that concession, the mandamus claim must be and is DISMISSED. As to Count Nine, meanwhile, Comey concedes that the Declaratory Judgment Act "only provides courts with discretion to fashion a remedy, not a cause of action," Comey Mem. 51 (quoting *Sunvestment Energy Grp. NY 64 LLC v. Nat'l Grid USA Servs. Co.*, 116 F.4th 106, 113-14 (2d Cir. 2024)), and must be DISMISSED on that basis alone. And Counts Seven and Eight — which assert due process

claims — are plainly moot, as the Court has granted judgment to Comey on Counts Five and Six, which also allege due process violations, and she identifies no additional relief that could be given beyond that to which she is entitled for those counts. *See Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case . . . is that the relief sought can no longer be given or is no longer needed.").[10] They are therefore DISMISSED as well.

Only Count Four — Comey's claim that Defendants violated her First Amendment rights to free speech and free association, *see* Compl. ¶¶ 97-100 — remains. Defendants move to dismiss the claim as "speculative and conclusory" and argue, among other things, that Comey fails to allege the kind of harm to a familial relationship that would be sufficient to sustain a free association claim. *See* Gov't Reply 29; Gov't Mem. 22-24. The Court is inclined to grant Defendants' motion to dismiss the claim — but not for the reasons they offer (upon which the Court intimates no views here). In connection with Count Four, Comey seeks "backpay" and "other available damages" as well as a declaration that Defendants violated her First Amendment rights. Compl. ¶ 100; *see also id.*, Prayer for Relief. But Comey's victory on Counts One, Two,

---

[10] At oral argument, Comey suggested that Counts Seven and Eight seek "name-clearing" relief to cure the alleged reputational harm she has suffered. *See* Tr. 51-52, 71-72. But putting aside whether Comey adequately raised that suggestion in her memoranda of law, Defendants have admitted that Comey's overall rating was "Outstanding" on each of her annual performance appraisals from 2019 through 2024. *See* Answer ¶¶ 25-26, 39. They have also admitted that those appraisals heaped praise on Comey — describing her as, among other things, "a brilliant lawyer and a gifted supervisor"; "the lawyer the office turns to when legal excellence is a must"; and "an outstanding AUSA in every respect," who "handled the highest profile cases in the office because her judgment, work product, and courtroom advocacy are among the finest in the country," *id.* ¶ 25; *see* Compl. ¶ 25 — and that Comey and her team received the EOUSA Director's Award for Superior Performance by a Litigative Team, *see* Answer ¶ 38. Further, Defendants admit that Comey's removal "was not 'for cause' and was not based on her performance." *Id.* ¶ 69; *see id.* ¶ 55; Tr. 34-35. Indeed, Defendants' counsel conceded at oral argument that Comey "had outstanding service as an AUSA." Tr. 60. In light of these admissions, not to mention this Court's opinions and rulings in the case, it is not clear what further "name-clearing" a judgment on Counts Seven and Eight would provide.

Five, and Six likely gives her all of the monetary relief to which she would be entitled were she to prevail on Count Four, so those portions of Comey's requests for relief would appear to be moot. *See Expressions Hair Design v. Schneiderman*, No. 13-CV-3775 (JSR), 2013 WL 7203883, at *2 (S.D.N.Y. Nov. 4, 2013) (dismissing a claim as moot "[i]n light of the relief described above"); *Metro. Transp. Auth. v. Duffy*, No. 25-CV-1413 (LJL), 2026 WL 588117, at *63 (S.D.N.Y. Mar. 3, 2026) (dismissing as moot a constitutional claim where the "APA claim offers [the plaintiffs] the relief that they seek").

And there appear to be good reasons to abstain from considering Comey's request for declaratory relief on Count Four. First, "declaratory relief is intended to operate prospectively." *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 301 (S.D.N.Y. 2012) (internal quotation marks omitted). Comey, however, has taken another job and no longer seeks actual reinstatement. *See* ECF No. 49, at 2. Thus, it is entirely speculative whether or when Comey would return to federal service, making a declaration that Defendants may not remove or otherwise discipline her for reasons that would run afoul of the First Amendment of doubtful importance. Put differently, it is no longer likely that there is "a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013) (cleaned up).

