Yale Journal on Regulation

# Notice & Comment

A blog from the Yale Journal on Regulation and ABA Section of Administrative Law & Regulatory Practice.

**Made possible in part by the support of Davis Polk & Wardwell LLP**

Cited in Comey v United States
25CV7625 Decided 10/26/26
Archived on 10/28/26
This document is protected by copyright.
Further reproduction is prohibited without permission.

NOTICE & COMMENT

# Even if the President is Immune, His Subordinates are Not, by Zachary S. Price

*Zachary S. Price – July 11, 2024*

By immunizing Presidents against criminal liability in some circumstances, the Supreme Court's recent decision in *Trump v. United States* (https://www.supremecourt.gov/opinions/23pdf/23-939_e2pg.pdf) limited one form of potential accountability for lawless presidents. Whatever the scope of this immunity, however, the decision left in place one of the most important constraints on the American presidency: the need to act through subordinates to carry out most government functions. Because those subordinates lack the same criminal immunity as the President, this constraint may now be all the more important—but its renewed salience could bring other untested questions to the fore.

Even before *Trump*, Presidents' need to act through subordinates was a key constraint on their power. Many governmental powers are not actually vested in the President personally but instead in other federal officers. The Attorney General, for example, holds statutory authority (https://www.law.cornell.edu/uscode/text/28/516) to control most litigation on behalf of the United States (including criminal prosecutions), and the Administrator of the Environmental Protection Agency holds authority to promulgate important pollution limits (https://www.law.cornell.edu/uscode/text/42/7409). By structuring the executive branch in these ways, Congress ensures that Presidents must act through other officers to achieve key policy goals. Furthermore, even when Presidents do personally hold the relevant legal authorities, they are often practically dependent on subordinates to carry out their wishes.

Cited in Comey v United States
25 CV 7625 Decided 10/26/26
Archived on 10/28/26
This document is protected by copyright.
Further reproduction is prohibited without permission.

Such dependence on subordinates helps maintain the rule of law because subordinate officers may resist unlawful directives—and when personal integrity and reputational concerns fail to induce such resistance, legal restraints on such officers create an important backstop. Indeed, as Justice Sotomayor pointed out in her *Trump* dissent, even civil officers such as judges and prosecutors who are absolutely immunity from civil damages may still be subject to criminal prosecution, and unlawful government actions may sometimes violate criminal laws. In particular, one landmark statute, the Antideficiency Act (https://www.law.cornell.edu/uscode/text/31/1350), makes it a crime to willfully disburse or even obligate federal funds without a supporting appropriation from Congress.

Because the Court's decision in *Trump v. United States* relates only to the Presidency itself, it creates no immunity for these officers with respect to such forms of accountability. Accordingly, even when the President is immune (and *Trump* carries significant ambiguities about the scope of that immunity), he or she will often be able to take

unlawful action only if subordinate officers are willing to risk personal legal jeopardy or career damage by doing so.

These constraints should alleviate some of gravest risks predicted by the dissenters in *Trump*. For example, even if attempting a coup somehow counted as an "official act" carrying at least presumptive immunity for the President under the decision, anyone who aided the President's efforts could be guilty of murder, treason, or other crimes (including state offenses that the President cannot pardon). Ditto for any attempted assassination of political rivals.

In addition, the Antideficiency Act should give teeth to limitations imposed by Congress through the appropriations process. Suppose, for example, that Congress exercised its power of the purse to forbid use of funds for certain actions—say, enforcement of a law, or use of military force against a foreign country. To carry out any contrary presidential directive, subordinate officials would have to violate the Act—and awareness of this personal legal risk should fortify them to resist carrying out the directive in the first place.

Such legal restraints on subordinates have historically been far more important than criminal prosecution of the President—a prospect that until now, as the *Trump* majority emphasized, has been entirely hypothetical. To the extent, however, that *Trump* now puts still greater weight on accountability mechanisms for those officers, it could raise further untested questions.

Cited in Comey v. United States
25CV7625 Decided 10/26/26
Archived on 10/28/26
This document is protected by copyright.
Further reproduction is prohibited without permission.