Second, in light of the declaratory relief that the Court granted Comey above, the discretionary factors would not necessarily favor a declaratory judgment on Count Four alone, should Comey ultimately prevail. *See, e.g.*, *Intellectual Capital Partner v. Inst. Credit Partners LLC*, No. 08-CV-10580 (DC), 2009 WL 1974392, at *6 (S.D.N.Y. July 8, 2009) (concluding that "declaratory relief would serve no useful purpose as the legal issues will be resolved by litigation of [another] claim"); *Dolphin Direct Equity Partners, LP v. Interactive Motorsports & Entm't*

*Corp.*, No. 08-CV-1558 (RMB) (THK), 2009 WL 577916, at *11 (S.D.N.Y. Mar. 2, 2009) (declining to issue declaratory relief where "a declaratory judgment on the same issues [as other, resolved claims] would be superfluous" (cleaned up)), *aff'd*, 419 F. App'x 60 (2d Cir. 2011); *Fleisher*, 858 F. Supp. 2d at 301-02 (same, where "the declarations [p]laintiffs seek involve conduct so similar to that covered by their [other] claim that entertaining the declaratory judgment claim would not satisfy [the discretionary] criteria"). These reasons to hesitate take on extra weight here, as adjudication of Comey's First Amendment claim is likely to raise thorny constitutional issues even apart from the merits, such as executive privilege, *see* ECF No. 92, at 1; Tr. 76-77; *see also United States v. Nixon*, 418 U.S. 683, 711 (1974) (holding that executive privilege is "constitutionally based"), and "federal courts should, where possible, avoid reaching constitutional questions," *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149-50 (2d Cir. 2001).

For these reasons, the Court reserves judgment on Comey's First Amendment claim pending supplemental briefing from the parties. Specifically, Comey is ORDERED to show cause in writing, in the form of a memorandum of law not to exceed 3,500 words and filed no later than **November 9, 2026**, why Count Four should not be dismissed for the reasons set forth above. Defendants shall file any opposition, also not to exceed 3,500 words, **within one week of Comey's submission**. No reply may be filed absent prior leave of Court.

## CONCLUSION

For the reasons set forth above, the Court concludes that Comey's removal was unlawful. Through Section 542(b), Congress granted the Attorney General power to remove Comey. But through the CSRA, Congress imposed limits on that power — limits that, even Defendants concede, were violated in Comey's case. And those limits are consistent with nearly two centuries of Supreme Court jurisprudence holding that, consistent with the Appointments Clause,

Congress may generally regulate the removal of inferior officers, so long as they report to a principal officer removable at will by the President. Defendants' effort to upend this long-settled case law by invoking *Trump v. Slaughter* and *Trump v. United States* — really, by invoking stray language in the latter of those decisions — is without merit, even if this Court were free to entertain it. Moreover, to reward that effort would disrupt "the equilibrium established by our constitutional system," *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring), and risk a return to the spoils system that Congress has sought to end since the nineteenth century.

Accordingly, Comey's cross-motion for judgment on the pleadings is GRANTED as to Counts One, Two, Five, and Six, but it is DENIED as to Count Three. (Comey's alternative motions to strike or dismiss several of Defendants' affirmative defenses or to convert the motions into motions for summary judgment are denied as moot.) Meanwhile, Defendants' motion is GRANTED as to Count Three, but it is DENIED as to Counts One, Two, Five, and Six. Counts Seven, Eight, Nine, and Ten are DISMISSED, albeit not for the reasons offered by Defendants in their motion. The Court reserves judgment on Count Four pending the parties' supplemental briefing ordered above.

With respect to Counts One, Two, Five, and Six, the Court grants Comey retroactive reinstatement and backpay effective from the date of her termination through December 20, 2025, which will make her whole for the period during which she was unlawfully terminated. Additionally, it grants her a declaration that Defendants (1) violated the separation of powers (and, relatedly, that their reliance on Article II as a removal authority was invalid), (2) violated the APA, and (3) violated her Fifth Amendment due process and statutory rights. The Court reserves judgment on the amount of backpay to which Comey is entitled and on whether she is also entitled to costs and attorneys' fees, as she requests. *See* Compl. Prayer for Relief.

The rulings in this Opinion and Order largely, if not entirely, render discovery unnecessary. Thus, unless and until the Court orders otherwise, discovery is hereby stayed.

The Clerk of Court is directed to terminate ECF Nos. 67 and 76.

SO ORDERED.

Dated: October 26, 2026
New York, New York

JESSE M. FURMAN
United States District Judge