For one thing, subordinate officers themselves might assert various defenses in any after-the-fact criminal prosecution. As Chief Justice Marshall held in the foundational 1804 case of *Little v. Barreme* (https://supreme.justia.com/cases/federal/us/6/170/), the President cannot actually legalize unlawful conduct. Nevertheless, modern case law could permit certain defenses based on any good-faith reliance on presidential assurances or executive-branch legal determinations.

In an article several years ago (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3430793), I attempted to sort out when such reliance defenses would be valid. Precisely because of the importance of maintaining legal restraints on executive personnel, I argued that any such defenses should be limited, despite the considerable unfairness in exposing government personnel to civil or criminal liability for actions that superior officers assured them were lawful. Maintaining such limits now may be essential to offsetting any accountability gap created by the President's personal immunity.

A second set of questions relates to the President's authority to circumvent the statutory allocation of powers within the executive branch. Again, governing statutes vest many important governmental powers in officers other than the President, meaning that the President must act through those officers to carry out certain goals. Accordingly, even if the President can fire such officers at will, he may need to do so to get his way—and firing an officer may only elevate the underlying disagreement's political salience (an effect I have called the "fire alarm function (https://takecareblog.com/blog/the-fire-alarm-function-of-office-holding)" of office-holding). In this way, legal dependence on subordinates may help ensure political enforcement of legal requirements.

Unfortunately, the lead opinion in *Trump* continued a recent trend of casting doubt, albeit obliquely, on Congress's authority to vest duties by statute in this way. In explaining why President Trump is absolutely immune for threatening removal of an Acting Attorney General who resisted the President's interest in pursuing election fraud charges, Chief Justice Roberts's opinion noted that "[i]nvestigative and prosecutorial decisionmaking is the special province of the Executive Branch, and the Constitution vests the entirety of the executive power in the President" (internal quotation and citation omitted). Similarly, in *Seila Law LLC v. Consumer Financial Protection Bureau* (https://www.supremecourt.gov/opinions/19pdf/19-7_n6io.pdf), the Court justified its inference of presidential removal power in part by suggesting that subordinate officers "wield" the President's own executive power.

Though in both cases the Court ultimately held only that the Constitution requires presidential removal authority, these stray remarks could support a still more robust theory of the "unitary" executive branch: the view that the President must hold authority not only to remove recalcitrant subordinates, but also to countermand their actions or even personally perform their duties. As I have explained in another article (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3550548), this strong form of the unitary executive branch is at odds with longstanding practice even for the military, let alone civil administration. Courts should disavow it at the earliest opportunity.

Cited in Somey v United States
25CV7625 Decided 10/26/26
Archived on 10/26/26
This document is protected by copyright.
Further reproduction is prohibited without permission.

Under the historical English constitution, the king could do no wrong but his ministers could still be held to account. To the extent *Trump v. United States* brings the U.S. system closer to this understanding, the decision may distort our own Constitution, which aimed to place no one above the law. Even in England, however, the king's dependence on ministers at times created meaningful forms of accountability, and the President's dependence on subordinates could do the same here. Courts must now be on guard against doctrinal changes that erode those restraints as well.

*Zachary S. Price is a professor at UC Law San Francisco (formerly UC Hastings). His book "Constitutional Symmetry: Judging in a Divided Republic* (https://www.cambridge.org/us/universitypress/subjects/law/constitutional-and-administrative-law/constitutional-symmetry-judging-divided-republic?format=PB)*" is forthcoming with Cambridge University Press this fall.*

Subscribe to the Yale Journal on Regulation

Established in 1983, the Yale Journal on Regulation (JREG) is one of the top ten specialized law journals in the United States. JREG publishes in-depth scholarly articles by professors and legal practitioners twice a year.

SUBSCRIBE ▸

© 2026 Yale Journal on Regulation

Cited in Comey v United States
25CV7625 Decided 10/26/26
Archived on 10/28/26
This document is protected by copyright.
Further reproduction is prohibited without permission.